# EXHIBIT A

Case 1:25-cv-02836    Document 1-2    Filed 04/04/25    Page 2 of 52

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF   New York
------------------------------------------------

Ligado Networks LLC
Ligado Networks (Canada) Inc.

               Plaintiff(s),

          *-against-*

Inmarsat Global Limited

             Defendant(s).
------------------------------------------------

Index No.

## Summons

Date Index No. Purchased:   March 19, 2025

To the above named Defendant(s)

  Inmarsat Global Limited

      You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

      The basis of venue is   CPLR 503(a)

which is   None of the parties resided in the state and this case may proceed in any county designated by the plaintiff. Plaintiff has chosen New York County.

Dated:   New York, New York

      March 19, 2025

               Mayer Brown LLP

               by  /s/ Reginald R. Goeke
               Reginald R. Goeke
               Attorneys for Plaintiff
               Ligado Networks LLC and Ligado Networks
               (Canada) Inc.

               Mayer Brown LLP
               1221 Avenue of the Americas
               New York, NY 10020
               Telephone: (212) 506-2500
               Email: rgoeke@mayerbrown.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – x

LIGADO NETWORKS LLC, and LIGADO
NETWORKS (CANADA) INC.,

                    Plaintiffs,

   – against –

INMARSAT GLOBAL LIMITED,

                    Defendant.

– – – – – – – – – – – – – – – – – – – – – – –

**Index No.:_____**

**COMPLAINT**

Plaintiffs Ligado Networks LLC ("Ligado USA") and Ligado Networks (Canada) Inc. ("Ligado Canada") (collectively "Ligado"), by their attorneys, Mayer Brown LLP, as and for their complaint against defendant Inmarsat Global Limited ("Inmarsat"), allege:

## NATURE OF THE ACTION

1.    This action arises from Inmarsat's intentional and repeated failure to fulfill its contractual obligations under Ligado and Inmarsat's (each of Ligado and Inmarsat, a "Party" and together, the "Parties") August 6, 2010, Amended and Restated Cooperation Agreement (the "Agreement," or "Cooperation Agreement"), and the amendments thereto. Inmarsat and Ligado (together with its predecessor entities) agreed to cooperatively allocate their licensed spectrum in the L-band (a range of frequencies from 1525 to 1660.5 MHz) into contiguous spectrum blocks. This allowed both Ligado and Inmarsat to more effectively use their respective spectrum, including without limitation for Ligado to deploy an advanced terrestrial wireless service in North America.

2.    The fundamental purpose of the transaction was to enable each Party to use its spectrum for specific purposes. Inmarsat intended to use its spectrum for a Mobile Satellite Service

("MSS"). Ligado intended to use its spectrum to offer a nationwide terrestrial wireless service and an MSS service, all as defined in parameters specified by the Parties and set out in detail in Spectrum Plans in the Agreement.

3.      To fulfill the purpose of the Agreement, Ligado required an authorization from the Federal Communications Commission ("FCC") to use its MSS spectrum license for terrestrial wireless service. The Parties agreed that Inmarsat would help Ligado obtain the necessary FCC license authorization and any other necessary government approvals.

4.      Inmarsat's MSS service employed terminals installed on airplanes and ships to transmit signals over Inmarsat's network. To enable maximum nationwide deployment of Ligado's services, including near airports and waterways, interference issues posed by those terminals ("terminal interference") had to be resolved. Thus, the Parties agreed Inmarsat would resolve those terminal interference issues.

5.      In addition to resolving terminal interference issues and facilitating necessary FCC license authorization, Inmarsat was also obligated to implement the Spectrum Plans contemplated in the Agreement and to use its best commercial efforts to ensure that Ligado received the full anticipated benefit of the spectrum.

6.      Despite those obligations, Inmarsat failed to deliver the full spectrum benefits for which Ligado has paid by not adequately resolving the terminal interference issues. Because Inmarsat did not resolve the terminal interference issues, when the FCC finally issued its approval of Ligado's application in April 2020 (the "FCC Order"), that approval included power limits near airports and waterways ("exclusion zones") that reduced the geographic coverage that Ligado had negotiated to receive.

2

7.      After receiving the FCC approval, and 10 years after assuming the obligations in the Agreement, however, Inmarsat disclosed that it is likely years away from resolving the terminal interference issues and has identified approximately 12,000 Inmarsat maritime customers and over 10,000 aircraft that use Inmarsat terminals that are not modified to address terminal interference.

8.      In addition, Inmarsat sat on its hands during the license modification process for terrestrial authorization while those very interference issues were used by Inmarsat's customers to advocate against Ligado's approval for terrestrial authorization. This opposition resulted in a prolonged FCC process and geographical limits placed on Ligado's terrestrial authorization.

9.      Moreover, unbeknownst to Ligado, the U.S. Department of Defense ("DOD") has for some time been operating systems that use or depend on Ligado's authorized spectrum. The DOD's reliance on that spectrum led the DOD to oppose Ligado's FCC Modification Application, and to prevent Ligado's use of that spectrum even after the company obtained FCC approval. On information and belief, Inmarsat knew (though Ligado did not) that the DOD would oppose Ligado's deployment of its terrestrial wireless service regardless of FCC approval, making the benefits of Inmarsat's spectrum transfer to Ligado illusory. Notwithstanding that knowledge and obligation to assist Ligado in securing necessary regulatory approvals, Inmarsat continued to accept Ligado's payments and induced Ligado into making additional and accelerated payments.

10.      Ligado has paid Inmarsat more than $1.7 billion, including annual payments and a $250 million transition payment intended in part to compensate for the cost of resolving terminal interference issues. Nonetheless, Ligado received none of the benefits of the Parties' Agreement, in part due to delays to its FCC license modification process exacerbated by Inmarsat's failure to timely resolve the terminal interference issues. Despite those payments, Ligado's spectrum is now impaired by the imposition of exclusion zones due to Inmarsat's failure to address terminal

3

interference issues. This action is intended to enforce Ligado's rights under the Agreement and to recover the value of benefits that Inmarsat's conduct has denied Ligado.

## THE PARTIES

11.    Plaintiff Ligado Networks LLC is a telecommunications company that has a license from the FCC to provide mobile satellite services and advanced terrestrial wireless services. Ligado Networks LLC is organized under the laws of Delaware and headquartered with its principal place of business in Reston, Virginia.

12.    Plaintiff Ligado Networks (Canada) Inc. is a telecommunications company that has a license from Industry Science and Economic Development Canada to provide mobile satellite services. It is incorporated under the laws of Ontario and headquartered in Ottawa, Ontario, Canada.

13.    Mobile Satellite Ventures, MSV LP and MSV Canada (collectively, "MSV"), predecessors in interest to Ligado, were established in 2000 and 2001, respectively, and provided mobile satellite services in the U.S. and Canada.

14.    In 2008, the MSV entities were incorporated into SkyTerra Communications Inc. (the company name was changed in 2010 to LightSquared). At this time, the company began to develop plans to deploy a terrestrial wireless network to complement its MSS services.

15.    LightSquared operated a sophisticated MSS network through the company's SkyTerra 1 L-band satellite, which is among the most powerful commercial satellites ever built and enables connectivity via small, low-cost devices. In 2010, LightSquared planned for its existing satellite system to be combined with a terrestrial wireless network, which would allow it to provide advanced wireless services throughout the United States.

4

16.    LightSquared and various affiliated entities entered bankruptcy in 2012 and emerged in December 2015. LightSquared was renamed Ligado in February 2016.

17.    Defendant Inmarsat Global Limited is a provider of global mobile satellite communications that has a license from OfCom, the communications regulator in the United Kingdom. Inmarsat is incorporated under the laws of England and Wales and headquartered in London, England, United Kingdom.

<u>**JURISDICTION AND VENUE**</u>

18.    This Court has jurisdiction over Inmarsat pursuant to § 9.7(b) of the Cooperation Agreement, in which the parties agreed to "irrevocably submit[] to the exclusive jurisdiction of the New York courts, including the federal and state courts for the purpose of any action or proceeding arising out of or relating to this Agreement, and each Party hereby irrevocably agrees that all claims in respect to such action or proceeding may be heard and determined exclusively in such courts."

19.    Pursuant to N.Y. Gen. Oblig. L. § 5-402, the Agreement's forum selection clause is enforceable because the Agreement involves more than $1 million and obligations and the parties agreed that the Agreement would be "governed exclusively by the law of the State of New York." See Agreement at § 9.6.

20.    Venue is proper in this Court pursuant to CPLR § 503(a), which states, in relevant part, that when "none of the parties . . . resided in the state," when the action is commenced, the case may proceed "in any county designated by the plaintiff."

<u>**FACTUAL ALLEGATIONS**</u>

**A.    BACKGROUND AND OVERVIEW**

21.    Wireless communications work by transmitting and receiving electromagnetic waves. The different types of electromagnetic waves are defined according to their frequencies—

5

that is how many times per second the wave oscillates—and are categorized along an electromagnetic spectrum.

22.    For example, the electromagnetic waves picked up by an FM radio oscillate at a frequency of 88 to 108 million times per second, or 88 to 108 MHz. A given range of spectrum is known as a "band," and its capacity is finite.

23.    Ligado's spectrum is part of the spectrum known as the "L-band," which includes the range of frequencies from 1525 to 1660.5 MHz.

24.    Historically, Inmarsat and the predecessor to Ligado each held rights to thin slivers of L-band spectrum. Inmarsat used that spectrum to provide MSS services, including aeronautical and maritime communications and navigation services. Ligado used that spectrum to provide MSS services to government and commercial customers for emergency response, remote monitoring, and numerous other mission-critical applications.

25.    In 2007, Inmarsat and Ligado entered into the original Cooperation Agreement (the "Original Agreement"). The purpose of that agreement was to coordinate the L-band spectrum. That coordination provided Inmarsat with the right to use certain spectrum, and also provided Ligado with sufficient contiguous spectrum blocks free from interference to enable Ligado to provide mobile services to the North American market consisting of a MSS network and a terrestrial wireless service ("Ancillary Terrestrial Component" or "ATC").

26.    The metes and bounds of the spectrum to be exchanged were clearly defined by specific frequencies, geography, and power levels such that there could be no ambiguity as to the characteristics of the spectrum Ligado was entitled to receive from Inmarsat and vice versa. The agreement required Ligado to pay Inmarsat substantial sums over a period of 99 years.

6

Case 1:25-cv-02836    Document 1-2    Filed 04/04/25    Page 9 of 52

27. Between 2007 and 2010, the Original Agreement was amended multiple times. In 2010, Inmarsat and Ligado entered into the Amended and Restated Cooperation Agreement dated August 6, 2010, which consolidated and superseded all prior agreements.[1]

28. To achieve the Agreement's goal of enabling Ligado to offer an advanced terrestrial wireless service to the North American market, the Agreement required Inmarsat to deliver to Ligado spectrum that served all of North America. Under the Agreement, Ligado was to be able to operate at a power level of 42 dBW on the "downlink" spectrum.

29. Importantly, the Agreement also required Inmarsat to address interference that was anticipated to arise between Inmarsat satellite terminals operating on Inmarsat's system and Ligado's new ATC operations. Inmarsat's resolution of these terminal interference issues was needed to ensure Ligado could operate near airports and waterways.

30. Specifically, aviation and maritime customers of Inmarsat use systems provided by Inmarsat for communications. Those systems operate in spectrum that is near to the spectrum the Agreement specifies for use by Ligado for its terrestrial wireless service. The potential for interference between Inmarsat's customers' terminals and Ligado's terrestrial wireless service caused by this proximity of spectrum can be remedied through replacement of the Inmarsat terminals or through modification (with the use of filters or otherwise) of the Inmarsat terminals. The Parties sometimes refer to this as "terminal resilience." Achieving this terminal resilience was a material element of Inmarsat's provision of unencumbered spectrum to Ligado.

31. To address the terminal resilience issues, the Parties agreed on the need to develop a plan to replace or modify those terminals. Because those terminals were Inmarsat terminals provided to Inmarsat customers to enable them to receive signals over the Inmarsat system, the

---

[1] Capitalized terms not otherwise defined in the Complaint will have the meaning provided in the Agreement.

7

Case 1:25-cv-02836    Document 1-2    Filed 04/04/25    Page 10 of 52

Parties' understanding, as reflected in the Agreement and the Parties' course of conduct, was that Inmarsat would be responsible for ensuring the design, development, approval, manufacture, distribution, and installation of the equipment needed to achieve terminal resilience, and that Inmarsat would be responsible for all costs in connection with that transition. Inmarsat was also responsible for implementing that plan through modifications in all contracts and relationships with its customers. This was part of Inmarsat's obligation to provide Ligado with spectrum at specific frequencies that could be used at specific power levels needed to provide interference-free spectrum. These terms were agreed to by the Parties and clearly set out in technical exhibits to the Agreement.

32.    To resolve the terminal interference issues, the Cooperation Agreement required that "appropriate modifications" be made to "all terminals operating on the Inmarsat system" that might receive or cause interference, or that Inmarsat in its discretion could otherwise address such interference by discontinuance or replacement of any affected service or terminal. Agreement §3.2(g). In part to offset the costs of that transition, Ligado paid Inmarsat a $250 million transition payment. Agreement § 4.3(b).

33.    In anticipation of the increased resilience achieved by modifications to Inmarsat's terminals, the Parties set forth detailed specifications about the geographic and power limitations within which Ligado could operate near Airports and Navigable Waterways, which are important coverage areas for any terrestrial wireless service. The Agreement specifies a "Proximity Model" that details the power flux density levels at which Ligado can operate when near Airports (-26.8 dBW/m$^2$) and Navigable Waterways (-34.6 dBW/m$^2$). For example, to ensure proper coverage to buildings adjacent to Airports, Inmarsat even agreed to waive certain limitations in the Proximity Model.

8

34. The Parties also understood that FCC approval of Ligado's license modification ("Modification Application") was critical to achieving the purpose of the Agreement. Without FCC approval, Ligado would not be able to provide terrestrial wireless services. Thus, both Parties pledged to use their best commercial efforts to support approval from the relevant regulatory authorities, including specifically the FCC, and to remedy the situation in the event of any indication of objection or disapproval.

35. Inmarsat's customers have repeatedly alleged in public FCC filings that their Inmarsat terminals would be impacted by Ligado's planned terrestrial wireless service. This is because Inmarsat neither upgraded the terminals as it agreed nor communicated with its customers about its plan to do so.

36. When Ligado turned to Inmarsat for the regulatory support for which it bargained and paid, however, Inmarsat reneged on its contractual obligations. Critically, Inmarsat failed to develop a detailed plan sufficient to address the terminal interference issues, did not assert responsibility for resolving the terminal resilience issues, and did not take more than perfunctory steps to support Ligado in its Modification Application or to rebut the assertions about interference made by its customers. Such failure to address or ameliorate the objections being raised by Inmarsat's own customers directly contributed to the FCC's delay in approving Ligado's Modification Application.

37. The FCC approved Ligado's license Modification Application on April 22, 2020. But due to Inmarsat's failure to resolve the terminal interference issue, the FCC Order expressly limited Ligado's ability to provide service near airports and waterways. Specifically, Ligado's base stations were prohibited from exceeding a power flux density limit of -56.8 dBW/m$^2$/200 kHz at the edge of airport runways, and aircraft stand areas and from exceeding a power flux density limit

9

of -56.6 dBW/m$^2$/200 kHz at the water's edge of any Navigable Waterways. These substantially reduced power levels have the effect of reducing the geographic area in which Ligado can use the spectrum, reducing the value of the spectrum.

38.     The limit in the FCC Order created exclusion zones around every Airport and Navigable Waterway in the U.S. in which Ligado cannot operate. This technical limit means that Ligado cannot operate closer than 430 and 420 meters, respectively, from Airports and Navigable Waterways. This distance is substantially further than what the Parties agreed to in their Agreement. There are more than 550 Airports, 128 ports, and thousands of miles of Navigable Waterways in the geographic area Ligado has a right to use under the Agreement. Being able to provide terrestrial wireless service in those areas was a material benefit for which Ligado had negotiated, which is why the Agreement contains so many provisions relating to ensuring Inmarsat took steps to make it available for Ligado's use.

39.     The FCC Order does permit Ligado to obtain a waiver from that restriction to be able to use the spectrum closer to Airports and Navigable Waterways, but only if Inmarsat terminals are upgraded to resolve interference.

40.     As of December 31, 2021 (the delivery date), and as of the date of this complaint, Inmarsat has failed to take steps necessary to replace or modify its terminals. For maritime applications, while Inmarsat had modified its terminal requirements for deployment of new terminals, it took no steps to replace existing terminals. As a result, based on the last data available from Inmarsat, there are approximately 12,000 non-resilient Inmarsat maritime broadband terminals being used in North American waterways. As Ligado understands it, replacing these terminals will take years.

10

41.     For aeronautical terminals (which are used on airplanes), Inmarsat told Ligado that there are over 10,000 Inmarsat terminals that are not resilient as defined and required by the Agreement.

42.     Replacing and modifying terminals to be used in aircraft also takes many years. It requires the development and issuance of new standards for the new terminals by the Federal Aviation Administration ("FAA"). The terminals must be developed technically. The airline industry needs to approve the new terminals. There must also be FAA approval for a supplemental type certificate ("STC") for every aircraft model. The terminals then must be manufactured at scale. Once appropriate approvals are obtained and the equipment is developed and manufactured, then the equipment must be installed on existing aircraft. As those aircraft are typically in operation, any installation will depend on fitting the installation into the existing maintenance and repair schedules. It takes years to plan for an upgrade of equipment, such as the one that Inmarsat would need to take to make its customers' terminals sufficiently resilient. This lead time requirement was addressed by the obligation in the Agreement to both develop a plan and to incorporate that plan in Inmarsat's future commercial relationships and operators' agreements.

43.     For aeronautical terminals, Inmarsat materially delayed the process of developing the resilient terminals that were essential to Ligado receiving the bargained-for spectrum. As a result of that delay, and due to its failure to pursue the development and regulatory approval process, the approval of the relevant standard for the replacement terminals was delayed for years.

44.     In addition, Inmarsat had not even contracted with manufacturers of equipment necessary to replace or remediate the terminals until September 2018—long after it assumed the obligations for terminal resiliency, and long after it should have in light of the length of time it takes to replace all existing equipment. By 2021, the terminal design had only been completed for

11

one type of terminal, and neither the validation nor the airworthiness of that terminal type had yet

been tested. For the second type of terminal, the contract for manufacturing was not signed until

June 2019, and design had not yet been completed. Inmarsat failed to obtain all of the approvals

needed from the FAA for the above equipment and has been unwilling to even support the

equipment manufacturers' application for such approvals. As a result, there has been neither

distribution nor installation of such terminals in any aircraft. Recent estimates from key airlines

indicate that it will take three to five years to make substantial progress on achieving terminal

resilience.

45.    Even after the delivery deadline lapsed, Inmarsat refused to work with Ligado to

address interference concerns raised by the aeronautical industry, insisting that it had no obligation

to execute or fund such a transition. And, even when leading industry players sought to partner

with Inmarsat and Ligado to facilitate upgrading their Inmarsat equipment, Inmarsat did not take

action sufficient to meet its obligations under the Agreement.

46.    Inmarsat failed to take the steps necessary to deliver to Ligado the spectrum for which

it contracted, instead watching and waiting, betting that Ligado would not succeed in obtaining its

license approval from the FCC, while at the same time insisting that Ligado pay amounts owed

under the Agreement despite those failed steps.

47.    On information and belief, Inmarsat was working with the DOD and knew, as a result

of its work with the DOD, that the DOD would oppose Ligado's use of its spectrum even if the

FCC approved the Modification Application. For example, Inmarsat entered agreements prior to

2020 for $700 million in services to the government, including for the Navy. And in 2022, Inmarsat

entered into a $578 million contract with the military, a $980 million contract with the Navy and

a $410 million contract with the Army. On information and belief, as a result of its work with the

DOD, Inmarsat knew that the DOD would oppose Ligado's use of its spectrum. Inmarsat not only failed to assist Ligado in obtaining the necessary governmental approvals but knew that its work with the DOD was contrary to the purpose of the Agreement and to the spectrum plans agreed to by the Parties. Nonetheless, it continued to insist on payments for spectrum coordination that Inmarsat knew Ligado would likely be unable to use.

48.    Inmarsat's intentional and willful breach of contract has cost Ligado hundreds of millions of dollars for benefits it has never received. Inmarsat, for its part, has received over $1.7 billion from Ligado for which it has done very little work and seriously underdelivered on its obligations, while its conduct has caused Ligado to lose a material percentage of the fair market value of the spectrum for which it contracted and paid, as well as to lose the revenues and profits that would have been derived from the use of that spectrum. Inmarsat must be ordered to immediately comply with its contractual obligations and to compensate Ligado for the harm its conduct has caused to date and will continue to cause.

49.    Alternatively, Inmarsat should be ordered to specifically perform its obligations related to terminal resilience and should be ordered to pay Ligado restitution to the extent necessary to compensate Ligado for Inmarsat's delay and failure of its performance obligations and to disgorge Inmarsat's unjust enrichment.

50.    Also in the alternative, Inmarsat should be ordered to return all funds paid under the Cooperation Agreement due to Inmarsat's breach of the covenant of good faith and fair dealing. Ligado would not have made those payments had it known (as Inmarsat did) that the DOD was operating programs that would result in the DOD vigorously opposing Ligado's planned terrestrial wireless service and ultimately blocking Ligado from offering such service over its spectrum. Inmarsat should also be ordered to return all funds paid as a result of the impossibility of

13

performance and frustration of purpose due to Inmarsat's knowledge of, and/or involvement in, the DOD's opposition to Ligado's use of the spectrum for commercial wireless service.

**B.      THE AGREEMENT BETWEEN LIGADO AND INMARSAT**

51.     Ligado's use of its licensed spectrum is subject to United States and Canadian treaty commitments to the International Telecommunications Union ("ITU") and the terms of multilateral and bilateral coordination agreements entered into pursuant to the ITU Radio Regulations. Ligado and Inmarsat are both parties to this coordination framework agreement developed in 1996, providing for their shared use of L-band MSS with the other three L-band users in ITU Region 2, which covers North America, pursuant to the ITU Radio Regulations.

52.     On December 20, 2007, Inmarsat and MSV entered into the Original Agreement that, among other things, provided for the allocation of spectrum assigned to MSV and Inmarsat in the L-band spectrum to meet the parties' future needs.

53.      By establishing a commercial arrangement with Inmarsat in 2007 to expedite what is normally a long international coordination process, the intended purpose of the Original Agreement was to provide Ligado with contiguous blocks of spectrum that could be used to offer current and future communication services, including without limitation to implement and operate Ligado's planned terrestrial wireless service. To achieve that purpose, the Parties agreed to a plan that would increase the amount of contiguous spectrum in the L-band available to Inmarsat and Ligado by reallocating their assigned spectrum to each other to create the contiguous blocks.

54.     Inmarsat would then provide certain spectrum in the contiguous blocks to Ligado for Ligado to use in North America. The spectrum available to the Parties before and after their agreement is shown in Figure 1 below.

14

**Figure 1: Spectrum Available to Parties Before and After Agreement**

| | Ligado | | Inmarsat |
| | ATC | MSS | MSS |
|---|---|---|---|
| Before Agreement | N/A | 28.8 MHz | 24.76 MHz |
| At Delivery (12/31/2021) | 30 MHz | 38.2 MHz | 25.8 MHz |
| Since 12/31/2023 | 30 MHz | 41.2 MHz | 22.8 MHz |

55.    The Original Agreement and its amendments were consolidated in, and superseded by, the Agreement.

56.    The Agreement contemplated reallocation of the spectrum in three phases: (i) Phase 0, (ii) Phase 1, and (iii) Phase 2. The Phase 0 Spectrum Plan became effective upon execution of the Agreement and provided Ligado with the right to use certain L-band frequencies principally for testing purposes. Under the Agreement and its subsequent amendments, in Phase 1 and Phase 2, Ligado had the option to elect from various spectrum plans up to a total of 40 MHz of spectrum.

57.    The Agreement established specific requirements and transitions from one phase to another and further confirmed that the costs for effectuating those transitions were to be borne by Inmarsat (see Agreement Sections 3.2(b)(ii)(B), 3.2(d)(ii)). Pursuant to Section 3.1(a), the Parties' coordination included agreement on the terms for operation of ATC (as set out in Exhibits N, N Prime, T, U, and V), which agreement was incorporated into all of the Spectrum Plans.

58.    In addition to those obligations, the Agreement also set forth further obligations with respect to the transition of each phase in the Spectrum Plans. Section 3.2(g) of the Agreement required both Parties to expedite the development of an implementation plan to reflect all actions

15

"necessary or advisable" to effectuate the implementation of the L-band frequency arrangements set forth in each of the Spectrum Plans, including replacement or modification of user terminals operating on the Inmarsat system that might otherwise receive interference from, or cause interference to, the operations of Ligado. Specifically, Section 3.2(g) provides:

> In the case of Phase 1 Spectrum Plan (in the event a Phase 1 Election is made, upon the Trigger Date . . . . In the case of the Phase 2 Spectrum Plans, upon delivery of Phase 2 Notice (or, in the event of the giving of Reversion Election notice, upon the giving of such notice), . . . each Party shall expedite the development of an implementation plan, which shall be coordinated with each of the other Parties, that will reflect all such actions as shall be necessary or advisable to effect the implementation of the L-band frequency ITU Region 2 use arrangements set forth in the respective Spectrum Plan, including, but not limited to (i) replacement or modification of user terminals, including in the case of the Phase 1, 1A and Phase 2 Spectrum Plans, making appropriate modifications to all terminals operating on the Inmarsat system that might otherwise receive interference from or cause interference to the operation of the systems of the [Ligado] Parties operating in accordance with this Agreement (or otherwise addressing such interference by other appropriate means, including at the absolute discretion of Inmarsat by discontinuance or replacement of any affected service or terminal) . . . .

59.    The Parties agreed in Section 4.3(b) of the Agreement that Ligado would pay $250 million "to compensate Inmarsat for the direct and indirect costs expected to be borne by Inmarsat in implementing Phase 1 transition in accordance with the provisions of the Agreement."

60.    With the exception of the Section 4.3(b) payment for transitioning the Inmarsat terminals, the Parties agreed that each Party would bear the costs of transition with respect to its own customers or for those with whom the Parties had contractual or other business relationships. Specifically, Section 3.2(i) of the Agreement provides:

> With the exception of the payment of the Phase 1 Compensation to Inmarsat, as described in Section 4.2 and Section 4.4 and the sharing of costs and expenses relating to the acquisition and maintenance of Additional L-band Spectrum as set out at Section 3.4 below, each Party shall be solely responsible for (and shall indemnify the other Party against) any and all damages, costs, claims, losses and expenses incurred by it in connection with the transition of such Party's customers, resellers, agents or other parties (whether under its control or otherwise) or with

16

whom it has a contractual or other business relationship, in connection with the implementation of any Spectrum Plan, . . . .

61.    With respect to the transition of Inmarsat's terminals, given that Inmarsat was the party exclusively knowledgeable about the potential of interference from Inmarsat terminals operating on its system, and given that any modification or replacement terminal would have to work on Inmarsat's system going forward, and given that only Inmarsat knew the specifications for its system and would have to coordinate with the relevant terminal manufacturers, Inmarsat was contractually obligated to develop and implement the relevant plan. This obligation was underscored by Inmarsat's obligation to indemnify Ligado from any claims by third parties resulting from any interference caused to End Users by the operation of Ligado's terrestrial network.

62.    Inmarsat was obligated to use its best commercial efforts to take all actions necessary or desirable to ensure that Ligado obtained the full benefit of the Plans and other benefits described within the Cooperation Agreement, including those specifications set forth in the Exhibits to the Agreement. Inmarsat was also obligated to use its commercial best efforts to implement that plan to address all terminal interference issues. This included designing or identifying the relevant filters and other terminal modifications, developing a standard applicable to those terminals, obtaining approval of the standard from the FAA (and any other regulator, as needed), contracting with appropriate manufacturers, communicating with Inmarsat customers, arranging for installation, and implementing a replacement or modification plan that would ensure that Ligado would be delivered unencumbered spectrum capable of being used for all communication purposes, including those specifically contemplated by the Agreement.

63.    Inmarsat was also obligated under Section 3.1(b) of the Agreement to "provide for satellite and spectrum coordination and use that is consistent with the Plans . . . in each Party's

17

future commercial relationship and operators' agreements (including any renewals or extensions of existing commercial relationships and operators' agreements) and in its correspondence and actions with or before the ITU, all relevant Administrations and third party coordination agreements."

64.     To ensure implementation of the plan, the Parties also agreed to additional Transition Actions. Specifically, Section 3.2(h) of the Agreement provides:

> The Parties shall take the following steps which will be deemed part of the implementation plan with respect to each Spectrum Plan: the Parties will meet on a quarterly basis to review the transition plans referred to above and to provide any updates to such plans, including any material issues that have occurred or may occur, with a goal of trying to work cooperatively to effect a smooth transition for their respective services, customers, resellers, agent and end users, and will provide each other updated confirmation (in the minutes of the meeting and/or other written confirmation) that there are no other issues outstanding which place the continued and timely execution of their respective implementation plans at risk.

65.     Critical to the Agreement's purpose was receipt of approval by the relevant regulators of Ligado's proposed spectrum plans, including steps to be taken to address any interference issues. Both Parties knew and understood this well, which is why the Agreement in several paragraphs required Inmarsat to use its best efforts to facilitate approval of Ligado's FCC Modification Application. For example, Section 3.1(b) of the Agreement provides:

> The Parties agree to use their respective best commercial efforts to take all actions (or omit to take actions) necessary or desirable in order to ensure that each Party obtains the full benefit of the . . . Plans in accordance with the provisions of this Article 3 . . . or other benefits of the Parties described hereunder.

> [T]he Parties agree that if, at any time, any particular Trial, Plan, Arbitration or other benefit hereunder cannot readily be made available to the Parties or any of them hereunder in accordance with the terms of this Agreement because the Administrations or other third parties indicate disapproval of any of the same, then, . . . the Parties shall use their respective best commercial efforts . . . to take all actions (a) to remedy the situation, to make fully available the full benefit of . . . the Plans in accordance with the provisions of this Article 3 . . . .

18

66.    This obligation is reiterated again in Section 3.1(d) of the Agreement, which

provides:

> As further provided in this Agreement, the Parties agree to use their respective best
> commercial efforts (i) to implement the Spectrum Plans contemplated by this
> Agreement by establishing spectrum usage rights with the Administrations, with
> any other appropriate regulatory authorities and with any and all affected satellite
> system operators . . . . The Parties shall take all actions in support of (and none
> against) the utilization of the L-band in ITU Region 2 as may be required pursuant
> to the terms of this Agreement or as may reasonably be requested by any Party in
> order to implement such terms." The Parties also agreed not to "act in any way
> contrary to such Plans and arrangements . . .

67.    Further, Section 5.2 of the Agreement also underscored the obligation of both Parties

to use their best commercial efforts to implement the Spectrum Plans, providing:

> The Parties agree to use their respective best commercial efforts to assist each other
> and Related Parties in seeking and obtaining all other approvals and authorizations
> from any of the Administrations to implement this Agreement, including, but not
> limited to, grant of equipment certifications and mobile earth terminal applications
> for the operation of the networks of the [Ligado] Parties or Inmarsat, the FCC
> applications listed in Exhibit P, the applications listed in Exhibit Q, and any other
> applications seeking to use the Disputed Spectrum, the Tolled Spectrum, the Phase
> 0 Block, and/or any Inmarsat satellite or satellite of the [Ligado] Parties in a manner
> consistent with this Agreement.

68.    Sections 6.9(a) and (b) of the Agreement again confirm each Party's obligation to

"use its commercially reasonable efforts . . . to take, or cause to be taken, all actions, and to do, or

cause to be done, all things, reasonably necessary, proper or advisable . . . to accomplish and make

effective the purposes, objectives and actions contemplated by this Agreement." Further, each

Party was obligated to make all filings with, and to obtain all consents of, any governmental

authority, and to take all such actions as the Party is reasonably requested to take from time to

time. Specifically, Section 6.9(b) provides:

> Without limiting the foregoing, prior to, on and after the Signing Date, each Party
> shall cooperate with the other Parties, and without any further consideration, but at
> the expense of the requesting Party, to execute and deliver, or use its commercially
> reasonable efforts to cause to be executed and delivered, all instruments, and to
> make all filings with, and to obtain all consents of, any governmental authority or

19

any other Person under any permit, license, agreement, indenture or other instrument, and to take all such other actions as such Party may reasonably be requested to take by any other Party from time to time, consistent with the terms of this Agreement, in order to effectuate the provisions, purposes and objectives of this Agreement and the other actions contemplated hereby and thereby.

69.    The Parties further agreed in Sections 5.5(b) and (f) of the Agreement to "use their respective best efforts to work with their respective Administrations, any other applicable administrations, and any applicable satellite operators, in a mutually agreed manner, to establish long-term stability for each Party's respective operations," and to "work together cooperatively on a best commercial efforts basis to best position this Agreement (including the L-band Coordination Plan) and any subsequent agreements between the Parties . . . ." Further, in Section 5.5(h) of the Agreement Inmarsat agreed as follows:

> Inmarsat agrees to use its best commercial efforts to obtain all regulatory and third party approvals needed for a timely implementation of the Phase 1 Spectrum Plan, including any approvals required with respect to the provision of AMSIS. In that regard, Inmarsat commits that it will provide the [Ligado] Parties with (i) a written plan discussing its current and projected efforts to secure such approvals to be delivered within ninety days of the Effective Date and (ii) periodic updates regarding such efforts, including as requested by the [Ligado] Parties; and (iii) timely notice of any changes to the plan or issues raised by others that may impact the timely and complete implementation of the Phase 1 Spectrum Plan.

70.    To further address issues regarding the potential interference between Ligado's terrestrial wireless service and Inmarsat's satellite terminals, the Parties set forth in detail in Exhibit N to the Agreement the permissible and expected technical criteria for ATC operations. Exhibit N expressly permits Ligado's terrestrial wireless service to operate near Airports at power flux densities of up to -26.8dBW/m$^2$ and -34.6 dBW/m$^2$ near Navigable Waterways. Further, the Parties agreed in Section 3.5(a) of the Agreement that Ligado "shall be permitted to deploy and operate the ATC if the ATC is operated in compliance with the requirements set forth in Exhibit T. . . ." And, in Exhibit T, the Parties agreed that Ligado would operate its ATC network consistent

with Exhibit N. As previously alleged, Inmarsat agreed to use its best commercial efforts to take all actions to ensure that Ligado obtained the full benefit of those provisions.

71.     The Parties agreed that, so long as Ligado was operating within those limitations, any interference related to Inmarsat's terminals caused by Ligado's terrestrial wireless service would be Inmarsat's responsibility. Indeed, Section 8.1 of the Agreement provides:

> Inmarsat shall defend, indemnify and hold harmless any [Ligado] Affiliated Party from and against any and all Damages incurred by any [Ligado] Affiliated Party in connection with the defense or settlement of any Claims by any third Person . . . provided [] that the [Ligado] parties continue to act in full compliance with the terms of this Agreement, any interference caused to End Users by the operation of the [Ligado] Network, as long as the [Ligado] Network is operated in accordance with this Agreement, including any operating and technical parameters applicable thereto in accordance with this Agreement.

72.     In addition to setting forth the Parties' respective substantive obligations, the Agreement also spelled out the procedural obligations of the Parties. Section 9.6 provides that the Agreement "shall be construed in accordance with and governed exclusively by the law of the State of New York." Section 9.7(b) provided that both parties irrevocably submit to the exclusive jurisdiction of the New York courts for the purpose of any action or proceeding arising out of or related to this Agreement, and agree that all claims may be heard and determined exclusively in such courts.

73.     Section 9.8 of the Agreement made clear that "time is of the essence in this Agreement." It also specified that available relief to the Parties included relief available "at law or in equity to ensure that the intended respective benefits are realized by each Party" and specified that direct damages included (among other damages) the reasonable fair market value of any right or benefit (including, without limitation, access to spectrum) with respect to which the injured Party is deprived.

21

74.     Section 9.8(b) of the Agreement further provides that certain remedies—including indirect, special, incidental, consequential, or punitive damages—that are not ordinarily available as remedies, may nonetheless be available in the event of willful or intentional breach.

75.     Section 9.11 of the Agreement further provides for severability of provisions in the agreement, stating that if "any covenant or provision hereof is determined to be void or unenforceable in whole or in part, it shall not be deemed to affect or impair the validity of any other covenant or provision, each of which is hereby declared to be separate and distinct" and that "[i]f any provision of this Agreement is declared invalid or unenforceable for any reason other than over-breadth, the offending provision will be modified so as to maintain the essential benefits of the bargain among the Parties to the maximum extent possible . . . ."

C.     **PARTIES' INITIAL EFFORTS TO TRANSITION SPECTRUM TO LIGADO AND BEGIN SERVICE**

76.     Following approval with conditions by the FCC of its license modification application in 2010, Ligado took steps to begin the spectrum exchange process. Among those steps, Ligado and Inmarsat met regularly in 2011 to discuss the terminal resilience process and, in particular, to review Inmarsat's progress with respect to its terminal resilience plans for both maritime terminals and aeronautical terminals (referred to by the Parties as "Aero Terminals"). During those discussions, Inmarsat described the contracts it had set in place to address terminal resilience of certain maritime terminals and the process that it intended to follow regarding Aero Terminals, including client outreach and issuances of RFQs to equipment manufacturers.

77.     In or around February 2012, due to concerns raised by the National Telecommunications and Information Administration ("NTIA") regarding potential issues related to GPS services that could be caused by ATC operations, the FCC issued a public notice proposing to suspend indefinitely Ligado's ATC authority, first granted by the FCC in 2004. Ligado

22

disagreed with the NTIA's conclusions and with the FCC's proposals and filed comments to that effect in March 2012.

78.     Following that notice, Ligado and Inmarsat entered into Amendment Number 2 to the Agreement effective April 18, 2012 ("Amendment 2"). Under Amendment 2, the Parties agreed to halt the Phase 2 Transition and resolved certain payment obligations. Ligado was given the option of recommencing the Phase 2 Transition, but only if it delivered a notice to do so before March 31, 2014. The Parties also agreed that Ligado could choose among a range of Phase 2 Spectrum Plan Options, ranging between 10 MHz and 40 MHz of terrestrial spectrum (the "Phase 2 Plans"), and that Ligado could designate a different Spectrum Plan Option if notice was delivered before March 31, 2016.

79.     Among other items included in Amendment 2, the Parties expressly agreed that, in the event Ligado (then LightSquared) elected to recommence the Phase 2 Transition, Inmarsat would remain responsible for complying with its terminal resilience obligations. Specifically, Section 1.2 of Amendment 2 provides:

> Notwithstanding the making of the foregoing payment, if LightSquared elects to recommence the Phase 2 Transition (as described in Section 3 below), each of the Parties shall remain responsible for complying with all applicable terms of the Cooperation Agreement (as amended), including, without limitation, any terminal resiliency requirements, it being understood that nothing in this Amendment modifies the Parties' existing obligations under the Cooperation Agreement, which shall remain in effect to the same extent and with the same limitations set forth therein. If LightSquared elects to recommence the Phase 2 Transition, each of the Parties reserves the right to dispute any failure by the other Party to comply with the applicable terms of the Cooperation Agreement (as amended).

80.     Shortly after entering into Amendment 2, and in light of the FCC notice, LightSquared and certain of its affiliates filed for bankruptcy in May 2012.

81.     LightSquared operated as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court from May 14, 2012 until its emergence from bankruptcy on December 7, 2015,

23

when the company completed its financial restructuring. The entity emerging from that restructuring was renamed Ligado, which succeeded to LightSquared's rights under the Agreement. Upon emerging from Bankruptcy, on December 31, 2015, Ligado filed an omnibus License Modification Application with the FCC.

82.     While operating as a debtor-in-possession, in order to exercise its rights to recommence Phase 2, LightSquared delivered notice to Inmarsat of Phase 2 recommencement on the deadline date of March 31, 2014, electing the minimum spectrum option of 10 MHz. Under the terms of the Cooperation Agreement, Inmarsat remained responsible for its terminal resilience obligations and should have restarted the terminal resilience process once LightSquared delivered notice of Phase 2 recommencement.

## D.     LIGADO'S EFFORTS TO OBTAIN FCC APPROVAL

83.     After Ligado filed the December 31, 2015, License Modification Application (the "Modification Application"), Ligado struggled to obtain swift approval by the FCC of its application due in material part to Inmarsat's failure to perform the necessary terminal resilience steps.

84.     On March 29, 2016, just prior to the deadline set in Amendment 2, Ligado was compelled (at the risk of forfeiting the right under the Agreement) to deliver to Inmarsat an additional notice to commence delivery of the 30 MHz Up Shift Plan ("30 MHz Plan") under the Phase 2 Plans. That notice set out a list of activities and deliverables to be completed during the Phase 2 Transition, including completion of the terminal resilience work. Shortly thereafter, the Parties entered into Amendment Number 3 to the Agreement with an effective date of April 1, 2016 ("Amendment 3").

85.     Under Amendment 3, the Parties agreed that the Phase 2 Transition to the 30 MHz Up Shift Spectrum Plan would be deferred until the Implementation Notice Date and would be

24

completed before the Implementation Date. The Parties noted in more than three provisions in Amendment 3 that the Phase 2 Transition obligations remained to be completed. The Parties specifically agreed that "the Phase 2 Transition to the 30 MHz Up Shift Spectrum Plan must still be completed" and that "neither the making nor the deferral of any portion of the Phase 2 Annual Payments shall operate or be construed as acceptance by Ligado that the Phase 2 Transition to the 30 MHz Up Shift Spectrum Plan has been completed." Amendment 3 further provided that the Agreement and Amendment 2 shall remain in full force and effect except as set forth in Amendment 3.

86.    During the course of Ligado's pending FCC application, several Inmarsat customers and/or their representatives submitted comments to the FCC on Ligado's Modification Application, stating their view that the terminal resilience issues needed to be addressed before the FCC could approve Ligado's plan. Specifically, two influential parties—Boeing and Aviation Spectrum Resources Inc. ("ASRI")—requested that the FCC determine how Inmarsat terminals would be replaced before acting on Ligado's Modification Application.

87.    Ligado sought Inmarsat's help in addressing the concerns raised by Boeing and ASRI. Inmarsat's response was inadequate. Inmarsat's letter filed with the FCC confirmed that Inmarsat was "working with manufacturers, customers, and Ligado to reduce potential interference from Inmarsat users." Nonetheless, Inmarsat provided no information about when manufacturers would make filters or other terminal modifications available, it said nothing about when standards would be adopted or approvals obtained by the FCC, and it said nothing about the timing of terminal replacements or who would pay for those terminal modifications or replacements.

88.    Thereafter, representatives of ASRI filed another comment letter with the FCC, noting that Inmarsat continues providing services in the L-band and specifically referencing that

25

Inmarsat had never explained the technical or operational basis for the cooperation arrangement between Inmarsat and Ligado as a basis for their objection to Ligado.

89.     Despite the persistence of those concerns by Inmarsat's customers about the details of Inmarsat's terminal resilience plan, and notwithstanding its obligations in the Agreement and its repeated assurances that it was working to address those interference issues, Inmarsat took no action to directly address these concerns, to develop and implement the plan needed to modify or replace the terminals, or to otherwise address the terminal interference issues. Nor did it explain to its customers, the complaining entities, or the FCC its plan to address the interference issues in a level of detail sufficient to assuage their concerns. In fact, the little bit of information Inmarsat provided had the opposite effect—it contributed to increasing concern by creating confusion and uncertainty among its customers. As a result, Inmarsat wholly failed to use its best commercial efforts to assist Ligado in obtaining the necessary approvals.

90.     Inmarsat's continued inaction fostered additional calls for delay of the FCC approval. Boeing again expressed concern about the potential for interference with Inmarsat terminals. Inmarsat should have responded to address those concerns with concrete information about how terminal interference would be resolved to assure both the FCC and Inmarsat's customers that such interference would not be an issue.

91.     Inmarsat was not able to do so because it had failed to develop (let alone implement) a plan in accordance with Section 3.2(g) of the Agreement sufficient to address those interference issues and to ensure that Ligado receives the full value of the spectrum in a timely manner. Ligado sent Inmarsat a letter setting forth its views regarding the impact of Inmarsat's lack of action on Ligado's regulatory approval. Inmarsat took no actions to remedy the situation.

26

E. **FCC APPROVAL AND THE IMPACT OF INMARSAT'S REFUSAL AND INABILITY TO PERFORM**

92.   On April 20, 2020, Ligado received notice that the FCC had approved Ligado's Modification Applications, and, on April 22, 2020, the FCC issued the final order. The FCC Order gave Ligado permission to operate a terrestrial wireless service across North America in the L-band on Ligado's spectrum (including that coordinated with Inmarsat). But Ligado's FCC ATC authorization fell materially short of what the Agreement contemplated by creating exclusion zones around airports and waterways.

93.   That FCC Order limited Ligado's ability to use its spectrum due to Inmarsat's failure to resolve its customers' terminal interference issues. Specifically, the FCC Order stated that "emissions from Ligado's base stations must comply with the section 25.253(d)(5) power flux density limit of -56.8 dBW/m$^2$/200 kHz at the edge of all airport runways and aircraft stand areas" and noted that similar limitations apply with respect to the edge of any Navigable Waterway.

94.   The effect of that requirement and of the limitations in Section 25.253 is that Ligado cannot operate a base station within 430 meters of any Airport or within 420 meters of any Navigable Waterway.

95.   That Inmarsat's failure to resolve terminal interference is the only reason for this limitation is also clear: The FCC stated that Ligado and Inmarsat may seek a waiver of section 25.253(d)(5) and operate closer to Airports and at higher power levels after the Inmarsat receivers have been upgraded through the process agreed to between the Parties. Thus, only after Inmarsat has fully resolved terminal resilience and the FCC has signed off on that resolution can Ligado operate at a total power spectral density limit of -26.8 dBW/m$^2$ within the receiver bandwidth, which is the level agreed to by the Parties and set forth in the Agreement.

27

96.     With the issuance of the FCC Order, during the summer and fall of 2020, Ligado sought to agree with Inmarsat on a schedule to complete the delivery of the spectrum and to discuss potential payment options. Despite Ligado's efforts to understand Inmarsat's terminal resilience efforts as part of those discussions and to agree upon a schedule for completion of that work, Inmarsat refused to even discuss its terminal resilience efforts or to provide an update on the status of that process. Such discussions were specifically required under Section 3.2(h) of the Agreement.

97.     The Parties ultimately agreed on Amendment Number 5 to the Agreement, dated June 30, 2020 ("Amendment 5"). That amendment addressed Ligado's payment obligations, the payment options available to Ligado with additional funding, and the potential timing for completion of the Phase 2 Transition with respect to the 30 MHz Up Shift Spectrum Plan under two alternative scenarios. Inmarsat also agreed to provide an informational briefing on its progress with respect to terminal interference after the signing of Amendment 5.

98.     Under Amendment 5, Ligado had the option to make a lump-sum payment of $700 million to Inmarsat if it secured certain financing and consents. The Parties also agreed to develop a "Revised Interim Spectrum Plan" by October 9, 2020. Further, upon completion of the transition to the Revised Interim Spectrum Plan, the Parties also agreed to a develop a schedule to complete the Phase 2 Transition with respect to the 30 MHZ Up Shift Spectrum Plan by the Final Implementation Date of December 31, 2021.

99.     Amendment 5 also provided that Inmarsat would provide Ligado with an informational briefing regarding the status of Inmarsat's terminal resilience plan within 14 days of the signing of the Amendment.

100.    That information briefing was held on July 14, 2020. During that briefing, Ligado learned the following:

28

(a)      With respect to maritime terminals, while Inmarsat stopped selling non-resilient terminals in 2012, there were still over 11,600 Inmarsat maritime terminals in use in North America that are not resilient as defined and required by the Agreement.

(b)      With respect to certain maritime terminals, Inmarsat still had no plan to modify or replace any of those terminals, nor had it offered any incentive program to encourage the modification or replacement of those terminals by its customers. Rather, Inmarsat simply hoped that maritime vessels with those terminals would either adopt the new terminals upon notice of Ligado's new service or that those vessels would be retired. On information and belief, Inmarsat told some customers that Ligado had kicked them off its spectrum.

(c)      With respect to other of its maritime customers in North America, Inmarsat conceded that it had only limited ability to identify the vessels using those terminals and that, for many of those vessels, Inmarsat did not maintain any customer relationship. Inmarsat provided no estimate concerning when those terminals might be upgraded or terminated.

(d)      With respect to Aero Terminals (which are used on airplanes), Inmarsat conceded that there were over 10,000 Inmarsat terminals in North America that were not resilient as defined and required by the Agreement.

(e)      Inmarsat confirmed that it could provide no timeline as to when those Aero Terminals would be modified or upgraded. With respect to certain terminals, Inmarsat explained that it did not intend to transition those terminals at all. Rather, it expected that service with respect to those terminals would be terminated at the end of 2023—two years after Inmarsat was to have delivered the spectrum to Ligado on December 31, 2021.

29

(f)  Inmarsat told Ligado that, with respect to other terminals, Inmarsat only entered into contracts needed to develop resilient equipment in 2018 and 2019. Inmarsat also told Ligado:

- airworthiness testing had yet to begin;

- Inmarsat and the equipment manufacturer had not developed a go-to-market plan;

- Inmarsat had identified no plan to incentivize aircraft owners to switch their terminals to resilient terminals; and

- Inmarsat did not intend to assist its manufacturers in obtaining STC approvals.

(g)  Inmarsat made clear that, while it had known about its terminal resilience obligations for well over a decade, during that entire period, as it continued to sell new and replacement terminals, it never included in its agreements any information about the inevitable need to transition to new equipment or required Inmarsat's customers to upgrade their terminals once the transition was complete.

101.  In short, Inmarsat did not dispute its obligation to resolve terminal interference, but confirmed that for years it has not taken the steps needed to permit Inmarsat to deliver the spectrum as required by the Agreement and failed to take steps necessary to meet its contractual terminal resilience obligations, and that Inmarsat was unlikely to achieve terminal resilience within any time frame that would reasonably permit Ligado to offer a commercial wireless service without the exclusion zones around airports and waterways.

102.  In September 2021, Inmarsat informed the aviation industry (including its customers and Ligado at a public meeting) that, with respect to certain terminals, the required product would not be ready for the market until at least March 2022. Beyond that notice, Ligado has received no

formal updates from Inmarsat regarding its progress in completing its terminal resilience obligations.

103.  Despite its obligation to assist Ligado in obtaining all necessary approvals, Inmarsat has also refused to support Ligado in its effort to obtain FCC approval for the waiver of section 25.253(d)(5), which is necessary for Ligado to operate within the spectrum and power constraints agreed upon by the Parties.

104.  Even worse, by failing to remediate the terminal interference issues, or to even communicate to the industry and the FCC that Inmarsat would take responsibility for such remediation, Inmarsat's conduct led to additional resistance to Ligado's regulatory approval and use of its spectrum. For example, on June 29, 2021, a dozen members of the aviation industry filed a letter in support of a petition for reconsideration of the FCC's April 2020 approval of Ligado's Modification Application. Those industry participants specifically decried the lack of "any formal implementation plan to fund the replacement of aviation Inmarsat terminals receiving interference from Ligado Operations." It is the development of just such a plan, and just such funding responsibility, that the Agreement assigns to Inmarsat.

105.  To assuage the concerns of the industry, Ligado requested that Inmarsat promptly file a letter with the FCC stating that it would replace, modify, or discontinue service to customers whose terminals were suffering interference. Inmarsat refused to make any such filing.

106. In correspondence exchanged between the Parties in spring 2021, Inmarsat disclaimed any obligation to replace or modify terminals unless it was in Inmarsat's own commercial interests, despite the plain language in the Agreement to the contrary. Inmarsat conceded that it bears the risk of any interference that arises from ATC base stations to Inmarsat terminals but claimed (contrary to the language of the Agreement) that it had no obligation to

31

address that risk; rather, it could "suffer interference" when Inmarsat's terminals are close to a Ligado ATC base station. No such right exists within the Agreement, which requires the interference to be addressed through modification, replacement, or discontinuance of service, and which requires Inmarsat to use its best commercial efforts to take all actions to provide the benefit of the Plans and other benefits of the Agreement to Ligado.

107. Further, when a leading aerospace industry participant sought assistance in transitioning its Inmarsat terminals in order to address terminal interference issues, Inmarsat refused to even participate in a joint effort to address that issue.

## F.  INMARSAT'S KNOWLEDGE OF AND COMPLICITY IN DEPARTMENT OF DEFENSE MISAPPROPRIATION OF LIGADO'S SPECTRUM

108.  Unbeknownst to Ligado, the U.S. Department of Defense ("DOD") has for some time been operating systems that use or depend on Ligado's authorized spectrum. The DOD's reliance on that spectrum led the DOD to oppose Ligado's FCC Modification Application, and to prevent Ligado's use of that spectrum even after the company obtained FCC approval. The DOD's uncompensated taking of Ligado's spectrum rights are the subject of a separate legal action by Ligado against the United States.

109. On information and belief, Inmarsat was either complicit in the DOD's use of Ligado's spectrum or knew about the DOD's use of the spectrum. In the first instance, having been operating MSS services in the licensed spectrum areas, Inmarsat would be aware of other services operating near its frequencies. But worse, Inmarsat contracted with the DOD to provide satellite communication services, including internet-of-things satellite connectivity for the Army. Thus, Inmarsat would have been uniquely aware of interference between the licensed spectrum and the DOD's use of either that spectrum or neighboring spectrum.

32

110. In fact, Inmarsat profited from Ligado's inability to use the spectrum that the FCC had authorized. As long as Ligado could not use the licensed spectrum, Inmarsat could continue to collect revenues from the DOD for the use of that spectrum. Because the loss of spectrum in the U.S. would impair Inmarsat's ability to service the DOD (or any other customers using the licensed spectrum), Inmarsat hoped to delay any delivery of the spectrum so that it could generate the revenue from the very spectrum with which it had already coordinated with Ligado.

111. Given its unique knowledge of the DOD's spectrum use, Inmarsat knew that the DOD would prevent Ligado's use of the spectrum for which Ligado was paying Inmarsat hundreds of millions of dollars.

112. Rather than informing Ligado in good faith of that insurmountable hurdle, which would be required both by the terms of the Cooperation Agreement and Inmarsat's duty of good faith under that Agreement, Inmarsat remained silent and continued to accept Ligado's payments, secure in the understanding that Ligado would be unable to ever utilize the spectrum for which it was paying.

113. Indeed, in October 2020, when Ligado made its extraordinary payment of $700 million to Inmarsat, Inmarsat was aware that the DOD's use of, or interference with, the Ligado spectrum would lead the DOD to prevent Ligado from using the spectrum. Thus, Inmarsat knew at that time that Ligado would never receive the benefit of the spectrum for which it was paying. Inmarsat nonetheless induced Ligado into making that $700 million payment, and accepted that $700 million payment, under the false pretense that Ligado would one day be able to use that spectrum.

114. Ligado has only recently (and partially) learned of the importance assigned by the DOD to its spectrum usage, and the lengths to which it will go to block Ligado's usage of its

33

spectrum rights. It appears that the DOD intends to entirely frustrate Ligado's ability to use its spectrum rights for purposes of supporting an advanced terrestrial wireless service. On information and belief, Inmarsat was aware of those facts for some time, even as it continued to receive hundreds of millions of dollars in payments from Ligado.

115. Given the DOD's spectrum usage, Ligado—unbeknownst to it—stood little chance at the time it made payments under the Agreement of being able to use the full terrestrial spectrum it has long sought. In essence, Ligado was paying for something it had little chance of receiving.

## G.    INMARSAT'S FAILURE TO DELIVER THE SPECTRUM FREE OF INTERFERENCE

116. Under Amendment Number 5, Inmarsat was required to complete the transition by December 31, 2021. On December 31, 2021, Inmarsat advised Ligado that it had completed its spectrum transition. However, since Inmarsat has not met its terminal resilience obligations, it has failed to deliver the spectrum as required.

117. Inmarsat's claim that it has no obligation to address or resolve the terminal interference issues is contrary to the express terms of the Agreement and would effectively nullify the purpose of the Agreement. The Agreement's primary purpose was to provide Ligado spectrum free from interference, including without limitation spectrum capable of providing nationwide terrestrial wireless service. To enable that, Inmarsat was obligated to address potential interference from or to Inmarsat terminals. By failing to take steps to address those interference issues, Inmarsat negated the goal of the Agreement.

118. Inmarsat has failed to meet its contractual obligations under the Agreement. As a result of this breach of contract, Ligado has suffered material injury.

34

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT:
## TERMINAL RESILIENCE OBLIGATION

119.  Ligado repeats and realleges the allegations of paragraphs 1 through 118 as if fully set forth herein.

120.  Inmarsat has breached its obligations as set forth in Sections 3.1(b), 3.2(b), 3.2(d), 3.2(g), 3.2(h), 3.2(i) of the Agreement, and other sections, to expedite the development of an implementation plan to take actions necessary or advisable to effectuate the implementation of the Agreement. As set forth above, Section 3.2(g) of the Agreement requires Inmarsat to expedite the development of such a plan upon delivery of the Phase 2 Notice. That plan was to include, without limitation, the replacement or modification of user terminals, including making appropriate modifications to all terminals operating on the Inmarsat system that might otherwise receive interference from or cause interference to the operation of the systems of Ligado.

121.  Inmarsat was responsible for meeting on a quarterly basis with Ligado to review the transition plans and to provide updates to such plans, with a goal of trying to work cooperatively to effectuate a smooth transition for their respective services, customers, and end users.

122.  Ligado delivered the Phase 2 recommencement notice in March 2014 and delivered the notice to commence delivery of the 30 MHz Plan on or about March 29, 2016, and again in May 2020, pursuant to the terms of the amendments to the Agreement. Pursuant to the terms of Amendment 5 to the Agreement, Inmarsat promised to complete Implementation by December 31, 2021. Ligado has fully performed its obligations under the Parties' Agreement.

123. Inmarsat failed to develop any meaningful plan regarding the transition of its customers and other users of its terminals, including with respect to the replacement and modification of user terminals in response to any of the commencement and recommencement

35

notices provided by Ligado. Nor did Inmarsat participate in quarterly meetings to review any such transition plans.

124. Inmarsat has made few meaningful plans to replace or modify any user terminals. It has not completed the development of designs for all relevant user terminals nor of the proposed modifications for those terminals. For those terminal models for which it has developed designs, it has not completed testing of those designs nor obtained the required and necessary approvals for the modified designs, nor has it ensured the manufacture of such replacement terminals in quantities sufficient to meet the needs of its customers and terminal users.

125. Inmarsat has also failed to develop or implement any plan to distribute and install those terminals or modifications. The Agreement requires Inmarsat to bear the costs and expenses associated with the transition of its customers or of other parties with whom it has a contractual or business relationship in connection with the implementation of the Spectrum Plans. Yet Inmarsat has provided no incentive to customers to convince them to transition their terminals, let alone manage and finance a comprehensive terminal resilience plan. And it has refused to help fund even the specific customers who have sought assistance from Inmarsat regarding the replacement of their terminals.

126. Inmarsat has also failed to develop go-to-market plans with its terminal manufacturers. Inmarsat has over 20,000 Maritime and Aero Terminals within North America that it has not made sufficiently resilient. It has whole categories of terminals that it does not intend to replace at all, instead waiting for years (if at all) to end the service on those terminals. It has other categories of terminals for which it has yet to even obtain approval of the replacement terminals, much less manufacture sufficient quantities to achieve terminal resilience and deliver the spectrum to Ligado as specified in and required by the Agreement.

36

127. Inmarsat's failure to timely plan, develop, and implement a plan to address terminal interference issues led to material delay in regulatory approval, which led to a delay in Ligado's launch of a terrestrial wireless service. The Agreement made clear that "time is of the essence in this Agreement," and Inmarsat's failure to deliver its implementation plans timely is a material breach of its obligation.

128. Based on presentations made by and communications with Inmarsat, it is apparent that Inmarsat does not intend to fulfill its terminal resiliency obligations, it failed to fulfill those obligations by the December 31, 2021 deadline, and it has continued in its failure to perform those obligations to date.

129. Under New York law, Inmarsat owes Ligado a duty of good faith and fair dealing in the performance of all of its contractual obligations. By delaying its efforts to develop and implement upgraded and replacement terminals, Inmarsat breached that duty. By refusing to modify, replace, or discontinue service to all terminals suffering interference, Inmarsat has further breached that duty of good faith and fair dealing.

130. Inmarsat's breach was willful and intentional. Even after Ligado pleaded with Inmarsat to prepare an implementation plan to address concerns raised in Ligado's FCC proceeding, Inmarsat refused to prepare a plan, let alone a plan with sufficient detail to address the concerns being raised by Inmarsat's customers and terminal users that objected to Ligado's approval.

131. Inmarsat's failure to prepare such a plan and participate in quarterly meetings to review the transition plans was a material breach of Inmarsat's obligations under the Agreement. The absence of such a plan materially delayed the approval of Ligado's FCC Modification Application, and it has delayed (and, to date, precluded) Ligado from obtaining a waiver that would

37

Case 1:25-cv-02836    Document 1-2    Filed 04/04/25    Page 40 of 52

permit Ligado to operate within the proximities of Airports and Navigable Waterways as the Parties specified in the Agreement.

132.  As a result of Inmarsat's breach, Ligado has suffered substantial damages from the delay of the FCC approval and from the limitations set forth within that FCC approval. Therefore, Ligado prays for the relief listed below.

**SECOND CAUSE OF ACTION – BREACH OF CONTRACT:
OBLIGATION TO PROVIDE SPECTRUM AT AGREED POWER LEVELS**

133.  Ligado repeats and realleges the allegations of paragraphs 1 through 132 as if fully set forth herein.

134.  As set forth above, under the Agreement, the Parties agreed that Ligado shall be permitted to deploy and operate its terrestrial network so long as it is operated in compliance with the requirements set forth in Exhibit T of the Agreement. Exhibit T further provides that Ligado would operate its terrestrial network consistent with Exhibit N of the Agreement.

135.  Exhibit N of the Agreement expressly permits Ligado to operate with the power flux densities of up to -26.8dBW/m$^2$ at the edge of Airport runways and aircraft stand areas and up to -34.6dBW/m$^2$ at the edge of Navigable Waterways.

136.  Inmarsat agreed to use its best commercial efforts to take all actions necessary or desirable to ensure that Ligado obtained the full benefit of the Plans and other benefits under the Cooperation Agreement, including the ability to operate with the power flux densities set forth in Exhibits T and N of the Agreement.

137.  Yet, due to Inmarsat's failure to fulfill its terminal resilience obligations, Ligado is not able to operate within the spectrum and at the power levels agreed upon by the Parties and set forth in the Agreement. Thus, Inmarsat has breached its obligation to deliver the spectrum that it

38

was required to deliver to Ligado in a manner consistent with the specific technical conditions with which it agreed that Ligado could operate.

138.  As a result of Inmarsat's breach of contract, Ligado is constrained to operate its ATC base stations at power flux density of no more than -56.8dBW/m$^2$/200 kHz at the edge of Airport runways and aircraft stand areas and no more than -56.6dBW/m$^2$/200 kHz at the water's edge of any Navigable Waterway. As a result of this limitation, Ligado is precluded from operating ATC base stations within 420 to 430 meters of Airports and Navigable Waterways, thereby materially reducing the geographic scope of Ligado's spectrum and terrestrial service, as well as revenue potential and value of Ligado's spectrum rights and its overall business.

139.  Inmarsat has further breached its obligation to assist Ligado in obtaining FCC approval to waive the requirements of Section 25.253. Inmarsat is neither taking the steps needed to upgrade its terminals as required by the FCC, nor to seek an exception from the FCC of the need to upgrade those terminals. As a result, Inmarsat has breached its obligations under the Agreement with respect to providing spectrum at the power levels agreed upon by the Parties.

140.  Ligado has suffered, and will suffer, substantial injury as a result of Inmarsat's breach. Those losses include, but are not limited to, the loss of revenue due to the limitations on Ligado's wireless terrestrial network operations, the delay in offering commercial wireless services, and a reduced value of the spectrum as a result of the exclusion zones created by the FCC's order as a result of Inmarsat's failure to address terminal interference. Inmarsat's breach is also willful and intentional, entitling Ligado to additional damages, including incidental and consequential damages. Therefore, Ligado prays for the relief listed below.

39

## THIRD CAUSE OF ACTION – BREACH OF CONTRACT:
## OBLIGATION TO USE BEST EFFORTS TO SUPPORT LIGADO LICENSE
## APPLICATION

141.  Ligado repeats and realleges the allegations of paragraphs 1 through 140 as if fully set forth herein.

142.  As set forth further above, several provisions of the Agreement required Inmarsat to use its best commercial efforts to seek and obtain all approvals and authorizations from any of the Administrations to implement the Agreement (Section 5.2), to ensure that each party obtains the full benefit of the Plans (Section 3.1(b)), to implement the Spectrum Plans (Section 3.1(d)), and to obtain all consents of any governmental authority (Section 6.9(b)). Further, under New York law, Inmarsat owed Ligado an implied obligation of good faith and fair dealing in all aspects of its performance under the Agreement.

143.  Notwithstanding those obligations, Inmarsat wholly failed to take even minimal efforts—let alone best commercial efforts—to support Ligado's FCC Modification Application. At multiple times leading up to the FCC approval, entities that use Inmarsat terminals urged the FCC to delay approval of Ligado's Modification Application due to the lack of any plan to address terminal interference on Inmarsat's terminals. On multiple occasions, Ligado asked Inmarsat to develop and provide such detailed plans in order to address those concerns. In 2021, Inmarsat customers and terminal users again raised the issue of interference to Inmarsat terminals—this time as a basis for supporting the FCC's reconsideration of its approval of Ligado's Modification Application.

144.  But Inmarsat took no effort to address the concerns raised by those objectors. Inmarsat did not draft any detailed plan to explain how it would replace or modify its Aero Terminals. Inmarsat failed to take steps to have the necessary equipment manufactured, and, until

40

very recently, it had failed to identify any manufacturers for such equipment. Inmarsat failed to adequately address Boeing's concerns regarding the modification or replacement of Aero Terminals, or to assist Boeing in obtaining FAA and EASA approvals for such redesigned terminals. And Inmarsat has failed to address the funding concerns from industry participants regarding the replacement of Inmarsat's terminals.

145. By allowing Ligado's Modification Application to be delayed by such concerns, Inmarsat not only breached its multiple contractual obligations to use its best commercial efforts to help obtain relevant approvals, but it also breached its obligation of good faith and fair dealing under the Agreement.

146. Not only did Inmarsat's conduct delay the approval of Ligado's FCC Modification Application, its ongoing failure to perform still stands in the way of obtaining FCC approval for Ligado to operate its service at the levels anticipated by the Parties' Agreement. The FCC Order makes clear that it will not approve such application unless and until Inmarsat has upgraded its receivers. Inmarsat's failure to clearly address the issues raised by Inmarsat customers has also cost Ligado substantial time and money in responding to those concerns.

147. In addition to Inmarsat's failure to support Ligado's FCC Modification Application and license, Inmarsat has also failed to adequately and timely obtain FAA approval for the equipment needed to modify or replace the Inmarsat terminals receiving interference. The ambivalence shown by Inmarsat in the pursuit of that approval breaches Inmarsat's obligation to use its best commercial efforts to obtain such approvals.

148. Inmarsat's failure to use its best commercial efforts to support Ligado's FCC Modification Application and to timely obtain other needed approvals was willful and intentional. Indeed, Ligado repeatedly asked Inmarsat to prepare the terminal resilience plan that would

41

address the concerns of those parties that objected to Ligado's proposed wireless terrestrial service, but Inmarsat refused to do so.

149. Inmarsat's failure to use its best commercial efforts to support Ligado's FCC Modification Application and to help defend its license also constitutes a material breach of the Agreement. Obtaining regulatory approval to deploy an ATC network at the power levels anticipated in the Agreement is a necessary step to the achievement of one of the purposes of the Agreement, and the breach of that obligation is fundamental to performance under the Agreement. The failure to use best commercial efforts resulted in a lengthy delay in obtaining necessary approvals, further delaying Inmarsat's performance of its terminal resilience obligations. Such delay is material to the contract, where time is of the essence.

150. Inmarsat's intentional and material breach of its obligation to use its best commercial efforts to support Ligado's FCC Modification Application and to obtain other approvals injured Ligado in several ways. Without limitation, that conduct caused the approval of Ligado's Modification Application to be materially delayed, resulting in lost value from the spectrum rights, lost revenue and profit associated with operating the Ligado wireless terrestrial services, and additional costs to Ligado (including, but not limited to, the payment to Inmarsat for the coordination of those spectrum rights over many years while Ligado was unable to enjoy the benefits of such rights). The failure to upgrade its terminals also precludes the FCC from granting an approval for Ligado to operate at the levels expected by the Parties and set out in the Agreement, thereby further impairing the value of Ligado's spectrum rights. Therefore, Ligado prays for the relief listed below.

## FOURTH CAUSE OF ACTION – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

151.  Ligado repeats and realleges the allegations of paragraphs 1 through 150 as if fully set forth herein.

152.  Every contract governed by New York law contains an implied covenant of good faith and fair dealing. This includes the Cooperation Agreement.

153.  Upon information and belief, Inmarsat was aware that the DOD was using certain L-band spectrum that Inmarsat was coordinating with and leasing to Ligado. Inmarsat was also aware that the DOD would thus not permit any commercial use of the spectrum for purposes of a terrestrial network. Ligado is not aware of exactly when Inmarsat became aware of those facts but believes that Inmarsat became aware of those facts at some point prior to 2020. Despite its knowledge, and notwithstanding its duty, Inmarsat did not inform Ligado of that material fact at any time, including during the parties' negotiation of Amendment Number 5 nor prior to Ligado's exercise of its option under the Amendment.

154.  Inmarsat withheld that information, intending that Ligado would proceed with making certain payments under the Parties' Agreement, specifically (and without limitation) the $700 million payment made by Ligado following the execution of Amendment 5 to the Agreement and the payments beginning in January 2023. Inmarsat knew or should have known that Ligado was relying upon its ability to offer commercial wireless service over a terrestrial network using the spectrum described in the Agreement and for which it had paid Inmarsat. Inmarsat knew or should have known that, given the DOD's programmatic need for L-band spectrum, the DOD would prevent Ligado from offering the service the Parties anticipated and that was at the heart of the Agreement.

43

155. Inmarsat withheld disclosure of the information it had about the DOD's usage of the spectrum, intending that Ligado would continue to make payments to Inmarsat in reliance on Inmarsat's assurances that it would deliver spectrum on which Ligado could provide a wireless terrestrial network service. Inmarsat knew that, if it disclosed the DOD's L-band spectrum needs, Ligado would understand that its wireless terrestrial service would be highly unlikely (if not impossible) to be approved and permitted to proceed, and that the DOD would take steps necessary to prevent Ligado's deployment. Inmarsat further knew that knowledge of those facts would have led Ligado to not to exercise its right under the option set forth in Amendment 5.

156. Given the extensive negotiations and discussions held between Ligado and Inmarsat over more than a decade and Inmarsat's knowledge of Ligado's anticipated use of the spectrum, Ligado reasonably expected that if Inmarsat had information related to the DOD's L-band spectrum use that might impair Ligado's spectrum deployment, Inmarsat would have disclosed that information to Ligado. Indeed, such disclosure would have been consistent with Inmarsat's duty of good faith and fair dealing, and its obligation to use its best commercial efforts to implement the Agreement and deliver usable spectrum to Ligado.

157. Inmarsat had been operating on the exact spectrum Inmarsat was leasing to Ligado for many years. Inmarsat was in a unique position to know the users of the spectrum it was required to deliver to Ligado. Indeed, on information and belief, Inmarsat was itself working with the DOD, giving it a unique insight into the L-band spectrum needs of the DOD. Ligado reasonably expected that if Inmarsat was aware of users who would suffer interference from Ligado's terrestrial wireless service, or whose objections might preclude Ligado from being able to provide that service, Inmarsat would notify Ligado of such potential objectors.

44

158.  Due to Inmarsat's failure to disclose its awareness of the DOD's potential conflict with Ligado's use of the spectrum it had paid for, Ligado continued to coordinate spectrum with Inmarsat, expending over $1.7 billion in annual payments. Ligado has now learned that the DOD opposes Ligado's use of the subject spectrum for terrestrial wireless services due to its own programmatic need for L-band spectrum. The DOD has opposed Ligado's license and has obtained Congressional action to deter or prevent Ligado from using its spectrum. That opposition and resulting Congressional action has precluded Ligado's ability to deploy its planned wireless terrestrial service. As a result, Ligado has paid over a billion dollars to Inmarsat for spectrum that it will likely never be able to use for terrestrial wireless service, a fact that Inmarsat has known but failed to disclose to Ligado for years.

159.  Inmarsat breached the covenant of good faith and fair dealing through its failure to disclose the DOD need for L-band spectrum has injured Ligado and unjustly enriched Inmarsat. Ligado has continued making ongoing annual payments to Inmarsat that it would not have made had Ligado known that its wireless terrestrial service would never be permitted to come to fruition. Ligado seeks remedies as set forth below, to include recessionary remedies and a declaration that Ligado is no longer obligated to make further payments under the Agreement.

### FIFTH CAUSE OF ACTION – REFORMATION AND RESTITUTION BECAUSE OF FRUSTRATION OF PURPOSE

160.  Ligado repeats and realleges the allegations of paragraphs 1 through 159 as if fully set forth herein.

161.  The agreed-upon purpose of the Agreement is to provide Ligado with spectrum that can be used for the purpose of deploying a wireless terrestrial network. Absent this benefit, Ligado would not have entered into the Agreement. Both Parties recognized that the purpose for Ligado to enter into the Agreement was for Ligado to provide a terrestrial wireless service capable of

45

providing comprehensive geographic coverage to users of that network, including coverage near airports and waterways.

162.  The Agreement was entered into based on each party's understanding that operation at the specifications and power levels set forth in Exhibit N of the Agreement would be necessary to achieve the purpose set forth in the Agreement. As a result of the inability to resolve the terminal interference issues, an event unforeseen by Ligado, Ligado has been forced to reduce the power of its ATC and/or to move its towers—and thus its customers—far away from Airports and Navigable Waterways. As a result, Ligado is unable to achieve its fundamental purpose of deploying a wireless terrestrial service with comprehensive geographic coverage.

163.  Further, to the extent that the DOD precludes Ligado from deploying its wireless terrestrial service, that event, also unforeseen by Ligado, would frustrate the fundamental purpose of the Agreement.

164.  Because the coverage limitations imposed by Inmarsat's conduct has frustrated a fundamental purpose of the Agreement, Ligado is entitled to restitution of all payments from Ligado to Inmarsat for the right to use coordinated spectrum within 430 meters of Airports and 420 meters of Navigable Waterways, and reformation of the Agreement as necessary to reflect that change. Ligado should also be relieved of any obligation to make future payments under the Agreement to the extent such payments are tied to the use of coordinated spectrum within 430 meters of an Airport and 420 meters from Navigable Waterways. Further, given Ligado's inability to use the spectrum for the intended purpose within those geographic areas, Ligado is entitled to restitution for the difference between the value of the spectrum as originally anticipated in the Agreement and the value of that spectrum that was actually delivered by Inmarsat.

46

165.   Although the inability to use the spectrum within 430 meters of Airports and 420 meters of Navigable Waterways has frustrated the purpose of the Agreement, enforcement of the remainder of the Agreement should be preserved through reformation of the Agreement. Under the severability clause contained in Section 9.11, the Agreement must "be modified so as to maintain the essential benefits of the bargain" between the Parties. Thus, to the extent that the Agreement is reformed in part to return to Ligado the payments attributable to the spectrum lost due to Inmarsat's delays and failure to complete terminal resilience obligations, the remainder of the Agreement should be enforced to provide the Parties with the essential benefits of the bargain that can still be obtained.

### SIXTH CAUSE OF ACTION – UNJUST ENRICHMENT

166.   Ligado repeats and realleges the allegations of paragraphs 1 through 165 as if fully set forth herein.

167.   Ligado has paid Inmarsat over $1.7 billion to acquire exclusive rights to the spectrum as set forth in the Agreement, including the right to use the spectrum at Airports and near Navigable Waterways. The Parties anticipated that Ligado's FCC Modification Application would be timely approved, would permit service at Airports and near Navigable Waterways, and would enable Ligado to launch a commercial wireless service capable of providing contiguous geographic coverage.

168.   A significant portion of Ligado's payments to Inmarsat were made to acquire the right to operate at or near Airports and Navigable Waterways. Due to Inmarsat's failure to satisfy its terminal resilience obligations and due to objections raised by Inmarsat's customers and terminal users, the FCC limited the geographic area in which Ligado can provide terrestrial

47

wireless services. As a result, Ligado is unable to offer the comprehensive geographic coverage, which was a principal purpose of the Agreement.

169.  Ligado's payments were made pursuant to contractual provisions that must be reformed, because the purpose of those provisions has been frustrated, as set forth in Count Five above. Further, the approval of Ligado's Modification Application was substantially delayed due in part to Inmarsat's failure to develop its terminal resilience plan or to address the objections raised to Ligado's Modification Application.

170.  Under the circumstances, it would be against equity and good conscience for Inmarsat to retain payments made by Ligado to support Inmarsat's terminal resilience efforts or based on Ligado's ability to use spectrum as specified in the Agreement. It is also against equity and good conscience for Inmarsat to retain payments made by Ligado for the use of spectrum during the period in which the FCC's approval of Ligado's Modification Application was unnecessarily delayed. Further, given the inability to use the remaining spectrum for the purpose originally intended in the Agreement, and given the diminished value of the spectrum as it has been delivered to Ligado by Inmarsat, it is against equity and good conscience for Inmarsat to retain the difference between the value of the spectrum under each scenario.

171.  By reason of the foregoing, Ligado is entitled to the return of all payments it made to Inmarsat respecting the terminal resilience efforts and the use of spectrum as specified in the Agreement in an amount to be determined at trial, including interest thereon. It is also entitled to the return of payments made to Inmarsat for periods during which the FCC's approval was delayed due to Inmarsat's conduct in an amount to be determined at trial. Further, to the extent not disgorged through the above return of payments, Inmarsat should be obligated to repay to Ligado

48

the benefits it has received based on the difference in the value of the spectrum as the Parties originally anticipated, and the value of that spectrum as it now exists.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against defendant Inmarsat as follows:

A.      An award of damages, including direct, indirect, consequential, and punitive damages, in an amount to be determined at trial, to fully compensate Ligado for Inmarsat's contract breaches;

B.      An order directing Inmarsat to complete within 120 days its planning and implementation of its terminal resilience obligations, including replacement or modification of all user terminals that might otherwise receive interference from, or cause interference to, the operation of Ligado's wireless terrestrial service;

C.      An order of (1) restitution in the full amount of payments Ligado made to Inmarsat to support terminal resilience efforts or for use of the spectrum that has not been delivered to Ligado, (2) restitution in the full amount of payments made to Inmarsat for periods during which FCC approval was delayed due to Inmarsat's conduct, (3) restitution and disgorgement of the amount received by Inmarsat representing the difference between the value of the spectrum as originally anticipated in the Agreement, and the value of that spectrum that Inmarsat has provided to Ligado, and (4) reformation of the Agreement as necessary to reflect the benefits that Inmarsat failed to deliver to Ligado and for which Ligado obtains restitution;

D.      An order that Ligado is relieved of any obligation to make future payments under the Agreement to the extent such payments are tied to the use of coordinated spectrum within 430 meters of an Airport and 420 meters from Navigable Waterways;

49

E.    An award of Plaintiffs' reasonable fees, including attorneys' fees, costs, expenses, prejudgment interest, and disbursements; and

F.    Such other relief as the Court may deem just and proper.


Dated: March 19, 2025                Respectfully submitted,
New York, NY

By:    /S/ Reginald R. Goeke
       Reginald R. Goeke
       John M. Conlon
       Niketa K. Patel
       **MAYER BROWN LLP**
       1221 Avenue of the Americas
       New York, NY  10020
       Telephone: (212) 506-2500
       Email:    rgoeke@mayerbrown.com
                 jconlon@mayerbrown.com
                 npatel@mayerbrown.com

       *Attorneys for Plaintiff Ligado Networks LLC*
       *and Ligado Networks (Canada) Inc.*

50