# EXHIBIT F

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>LIGADO NETWORKS LLC, *et al.*,<br><br>Debtors. | Ch. 11<br><br>Case No. 25-10006 (TMH)<br><br>Jointly Administered |
| LIGADO NETWORKS LLC and<br><br>LIGADO NETWORKS (CANADA) INC.,<br><br>Plaintiffs,<br><br>—*against*—<br><br>INMARSAT GLOBAL LIMITED,<br><br>Defendant. | Adversary Pro. No. 25-50000 (TMH) |

## INMARSAT GLOBAL LIMITED'S BRIEF
## IN SUPPORT OF ITS MOTION TO DISMISS

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100

**STEPTOE LLP**
Alfred M. Mamlet
Jeffrey M. Reisner
Charles Michael
Michael G. Scavelli
1330 Connecticut Ave NW
Washington, DC 20036
(202) 429-3000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone
Matthew Scheck
295 5th Avenue,
New York, NY  10016
(212) 849-7000

February 27, 2025

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 4

    A.   The Parties ......................................................................................... 4

    B.   The FCC First Authorizes ATC .......................................................... 4

    C.   The Cooperation Agreement And Resulting DOD Concerns ...................... 5

    D.   LightSquared's Increased ATC Ambitions Cause
       A Backlash And Bankruptcy ................................................................ 6

    E.   Ligado Re-Applies For FCC Approval .................................................. 7

    F.   The FCC Grants Ligado's Modified Application ...................................... 8

    G.   Government Opposition Leads To Ligado's "Takings" Case ...................... 9

    H.   Ligado Re-Raises "Resiliency" Issues In 2020 And 2021 ........................ 10

    I.   Unable To Pay Inmarsat, Ligado Files For Bankruptcy............................ 11

    J.   Ligado's Bankruptcy Filing ................................................................ 12

    K.   The Adversary Complaint .................................................................. 12

ARGUMENT ....................................................................................................... 12

  I.   Motion To Dismiss Standard.................................................................. 12

  II.   The Contract Claims (Counts I-III) Are Untimely And Fail To State A Claim ..... 13

    A.   The Contract Claims Are All Untimely .................................................. 13

        1.   Delaware's Three-Year Statute Of Limitations Governs ............... 13

        2.   Count I's Alleged Breach, That Inmarsat Did Not Meet The
            "Deadline" For Its "Resiliency" Obligation, Occurred
            More Than Three Years Before The Adversary Complaint ........... 13

        3.   Inmarsat's Alleged Repudiation Of Any "Resiliency" Obligation
            In 2021 Independently Confirms Count I Is Untimely ................. 15

        4.   The Breach of Contract Theories In Counts II and III, Relating To
            The FCC Approval Process And Regulations Limiting
            Ligado's Cell Tower Power Near Waterways And Airports,
            Are Also Untimely ............................................................... 16

    B.   Ligado Cannot Allege Causation For Any Of Its Contract Claims Because
       Inmarsat Is Not Responsible For The Government Blocking Ligado ....... 17

    C.   Count II Fails For the Independent Reason That Inmarsat
       Did Not Guarantee Approval For Particular Power Levels ...................... 19

  III.   The Fraudulent Inducement Claim (Count IV) Is Untimely
      And Fails To State A Claim.................................................................... 20

    A.    The Payments Allegedly Induced By Fraud Occurred Either Outside The Limitations Period Or After The Allegedly Concealed Risk Materialized ................................................................. 20

    B.    Ligado Fails To Plead Fraudulent Inducement With Particularity ............ 21

    C.    DOD's Forceful Opposition To Ligado Was Publicly Known .................. 22

    D.    Ligado Fails To Allege Inmarsat Owed Any Disclosure Duties Independent Of The Cooperation Agreement ................................ 24

    E.    Ligado Cannot Partially Rescind The Cooperation Agreement ................ 24

IV.    Ligado Fails To Plead Facts Supporting "Frustration of Purpose" (Count V) ....... 25

V.    The Unjust Enrichment Claim (Count VI) Is Untimely And Duplicative ............ 27

VI.    Ligado's Fraudulent Transfer Claim (Count VII) Is Untimely And Meritless ...... 28

CONCLUSION ...................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AGB Contemporary A.G. v. Artemundi LLC*,
   2021 WL 1929356 (D. Del. May 13, 2021) ............................................................ 4

*American Energy Technologies, Inc. v. Colley & McCoy Co.*,
   1999 WL 301648 (D. Del. Apr. 15, 1999) ............................................................ 13

*Anspach ex rel. Anspach v. City of Philadelphia*,
   503 F.3d 256 (3d Cir. 2007) ............................................................................ 5

*Aronow Roofing Co. v. Gilbane Building Co.*,
   902 F.2d 1127 (3d Cir. 1990) ............................................................................ 13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................ 13

*Aubrey v. New School*,
   624 F. Supp. 3d 403 (S.D.N.Y. 2022) .............................................................. 28

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 13

*BioVeris Corp. v. Meso Scale Diagnostics, LLC*,
   2017 WL 5035530 (Del. Ch. Nov. 2, 2017), *aff'd*, 202 A.3d 509 (Del. 2019) .................. 15, 16

*Cavi v. Evolving Systems NC, Inc.*,
   2018 WL 2372673 (D. Del. May 24, 2018) ...................................................... 21

*Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.*,
   453 N.Y.S.2d 750 (App. Div. 2d Dep't 1982) .................................................. 18

*Cronos Group Ltd. v. XComIP, LLC*,
   64 N.Y.S.3d 180 (App. Div. 1st Dep't 2017) .................................................. 24

*Davis v. 24 Hour Fitness Worldwide, Inc.*,
   75 F. Supp. 3d 635 (D. Del. 2014) .................................................................. 14

*Diaz v. FCA US LLC*,
   693 F. Supp. 3d 425 (D. Del. 2023) ................................................................ 21

*Diesel Props S.r.l. v. Greystone Business Credit II LLC*,
   631 F.3d 42 (2d Cir. 2011) .............................................................................. 17

*Eurand, Inc. v. Mylan Pharmaceuticals, Inc.*,
   263 F.R.D. 136 (D. Del. 2009) ........................................................................ 21

*Evolved Wireless, LLC v. Samsung Electronics Co., Ltd.*,
　　2016 WL 1019667 (D. Del. Mar. 15, 2016) ............................................................................ 4

*Gap Inc. v. Ponte Gadea New York LLC*,
　　524 F. Supp. 3d 224 (S.D.N.Y. 2021) ................................................................................. 26

*Gavin v. Club Holdings, LLC*,
　　2016 WL 1298964 (D. Del. Mar. 31, 2016) ......................................................................... 27

*Harris v. Provident Life and Accident Insurance Co.*,
　　310 F.3d 73 (2d Cir. 2002) ................................................................................................ 20

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
　　907 N.E.2d 268 (N.Y. 2009) .............................................................................................. 27

*In re Center City Healthcare, LLC*,
　　641 B.R. 793 (Bankr. D. Del. 2022) ............................................................................... 4, 29

*In re CL H Winddown LLC*,
　　2023 WL 5740195 (Bankr. D. Del. Sept. 5, 2023) ............................................................. 28

*In re Condado Plaza Acquisition LLC*,
　　620 B.R. 820 (Bankr. S.D.N.Y. 2020) ............................................................................... 26

*In re Dayton Seaside Associates No.2, L.P.*,
　　257 B.R. 123 (Bankr. S.D.N.Y. 2000) ............................................................................... 25

*In re Donald J. Trump Casino Securities Litigation*,
　　7 F.3d 357 (3rd Cir. 1993) ................................................................................................ 23

*In re Fairchild Aircraft Corp.*,
　　6 F.3d 1119 (5th Cir. 1993) .............................................................................................. 30

*In re Fresh Acquisitions, LLC*,
　　2024 WL 2232432 (Bankr. N.D. Tex. May, 16, 2024), *adopted in relevant part*,
　　2024 WL 4224949 (N.D. Tex. Sept. 18, 2024) .................................................................. 29

*In re Gilbert*,
　　642 B.R. 687 (Bankr. D.N.J. 2022) ................................................................................... 28

*In re Gulf Fleet Holdings, Inc.*,
　　491 B.R. 747 (Bankr. W.D. La. 2013) ............................................................................... 29

*In re HH Liquidation, LLC*,
　　590 B.R. 211 (Bankr. D. Del. 2018) .................................................................................. 30

*In re J&M Sales Inc.*,
　　2022 WL 532721 (Bankr. D. Del. Feb. 22, 2022) .............................................................. 28

*In re Medical Wind Down Holdings III, Inc.*,
    332 B.R. 98 (Bankr. D. Del. 2005) ........................................................................ 21

*In re Network Access Solutions, Corp.*,
    330 B.R. 67 (Bankr. D. Del. 2005) ........................................................................ 30

*In re R.M.L., Inc.*,
    92 F.3d 139 (3d Cir. 1996) ...................................................................................... 29

*In re Winstar Communications, Inc.*,
    435 B.R. 33 (Bankr. D. Del. 2010), *aff'd*, 2013 WL 6053838 (D. Del. Nov. 15, 2013), *aff'd*,
    591 F. App'x 58 (3d Cir. 2015) .............................................................................. 13

*Kermanshah v. Kermanshah*,
    580 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................... 20

*Latouche v. Wells Fargo Home Mortgage Inc.*,
    752 F. App'x 11 (2d Cir. 2018) .............................................................................. 21

*Lazard Freres & Co. v. Protective Life Insurance Co.*,
    108 F.3d 1531 (2d Cir. 1997) .................................................................................. 24

*Lola Roberts Beauty Salon v. Leading Insurance Group Insurance Co., Ltd.*,
    76 N.Y.S.3d 79 (App. Div. 2d Dep't 2018) ........................................................... 18

*Manley v. AmBase Corp.*,
    126 F. Supp. 2d 743 (S.D.N.Y. 2001) ................................................................... 27

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc.*,
    2016 WL 1449751 (S.D.N.Y. April 12, 2016) ...................................................... 14

*McCray v. Fidelity National Title Insurance Co.*,
    2010 WL 3023164 (D. Del. July 29, 2010) .............................................................. 5

*Merry Realty Co. v Shamokin & Hollis Real Estate Co.*,
    130 N.E. 306 (N.Y. 1921) ...................................................................................... 25

*Merryman v. Gottlieb*,
    472 N.Y.S.2d 488 (App. Div. 3d Dep't 1984) ....................................................... 25

*O'Boyle v. Braverman*,
    337 F. App'x 162 (3d Cir. 2009) .............................................................................. 5

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) .......................................................................................... 23

*Panattoni Development Co. v. Scout Fund 1-A, LP*,
    63 N.Y.S.3d 325 (App. Div. 1st Dep't 2017) ......................................................... 24

*R.C. Beeson, Inc. v. Coca Cola Co.*,
    337 F. App'x 241 (3d Cir. 2009) ............................................................ 15, 16

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*,
    68 F.3d 1478 (2d Cir. 1995) ..................................................................... 24

*Seibert v. Sperry Rand Corp.*,
    586 F.2d 949 (2d Cir. 1978) ..................................................................... 22

*TVT Records v. Island Def Jam Music Group*,
    412 F.3d 82 (2d Cir. 2005) ....................................................................... 24

*United States v. General Douglas MacArthur Senior Village*,
    508 F.2d 377 (2d Cir. 1974) ..................................................................... 25

*United Teamster Fund v. MagnaCare Administrative Services, LLC*,
    39 F. Supp. 3d 461 (S.D.N.Y. 2014) ........................................................ 21

*Van Lake v. Sorin CRM USA, Inc.*,
    2013 WL 1087583 (Del. Super. Feb. 14, 2013) ...................................... 20

*Walker v. Walker*,
    888 N.Y.S.2d 823 (App. Div. 4th Dep't 2009) ........................................ 27

*Wang v. Bear Stearns Cos. LLC*,
    14 F. Supp. 3d 537 (S.D.N.Y. 2014) ........................................................ 22

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007) ....................................................................... 4

**Statutes**

10 Del. Code § 8106 ...................................................................................... 13, 20

11 U.S.C. § 502 ................................................................................................... 28

11 U.S.C. § 544 ................................................................................................... 28

26 U.S.C. § 6502 ................................................................................................. 28

6 Del. Code § 1301 ............................................................................................. 28

6 Del. Code § 1303 ............................................................................................. 28

6 Del. Code § 1309 ............................................................................................. 28

Pub. L. 112-81, 125 Stat. 1298 (Dec. 31, 2011) ................................................. 7

Pub. L. 116-283, 134 Stat. 3388 (Jan. 1, 2021) ................................................ 10

Case 25-500006   Document 51-7   Filed 02/24/25   Page 8 of 40

**Rules**

Fed. R. Civ. P. 12 ...................................................................................................................... 12

Fed. R. Civ. P. 9 ................................................................................................................... 21, 22

**Treatises**

3 William L. Norton III, Norton Bankruptcy Law & Practice 3d § 67:4 (2024) .......................... 30

## INTRODUCTION

Nearly twenty years ago, Inmarsat Global Limited ("Inmarsat") and the predecessors to Ligado Networks LLC and Ligado Networks (Canada) Inc. (collectively, "Ligado") signed a "Cooperation Agreement." Under the Agreement, Ligado agreed to pay Inmarsat for the right to use certain satellite spectrum within the highly valuable "L-band," which Ligado has described to the Court as "beachfront property." D.I. 109, at 20:10-20. Ligado could have used that "beachfront property" for satellite communications. Indeed, Ligado's exit plan from this bankruptcy proposes to do just that: It includes a term sheet for a third party, AST & Science, LLC ("AST"), to pay hundreds of millions of dollars to use Ligado's spectrum rights under the Cooperation Agreement to provide satellite services.

But Ligado and its predecessors had a more ambitious plan: They wanted to enhance their L-band satellite communications with a terrestrial component to create a new network that could compete with incumbent cellular providers like Verizon and AT&T. That plan always carried significant risks given the potential for interference with, for instance, GPS systems. Ultimately, those risks proved impossible for Ligado to overcome. While the Federal Communications Commission ("FCC") approved Ligado's plan to some extent, it did so subject to, among other things, a duty to work with federal government spectrum users, including the Department of Defense ("DOD"). That cooperation was not forthcoming and, ultimately, in January 2021, Congress passed a law that Ligado characterizes as effectively shutting down its terrestrial network ambitions, leading to its bankruptcy. In response, Ligado has sued the federal government for a $39 billion "taking" under the Fifth Amendment. Ligado and AST now plan to use the spectrum obtained from Inmarsat for traditional satellite communications.

In the meantime, Ligado owes Inmarsat $525 million under the Cooperation Agreement—a contract that is essential to the AST transaction and hence to Ligado's exit plan.

In an apparent effort to either delay repayment or offset the debt, Ligado brought this suit, which resurrects baseless grievances that Ligado has known about for more than a decade but never pursued in court. In effect, Ligado belatedly blames Inmarsat for Ligado's own failure to overcome the obstacles from the federal government. This Court should not go along. Ligado's claims are barred by the statute of limitations or otherwise fail to state a claim.

Ligado's core allegation relates to interference that Ligado's hypothetical terrestrial network could cause to existing terminals on Inmarsat's network. Inmarsat's customers include ships and airplanes that connect to its satellites via terminals that could experience interference near a (hypothetical) Ligado cell tower. To manage this risk, the FCC imposed stricter power limits on Ligado cell towers near waterways and airports. Ligado alleges Inmarsat breached the Agreement by failing to upgrade or replace every one of its tens of thousands of customer terminals so that they would be "resilient" to this hypothetical interference. Inmarsat was allegedly supposed to be working on this issue all along, with the upgrades completed, at the latest, by the "December 31, 2021 deadline" for the final spectrum transfer. Had Inmarsat been upgrading or replacing terminals in the years ahead of the deadline, the theory goes, Ligado's FCC license would have been approved sooner, with fewer limitations. Inmarsat, however, resisted Ligado's implausible interpretation for more than a decade and told Ligado directly in April 2021 that it simply does not read the Agreement to impose any such obligation.

Ligado's contract claims fail for two straightforward reasons. *First*, Ligado's claims are untimely under Delaware's three-year statute of limitations. Ligado repeatedly alleges that, under its theory, Inmarsat's "deadline" to upgrade all terminals was in December 2021. But Ligado waited more than three years after that "deadline" to sue. In addition, Inmarsat stated unequivocally in April 2021 that it had *no* obligation to make every terminal resilient. Under

Delaware law, when a party clearly informs its counterparty that it rejects an asserted performance obligation, the limitations clock starts running and does not restart each time the party does not do what it explicitly stated it would not do. *Second*, and independently, Ligado fails to allege facts in support of the notion that Inmarsat's refusal to replace the terminals caused Ligado's harm. By Ligado's own allegations, the blame for Ligado's lack of a terrestrial network lies with the federal government—the target of Ligado's $39 billion takings case—not Inmarsat.

Ligado's claim for fraudulent inducement also fails for multiple reasons. *First*, most of its claims are untimely. Ligado accuses Inmarsat of knowing that DOD was secretly using L-band spectrum in ways that would ensure DOD's vigorous opposition to Ligado and alleges that Ligado would have stopped paying Inmarsat if it had known that fact. Delaware's three-year statute of limitations for fraud bars this claim with respect to most of the "induced" payments. *Second*, the two payments Ligado made within the last three years cannot be grounds for a claim because they occurred well ***after*** DOD's position was obvious and Congress enacted the law that Ligado characterizes as terminating its terrestrial network plans. *Third*, Ligado does not allege fraud with sufficient particularity. Ligado asserts no facts that support any inference that Inmarsat had non-public information about DOD's views on the viability of Ligado's proposed network. Moreover, DOD's fervent ***and public*** opposition to Ligado refutes any suggestion that anything material could have been concealed, again defeating any claim for fraud.

Ligado also fails to plead facts sufficient to make out its "frustration of purpose" claim. That claim requires that unforeseeable events rendered the Cooperation Agreement valueless. But the risks that materialized here—government opposition stopping Ligado's terrestrial plans—were actually foreseen by Ligado. And the contract is not valueless, which is why Ligado is planning to assume it and lease AST access to its "beachfront" satellite spectrum rights.

3

Ligado's unjust enrichment claim is also untimely and duplicates its contract claims.

Finally, Ligado cannot unwind any payments to Inmarsat as fraudulent transfers. Most of the challenged payments are outside Delaware's four-year limitations period. Regardless, because Ligado was merely paying Inmarsat what it owed under the Cooperation Agreement, the payments on account of antecedent debt are not fraudulent transfers. And in all events, Ligado's eventual assumption of the contract bars any fraudulent transfer allegation as a matter of law.

## BACKGROUND

### A.    The Parties

Inmarsat provides critical satellite connectivity to ships, planes, and other customers outside the reach of terrestrial wireless communications services. D.I. 74 ("Compl.") ¶¶ 18, 29. Ligado also provides satellite connectivity and, dating back to the early 2000s, its predecessors planned to combine traditional satellite services with terrestrial communications from base stations (cell towers)—known as an "ancillary terrestrial component" ("ATC")—to create a next-generation network. *Id.* ¶¶ 12-13, 16, 30. Inmarsat and Ligado historically have held overlapping rights to a range of the highly valuable "L-band" satellite spectrum. *Id.* ¶ 29.

### B.    The FCC First Authorizes ATC

Ligado's predecessors' ATC aspirations date back to at least 2001, when the FCC first sought public comment on satellite providers operating ATC networks. *See* Ex. 24.[1] At the time,

---

[1] Citations in the form "Ex. ___" refer to the exhibits to the Declaration of Charles Michael. The first 23 exhibits are the Cooperation Agreement and its amendments. These and the remaining exhibits are properly considered because they are either (1) "documents incorporated into the complaint by reference," *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007), such as the Cooperation Agreement (as amended) and certain correspondence cited in the Complaint, *see In re Center City Healthcare, LLC*, 641 B.R. 793, 802 (Bankr. D. Del. 2022) (demand letters cited in complaint); *AGB Contemporary A.G. v. Artemundi LLC*, 2021 WL 1929356, at *2 n.11 (D. Del. May 13, 2021) (emails between parties and referenced in complaint); *Evolved Wireless, LLC v. Samsung Elecs. Co., Ltd.,* 2016 WL 1019667, at *3 n.2 (D. Del. Mar. 15, 2016) (correspondence between the parties "referenced in the complaint"); or (2) public agency records

the FCC conceived of the terrestrial component as truly "ancillary," insofar as it would only be "augmenting" service where the primary satellite signals were "attenuated," such as in urban areas. *Id.* at 10, 15-16.

The FCC specifically sought public comments on the risk that the terrestrial signals would interfere with GPS equipment. *Id.* at 28. Inmarsat was among the commentators that flagged interference with GPS as a problem. *See* Ex. 25 at 5, 7, 12-18. So, too, did the National Telecommunications and Information Administration ("NTIA"), an arm of the Commerce Department that represents DOD and other executive branch users of telecommunications services before the FCC. *See* Ex. 26. In 2003 and 2004, the FCC issued orders authorizing Ligado's predecessor, Mobile Satellite Ventures, to proceed with ATC. *See* Ex. 27; Ex. 28.

**C.     The Cooperation Agreement And Resulting DOD Concerns**

In 2007, Inmarsat and SkyTerra (successor to Mobile Satellite Ventures) entered into the Cooperation Agreement, by which Inmarsat provided SkyTerra rights to use large, contiguous blocks of L-band spectrum so that SkyTerra could "more effectively use its spectrum" for its planned ATC network. Compl. ¶¶ 1, 59; Ex. 1. In August 2010, Inmarsat and LightSquared (SkyTerra's new name) entered into an Amended and Restated Cooperation Agreement. Ex. 2. It called for Inmarsat to provide LightSquared with increasing amounts of spectrum in two phases and, in the second phase, for LightSquared to make annual payments of $115 million to Inmarsat (increasing 3% annually) through the end of the term in 2107. *Id.* § 4.5(a); Compl. ¶ 90.

_____

of which the Court may take judicial notice, such as FCC filings made in connection with Ligado's licensing applications and public court filings in other cases involving Ligado. *Anspach ex rel. Anspach v. City of Phil.*, 503 F.3d 256, 273 n.11 (3d Cir. 2007) ("public records" such as FDA materials); *O'Boyle v. Braverman*, 337 F. App'x 162, 165 (3d Cir. 2009) (court filings); *McCray v. Fidelity Nat'l Title Ins. Co.*, 2010 WL 3023164, at *1 n.3 (D. Del. July 29, 2010) ("public records of a state administrative agency"). Public, government documents are also hyperlinked for the Court's convenience.

In June 2009, SkyTerra sought to modify its ATC license given the expanded spectrum it obtained in the Cooperation Agreement. Ex. 29. In response, in March 2010, DOD filed a letter with the FCC reporting that it had "met with SkyTerra and Inmarsat many times" about whether there could be a "successful coexistence" between the contemplated ATC network and DOD's use of the L-band. *See* Ex. 30 at 1. The letter stated that DOD would "require a high confidence of protection from interference for national security reasons" and that SkyTerra should not "commence operating" unless and until DOD's concerns were addressed. *Id.* at 2.

### D. LightSquared's Increased ATC Ambitions Cause A Backlash And Bankruptcy

In November 2010, LightSquared sought to modify the terms of its ATC license again to allow for a "terrestrial-only" service option and announced that it would build 40,000 cell towers nationwide. *See* Ex. 31 at 2-3. The GPS industry swiftly responded that the reimagined and more expansive ATC plans, with cell towers "effectively blanket[ing] entire urban areas," raised fundamentally different and worse interference problems than the original plan under which the terrestrial component was only a "gap-filler." Ex. 32 at 2.

In January 2011, the FCC authorized LightSquared to move forward with its revised ATC plans. *See* Ex. 33. But, critically, the approval was conditioned on LightSquared and the "GPS community" forming a "working group" to solve the issue before a commercial launch. *Id.* ¶¶ 40-41. The GPS industry, however, continued to oppose the modified ATC plan, noting to the FCC in August 2011 that the new version of the network would involve "power levels that are ONE BILLION times stronger" than the original plan, so that nearby GPS receivers would be "wipe[d] out." *See* Ex 34 at 32 (capitalization in original). Government users became more concerned as well. DOD and the Department of Transportation called for "a comprehensive study of all the potential interference to GPS" in light of the "significantly expand[ed]" terrestrial

6

plans. *See* Ex. 35. Echoing this concern, Congress passed a law in December 2011 prohibiting the FCC from allowing LightSquared to proceed until the GPS issues were resolved. *See* Pub. L. 112-81, § 911(a)(1), 125 Stat. 1298, 1534 (Dec. 31, 2011).

In January 2012, an executive branch committee, co-chaired by DOD's Deputy Secretary and comprised of nine federal agencies, came to the "unanimous conclusion" that there were "no practical solutions or mitigations" to the GPS issues. *See* Ex. 36. On February 14, 2012, NTIA similarly reported to the FCC that there were "no mitigation strategies" to allow for a commercial launch alongside existing GPS systems. *See* Ex. 37 at 8. The next day, the FCC issued a public notice proposing to "suspend indefinitely LightSquared's underlying ATC authorization," *see* Ex. 38 at 4, causing LightSquared to file for bankruptcy protection in the Southern District of New York. Compl. ¶¶ 83, 86.

Shortly before the bankruptcy, Inmarsat and LightSquared agreed in Cooperation Agreement Amendment No. 2 that LightSquared could defer certain payments and pause a planned spectrum transition. Compl. ¶¶ 84-85; Ex. 4. In this amendment—executed in 2012— each side expressly reserved its respective rights concerning the terminal resiliency disputes that were ongoing at the time and that Ligado did not pursue until this suit in 2025, ***thirteen years*** later. Ex. 4 § 1.2.

### E.    Ligado Re-Applies For FCC Approval

In December 2015, LightSquared emerged from bankruptcy as Ligado, and filed an application with the FCC to modify its ATC license to address the long-running GPS issues. *Id.* ¶ 87; *see* Ex. 39. Recognizing that FCC approval would likely take years, Ligado sought significant payment deferrals in return for Inmarsat retaining the right to use the majority of the L-band spectrum. *See* Ex. 5; Compl. ¶¶ 90-91. Inmarsat agreed. *Id.*

Ligado's revised application continued to be met with resistance. In 2019, NTIA wrote to the FCC that after a "thorough" assessment, "federal agencies have significant concerns regarding the impact to their missions, national security, and the U.S. economy" of the Ligado network, and that therefore "NTIA, on behalf of the executive branch," opposed the application. *See* Ex. 40 at 2. The NTIA letter enclosed two earlier letters from two acting Secretaries of Defense expressing their strong opposition to Ligado's ATC plans. *Id.* at Attachments 1, 2.

### F.  The FCC Grants Ligado's Modified Application

In April 2020, and notwithstanding public opposition from the executive branch, the FCC granted Ligado's ATC license modification application, albeit with more stringent conditions to mitigate the risk of GPS interference. *See* Ex. 41 ¶¶ 9-18; Compl. ¶ 98. The Order required Ligado to cooperate with DOD and other federal agencies to ensure the GPS interference issues were resolved before launching the service. *Id.* ¶¶ 101-06, 130.

Separately, the Order also noted that Ligado's terrestrial operations could interfere with Inmarsat customer terminals on planes and ships and addressed that issue by holding Ligado to existing power limitations in FCC regulations for operations near airports and waterways. *Id.* ¶ 111 & n.367. The FCC added that Ligado could later apply for a "waiver" to allow for higher power levels as Inmarsat terminals were upgraded over time. *Id.*; *see* Compl. ¶¶ 99-101.

In June 2020, Inmarsat and Ligado signed Amendment No. 5, restructuring Ligado's payment obligations yet again. *See* Ex. 7; Compl. ¶¶ 105-06. Ligado agreed to make an upfront $700 million payment to reduce its annual payment obligations by 60% going forward, Ex. 7 §§ 1.13, 1.22, 2, 6, and to make a payment of $395 million on long-deferred amounts in January 2023. *Id.* § 5. In the meantime, by December 31, 2021, Inmarsat was to provide Ligado the right to use the bulk of the L-band spectrum so it could launch its ATC network. *Id.* § 1.10, 8.6.

G.     **Government Opposition Leads To Ligado's "Takings" Case**

Even after the FCC's April 2020 Order, executive branch telecommunications users (including DOD) continued to oppose Ligado, preventing Ligado from building its terrestrial network. The details of these events are set forth in a complaint that Ligado filed in October 2023 with the United States Court of Federal Claims alleging that the federal government is liable for a Fifth Amendment "taking" of Ligado's property rights in the spectrum. *See* Ex. 42 (cited Compl. ¶ 115). In November 2024, the Court of Federal Claims largely denied the Government's motion to dismiss, thus allowing Ligado's takings case to proceed. *See* Ex. 48.

Ligado's takings complaint alleges that DOD has been secretly using the L-band spectrum for a classified program, and that the DOD has advanced "fabricated arguments" about GPS interference to prevent Ligado's ATC network from disrupting DOD's secret program. Ex. 42 ¶ 2. DOD and other agencies have allegedly refused to engage with Ligado over aspects of the FCC's Order that require their cooperation and, as a result, have "wholly blocked Ligado from using its ATC authority." *Id.* ¶ 83. The Complaint describes the case as involving the "largest uncompensated taking" in "modern times" and claims that the "destroyed" spectrum rights are "worth as much as $39 billion." *Id.* ¶¶ 1, 121.

Importantly for purposes of this motion (especially for the statute of limitations issues), Ligado's takings complaint alleges that, after the FCC's modification of the ATC license in April 2020, DOD needed to "selectively disclose" its previously-concealed use of L-band spectrum as part of an "effort . . . to rally the support of Congress, other agencies, and the public" against Ligado. *Id.* ¶¶ 122-23. One of those disclosures occurred in May 2020, when, as the takings complaint alleges, DOD officials testified to the Senate Armed Services committee that DOD operated in the spectrum at issue and made clear that DOD's strong objection to Ligado's network related to DOD's own, unspecified uses of the spectrum—not just GPS. *Id.* ¶ 43; *see* Ex.

43 (cited testimony). DOD made its case to the public, as well. On May 5, 2020, Defense

Secretary Mark Esper wrote a *Wall Street Journal* Op-Ed arguing that Ligado's business plan

"undermines national and economic security." *See* Ex. 44 at 3.

NTIA would later file three notices in Ligado's FCC licensing proceeding stating that, in

June and July 2020, DOD officials held "classified" briefings with the FCC over Ligado's ATC

authority—providing further public notice that DOD had classified objections to ATC that went

beyond the well-known GPS issues. *See* Ex. 45, Ex. 46, Ex. 47.

DOD's anti-Ligado campaign worked. In January 2021, Congress passed a law

prohibiting spectrum users—*i.e.*, any potential Ligado customer or partner—from doing business

with DOD, absent a certification from the Secretary of Defense that the usage would not cause

harmful interference. Ex. 42 ¶ 100 (citing Pub. L. 116-283, §§ 1661–1664, 134 Stat. 3388, 4073-

76 (Jan. 1, 2021)). Ligado alleges that the law rendered it "impossible for Ligado to use the ATC

authority conferred by Ligado's FCC license without DOD's sign-off." *Id.* ¶ 100.

## H.    Ligado Re-Raises "Resiliency" Issues In 2020 And 2021

In July 2020, within months of the April 2020 FCC Order, Inmarsat and Ligado held a

meeting to discuss Inmarsat's efforts to upgrade its terminals to make them resilient to

interference from Ligado's contemplated network. Compl. ¶ 107. As Inmarsat told Ligado in the

meeting, it had been requiring every new maritime terminal to be resilient since 2012 and would

terminate certain services to aviation terminals in 2023. *Id.* ¶ 107(a), (e).

But Ligado alleges that these efforts fell far short of what the Cooperation Agreement

required, which was to have ***all*** non-resilient terminals replaced or upgraded by, at the latest,

December 31, 2021—*i.e.*, the date of spectrum delivery. *Id.* ¶¶ 46, 107(e), 123, 135. Ligado

concluded from the meeting that Inmarsat "ha[d] not taken the steps needed to permit Inmarsat to

deliver the spectrum as required by the Agreement," despite having "known about its terminal resilience obligations for well over a decade." *Id*. ¶¶ 107(g), 108.

On April 13, 2021, Ligado wrote to Inmarsat to again raise terminal "resiliency" issues. Ex. 49; Compl. ¶ 113. Ligado's letter reflects what is now the central allegation of the Adversary Complaint: that the Cooperation Agreement requires Inmarsat to replace or modify every single terminal deployed by its customers. *Id.* Ten days later, Inmarsat responded that these terminal resilience issues had been fully aired and resolved years before, and that, regardless, the Cooperation Agreement simply did ***not*** require Inmarsat to replace or modify every non-resilient terminal. *See* Ex. 50. As Inmarsat explained, if such a drastic, far-reaching obligation existed, it would be plainly stated in the Cooperation Agreement—but it is not. *Id*. at 4-5.

Inmarsat's position was not lost on Ligado, which replied that it was left with "no alternative" but to pursue "appropriate legal remedies." *See* Ex. 51 at 9. Inmarsat stood firm, *see* Ex. 52 (quoted in Compl. ¶ 113), but Ligado did not pursue its threatened "legal remedies" until three-and-a-half years later in this case.

### I.    Unable To Pay Inmarsat, Ligado Files For Bankruptcy

In December 2021, Inmarsat advised Ligado that it had "completed its spectrum transition," as required. Compl. ¶ 123. However, in late 2022—with no ATC network in sight—Ligado told Inmarsat that it was not going to make the $395 million payment due in January 2023, forcing Inmarsat to file a lawsuit for anticipatory breach in December 2022. *See* Ex. 53.

The complaint explained that Ligado tried to avoid payment by improperly invoking terminal "resiliency" issues. *Id*. ¶¶ 2, 38. The case was voluntarily dismissed after Ligado agreed to pay $30 million, and Inmarsat agreed Ligado could defer paying the remaining $365 million. *See* Ex. 9. Inmarsat granted ***fourteen*** more payment deferrals thereafter. Exs. 10-23.

### J.       Ligado's Bankruptcy Filing

Under the most recent Cooperation Agreement amendment, Ligado agreed to pay

Inmarsat $524,929,337.40 by January 10, 2025. *See* Ex. 21 §§ Recital U, 1.2-1.3. Rather than

pay the agreed amount, Ligado filed for Chapter 11 on January 5, 2025. D.I. 1.

Ligado's proposed reorganization assumes its continued access to the spectrum Inmarsat

is providing under the Cooperation Agreement. The centerpiece of Ligado's bankruptcy plan is

an agreement with AST whereby AST would pay for usage rights over the spectrum assigned to

Ligado through the expiration of the Cooperation Agreement in 2107. D.I. 2, at 320-31.

### K.       The Adversary Complaint

On January 7, 2025, Ligado filed the Adversary Complaint against Inmarsat, rehashing a

strategy that Ligado has used over the years of invoking misplaced terminal "resilience"

grievances to try to avoid honoring its payment obligations. The Complaint has seven claims.

- Counts I-III are contract claims accusing Inmarsat of failing to replace or modify all terminals and, as a result, failing to ensure Ligado could operate at certain power levels near airports and waterways. Compl. ¶¶ 126-56.

- Count IV alleges that Inmarsat fraudulently induced Ligado into making certain payments by failing to disclose DOD's plans. *Id*. ¶¶ 157-64.

- Count V seeks to "reform" the Cooperation Agreement, and for Ligado to be paid restitution, because Ligado's plans have been frustrated. *Id*. ¶¶ 165-70.

- Count VI, for unjust enrichment, seeks return of all Ligado's payments, given the frustration of purpose and contract breaches. *Id*. ¶¶ 171-76.

- Count VII alleges that approximately $800 million in payments from Ligado should be set aside as fraudulent conveyances. *Id*. ¶¶ 177-84.

<u>ARGUMENT</u>

### I.       Motion To Dismiss Standard

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[L]abels and conclusions" or "formulaic recitation[s]" of claim elements "will not do." *Twombly*, 550 U.S. at 555.

## II.     The Contract Claims (Counts I-III) Are Untimely And Fail To State A Claim

### A.     The Contract Claims Are All Untimely

Ligado's contract claims (Counts I-III) are barred by Delaware's three-year statute of limitations for contract claims, 10 Del. Code § 8106(a), as detailed below.

#### 1.     Delaware's Three-Year Statute Of Limitations Governs

Delaware's statute of limitations applies here because, under Delaware's choice-of-law rules, statutes of limitations are "procedural rather than substantive law," and so the forum's law controls. *Am. Energy Techs., Inc. v. Colley & McCoy Co.*, 1999 WL 301648, at *2 (D. Del. Apr. 15, 1999). This is so even where a contractual choice-of-law clause governs substantive issues. *In re Winstar Comm'ns, Inc.*, 435 B.R. 33, 44-45 (Bankr. D. Del. 2010), *aff'd,* 2013 WL 6053838 (D. Del. Nov. 15, 2013), *aff'd,* 591 F. App'x 58 (3d Cir. 2015) (applying Delaware statute of limitations despite underlying contract calling for New York law to apply).

Under Delaware law, "the statute of limitations begins to run when the contract is breached." *Aronow Roofing Co. v. Gilbane Bldg. Co*., 902 F.2d 1127, 1128 (3d Cir. 1990). Ligado's Adversary Complaint was filed on January 7, 2025, and, thus, contract claims can proceed only if Ligado alleges breaches occurring **after** January 7, 2022. Ligado cannot do so.

#### 2.     Count I's Alleged Breach, That Inmarsat Did Not Meet The "Deadline" For Its "Resiliency" Obligation, Occurred More Than Three Years Before The Adversary Complaint

Count I alleges that Inmarsat "does not intend to fulfill its terminal resiliency obligations, and it failed to do so by the December 31, 2021 deadline" for Inmarsat's delivery of the

spectrum. Compl. ¶ 135; *see also id.* ¶ 50. Taking as true that Inmarsat's "deadline" was December 31, 2021, any alleged breach occurred, at the latest, on that day. But that is outside the limitations period. And the period does not restart with every alleged failure by Inmarsat **after** December 31, 2021 to cure the issue because the statute's trigger is the alleged breach—not subsequent failures to cure that breach. *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, 2016 WL 1449751, at *5 (S.D.N.Y. April 12, 2016) (a "demand to cure . . . cannot make [a claim] timely").

Statutes of limitations exist to "keep stale litigation out of court," *Davis v. 24 Hour Fitness Worldwide, Inc.*, 75 F. Supp. 3d 635, 640 n.3 (D. Del. 2014) (alterations and quotation marks omitted), and, although Ligado's failure to sue within three years of the 2021 "deadline" suffices to establish that Ligado is bringing "stale" claims, additional allegations show that its claims had expired **years** before that. Dismissal is thus particularly appropriate here.

According to the Adversary Complaint, Inmarsat admitted in July 2020 to having "known about its terminal resilience obligations for **well over a decade**," but "failed to even try to meet its contractual terminal resilience obligations" for "that **entire period**." *Id.* ¶¶ 107-08.[2] Indeed, in April 2012, the parties expressly reserved their rights on the terminal resiliency issues in Amendment No. 2, confirming Ligado's allegation that these resiliency disputes go back more than a decade. Compl. ¶¶ 84-85; Ex. 4 § 1.2. But Ligado chose not to sue in 2012. Nor did it sue by April 2020 when, according to Ligado, "as a result of Inmarsat's failure to address terminal interference," the FCC issued an order with "exclusion zones" near waterways and airports. Compl. ¶ 146; *see also* D.I. 257 ¶ 24 ("Inmarsat agreed in the Cooperation Agreement to replace or modify its terminals . . . Because Inmarsat failed to do so, when the FCC issued its order in

---

[2] All emphases added unless noted otherwise.

2020 . . . that order included power limits. . . ."). Instead, Ligado waited to sue until 2025, in a last-ditch attempt to avoid its payment (*i.e.*, cure) obligations to Inmarsat. Resurrecting "stale litigation" in this manner is exactly what the statute of limitations is intended to avoid.

### 3. Inmarsat's Alleged Repudiation Of Any "Resiliency" Obligation In 2021 Independently Confirms Count I Is Untimely

Correspondence incorporated into the Complaint (and hence properly considered here) provides an independent basis for dismissing the contract claims on limitations grounds. When one party communicates "that any future performance either will not occur or will not be in compliance with the contract terms," that amounts to a "total breach," which starts the statute of limitations period for the ***entire contract***. *R.C. Beeson, Inc. v. Coca Cola Co.*, 337 F. App'x 241, 244 (3d Cir. 2009); *see also BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at \*7-10 (Del. Ch. Nov. 2, 2017), *aff'd*, 202 A.3d 509 (Del. 2019) (breach and repudiation constitute a "total breach," triggering the statute of limitations "for the entire contract").

That is precisely what happened here. As Ligado alleges, "in spring 2021" Inmarsat wrote letters stating plainly that it "had ***no obligation*** to address th[e] risk" of interference and could, instead, allow its customers to "suffer interference." Compl. ¶ 113; *see also* Exs. 50, 52 (cited letters). Ligado alleges that Inmarsat's April and June 2021 letters made it "apparent" that Inmarsat did "not intend to fulfill its terminal resiliency obligation." *Id*. ¶ 135. Indeed, Ligado immediately wrote back to Inmarsat ***threatening to sue*** on this very issue. Ex. 51 at 9. Thus, at least by June 2021, the three-year clock for Ligado to follow through on its threat to sue was running because Inmarsat had not complied with Ligado's resiliency demands and made clear it would not do so. But Ligado chose not to sue, instead waiting to bring this claim until it became useful to obscure its cure obligations in bankruptcy. Its claims are now untimely.

This case is analogous to *R.C. Beeson*. There, a consultant being paid a percentage of a company's royalties under a third-party license was entitled to a renegotiation of his share with each license amendment, but the company failed to do so on multiple successive occasions, resulting in lower payments to the consultant. 337 F. App'x at 242-43. The Third Circuit held that the statute of limitations started to run the first time the company underpaid the consultant and refused to renegotiate his share, and it did not restart each subsequent instance. As the court explained, the first refusal provided "effective notice" that the company "did not intend to comply with its obligations." *Id*. at 244-45. Subsequent ones were simply "part of the fallout from" the earlier repudiation, not new breaches. *Id*. at 245. Were the Court to rule otherwise, and treat the company's renegotiation obligation as "existing in perpetuity," the "statute of limitations would be robbed of meaning." *Id*. at 245; *see also*, *e.g.*, *BioVeris*, 2017 WL 5035530, at *8-9 (rejecting argument that due date of installment payments following a repudiation restarts the limitations period). The same reasoning applies here.

**4.      The Breach of Contract Theories In Counts II and III, Relating To The FCC Approval Process And Regulations Limiting Ligado's Cell Tower Power Near Waterways And Airports, Are Also Untimely**

Count II focuses on Inmarsat's alleged obligation to ensure Ligado can operate its hypothetical network at certain power levels near waterways and airports. Compl. ¶¶ 140-46. But Ligado attributes this breach "to Inmarsat's failure to fulfill its terminal resilience obligations," *id*. ¶ 143, so Count II is untimely for the same reasons as Count I. Ligado relatedly alleges in Count II that Inmarsat breached an obligation to help Ligado obtain FCC approval to waive regulations limiting power levels near waterways and airports. *Id*. ¶ 145. However, since the FCC's Order imposing those limitations issued in April 2020, *id*. ¶ 42, Ligado's claims based on Inmarsat's conduct before then have long since gone stale.

Count III similarly accuses Inmarsat of failing to "use its best commercial efforts to support Ligado's FCC Modification Application," resulting in the FCC Order being "materially delayed" and having power limits near waterways and airports below what Ligado expected. *Id*. ¶¶ 155-56. But, again, since the FCC Order issued in April 2020, claims based on Inmarsat's pre-Order conduct are clearly barred by the three-year statute of limitations.

### B.   Ligado Cannot Allege Causation For Any Of Its Contract Claims Because Inmarsat Is Not Responsible For The Government Blocking Ligado

Under New York law, "[c]ausation is an essential element of damages" meaning that "a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011) (citations and emphasis omitted). If "the claimed losses are the result of other intervening causes," then the claim fails. *Id*.

Ligado's claims fail because its allegations, taken as true, establish that its claimed losses were not the result of Inmarsat's alleged conduct. Ligado alleges contract damages arising from (1) "delay of the FCC approval," Compl. ¶¶ 139, 156; (2) the alleged "delay in offering commercial wireless services," *id*. ¶ 146, including "lost revenue and profit," *id*. ¶ 156; (3) the FCC's failure to waive regulations enhancing power limitations near waterways and airports in the 2020 FCC Order, allegedly resulting in "loss of revenue" and "reduced value of the spectrum" *id*. ¶¶ 139, 146; and (4) "payment[s] to Inmarsat" while "Ligado was unable to enjoy the benefits" for which it paid. *Id*. ¶ 156. But, by Ligado's own admissions, Ligado would have suffered these damages even if Inmarsat had done *everything* that Ligado says Inmarsat should have done. That is because it was the U.S. government—not Inmarsat—that prevented Ligado from launching its terrestrial network. Put simply, whatever Inmarsat did or did not do, Ligado would not have been able to get approval for its ATC network in the L-band.

This case is analogous to *Lola Roberts Beauty Salon v. Leading Ins. Grp. Ins. Co., Ltd.*, 76 N.Y.S.3d 79 (App. Div. 2d Dep't 2018). There, a burst water pipe caused a beauty salon to go out of business, and the salon blamed its insurance company, which had delayed paying a claim, for the salon's demise. *Id.* at 81. The court found, however, that there was an intervening cause: the local buildings department issued a "stop work" order "shortly after the water leak, for reasons unrelated to the" insurance company, thereby preventing the salon "from securing the necessary work permits prior to ceasing operations permanently." *Id.* at 82; *see also Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*, 453 N.Y.S.2d 750, 754 (App. Div. 2d Dep't 1982) (failure of real estate development project was not caused by a breach of warranty in the land purchase but was caused by local development moratorium and other unrelated issues).

Here, similarly, Ligado alleges various damages that all stem from the fact that it lacks a terrestrial network. Ligado's non-existent network is why it cannot generate "revenue and profit," why its spectrum rights have less "value," and why it cannot "enjoy the benefits" of its FCC license and associated spectrum rights. Compl. ¶¶ 146, 156. And the Complaint could not be clearer that it is DOD and Congress that blocked Ligado's terrestrial network:

> The DOD has opposed Ligado's license and has obtained Congressional action to deter or prevent Ligado from using its spectrum. That opposition and resulting Congressional action has ***precluded Ligado's ability to deploy its planned wireless terrestrial service***. As a result, Ligado has paid over a billion dollars to Inmarsat for spectrum that it will likely never be able to use for terrestrial wireless service . . . .

*Id.* ¶ 163. Ligado characterizes DOD's conduct as an "uncompensated taking of Ligado's spectrum rights," *id.* ¶ 115, and refers to its takings litigation where it similarly alleges that DOD has "wholly blocked Ligado from using its ATC authority." Ex. 42 ¶ 83. Indeed, the foundational premise of Ligado's takings case is that the government has "completely deprive[d]" it of "***all*** economically beneficial use" of the spectrum. *Id.* ¶¶ 144-45. There is no allegation that these

18

actions have anything to do with Inmarsat. Thus, even if Inmarsat had, for example, made every customer terminal resilient to Ligado's as-yet-unbuilt cell towers, those cell towers, and the Ligado terrestrial network, would still not exist and would still be generating no revenue.

Simply put, Ligado took on a significant but known risk—with enormous potential upside—by acquiring L-band spectrum from Inmarsat to try to create a cellular network. Ligado's allegations make clear that its ambitious plan failed because of insurmountable opposition from the federal government, not because of anything Inmarsat did. Ligado cannot recover damages from Inmarsat that Ligado admits were inflicted by someone else. Ligado thus fails to allege causation and its contract claims must be dismissed.

### C. Count II Fails For the Independent Reason That Inmarsat Did Not Guarantee Approval For Particular Power Levels

Ligado's allegations in Count II, Compl. ¶¶ 76, 141-43, that Inmarsat breached alleged obligations to ensure that Ligado could operate under certain power limitations set forth in Exhibits N or T of the Cooperation Agreement fail for an additional, independent reason: No such obligation exists.

The only Cooperation Agreement provision Ligado cites on this point is Section 3.5(a), *id.* ¶ 76, which states: "The ATC Operator"—defined as LightSquared (now Ligado)—"shall be permitted to deploy and operate the ATC *if the ATC is operated in compliance with the requirements set forth in Exhibit T* . . . ." Ex. 2 § 3.5(a) & Ex. A at A-1. By its plain language, this provision is a restriction *on Ligado*, conditioning "permi[ssion]" for it to operate on its compliance with Exhibit T. And Exhibit T states that after a specific milestone, the "ATC Operator"—again Ligado—must "operate[] the ATC consistent with Exhibit N." *Id.* Ex. T. In turn, Exhibit N imposes restrictions only on Ligado's ATC operations to ensure "[p]rotection of

*Inmarsat's*" systems. *Id.* Ex. N at 3, 6, 9. The Court should reject Ligado's attempts to use contractual language that does not obligate Inmarsat to do anything as the basis for any claim.[3]

## III.    The Fraudulent Inducement Claim (Count IV) Is Untimely And Fails To State A Claim

Ligado's fraudulent inducement claim—that Inmarsat allegedly failed to disclose DOD's grounds for opposition to ATC, knowing that DOD's opposition would render the spectrum rights worthless—must be dismissed for any of five independent reasons: (1) the "induced" payments occurred either outside the limitations period or after the allegedly concealed risk of DOD's opposition came to pass; (2) the claim is not pled with sufficient particularity for one that sounds in fraud; (3) DOD's opposition was publicly known; (4) Ligado fails to plead facts giving rise to an independent duty of disclosure; and (5) the allegations do not justify the "rescissionary" remedies Ligado seeks.

### A.    The Payments Allegedly Induced By Fraud Occurred Either Outside The Limitations Period Or After The Allegedly Concealed Risk Materialized

For a fraudulent inducement claim, Delaware's three-year statute of limitations, 10 Del. Code § 8106(a), begins to run when the challenged transaction occurs. *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *6 (Del. Super. Feb. 14, 2013) (calculating limitations period from when defendant "successfully perpetrated" the inducement). Ligado alleges it was induced into (1) paying $700 million under the Cooperation Agreement in October 2020, and (2) subsequent "payments beginning in January 2023." Compl. ¶¶ 120, 159.

---

[3] In Claims I and III, Ligado alleges in passing that Inmarsat not only breached express contractual obligations but also breached its implied duty of good faith. *See* Compl. ¶¶ 136, 148, 151. However, New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73 (2d Cir. 2002); *see also*, *e.g.*, *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 271-72 (S.D.N.Y. 2008). No distinct facts are pled, and so these allegations should be rejected, as well.

A claim for fraud in October 2020 is well outside the limitations period. And Ligado cannot toll the statute absent a separate, "affirmative act of concealment," *Cavi v. Evolving Sys. NC, Inc.*, 2018 WL 2372673, at *3 (D. Del. May 24, 2018), which it does not allege. The reason for this rule is self-evident: "If nondisclosure tolled the statute of limitations for a claim brought based on the nondisclosure, the statute of limitations would have no effect." *Latouche v. Wells Fargo Home Mortg. Inc.*, 752 F. App'x 11, 14 (2d Cir. 2018) (citation omitted).

As for the two payments on or after January 2023, Ligado cannot plausibly claim fraudulent inducement because DOD's consistent opposition was public. This is particularly true for payments after 2021, when "DOD . . . obtained Congressional action" that "**precluded** Ligado's ability to deploy its planned wireless terrestrial service," Compl. ¶ 163; *see also* Ex. 42 ¶¶ 100-03. At that point, the allegedly concealed risk—that "DOD would prevent Ligado from offering the service the Parties anticipated," *id*. ¶ 159—had already come to pass. Ligado made its subsequent payments knowing DOD's position and the obstacles it faced.

### B.    Ligado Fails To Plead Fraudulent Inducement With Particularity

Rule 9(b) requires fraud to be pleaded with particularity, which, in a fraudulent omissions case like this one, means plaintiffs must "set forth *precisely what* omissions were made, when they occurred, and how the plaintiffs were misled." *Diaz v. FCA US LLC*, 693 F. Supp. 3d 425, 432 n.11 (D. Del. 2023) (emphasis in original; brackets removed). Also, the "plaintiff must specify the person responsible for the failure to speak" and "the context of the omission." *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 473 (S.D.N.Y. 2014). These requirements exist to "place the defendants on notice of the precise misconduct with which they are charged," *In re Med. Wind Down Holdings III, Inc.*, 332 B.R. 98, 102 (Bankr. D. Del. 2005) and to "deter the filing of charges of fraud as a pretext for discovery of unknown wrongs." *Eurand, Inc. v. Mylan Pharms., Inc.*, 263 F.R.D. 136, 140 (D. Del. 2009).

Here, the Adversary Complaint vaguely alleges that Inmarsat failed to disclose "that the DOD was using certain L-band spectrum," Compl. ¶ 158, without specifying what portion of the spectrum DOD was using for what purpose, and what exactly Inmarsat knew—or when. Although Ligado complains of being unaware that "its wireless terrestrial service would never be permitted to come to fruition," *id*. ¶ 164, Ligado does not explain how anyone at Inmarsat was in a position to see into the future to know that DOD would unwaveringly oppose Ligado or that DOD would succeed in doing so. And, even assuming Inmarsat had some nonpublic information about DOD's L-Band usage, there are no details as to how that information added anything material to DOD's very public opposition to Ligado. At bottom, Ligado is speculating that Inmarsat must have at some point known something important about DOD that was not public already, and is hoping to use discovery as a fishing expedition to see if its guess happens to be correct. This is exactly what Rule 9(b) protects against.

### C.    DOD's Forceful Opposition To Ligado Was Publicly Known

Relatedly, Ligado fails to plead facts showing the necessary elements of materiality and justifiable reliance because the risk Inmarsat supposedly concealed—that DOD "might preclude Ligado from being able to provide" a terrestrial network, *id*. ¶ 162—was publicly known. *See*, *e.g.*, *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (allegedly concealed information not material where it was "discussed in Congress" and in the press); *Wang v. Bear Stearns Cos. LLC*, 14 F. Supp. 3d 537, 547 (S.D.N.Y. 2014) (plaintiff "cannot claim justifiable reliance on [defendant's] failure to mention" information that is "already public").

DOD publicly expressed concerns about Ligado's ATC plans as far back as 2010 and, by 2019, two acting Secretaries of Defense were on record with DOD's forceful opposition. *See* Background §§ C, E, *supra* (citing Ex. 30; Ex. 40). DOD continued its vigorous opposition after the FCC approved Ligado's modified license application in April 2020. Indeed, Ligado's takings

complaint cites May 2020 congressional testimony by DOD officials to allege that DOD's opposition was not limited to GPS concerns but was also based on DOD's other operations. Ex. 42 ¶ 43. Public FCC filings in June and July 2020 show that DOD gave the FCC three "classified" briefings on Ligado's application, which confirms DOD's continued opposition to Ligado and establishes that DOD's concerns included nonpublic matters. *See* Background § G, *supra*. All of this activity occurred ***before*** Ligado was supposedly duped into paying $700 million in October 2020. Compl. ¶ 120.

It is simply not plausible that some unspecified *additional* facts about DOD's L-band usage that Inmarsat may or may not have known about would have materially changed the public record, which already clearly demonstrated to Ligado that DOD vigorously opposed its plans and had no intention to relent and accept them. In other words, even assuming Inmarsat withheld some (unspecified) nonpublic fact about DOD's spectrum use, that marginal data point cannot plausibly have made a difference. What matters is that there had long been clear, public knowledge of the underlying risk that allegedly harmed Ligado—namely, the risk that DOD would succeed in blocking Ligado. It is not fraud when known risks come to pass, even assuming every associated fact is not disclosed. *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 374-75 (3rd Cir. 1993) (not fraudulent for investment materials to lack an "explicit statement" that a casino "would require a $1.3 million average daily" win to service its debt when the "substantial risks" of uncertain cash flow were disclosed); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 7 (2d Cir. 1996) (omission of a "specific statement" that an investment strategy was biased towards higher interest rate environments was immaterial because the risk that dropping rates would cause losses was known).

### D. Ligado Fails To Allege Inmarsat Owed Any Disclosure Duties Independent Of The Cooperation Agreement

A "concealment of facts supports a cause of action for fraud only if the non-disclosing party has a duty to disclose." *See Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, *N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995). However, because New York law carefully "guards against the erosion of the distinction" between contract and tort liability, a contracting party may not pursue a fraud claim unless it is based on a "duty collateral to or independent of" the contract. *Cronos Group Ltd. v. XComIP, LLC*, 64 N.Y.S.3d 180, 186, 190 (App. Div. 1st Dep't 2017); *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997) (fraudulent inducement sounds in tort, not contract). But Ligado alleges only contractual duties. It alleges that Inmarsat's disclosure of DOD's L-band usage "would have been consistent with Inmarsat's duty of good faith and fair dealing"—an implied ***contractual*** obligation—"and its obligation to use its best commercial efforts to implement the Agreement and deliver usable spectrum to Ligado." Compl. ¶ 161. These sorts of allegations must be pursued, if at all, as contract claims. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) ("the duty to disclose must exist separately from the duty to perform under the contract"); *Panattoni Dev't Co. v. Scout Fund 1-A, LP*, 63 N.Y.S.3d 325, 328 (App. Div. 1st Dep't 2017) (dismissing fraud claim where the alleged "duty to disclose. . . arose from contract" and holding that any claim "should proceed under a contract theory rather than a tort theory").

### E. Ligado Cannot Partially Rescind The Cooperation Agreement

The relief Ligado appears to seek for its fraudulent inducement claim is a form of ***partial*** rescission that has no basis in New York law.

New York law is clear that "[i]f rescission is the remedy selected, it must be in whole, and not in part." *Merry Realty Co. v Shamokin & Hollis Real Estate Co.*, 130 N.E. 306, 323 (N.Y.

1921). For its fraud claim, Ligado does not seek to entirely rescind the Cooperation Agreement—

which Ligado needs going forward—but instead seeks unspecified "rescissionary remedies" and

a "declaration that Ligado is no longer obligated to make **further payments** under the

Agreement." Compl. ¶ 164. The only reference to "rescission" in the Prayer for Relief is a

request for "rescission . . . **as necessary** to reflect the benefits that Inmarsat failed to deliver." *Id*.

p. 56 ¶ C. Apparently, Ligado wants the Court to rewrite the Agreement to erase some past and/or

future payments. This is impermissible. *Merryman v. Gottlieb*, 472 N.Y.S.2d 488, 490 (App. Div.

3d Dep't 1984) (party must rescind "completely and not partially").[4]

## IV.   Ligado Fails To Plead Facts Supporting "Frustration of Purpose" (Count V)

Count V invokes the "frustration of purpose" doctrine, which "excuses performance

when a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one

party." *United States v. Gen. Douglas MacArthur Senior Vill.*, 508 F.2d 377, 381 (2d Cir. 1974)

(internal quotations omitted). Ligado's claim, which is based on (1) the power limitations near

airports and waterways and (2) DOD's opposition, Compl. ¶¶ 166-68, fails for multiple reasons.

*First*, frustration is unavailable where, as here, the grounds were "foreseeable at the time

the contract was entered into." *In re Dayton Seaside Assocs. No.2, L.P.*, 257 B.R. 123, 139

(Bankr. S.D.N.Y. 2000). Often the best proof of what was foreseeable at the time of contract is

---

[4] Further, even if Ligado could "rescind" in part, it is too late to do so. New York law requires
any rescission be prompt; delays measured even in months are not. *R & A Food Servs., Inc. v.
Halmar Equities, Inc.*, 717 N.Y.S.2d 642, 643 (App. Div. 2d Dep't 2000); *see also Oquendo v.
CCC Terek*, 111 F. Supp. 3d 389, 410 (S.D.N.Y. 2015) (eight months); *Rivera v. Sovereign
Bank*, 976 F. Supp. 2d 270, 288 (E.D.N.Y. 2013) (six months); *Bank Leumi Trust Co v. D'Evori
Int'l,* 558 N.Y.S.2d 909, 914 (App. Div. 1st Dep't 1990) (six months). This is not an affirmative
defense but "an element of a *prima facie* rescission action." *In re Schick*, 232 B.R. 589, 596
(S.D.N.Y. 1999). As discussed, Ligado by its own admission was aware of the supposedly
concealed information about DOD's intentions, at the latest, by mid-2020. Ligado cannot wait
more than four **years** to see how things turn out before disavowing the Agreement.

the contract itself. After all, if the "the parties' contract made provision" for a risk, then it was necessarily foreseeable. *A/R Retail LLC v. Hugo Boss Retail*, 72 Misc. 3d 627, 643 (N.Y. Sup. Ct. 2021); *see*, *e.g.*, *Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d 224, 234 (S.D.N.Y. 2021) (no frustration based on a risk "referenced in the Lease itself"). *Force majeure* clauses, for example, are commonly "fatal to a frustration of purpose defense" because they show not only the parties' awareness of identified risks, but an "*ex ante*" choice as to "which disruptions will excuse which obligations." *A/R Retail*, 72 Misc. 3d at 643. Here, the Cooperation Agreement reflects the parties' clear awareness of regulatory and governmental risk. It refers to Ligado's need for various governmental approvals and, as Ligado alleges, it devotes "several paragraphs" to the parties' obligations to try to obtain them. Compl. ¶¶ 71-75 (citing Ex. 2 §§ 3.1(b), 5.2, 5.5(b), (f)). Further, there is a *force majeure* clause contemplating losses from governmental acts, including the "refusal to grant . . . a license"—but, notably, the clause carves out acts by regulators "having jurisdiction in the area of communication services or radio spectrum" (*i.e.*, the FCC). Ex. 3 § 7.4 & A-3. It was thus not only foreseeable, but was ***explicitly foreseen***, that the FCC and other agencies could frustrate Ligado's plans.

*Second*, Ligado cannot show that the events at issue "destroy[ed] the reason for performing the contract" and rendered it valueless. *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 839 (Bankr. S.D.N.Y. 2020). The regulatory impediments only affect Ligado's ability to use Cooperation Agreement spectrum for ATC services. Ligado concedes that "some of the essential benefits of the bargain can still be obtained." Compl. ¶ 170. Indeed, the fact that AST has agreed to pay hundreds of millions of dollars to use Ligado's spectrum rights for satellite services confirms that Ligado's frustration claim fails as a matter of law. *Gap*, 524 F. Supp. 3d at

234-36 (COVID shutdowns causing "particularly adverse financial consequences" did not render lease "valueless" or "completely" frustrated).

*Third*, Ligado's request to "reform" the Cooperation Agreement based on frustration, Compl. ¶¶ 169-70, should be rejected, because reformation is limited to circumstances where the written contract "does not reflect the actual agreement reached," typically because of a drafting mistake. *Manley v. AmBase Corp.*, 126 F. Supp. 2d 743, 754 (S.D.N.Y. 2001). Reformation "is not a mechanism to interject into the writings terms or provisions not agreed upon." *Walker v. Walker*, 888 N.Y.S.2d 823, 824 (App. Div. 4th Dep't 2009). Ligado's request here is not about accurately reflecting the parties' original bargain; it is about ***changing*** it.

## V.     The Unjust Enrichment Claim (Count VI) Is Untimely And Duplicative

Ligado's unjust enrichment claim is untimely. This claim is subject to the same three-year statute of limitations as Ligado's contract claims, and the "limitations period begins to run at the time the alleged wrongful act occurs." *Gavin v. Club Holdings, LLC*, 2016 WL 1298964, at *8 (D. Del. Mar. 31, 2016). The alleged wrongful acts are the same as for the contract claims. Compl. ¶¶ 173-75 (alleging wrongdoing relating to alleged resiliency obligations and power limits). As discussed, these events occurred outside the limitations period. *See* § II, *supra*.

Ligado's claim must also be dismissed on the separate ground: "[A] valid and enforceable written contract governing a particular subject matter" precludes an unjust enrichment claim "arising out of that subject matter." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009). Ligado's unjust enrichment claim is squarely based on "subject matter" covered by the Cooperation Agreement. The thrust of the claim is that Inmarsat's breaches resulted in Ligado paying more under the Cooperation Agreement than the value Ligado received in return, rendering it "unjust" for "Inmarsat to retain the difference." Compl. ¶ 175. This type of claim must be pursued, if at all, under a contract theory. *See*, *e.g.*,

*Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 423 (S.D.N.Y. 2022) (dismissing claim seeking the "value of enrichment" from alleged contract breaches).

## VI.  Ligado's Fraudulent Transfer Claim (Count VII) Is Untimely And Meritless

Ligado's effort to void five payments to Inmarsat as fraudulent transfers fails for four reasons. Compl. ¶¶ 177-84.

*First,* claims based on the three transfers made in 2020, *id.* ¶ 180, are barred by Delaware's four-year statute of limitations. 6 Del. Code § 1309(2). Ligado alleges it can void ***ten years'*** worth of transfers, Compl. ¶ 184, by standing in the shoes of the IRS as a "predicate" creditor and availing itself of the IRS's longer limitations period. 26 U.S.C. § 6502. Not so. A "predicate" creditor must hold "an unsecured claim that is allowable" under Section 502 of the Code, 11 U.S.C. § 544(b)(1). Ligado needed to plead facts showing that the IRS has an "allowable" claim—not just that the IRS is a potential creditor. *In re Gilbert*, 642 B.R. 687, 704 (Bankr. D.N.J. 2022). And an "allowable" claim is one that is "***filed*** under Section 501" to which a party in interest has not objected. 11 U.S.C. § 502. The IRS has not filed a claim and thus does not have an allowable claim. Accordingly, Ligado "cannot rely on the IRS as a predicate creditor for purposes of pursuing fraudulent conveyance claims beyond the four-year" period under Delaware law. *In re J&M Sales Inc.*, 2022 WL 532721, at *4 (Bankr. D. Del. Feb. 22, 2022).

*Second,* the transfers cannot be fraudulent because Ligado received "equivalent value" in exchange for the payments. A transfer made to satisfy an "antecedent debt" is presumed to be equivalent value. *See* 6 Del. Code § 1303(a). *In re CL H Winddown LLC*, 2023 WL 5740195, at *4 (Bankr. D. Del. Sept. 5, 2023). Ligado's payments were for "antecedent debts." The term "debt" is defined as a "liability on a claim," which is further defined as a "right to payment," whether "fixed, contingent, matured, unmatured, disputed [or] undisputed." 6 Del. Code § 1301(3)(5). The challenged payments arose because Inmarsat had a "right to payment" under

the Cooperation Agreement. The Complaint nowhere alleges that the Cooperation Agreement *itself* was a fraudulent transfer when executed in 2007, and so the effect of Ligado's payments was to reduce amounts validly owed under it. Courts in a wide variety of contexts have concluded that payments to satisfy contractually due amounts cannot be fraudulent transfers. *In re Center City Healthcare*, 664 B.R. at 219-20 (payments for medical supplies); *In re Fresh Acquisitions, LLC*, 2024 WL 2232432, at *39 (Bankr. N.D. Tex. May, 16, 2024), *adopted in relevant part*, 2024 WL 4224949, at *3 (N.D. Tex. Sept. 18, 2024) (payments under a settlement agreement); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 765-66 (Bankr. W.D. La. 2013) (payments under consulting contract).

*Third*, Ligado's explanation for why it received less than equivalent value—that "there was little chance that Ligado would receive full FCC approval," Compl. ¶ 182—is illogical. Every challenged payment occurred **after** the April 2020 Order, *id.* ¶ 180, meaning Ligado paid knowing exactly what it was and was not allowed to do by the FCC. More fundamentally, to the extent Ligado is claiming that it paid Inmarsat **assuming** that its opponents would relent so the ATC network could launch, Ligado misapprehends the legal standards. The "value" received for an alleged fraudulent conveyance is not viewed in hindsight after an investment was rendered unprofitable. It is instead "based on the circumstances that existed at the time," with courts asking if there was "any chance" the payment would "generate a positive return." *In re R.M.L., Inc.*, 92 F.3d 139, 152 (3d Cir. 1996). Ligado and its sophisticated stakeholders agreed to pay Inmarsat $700 million in October 2020 because they read the April 2020 FCC Order as providing "some chance" they would be able to launch the ATC network. There are no factual allegations as to how this was not equivalent value, except insofar as Ligado wrongly construes fraudulent transfer law as an insurance policy against risky business bets. *See also* 3 William L.

Norton III, Norton Bankr. L. & Prac. 3d § 67:4 (2024) (courts "should not use 'hindsight to recalibrate the risk—or potential reward'") (citation omitted); *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1126 (5th Cir. 1993) (funds spent to keep a regional airline afloat "until a buyer could be found" conferred equivalent value, even though the effort failed, because "the rewards from a sale . . . would have been high"). Ligado bet it could get regulatory approval for its ATC network and lost. It cannot now shift the consequences of that failed bet to Inmarsat.

*Fourth,* the fraudulent transfer claim must be dismissed if the Cooperation Agreement is assumed by Ligado. *See In re HH Liquidation, LLC*, 590 B.R. 211, 270 (Bankr. D. Del. 2018) (holding that assumption of a contract bars fraudulent transfer claims with respect to that contract as a matter of law); *In re Network Access Sols., Corp.*, 330 B.R. 67, 76 (Bankr. D. Del. 2005) (same). While the contract has not yet been formally assumed, Ligado has given every indication that it will seek assumption (for which Inmarsat reserves all rights). The proposed restructuring centers upon a transaction where AST uses the spectrum assigned to Ligado under the Cooperation Agreement and makes payments for those spectrum rights until the expiration of the Cooperation Agreement in 2107. The Court should therefore dismiss the claim on this basis, or, at a minimum, defer ruling on Count VII until Ligado's putative assumption is resolved.

### CONCLUSION

For the stated reasons, the Court should dismiss the Adversary Complaint with prejudice.

Dated: February 27, 2025

STEPTOE LLP

By: */s/ Alfred M. Mamlet*
    Alfred M. Mamlet (admitted *pro hac vice*)
    1330 Connecticut Ave NW
    Washington, DC 20036
    (202) 429-3000
    amamlet@steptoe.com

    Jeffrey M. Reisner (admitted *pro hac vice*)
    Charles Michael (admitted *pro hac vice*)
    Michael Scavelli (admitted *pro hac vice*)
    1114 Avenue of the Americas
    New York, New York 10036
    (212) 506-3900
    jreisner@steptoe.com
    cmichael@steptoe.com
    mscavelli@steptoe.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Benjamin Finestone*
    Benjamin Finestone
    295 5th Avenue,
    New York, NY 10016
    (212) 849-7000
    benjaminfinestone@quinnemanuel.com

    Matthew Scheck
    300 West 6th St., Suite 2010
    Austin, TX 78701
    (737) 667-6100
    matthewscheck@quinnemanuel.com

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Laura Davis Jones*
    Laura Davis Jones (DE Bar No. 2436)
    Timothy P. Cairns (DE Bar No. 4228)
    919 N. Market Street, 17th Floor
    P.O. Box 8705
    Wilmington, DE 19899-8705
    (302) 652-4100
    ljones@pszjlaw.com
    tcairns@pszjlaw.com

*Counsel for Inmarsat Global Limited*