# EXHIBIT H

1

1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                    .  Chapter 11
                              .  Case No. 25-10006 (TMH)
4   LIGADO NETWORKS LLC,      .
    *et al.*,                   .  (Joint Administration Requested)
5                             .
                              .  Courtroom No. 4
6                             .  824 Market Street
              Debtors.        .  Wilmington, Delaware 19801
7                             .
                              .  Tuesday, January 7, 2025
8   . . . . . . . . . . . . . .  2:00 p.m.

9

                    TRANSCRIPT OF HYBRID ZOOM HEARING
10             BEFORE THE HONORABLE THOMAS M. HORAN
                   UNITED STATES BANKRUPTCY JUDGE
11

12  APPEARANCES:

13  For the Debtors:         Michael J. Merchant, Esquire
                             RICHARDS, LAYTON & FINGER, P.A.
14                           One Rodney Square
                             920 North King Street
15                           Wilmington, Delaware 19801

16

17

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:          Ian Willoughby, ECRO

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

```
 1  APPEARANCES (CONTINUED):

 2  For the Debtors:          Andrew M. Leblanc, Esquire
                              Danielle Lee Sauer, Esquire
 3                            MILBANK, LLP
                              1850 K Street, NW
 4                            Suite 1100
                              Washington, DC 20006
 5
                              Abigail L. Debold, Esquire
 6                            Tuvia Peretz, Esquire
                              Jordan Rosen, Esquire
 7                            55 Hudson Yards
                              New York, New York 10001
 8

 9  For the U.S. Trustee:     Benjamin A. Hackman, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
10                            J. Caleb Boggs Federal Building
                              844 North King Street
11                            Suite 2207, Lockbox 35
                              Wilmington, Delaware 19801
12
    For Inmarsat
13  Global Limited:           Laura Davis Jones, Esquire
                              PACHULSKI, STANG, ZIEHL & JONES, LLP
14                            919 North Market Street
                              17th Floor
15                            Wilmington, Delaware 19801

16

17

18

19

20

21

22

23

24

25
```

1                             INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 13:   Debtors' Motion for Entry of an Order (I)         38
4               Directing Joint Administration of Chapter 11
                Cases and (II) Granting Related Relief
5               [Docket No. 3; filed January 6, 2025]

6               Court's Ruling:                                   38

7    Agenda
     Item 14:   Debtors' Motion for Entry of Interim and Final    43
8               Orders (I) Authorizing the Debtors to (A)
                Obtain Post-petition Financing and (B) Use
9               Cash Collateral; (II) Granting Liens and
                Superpriority Administrative Expense Claims;
10              (III) Granting Adequate Protection; (IV)
                Modifying the Automatic Stay; (V) Scheduling a
11              Final Hearing; and (VI) Granting Related
                Relief [Docket No. 4; filed January 6, 2025]

12
                Court's Ruling:                                   49
13
     Agenda
14   Item 15:   Debtors' Motion for Entry of Interim and Final    49
                Orders (I) Authorizing the Debtors to (A)
15              Continue to Operate Their Cash Management
                System and Maintain Existing Bank Accounts,
16              (B) Utilize Their Credit Cards, and (C) Engage
                in Intercompany Transactions, (II) Granting a
17              Waiver of the Requirements of Section 345(b)
                of the Bankruptcy Code and U.S. Trustee
18              Guidelines, and (III) Granting Related Relief
                [Docket No. 7; filed January 6, 2025]
19
                Court's Ruling:                                   51
20
     Agenda
21   Item 16:   Debtors' Motion for Entry of Interim and Final    52
                Orders (I) Authorizing the Payment of Certain
22              Taxes and Fees and (II) Granting Related
                Relief [Docket No. 11; filed January 6, 2025]
23

24              Court's Ruling:                                   53

25

<pre>
 1                              INDEX

 2   MOTIONS:                                             PAGE

 3   Agenda
     Item 17:   Debtors' Motion for Entry of Interim and Final   54
 4              Orders (I) Approving the Proposed Adequate
                Assurance of Payment for Future Utility
 5              Services and Related Procedures, (II)
                Prohibiting Utility Companies to Alter,
 6              Refuse, or Discontinue Services, and (III)
                Granting Related Relief
 7              [Docket No. 13; filed January 6, 2025]

 8              Court's Ruling:                            56

 9   Agenda
     Item 18:   Debtors' Motion for Entry of Interim and Final   56
10              Orders (I) Authorizing the Debtors to (A)
                Maintain Insurance Policies and Surety Bond
11              Program and Honor Obligations Thereunder, and
                (B) Renew, Amend, Supplement, Extend, or
12              Purchase Insurance Policies and Surety Bonds,
                and (II) Granting Related Relief
13              [Docket No. 14; filed January 6, 2025]

14              Court's Ruling:                            57

15   Agenda
     Item 19:   Debtors' Motion for Entry of Interim and Final   58
16              Orders (I) Authorizing Them to (A) Satisfy
                Prepetition Obligations on Account of
17              Compensation and Benefits Programs and (B)
                Continue Compensation and Benefits Programs,
18              and (II) Granting Related Relief
                [Docket No. 15; filed January 6, 2025]
19
                Court's Ruling:                            60
20
     Agenda
21   Item 20:   Debtors' Motion for Entry of an Order (I)         61
                Authorizing the Debtors to Redact Certain
22              Personal Identification Information and (II)
                Granting Related Relief [Docket No. 16; filed
23              January 6, 2025]

24              Court's Ruling:                            62

25
</pre>

1                            INDEX

2    <u>MOTIONS</u>:                                          <u>PAGE</u>

3    Agenda
     Item 21:  Debtors' Motion for Entry of an Order         62
4              Authorizing Ligado Networks LLC to Act as
               Foreign Representative Pursuant to 11 U.S.C. §
5              1505 [Docket No. 17; filed January 6, 2025]

6              Court's Ruling:                               63

7    Agenda
     Item 22:  Application of Debtors for Entry of an Order  64
8              (I) Authorizing and Approving the Appointment
               of Omni Agent Solutions, Inc. as Claims and
9              Noticing Agent and (II) Granting Related
               Relief [Docket No. 18; filed January 6, 2025]
10
               Court's Ruling:                               65
11

12

13                           EXHIBITS

14   <u>DECLARATIONS</u>:                                     <u>PAGE</u>

15   1) Declaration of Douglas Smith                         36

16   2) Declaration of Bruce Mendelsohn                      37

17   3) Declaration of Paul Deutch                           64

18

19   Transcriptionists' Certificate                          68

20

21

22

23

24

25

1          (Proceedings commenced at 2:00 p.m.)

2                THE CLERK:  All rise.

3                THE COURT:  Good afternoon, please be seated.

4                Mr. Merchant, great to see you.  Happy new year.

5                MR. MERCHANT:  Good to see you, Your Honor.  Good

6     afternoon.

7                THE COURT:  Okay.  Well, go ahead, please,

8     Mr. Merchant.  Sorry for --

9                MR. MERCHANT:  Sure.

10                For the record, Michael Merchant of Richards,

11     Layton & Finger, on behalf of the Ligado debtors.

12                Your Honor, we are co-counsel to the debtors.

13                Thank you to your new chambers for accommodating

14     all of our requests, particularly on a day when the court was

15     closed and scheduling this first day hearing.

16                My co-counsel are on Zoom today, and I already see

17     Mr. Leblanc.  He'll be providing the Court with an

18     introduction, so I'll cede the podium to him at this point.

19                THE COURT:  Thank you, Mr. Merchant.

20                MR. MERCHANT:  Thank you.

21                THE COURT:  Mr. Leblanc, welcome.

22                MR. LEBLANC:  Thank you, Your Honor.

23                Andrew Leblanc of Milbank.

24                Your Honor, can you hear me?

25                THE COURT:  I can.

1          MR. LEBLANC:  And can you see me okay?

2          THE COURT:  I sure can.

3          MR. LEBLANC:  It's always an adventure getting set

4    up for these Zoom hearings, Your Honor.  Every court is a

5    little different.  Every Zoom is a little different.  But, as

6    long as Your Honor can hear me, then I will proceed.

7          Your Honor, we are counsel, we at Milbank, are

8    counsel, proposed counsel to the debtors in this case, Ligado

9    Networks LLC and its various affiliates.  Let me echo

10   Mr. Merchant's thanks to the Court, your staff, and chambers

11   for accommodating us on this hearing, on the first day

12   hearing.  Your Honor's chambers have been very, very

13   accommodating to us, particularly, when I know that the

14   entire Mid-Atlantic region is dealing with a massive

15   snowstorm.  I know, for example, my kids have been home the

16   last two days, and so we very much appreciate the Court

17   accommodating us and, in particular, allowing us to appear at

18   a hybrid hearing here, via Zoom.  So thank you, Your Honor.

19          THE COURT:  My pleasure.

20          MR. LEBLANC:  I'd also like to extend our thanks,

21   on behalf of my team, to the Office of the United States

22   Trustee.  They have worked tirelessly with us, Your Honor.

23   We've coordinated closely with them, up leading into the

24   filing, and even since then, they've provided us comments on

25   our first day pleadings and subsequent to the filing of

1  those, even comments on motions.

2         And I think -- we are hopeful today, Your Honor,

3  that we'll have a hearing that will be without controversy,

4  in large part, because of the efforts that they and the

5  stakeholders in this case put in to bring us to this hearing.

6         If it's okay with the Court, what I'd like to do,

7  Your Honor, is just do an introduction to the Court of the

8  debtors.  We have a slide deck and we'll go through, probably

9  spend 20 minutes to 30 minutes introducing the Court to these

10 debtors and the path forward, and then we'll turn to the

11 motions and seek relief.  And for that, Your Honor, I'll

12 turn -- I'll be ceding the podium to a number of my

13 colleagues here in our conference room with us.

14         THE COURT:  Okay.

15         MR. LEBLANC:  Is that -- is Your Honor okay with

16 us proceeding that way?

17         THE COURT:  Yes, I am.

18         MR. LEBLANC:  Thank you, Your Honor.

19         I'm going to ask my colleague Dani Lee Sauer to

20 share a presentation that we have.

21         MR. MERCHANT:  Would Your Honor like a hard copy?

22         THE COURT:  I've got it on screen.

23         Thank you, Mr. Merchant.  I appreciate it.

24         MR. LEBLANC:  And, Your Honor, before we get into

25 this, let me just -- as Your Honor, no doubt, has seen, we

1  filed this case with a restructuring support agreement that
2  is supported by an overwhelming percentage of Ligado's
3  existing stakeholders, holding approximately 88 percent of
4  Ligado's funded debt.  The RSA has really two key elements.
5  The first is the restructuring.  There's a balance sheet
6  restructuring of the capital structure that, as we come over
7  levered in light of circumstances that I'll describe in a
8  moment, and the restructuring support agreement contemplates
9  a deleveraging of the company by over $7.8 billion with what
10 is really quite extraordinary, the agreement by those lenders
11 to keep in place the existing waterfall; meaning, all of the
12 preferred equity, all of the common stock will stay in place
13 and will be entitled to recover, consistent with the
14 waterfall that has been in existence since Ligado's last
15 bankruptcy in 2015 and I'll talk about in a moment.  So the
16 preferred and the common equity will retain their place in
17 the capital structure.
18           The second component of the RSA, and this is as
19 critical, if not more critical than the first, Your Honor, is
20 that we are very pleased to be here with a commercial
21 agreement with AST SpaceMobile, who's also a party to the
22 RSA.  AST SpaceMobile is a counterparty that we will engage
23 with, Your Honor, that will give usage rights to Ligado
24 spectrum to use on their existing and to-be-built satellite
25 network.  And in doing so, Your Honor, we are making the best

1   of a difficult situation and using the mobile satellite

2   services component of Ligado's vast spectrum network to

3   monetize and commercialize that for the first time ever.  And

4   when I say, "the first time ever," to be clear, the first

5   time at the scale that we're doing it.  And I'll talk more

6   about that in a moment.

7           So, let me just turn, Your Honor, to the slide

8   deck.  So let me first begin by introducing you to the

9   company, Your Honor.

10          If we could turn to Slide 2.

11          So, Your Honor, this is what I'll go through.  I'm

12  going to go through a company overview, talk about the

13  company and its capital structure, the events leading to the

14  Chapter 11 filing, and then what is our path forward.  But

15  before I even talk about the company overview, Your Honor,

16  just two other quick points that I'm going to come back to,

17  just to explain what causes us to be before the Court today.

18          First, and I mentioned we're making the best of a

19  difficult situation, a year ago, Your Honor, the company

20  commenced litigation against the United States Government for

21  the unlawful taking of Ligado's terrestrial component of its

22  spectrum assets.  That suit was commenced in the Court of

23  Federal Claims and it is seeking damages in the amount of $39

24  billion, Your Honor, which that is our estimate of the value

25  of the terrestrial spectrum assets that have been taken by

1  the Government in a secret program.

2          The Government had filed a motion to dismiss back

3  in January of 2024, but in November of 2024, the Court of

4  Federal Claims substantially denied that motion.  It granted

5  only one small part of that, but preserved the overwhelming

6  majority of most of our claims.  I'll talk about that case in

7  a little bit, again, Your Honor, I'll return to that.

8          But most importantly, you know, Your Honor, we are

9  not asking this Court to do anything with respect to that

10 litigation; in fact, one of the key elements of our

11 bankruptcy is to make sure that we do nothing to interfere

12 with the continuation of that litigation in the Court of

13 Federal Claims.  But that -- the Government's decision to

14 effectively squat on our spectrum and to use the spectrum

15 assets that we have been authorized by the FCC to use since

16 2022 is one of the precipitating events to the reasons that

17 we are here.

18         The second driving force, Your Honor, to our

19 filing is our relationship with Inmarsat and their actions

20 leading up to this filing and what we believe to be a breach

21 of the cooperation agreement between us.  Inmarsat --

22 throughout the day, Your Honor, I might refer to Inmarsat and

23 I may refer to Viasat.  Those are one in the same because

24 they merged, those two companies merged together in late 2023

25 and so we've been most recently dealing with Viasat, but the

1    contracts that we have in place, the cooperation agreement

2    itself is actually with Inmarsat and that is a 2007 vintage

3    contract.

4              Pursuant to that contract, the parties agreed to

5    coordinate their use of the L-band spectrum, which is the

6    spectrum assets that we control today.  Each of them were

7    assigned separate parts of that spectrum, but the

8    coordination agreement provides that Ligado could use the

9    vast majority of that.  And in return, Ligado has paid to

10   Inmarsat, and now Viasat, enormous amounts of money over the

11   course of that contract.  We've paid, to date, over $1.7

12   billion to Viasat or Inmarsat.

13             And in our view, Your Honor, Viasat has not kept

14   up its end of the bargain.  And, Your Honor, we filed a

15   complaint just a short time ago.  Nothing to be done in

16   today's hearing with respect to that.

17             Our co-counsel at Mayer Brown, representing

18   Ligado, filed that complaint.  That complaint was filed under

19   seal.  We'll work through the process with that, Your Honor.

20   But I'm going to not speak more about that issue now because

21   that'll be, obviously, an issue for another day.

22             But what's relevant for today and the

23   precipitating event here, Your Honor, as to what brings us to

24   this filing is we do have outstanding payments under that

25   coordination agreement that are due to Inmarsat or Viasat and

1   those are coming due.  We've negotiated for the last 18

2   months with Viasat in the hopes of reaching a commercial

3   transaction.  That proved unsuccessful when a tax issue came

4   up several months ago that was unexpected and unanticipated

5   by us and that really threw the entire negotiations that

6   we've been engaged in for more than a year, up in the air.

7          And so we rushed to get the next best alternative

8   and we are very pleased to have found the transaction that we

9   have before the Court today with AST, which we think is our

10  best effort to maximize value in light of both, the

11  Government's actions and Viasat's actions.

12         So, Your Honor, that's what led us here today, but

13  let me now go backwards and just introduce you to the

14  company.

15         So if we could turn to the next slide?

16         Your Honor, on the screen is the photos of the

17  executive team at Ligado and its board of managers and I just

18  want to highlight a couple of things.  As I mentioned, Your

19  Honor, Ligado went through a bankruptcy in the Southern

20  District of New York in 2000 -- they filed in 2012 and

21  emerged in 2015 before Judge Shelley Chapman in the Southern

22  District of New York.

23         Many of the people that you see on the screen and

24  the executive team, Your Honor, were people who were there at

25  that time.  Doug Smith is the CEO of the company; legacy,

1   long-term telecommunications expert; worked at Nextel; and

2   has been at the helm of Ligado since just before that

3   bankruptcy filing in 2012.  I was very honored to put

4   Mr. Smith on the stand in the bankruptcy case in front of

5   Judge Chapman and I'll be honored to do so, again, here

6   today.  Mr. Smith is also our first day declarant.

7            Eric Harrington is the company's chief financial

8   officer.  He was also the company's treasurer back in 2015

9   when the company went through that bankruptcy.

10           Scott Wiener has been leading the charge on our

11  commercial negotiations with AST, with Viasat.

12           Sachin Chhibber, Your Honor -- and that is not a

13  typo in his name; there are two Hs -- C-h-h-i-b-b-e-r, he's

14  the company's chief technical officer.

15           And Ms. Vicky McPherson is the company's general

16  counsel.

17           And, Your Honor, I believe all those people are on

18  the line.  I won't have them come on the screen.  But Your

19  Honor is going to hear from Mr. Smith.  You'll at least be

20  asked to accept his declaration in a few minutes, and I trust

21  Your Honor has had an opportunity to at least peruse his very

22  lengthy first day declaration.

23           Your Honor, before I leave this page, I did want

24  to mention the board of managers.  So, we're an LLC, so it's

25  a board of managers, but this is a world-class board of

1  directors for this company.  These are some of the leading

2  lights in the telecommunications industry.  Your Honor can

3  see, just by the descriptions.  The chairman of the company

4  is the former chairman of Verizon Communications.  The former

5  vice chairman of Verizon Communications is also a member of

6  our board.  We have two military flag officers, including one

7  of whom was the former administrator of NASA.  We have a

8  former chairman of the Federal Communications Commission.

9  This is a world-class board that's been operating this

10 company since the last bankruptcy, since 2015, and leading it

11 to where we sit today.

12          If we turn the page, Your Honor, just quickly,

13 Your Honor has already met Richards Layton, who's our co-

14 counsel in the case, Mr. Collins and Mr. Merchant are there

15 in the courtroom with you.  Milbank is the company's counsel

16 with respect to the bankruptcy.  There are also other

17 counsel.  I mentioned Mayer Brown, as well as a number of

18 lawyers who are working on the litigation against the

19 Government.

20          In addition, Your Honor, Perella Weinberg Partners

21 is the company's investment banker.  Bruce Mendelsohn is the

22 company's declarant, with respect to the DIP, and Your Honor

23 will see him a little bit later in my presentation.  FTI is

24 our financial advisor and Omni is aware claims and noticing

25 agent, and Your Honor will be asked to consider a motion,

1    with respect to their retention later in today's hearing.

2              If we turn the page, Your Honor, and I'll try to

3    be brief with this, Your Honor.  Going through the history of

4    this company, you could do so in many, many hours, but let me

5    try to be relatively brief with this, Your Honor.

6              As I mentioned a moment ago, the company emerged

7    from bankruptcy in 2015 with a plan to deploy a next-

8    generation satellite services business, coupled with a

9    terrestrial wireless solution.  That was intended to capture

10   a market that was growing for wireless communication

11   services.

12             Everything we predicted about the addressable

13   market at that time turned out to be more than true, Your

14   Honor.  Ligado's spectrum is in prime position to capitalize

15   on the terrestrial use of spectrum.

16             When I say, "terrestrial," Your Honor, that is,

17   you know, the cell phones that we use communicate on a

18   terrestrial-spectrum basis.  They communicate from your cell

19   phone to a cell tower and that's the terrestrial use of the

20   spectrum.

21             Ligado's spectrum has always been authorized for

22   MSS, mobile satellite services.  So that is communicating

23   from a device or a base station on the ground to a satellite

24   that's flying up in the air.  But Ligado was unique in that

25   starting in 2004, it applied for and was granted for the

1  authorization to use its mobile satellite spectrum in

2  connection with an ancillary terrestrial component, or "ATC,"

3  which I may refer to throughout the day.

4          It was authorized to use the spectrum in that way,

5  so it was primed coming out of the last bankruptcy, to

6  exploit the boom in the use of spectrum.  So we expected at

7  the time of the last bankruptcy that we were going to be the

8  market leader in deploying on 5G.  And, Your Honor, there's a

9  particular set of attributes with respect to the Ligado

10 spectrum that make that quite attractive, and I'll talk about

11 that in a moment.

12         What happened, Your Honor, is we had a number of

13 technical issues.  When we emerged from bankruptcy in 2015,

14 there were a number of technical issues that we had to

15 address because lids spectrum sits close to the GPS spectrum.

16 And so from 2015 to 2020, the company went through a tireless

17 effort with the FCC to answer all concerns with respect to

18 its spectrum use on a terrestrial basis and, ultimately,

19 in 2020, the FCC granted on a unanimous basis, the ATC

20 license for Ligado to use its spectrum on a terrestrial

21 basis.

22         Your Honor, we achieved something in 2020.  Ligado

23 achieved something in 2020 that is virtually unheard of.  In

24 connection with that granting of the ATC license, we were

25 actually able to restructuring our entire balance sheet, and

1  Your Honor is going to see that balance sheet in a moment, on
2  an out-of-court basis.  We obtained consent from 100 percent
3  of our secured creditors, 100 percent of our preferred
4  equity, and 100 percent of our common equity in reaching a
5  restructuring, without ever having to file for bankruptcy
6  in 2020.

7            And the reason for that was clear.  Ligado, at
8  that time, was off to the races, because we had this
9  terrestrial authorization and we were in the process of and
10 at the point where we were going to go and exploit that and
11 make that -- utilize something that, again, Your Honor, as I
12 mentioned at the outset, we believe is worth close to $40
13 billion, this spectrum.  And when we say, "close to $40
14 billion," that's just by comparing it to similar spectrum,
15 which, as I said a moment ago, in many respects, this is even
16 better than that.

17           After 2020, Your Honor, we became aware of --
18 there were some continued concerns.  There were requests for
19 reconsideration at the FCC, but ultimately, we became aware
20 that the Government was using -- and when I say, "the
21 Government," in particular, the Department of Defense, was
22 using our spectrum, the terrestrial component of our spectrum
23 in a way that was never disclosed, that they never raised,
24 and they continue even to this day, as a classified system.
25           When we learned of that, Your Honor, there was a

1    number of efforts made to try to resolve those issues through

2    negotiations, through lobbying.  Ultimately, we were unable

3    to do that and after spending, literally, years, and,

4    literally, billions of dollars to put ourselves in a position

5    to exploit our -- to monetize and commercialize our

6    terrestrial spectrum, we were forced to sue the U.S.

7    Government for the takings that I just described.

8           So on October 12th of 2023, Ligado commenced the

9    lawsuit that I described earlier.  As I mentioned, that

10   lawsuit is still in its relative infancy.  The Government's

11   answer is now due on February 3rd because the Government

12   moved to dismiss and as I said, that motion to dismiss was

13   substantially denied.  That was a significant win for Ligado.

14          And as I said, and I'll continue to repeat it,

15   because it's one of the most important things here, nothing

16   in this bankruptcy is designed to interrupt with, interfere,

17   slow down, delay, even by a minute, the progress of that

18   government litigation.  We want that to continue in the Court

19   of Federal Claims and that's what we absolutely intend to do.

20          Now, Your Honor, just to give Your Honor a sense,

21   if we turn to the next slide, Your Honor, this is the

22   company's spectrum now.  The items in blue are the

23   company's -- the spectrum that the company controls pursuant

24   to its coordination agreement, most of which is controlled by

25   Ligado, some of which comes through the coordination

1   agreement.  But this is all of the spectrum that Ligado has

2   usage rights over.

3           And there's a significant portion, 30 megahertz of

4   this, leaving aside the lower-bottom, right-corner box that

5   I'll describe in a second, 30 megahertz of this has been

6   authorized by the FCC for ATC use.  This is the subject of

7   the Government litigation.  This is the portion that we are

8   trying desperately to use and we're suing the Government for

9   taking it from us.

10          Now, Your Honor, I used an analogy with Judge

11  Chapman 10 years ago, now, when we were in the confirmation

12  hearing, because it's hard to think about spectrum in a way

13  and how valuable it is, but what I can tell the Court, and I

14  know Judge Chapman, I think, found this useful and agreed

15  with it at the time, what Ligado has, Your Honor, is,

16  effectively, among the most ideal beachfront property in the

17  world.  Ligado has a 30 megahertz continuous block, uplink

18  and downlink of spectrum that it can use on a nationwide

19  basis.  And it is in a part of the spectrum band that is

20  ideal for telephony, for telecommunication services.

21          And that's because, Your Honor, it sits at

22  about 1.5 megahertz and that spectrum at that frequency

23  propagates extraordinarily well.  It's not too short, so I

24  can go very far.  It can spread very far; you don't need as

25  many towers.  And it's not too long, such that it can't

1   penetrate into buildings.  It's kind of at the ideal space on

2   the spectrum map.  It is the premier beachfront property for

3   these purposes.  That's why the company is so valuable and

4   why its assets are so valuable.

5          What we engaged in, Your Honor, when we emerged

6   from bankruptcy in 2015 to 2020, the closest analogy I could

7   come up with is we essentially had a zoning dispute and we

8   had to go through the process and deal with the Zoning Board.

9   In this example, in this analogy, our Zoning Board is the

10  FCC.  We needed to get authorization from the FCC to use it

11  on a terrestrial basis and to deal with all the people who

12  were objecting that the road was too close to the beach or

13  that there'd be too much traffic and too many cars going down

14  the road.

15         We dealt with all those issues and ultimately got

16  the Zoning Board, the FCC in our case, to authorize us to use

17  that spectrum on an ATC basis in a unanimous decision.  That

18  license authorization has not changed.  It's not been abated.

19  It's not been suspended.  It continues in existence today.

20         But, Your Honor, the Government actions, what

21  those constitute is we learned after getting that zoning

22  approval in 2020 that the Government was doing some

23  confidential, classified, clandestine program on our land and

24  wouldn't let us build the world-class resort that we were

25  authorized by our Zoning Board to do.  And, Your Honor,

1   that's what that litigation is about.

2          We have -- the asset that we have here is the

3   premier, among the most ideal spectrum you could imagine and

4   we're being prevented from using it because the Government is

5   squatting in our spectrum.

6          Now, what we've been able to do with the AST

7   transaction, Your Honor, that's where the analogy kind of

8   stops, because the AST transaction is not like we're using a

9   corner of our property or something like that.  That

10  understates the importance of that transaction.  The AST

11  transaction that's part of the RSA, that utilizes only the

12  MSS component of our spectrum.

13         Ligado has, for 25 years, used the satellite

14  component of its spectrum to operate a business and that

15  business does not have a significant amount of revenue.  It

16  is not a self-sustaining business because the company's

17  invested billions of dollars in striving for the terrestrial

18  component use, but the MSS spectrum assets, we're making the

19  best of those and we're very excited about the opportunity

20  that comes with the AST transaction.

21         As we've all become more mobile and the technology

22  has improved, there are real opportunities for direct-to-

23  device exploitation of spectrum like ours, and so AST has

24  reached an agreement with us it's going to -- and I'll talk

25  about it in a second -- that's going to pay us real value for

1  the use of the MSS component of our spectrum.  It is not

2  touching, however, the terrestrial component of the spectrum;

3  that is entirely the subject of the Government litigation.

4  And that's where the analogy falls apart because there's not

5  really an analog as it comes to beachfront property.

6           But I think the analog, just to try to visualize

7  what we're talking about here is we really have the best of

8  the best property and we've been unable to use it because of

9  the Government's actions.

10          If we turn to the next slide, Your Honor, and this

11  is the last slide that I have on the background of the

12  business, we do operate an existing satellite network.  That

13  network uses a satellite that's launched in the sky,

14  SkyTerra 1.  That was launched even before our last

15  bankruptcy, Your Honor, in November of 2020 -- I'm

16  sorry -- 2010.  And it's been operating and functioning in

17  orbit since 2011.

18          SkyTerra 1 is one of the most advanced satellites

19  that has ever been launched.  We have a second satellite that

20  is in storage right now, Your Honor.  Those two satellites

21  were built by Boeing.  Boeing is one of the very few

22  unsecured creditors that are at issue here, and I'll talk

23  about that in a moment.

24          But importantly, Your Honor, we currently have a

25  satellite network that uses a geostationary satellite with

1    our existing spectrum assets, using them on an MSS basis, so

2    satellite communication to base stations in Ottawa,

3    Saskatoon, Napa, and Dallas, which allows us to cover all of

4    North America, as you can see there on the map.  And we have

5    a backup satellite sitting on the ground in a storage

6    facility.

7         So, Your Honor, that's the company.  That's what

8    it does.  Let me turn to the corporate structure and the

9    capital structure.

10        Your Honor, the company structure, this is what

11   emerged from bankruptcy last time.  Each of these entities

12   that you see here before the -- on this chart are Delaware --

13   I'm sorry -- are companies that are in bankruptcy both, here

14   and in a parallel proceeding that we filed in Canada.  We

15   will be seeking appointment of a foreign representative to

16   file a recognition proceeding in Canada with respect to these

17   assets in the Ontario Court of Justice.

18        Let me turn now to capital structure, Your Honor.

19   Your Honor, this is a complicated capital structure that has

20   been borne out of years of efforts to commercialize these

21   assets.  The capital structure, at its core, came out of the

22   last bankruptcy.  The last bankruptcy, Your Honor, had

23   tremendous support from its creditors and ultimately resulted

24   in an emergence where equity substantially stayed in the

25   money.  And so you've had -- and as I mentioned a moment ago,

1    Your Honor, we had a restructuring out of court in 2020 where

2    the capital structure stayed substantially in place, just

3    moved down into a new series of preferred equity.

4             But the company has an enormous amount of debt

5    today, Your Honor.  When you look at the secured debt, it's

6    over $8 billion of secured debt both, on a first, in a 1.5

7    and a second lien basis.  And it has a series of preferred

8    equity units, much of which were converted from debt in both,

9    the prior bankruptcy and in the 2020 restructuring.

10            The capital structure has grown to the size it is

11   because, Your Honor, we have not paid interest since the

12   bankruptcy.  All of these facilities have been paid in kind.

13   So, no creditor has taken any dollars out of this.  All we've

14   done throughout the years is continue to PIK interest in

15   anticipation of being able to monetize these assets in the

16   way that we hope to do some.

17            Your Honor, what's not reflected on this page but

18   what I will mention, and I know would be important to the

19   Court, is the unsecured creditor body.  Your Honor, we filed,

20   with our petitions, a list of the top 30 creditors.  The two

21   largest, Your Honor, are Inmarsat, who I already talked about

22   for whom there is a complaint that we filed with respect to,

23   and Boeing. I mention them as well, they are the satellite

24   manufacturer and they are both -- both of those claims, Your

25   Honor, are contingent, unliquidated, disputed claims that we

1  will have to resolve as part of this bankruptcy.

2          Not listed on the top 30 but, Your Honor, is Crown

3  Castle which -- and, actually, now that I say that I forgot,

4  Your Honor, back on the Spectrum chart, we don't need to go

5  back to it, but in addition to the spectrum that is the

6  subject of the government litigation we also, Your Honor,

7  lease Spectrum at 1670 to 1675 megahertz, that is detailed in

8  Mr. Smith's declaration, from an entity called Crown Castle.

9  Pursuant to that lease approximately $150,000 of lease

10  payments became due prepetition when a payment was due on

11  January 1st.  So, we will deal with the Crown Castle issue

12  not at today's hearing but in the very near term.

13          Under our RSA, Your Honor, those are the only

14  three specified ones.  There are three additional creditors

15  on our unsecured creditors list totaling less than $40,000

16  but the RSA includes a provision that anticipates that all of

17  the unsecured creditors are going to ride through unimpaired.

18  So, there will be some disputes that Your Honor will have to

19  resolve in particular with respect to Inmarsat and

20  potentially with respect to Boeing but, otherwise, it's our

21  expectation that the very few number of creditors that we do

22  have on a prepetition basis will ride through unimpaired.

23          So, Your Honor, the capital structure, while its

24  very complicated, as I mentioned in the RSA it's going to

25  stay largely intact with most of the debt that you see on

1    there.  Any debt that is not being refinanced, and that is

2    the first out term loans that are being refinanced as part of

3    the DIP, being moved down into an equity position and with

4    the anticipation that the company will emerge with only the

5    DIP rolling into an exit facility so that the entirety of the

6    balance sheet coming out of bankruptcy on a debt basis will

7    consist of the DIP and its fees.  The DIP, its rollup, and

8    the fees associated with that.

9          Your Honor, if we turn the page, we have had the

10   great pleasure to work with lenders who are unbelievably

11   supportive of this company.  They have been for years and

12   they continue to be to this day.  They are represented by

13   Sidley Austin who is counsel to a group of first lien only

14   debt holders and Kirkland & Ellis who represents a group of

15   cross holders across much of the capital structure.  Foley,

16   Jones Day and Seward & Kissel represent certain of the

17   trustees and agents with respect to our debt facility.

18         As I said, Your Honor, when you file a case with

19   over 88 percent of your debt holders supporting the

20   restructuring you have tremendous cooperation from those

21   lenders and when you do an out of court restructuring, as we

22   did in 2020 that garnered 100 percent support, you know you

23   have a supportive group of creditors and this company could

24   not be more fortunate to have that.

25         If we turn the page, Your Honor, I have mentioned

1  this and I won't spend a lot of time here on it but we do

2  have -- one of our primary counterparties is Inmarsat.  They

3  have -- notice of appearance was filed yesterday, Your Honor,

4  by Davis Jones from Pachulski represented with co-counsel at

5  Quinn Emanuel and Steptoe & Johnson representing Inmarsat.

6  They are one of our key counterparties, Your Honor.

7            As I mentioned, we did file litigation with

8  respect to what we believe to be breaches of the cooperation

9  agreement by Viasat.  I will also just -- Mr. Smith details

10  this in his declaration but, Your Honor, we did engage for

11  months -- frankly, years we have been engaged in negotiations

12  to try to adjust the cooperation agreement to reflect both

13  what we believe to be breaches and changes in the environment

14  that were necessary to make adjustments there and we thought

15  we had come to an agreement in the September timeframe.

16            Unfortunately, at that point in time, we learned

17  of a tax issue that Viasat, Inmarsat and Viasat, had not

18  previously thought of and that really pulled the rug out from

19  under us to a great extent and we were forced to then go and

20  begin negotiations to try to find some alternative way to

21  satisfy the contact with Viasat.  That is really what we did

22  and what brought us here with AST.

23            Throughout that period of time, we engaged -- we

24  continued to engage with Viasat, even bringing potential

25  counterparties to them to have a triparty negotiation in an

1    effort to try to come to a resolution.  That is not the case

2    with AST, Your Honor.  We -- they have not been engaged in

3    negotiations with Viasat and that is the party that we found

4    the most compelling opportunity with to bring before the

5    Court.

6          Your Honor, just to summarize on the next slide

7    the timeline of events, I think I have gone through

8    everything that is on this slide.  So, I won't belabor it but

9    as a summary, Your Honor, as early as 2004 we filed the -- we

10   obtained authorization to use our spectrum on a terrestrial

11   basis.  In 2012 that authorization was suspended leading to

12   the first bankruptcy filing.  In 2015 we emerged from

13   bankruptcy and then in 2020 we got the SEC final

14   authorization to allow us to use the Spectrum on a

15   terrestrial basis.  That is what then led to us discover that

16   the government who was objecting after the SEC had approved

17   it -- when I say the government I mean the Department of

18   Defense and the Department of Commerce.  The Department of

19   Defense, in particular, was using our Spectrum in a way

20   without providing us with compensation.  So, that is what led

21   to that October filing for bankruptcy and then ultimately the

22   denial of the motion to dismiss.

23          If we turn the page, Your Honor, I think I have

24   talked enough about this at this point to not go into it more

25   because that -- Your Honor is not going to be asked to

1  resolve this litigation but needless to say when you file a

2  $39 billion takings claim it is a very important thing for

3  the company.  So, this is the company's most important asset

4  and we will do everything we can to make sure that that is

5  preserved and prosecuted for the benefit of all of the

6  stakeholders.

7        Lastly, Your Honor, we just simply find ourselves

8  with an unsustainable capital structure in light of our

9  obligations and our ability to monetize our assets. So, that

10 is what brought us here today, Your Honor.

11        Let me turn now to where are we going, what is our

12 path forward.  So, Your Honor, we have four guiding

13 principles for this bankruptcy or four objectives.  First is,

14 as I have said a number of times, we will continue to pursue

15 the lawsuit against the United States Government to obtain

16 compensation for the taking of Ligado's Spectrum.  That is

17 objective number one.

18        Objective number two, Your Honor, we have filed

19 our RSA with a term sheet, with AST Space Mobile.  We have a

20 very aggressive timeline to get that to definitive

21 documentation, seek approval by the Court and ultimately to

22 consummate that transaction. I will talk about the milestones

23 in connection with that in a moment.

24        Third, we need to deal with our claims that have

25 been filed just today against Inmarsat and resolve what cure

1 amounts may be due, if any, to Inmarsat in connection with

2 the cooperation agreement.

3          Fourth is to complete the balance sheet

4 restructuring.  That has already been agreed to by our

5 creditors and is reflected in the RSA.

6          Those are the objectives, Your Honor.  Let me just

7 walk through how we are going to get there.  So, first, as I

8 mentioned, we have an RSA. Your Honor is not being asked to

9 do anything with respect to the RSA today. The RSA does

10 include some of the terms of the various relief that we are

11 requesting. So, for example, the DIP that we are requesting

12 is referenced and contemplated in the RSA but the RSA has the

13 restructuring that I described but it also incorporates the

14 AST commercial agreement.

15          If we turn to the next page, Your Honor, I do want

16 to just highlight for the Court some of the milestones that

17 are put -- that are in the -- I'm sorry, the RSA.  Your

18 Honor, we filed today, not in connection with the first days,

19 a motion seeking approval of a breakup fee for the AST

20 transaction.  Your Honor has provided us with a hearing date

21 on January 27th for that and we appreciate that.  That is

22 inside the milestone -- the 22-day milestone that we have

23 agreed to with AST.

24          We have requested -- we are seeking entry of the

25 interim DIP order.  We have a milestone with respect to the

1   final DIP order where the rest of the relief would be

2   granted.  We have given ourselves, Your Honor, 75 days to

3   negotiate the definitive documentation with AST in connection

4   with the commercial transaction.  That part we understand is

5   very aggressive.  This is a complicated thing.  I have no

6   idea how to do it. I am not the one who is going to be

7   negotiating it but we are going to do everything we can to

8   negotiate that in that period of time.

9          Then, Your Honor, we are going to very quickly

10  thereafter, in connection with negotiating those documents,

11  file a plan, hope to get to confirmation of that plan

12  within 110 days of the -- I'm sorry, get to a disclosure

13  statement within 110 days of the petition date and then get

14  entry of a confirmation order within 145 days.

15         Your Honor, the last milestone there may be eye

16  opening to the Court but we do have a very long period from

17  the confirmation order until the effective date.  We are

18  going to move to that as quickly as we can but there are a

19  number of regulatory preconditions to the effective date and

20  we have given ourselves an enormous amount of time to try to

21  do that so that the RSA and the commercial agreement

22  provide 40 months after the petition date to get those

23  regulatory approvals.  So, we are going to move quickly, Your

24  Honor, to get to confirmation, ask the Court to approve a

25  plan that, as I said, is already supported by over 88 percent

1   of our lenders, and then we are going to run a huge number of

2   regulatory hurdles to emerge from bankruptcy, things that are

3   necessary for that commercial agreement to take effect.

4           Your Honor, you are going to hear from one of my

5   colleagues in a moment about the -- oh, I'm sorry, go back

6   one page.  As I mentioned, Your Honor, this just illustrates

7   the level of support that we have.  Let me be clear, we only

8   expressly sought support from the lenders because we believe

9   the preferred equity holders and the common equity holders

10  that they are unimpaired by this because they are simply

11  staying in place. The debt that is in front of them already

12  is moving, under the RSA, as preferred equity for the most

13  part and a portion of it will remain as DIP.

14          With cross holdings and with the direct support of

15  the lending groups this is the level of support that our RSA

16  that was filed with the Court already has.  To be clear, Your

17  Honor, we are not aware of any one in the capital structure

18  who doesn't support this plan.  What I mean by that is there

19  is no -- there are no objecting stakeholders on the funded

20  debt or the equity or the preferred equity side. It simply is

21  impossible to reach everybody given the size of the capital

22  structure and the time that we had.  We expect these numbers

23  to grow over time.  We think this will be an overwhelmingly

24  supported plan when we bring it before the Court for approval

25  on a disclosure statement basis.

1            Your Honor, I will preview just briefly the

2   debtor-in-possession financing facility that we have.  My

3   colleague, Abigail Debold, is going to present this to the

4   Court in a few minutes but just to preview this is what we

5   have negotiated with our creditors, Your Honor. On an interim

6   basis it's a very small amount of funding of $12 million.

7   The DIP, itself, is going to do two things: it's going to

8   fund up to $115 million on an up to 12-month DIP, although

9   there is interim periods associated with that, and then in

10  addition to that, Your Honor, its going to refinance out the

11  first lien, first out facility.

12           Your Honor, that first lien first out facility has

13  been the, effectively, rescue financing that this company has

14  been living off of for the last almost two years where

15  lenders have agreed to step up on a first lien first out

16  basis and provide the funding that the company needs.  So, we

17  are going to take that facility out with this loan and then

18  roll up some additional debt.  Your Honor, the roll up and

19  the refinancing are not being asked of this Court today.  So,

20  Ms. Debold is going to talk about it more in detail but I

21  just wanted to make the Court aware of that.

22           Importantly, Your Honor, again we have the support

23  of 88 percent of the lenders.  There is a backstop for this

24  but it will be offered to all of the first lien lenders

25  ratably to participate in this.

1          So, Your Honor, that is my presentation to you of

2    the company. If we could go to the next slide.  Our first day

3    agenda we filed with the Court, Your Honor, and these are the

4    items that we intend to go through.  What I would like to do

5    at this time, Your Honor, is I would propose to introduce the

6    two declarations that we are going to rely upon in connection

7    with the first day hearing and then I will handle, I have

8    been asked to cover the joint administration motion

9    anticipating that to be a flurry of activity.

10          THE COURT:  Okay.

11          MR. LEBLANC:  So, Your Honor, unless you have any

12    questions, I would be happy to move in our evidence.

13          THE COURT:  Yeah, let's go onto the evidence

14    please.

15          MR. LEBLANC:  So, Your Honor, the first day

16    pleadings are substantially supported by the declaration of

17    Douglas Smith, which was filed at Docket No. 2.  As I

18    mentioned earlier, Mr. Smith is on the Zoom line. I would --

19    I think Mr. Smith can turn his camera on.

20          THE COURT:  Good afternoon, Mr. Smith.

21          MR. SMITH:  Good afternoon, Your Honor.

22          MR. LEBLANC:  Your Honor, Doug Smith is the

23    company's CEO. He is also our first day declarant.  He is

24    here on the Zoom and, Your Honor, we would offer Docket

25    No. 2, Mr. Smith's declaration, into evidence as his direct

1  testimony.

2          THE COURT:  Does anybody object to the admission

3  of Mr. Smith's declaration for the purposes of today's

4  hearing?

5          MS. DAVIS JONES:  Good afternoon, Your Honor.

6  Laura Davis Jones of Pachulski Stang Ziehl & Jones.  Your

7  Honor, appearing in these cases with Fred Reisner from the

8  Steptoe firm and also Ben Finestone from Quinn Emanuel.

9          Your Honor, I rise simply with respect to this

10  declaration as well as Mr. Mendelsohn's declaration, we would

11  ask that they be admitted only for purposes of today's

12  hearing and nothing further than that.

13          THE COURT:  Okay, very good.  The declarations are

14  being moved for the purpose of today's hearing only.

15          MS. DAVIS JONES:  Thank you, Your Honor.

16          THE COURT:  Thank you, Ms. Jones.

17          Are there -- is there anybody else who wishes to

18  make any statements regarding the admission of Mr. Smith's

19  declaration?

20       (No verbal response)

21          THE COURT:  Okay, I hear no response. It is

22  admitted for the purposes of today's hearing only.

23       (Smith declaration received into evidence)

24          MR. LEBLANC:  Thank you, Your Honor.

25          THE COURT:  I'm sorry, let me ask, is there anyone

1  who wants to cross-examine Mr. Smith?

2          MS. DAVIS JONES:  No thank you.

3          THE COURT:  Okay.

4          MR. LEBLANC:  Thank you, Your Honor.  Your Honor,

5  the second declarant, and I will ask Mr. Mendelsohn to come

6  on the line, is Bruce Mendelsohn of Perella Weinberg

7  Partners. We submitted a declaration in support of the DIP

8  motion by Mr. Mendelsohn at Docket No. 6.  Your Honor, we

9  would offer Mr. Mendelsohn's declaration at Docket No. 6 as

10 his direct testimony subject to the same reservation that

11 Ms. Davis Jones just stated.

12         THE COURT:  Okay.  Is there anybody who objects to

13 the admission of Mr. Mendelsohn's declaration for the

14 purposes of today's hearing only?

15     (No verbal response)

16         THE COURT: Okay, I hear no response.  It is

17 admitted.

18     (Mendelsohn declaration received into evidence)

19         THE COURT:  Is there anyone who would like to

20 cross-examine Mr. Mendelsohn?

21     (No verbal response)

22         THE COURT:  Okay, I hear no response.

23         MR. LEBLANC:  Thank you, Your Honor.  Your Honor,

24 that concludes our presentation of evidence with respect to

25 the first day hearings.

1          As a housekeeping matter, Your Honor, I will

2    present our joint administration motion which is at Docket

3    No. 3.  When I stood up here it had not been entered but,

4    Your Honor, we would ask for joint administration for

5    procedural purposes only of the 11 separate cases that we

6    filed.

7          THE COURT:  Is there anybody who would like to be

8    heard regarding the joint administration motion?

9          Mr. Hackman, good afternoon.

10          MR. HACKMAN:  Good afternoon, Your Honor.  May I

11    please the Court, Ben Hackman for the U.S. Trustee.

12          I rise to confirm that we have no objection to

13    entry of this order and to confirm that our comments on the

14    other first day motions have been resolved. I thank counsel

15    for working with us on it.

16          THE COURT:  Thank you, Mr. Hackman.

17          Okay, the joint administration motion, of course,

18    is routine and it is granted.

19          MS. DAVIS JONES:  Your Honor, if I may on behalf

20    of Inmarsat.

21          THE COURT:  Yes, Ms. Jones.

22          MS. DAVIS JONES:  Your Honor, likewise, with

23    respect to not just this motion but the other motions, Your

24    Honor, we appreciate that they are interim in nature, I think

25    all for the most part.  We will not be objecting today on the

1  basis of an interim basis, Your Honor, but I clearly wanted

2  to reserve all of our rights to revisit issues at a final

3  hearing on any of these motions including the DIP financing.

4  I didn't want our silence to be deemed acquiescence to any

5  final relief.

6          Your Honor, I had a few other comments I wanted to

7  make in response to Mr. Leblanc that are very short now if

8  that would be okay with the Court or I can do it later.

9          THE COURT:  Now is fine, Ms. Jones.

10         MS. JONES:  Thank you, Your Honor.  Your Honor, as

11  you likely read in the declaration and, obviously, heard

12  today, and I am going to stay at a very high level, the

13  debtors have been in a cooperation agreement with Inmarsat

14  since 2007 which gives the debtors access to a valuable

15  satellite, Spectrum.

16         The cooperation agreement is a contract for

17  allocating rights to Spectrum, which is the lifeblood of the

18  satellite business.  There is a limited Spectrum and the FCC

19  generally requires licensees to coordinate with other

20  satellite operators authorized to use the same Spectrum by

21  other national governments.  In this case, Ligado's FCC

22  Spectrum license requires that it coordinate with other

23  operators like Inmarsat which holds a license from the United

24  Kingdom's Office of Communications.

25         The cooperation agreement I referenced gives the

1  debtor access to satellite Spectrum that Inmarsat could,

2  otherwise, use for its own business and that Inmarsat has

3  vacated to honor its commitment to make the Spectrum

4  available to Ligado.  No party, Your Honor, has supported

5  this debtor more than Inmarsat has.  For more than eight

6  years prior to this filing Inmarsat agreed to amend the

7  cooperation agreements to accommodate the debtors and to

8  defer payments under the contract, just as Inmarsat did prior

9  to Ligado's previous bankruptcy filing a decade ago.

10         Inmarsat, Your Honor, is owed approximately $500

11 million from the debtor making it likely the largest creditor

12 in this case.  Inmarsat continues to be owed money on a

13 quarterly basis post-petition making the Spectrum available

14 to the debtor with respect to which we are reserving all

15 rights.  Your Honor, the bankruptcy filing came as a

16 surprise.  Inmarsat did not know Ligado was filing yesterday.

17 This is disturbing but, obviously, we are reaching out and

18 talking to the debtor to see if we can reach an understanding

19 of what is going on and look forward to moving forward.

20         Needless to say, Your Honor, and despite what is

21 said in the declaration, Inmarsat is not the cause of the

22 debtors financial distress and, in fact, the cause is the

23 debtors inability to conduct its business.  Your Honor, I do

24 not know where our conversations are going to go. The debtors

25 RSA referenced a draft complaint prepared with respect to our

1  client and, again, Your Honor, on surprise we received right

2  before this hearing a complaint that has been filed under

3  seal.  We asked for a copy, I received it right before the

4  hearing but have not had a chance to review it.

5          Your Honor, the cooperation agreement is a vital

6  component of the debtors business.  Indeed, Inmarsat has not

7  been paid for years.  Ligado is getting extreme benefit

8  without paying for it and post-petition the obligations

9  continue. I expect the parties will have different points of

10  view.  Obviously, Judge, those are not issues for today as

11  Mr. Leblanc said but issues that I expect will be brought to

12  you shortly if not resolved.

13          So, Your Honor, I did want to make you aware of

14  that. I think Mr. Leblanc did touch on it but, Your Honor,

15  obviously, we see it very differently and more importantly,

16  Your Honor, we see it as a creditor who has now worked with

17  this debtor for quite some time.  No good deed goes

18  unpunished, Your Honor, we got surprised by a bankruptcy

19  filing.  We are owed about $500 million and we continue to be

20  owed money post-petition.

21          I just want to bring that to Your Honor's

22  attention and we will see where it goes from here.

23          THE COURT:  Thank you for the comments, Ms. Jones.

24          MS. DAVIS JONES:  Thank you, Your Honor.

25  Appreciate it.

1          THE COURT:  Mr. Leblanc.

2          MR. LEBLANC:  Thank you, Your Honor.  I welcome

3  Ms. Jones.  She and I have worked together for many decades.

4  I welcome her to this situation.  I think she -- the comments

5  that it is a surprise when we have a deadline to pay them by

6  Friday, I think, will not bear themselves out but I am not

7  going to address that, Your Honor.  Now is not the time to do

8  it but we will address all of those issues in due course.

9          So, Your Honor, unless the Court has any questions

10  with respect to the background I am going to turn now to the

11  rest of the motions if that is alright with the Court.

12          THE COURT:  Yes, please.

13          MR. LEBLANC:  Your Honor, I will -- my colleague,

14  Abigail Debold is going to present the DIP motion and then we

15  will move through the rest of the agenda.  We are going to

16  just use this same set up here.  So, Ms. Debold is going to

17  come right to his podium if that is okay with the Court.

18          THE COURT:  It is, of course.

19          MR. LEBLANC:  Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Leblanc.

21          Ms. Debold, welcome.

22          MS. DEBOLD:  Good afternoon.

23          THE COURT:  Good afternoon.

24          MS. DEBOLD:  Good afternoon, Your Honor.  Abigail

25  Debold of Milbank, proposed counsel for the debtors.

1          Your Honor, today we are seeking interim approval
2   of the proposed DIP financing and authorization for continued
3   use of cash collateral. This is the motion filed at Docket
4   No. 4 and Item No. 14 on the agenda.  In support of the
5   motion the debtors submitted the declaration of Bruce
6   Mendelsohn, which is filed at Docket No. 6 and is listed as
7   Item No. 14(i) on the agenda.  Mr. Mendelsohn's DIP
8   declaration has already been admitted into evidence for
9   today's hearing.  With that I will move into presenting the
10  motion.
11          The parties have worked very hard to get to the
12  point that we are at today with approximately 88 percent of
13  our funded debt holders supporting the proposed DIP facility
14  which is a key component of the broader restructuring
15  transaction contemplated by the restructuring support
16  agreement.  All of the debtors first lien debt holders will
17  be offered the opportunity to participate in the DIP.  Your
18  Honor has already heard some of these but I think it makes
19  sense to illuminate the key features of the DIP facility.
20          The DIP facility is comprised of new money term
21  loans in the principle amount of approximately $442 million,
22  $12 of which would be available upon entry of the interim
23  order and approximately $327 million would be used upon entry
24  of the final order to repay in full the debtors first out,
25  first lien loan obligations.  The remaining $103 million

1   would be available in up to three draws following entry of

2   the final order.

3          Also upon entry of the final order, approximately

4   $442 to $497 million of the debtors first lien loan and notes

5   obligations would roll up into DIP loans.  The roll up would

6   be on a one-to-one basis with the new money loans if all

7   eligible lenders participate pro rata in the DIP and on a two

8   to one basis for new money loans in excess of the lenders pro

9   rata share of the DIP participation.  Interest on the DIP

10  facility is 17.5 percent paid in kind which is consistent

11  with the debtors prepetition debt.  The DIP facility includes

12  a commitment fee of 5 percent paid in kind upon entry of the

13  interim order, funding discount fees of 5 percent paid in

14  kind upon each new money funding, and a 3 percent per annum

15  unused commitment fee paid in kind monthly beginning

16  January 31st.

17          Certain of the debtors existing lenders who are

18  party to the RSA have committed to backstop the entirety of

19  the DIP facility.  Accordingly, there is also a 12.5 percent

20  backstop fee to be paid in kind to the backstop parties on

21  the amount of new money commitments upon entry of the interim

22  order.  The DIP loans will be secured by first priority liens

23  in all of the debtors collateral.  Additionally, the RSA

24  provides for the conversion of the DIP facility into exit

25  financing upon Ligado's emergence from Chapter 11.

1        At this point I think it would make sense to focus

2 the discussion on the elements of the DIP that we actually

3 need to resolve today at this interim hearing.  For example,

4 the rollup and the refinancing components of the DIP are

5 subject to Your Honor's approval of the DIP on a final basis.

6 That, essentially, leaves for today only the $12 million

7 interim draw, the DIP fees, and interim cash collateral use.

8        In connection with cash collateral use, the

9 parties have agreed to provide adequate protection to the

10 prepetition secured parties whose liens are being primed by

11 the DIP liens, which includes adequate protection liens and

12 claims, payment of professional fees and expenses, and the

13 payment of PIK interest at the default rate to the holders of

14 prepetition first lien debt.

15        The uncontested evidence is clear that this

16 company needs immediate access to DIP financing and to cash

17 collateral.  As Mr. Mendelsohn has stated in his declaration,

18 it is paramount for the debtors to obtain the funding

19 necessary to, among other things, continue paying employees,

20 meet their working capital needs, and fund expenses

21 associated with these cases so that they can preserve and

22 maximize the value of their estates.

23        Your Honor, for interim relief with respect to the

24 DIP facility, the debtors are requesting immediate access

25 to $12 million in cash proceeds from the DIP.  That amount

1  will provide the liquidity needed for the debtors to operate

2  smoothly during the interim period.  The debtors and their

3  advisers believe that this amount, together with the use of

4  cash collateral and the additional final new money DIP

5  proceeds, should be enough to address their immediate

6  liquidity needs and allow them to responsibly administer

7  these Chapter 11 cases.

8         The debtors and the DIP lenders have also engaged

9  in hard-fought negotiations over the terms of the budget and

10  believe that it provides the debtors with the needed funds

11  for operational expenses during these Chapter 11 cases.  In

12  addition, there are various milestones related to the

13  restructuring transactions contemplated by the RSA, which are

14  included as part of the DIP facility to ensure that the

15  restructuring transactions are moving forward efficiently.

16         This DIP financing is on the best terms available

17  to the debtors.  Mr. Mendelsohn stated in his declaration

18  that the debtors and their advisers conducted a prepetition

19  marketing process to obtain DIP financing, and that, despite

20  their best efforts, the only available financing came in the

21  form of this DIP from the prepetition lenders.  The debtors

22  and their professionals tried to obtain DIP financing on

23  better terms, but such financing was not available.  As

24  stated in Mr. Mendelsohn's declaration, the proposed DIP

25  facility is the only option available to the debtors given

1  the debtors' financial situation and prepetition capital

2  structure.  There is simply no option for the debtors to

3  obtain DIP financing on better terms.

4          The features of the DIP facility, including the

5  interest rate, the fees, the rollup, and the first-out

6  refinancing were all critical conditions that the DIP lenders

7  insisted upon.  No DIP financing is available to debtors in

8  their current circumstances without these terms.  However, I

9  again want to note that the rollup and refinancing features

10 of the DIP are not components for which we are seeking

11 approval today.

12          Your Honor, this DIP facility represents the best

13 and only option for post-petition financing, and it must be

14 viewed in the context of how we got here.  Our secured

15 lenders have been funding the company for years through the

16 super senior first-out term loans, notwithstanding the issues

17 that the company has faced because of the actions of the

18 Government.  Portions of the first-out loans were effectively

19 a pre-DIP DIP provided by our lenders.  This DIP must also be

20 viewed in the context of the broader restructuring under the

21 RSA, which is supported by 88 percent of the funded debt, and

22 material portions of the preferred equity.  This RSA is

23 highly unusual in that it provides for a restructuring that

24 preserves the capital structure waterfall, which is highly

25 beneficial for the company's stakeholders.

1          When viewed in this context and under these very

2   unique circumstances, the terms of this DIP are appropriate.

3          The parties have also worked with Mr. Hackman to

4   resolve the issues raised by the U.S. Trustee, and we believe

5   that those issues have now been resolved.  An amended form of

6   order will be filed following the hearing reflecting a

7   cleanup change to paragraph 22 to remove the reference to the

8   USTP guidelines in that paragraph.

9          We therefore ask, subject to any comments that the

10  Court may have, that Your Honor grant the motion on an

11  interim basis so that the debtors may immediately access the

12  new money under the DIP facility and continue using cash

13  collateral before the final hearing, each of which is

14  critical to the debtors' ability to preserve and maximize the

15  value of their estate.

16         I'll pause here for any questions or comments that

17  Your Honor may have.

18         THE COURT:  Thank you, Ms. Debold.

19         Is there anybody who'd like to be heard regarding

20  the request for interim approval of the DIP financing motion?

21     (No verbal response)

22         THE COURT:  Okay, I hear no response.

23         So the only change that will be coming is to

24  strike the language about not being required to comply with

25  the USTP guidelines at paragraph 22?

1          MS. DEBOLD:  That's correct.

2          THE COURT:  Okay.  Based upon that and the

3    evidence before me, I do find that it's necessary to avoid

4    immediate and irreparable harm that I approve the DIP

5    financing motion on an interim basis.  The debtors have

6    demonstrated why it's an appropriate exercise of their

7    business judgment to enter into these transactions and, for

8    those reasons, I will grant the motion on an interim basis.

9          MS. DEBOLD:  Thank you, Your Honor.  I'll now turn

10   the podium over to my colleague Tuvia Peretz to address the

11   next item on the agenda, which is the cash management motion.

12         THE COURT:  Thank you, Ms. Debold.

13         MR. PERETZ:  Good afternoon, Your Honor.  For the

14   record, Tuvia Peretz of Milbank LLP.

15         Next on the agenda is Item Number 15, which is the

16   debtors' cash management motion, filed at Docket Number 7.

17   The debtors are requesting to continue to operate their

18   existing cash management system in the ordinary course, to

19   pay related fees and credit cards, and to engage in

20   intercompany transactions.

21         To facilitate the efficient operation of their

22   business, the debtors use an integrated, centralized cash

23   management system to collect, manage, disburse, and invest

24   funds generated by their operations.  The significant

25   components of the debtors' cash management system are

1  outlined in Exhibit D attached to the motion, and the

2  debtors' nine bank accounts are listed on Exhibit C.

3          The cash management system facilitates cash

4  monitoring, forecasting, and reporting, and enables the

5  debtors to maintain control over the administration of their

6  bank accounts.  The debtors use their bank accounts to

7  organize and monitor cash flows across the corporate

8  enterprise, and to centralize procurement and general admin

9  and operating expenses.  The debtors also maintain current

10  and accurate accounting records of all their daily cash

11  transactions.

12          In addition, the debtors are seeking a waiver of

13  the requirements under Section 345 of the Bankruptcy Code,

14  which the Bankruptcy Court may grant for cause.

15          There are two accounts at banks that are not

16  authorized deposit -- on the authorized depository list.  In

17  the ordinary course of business, the debtors maintain one

18  domestic investment account with Royal Bank of Canada, and

19  one foreign bank account at Scotiabank.  These bank accounts

20  are vital to the debtors' cash management system, and

21  requiring the debtors to transfer funds to other banks on the

22  authorized depository list would be expensive and burdensome

23  to the debtors' operations.

24          Both accounts are maintained at banks that are

25  well-capitalized and highly rated and comparable to those

1  financial institutions included on the authorized depository

2  list, and both have strong Moody's and S&P long-term debt and

3  deposit ratings and general reputations in the banking

4  market.  The debtors also believe their investment policies

5  satisfy the requirements of Section 345(a) and that

6  sufficient cause exists to exempt the investment account

7  from 345(b).  The Scotiabank account is used for Canadian

8  operational purposes and central to the Canadian operations

9  and payroll.

10       For these reasons, the debtors believe a waiver of

11  the requirements under Section 345(b) is appropriate.

12       We've also discussed the order with the Office of

13  the United States Trustee, and shared the motion with the

14  other two stakeholders.  We've incorporated any comments

15  received, but otherwise have not received any objections to

16  the motion.

17       Unless Your Honor has any questions, we would ask

18  that the proposed interim order be entered.

19       THE COURT:  Okay.  Is there anybody who would like

20  to be heard regarding interim approval of the cash management

21  motion?

22     (No verbal response)

23       THE COURT:  Okay, I hear no response.

24       Based upon the record before me, I do find that

25  the relief requested in the motion is appropriate and

1 || warranted, and I will grant the motion on an interim basis.

2 ||          MR. PERETZ:  Thank you, Your Honor.

3 ||          Moving on to the next item on the agenda, which is

4 || Item Number 16, the debtors' taxes and fees motion, which is

5 || filed at Docket Number 11.

6 ||          The debtors request entry of interim and final

7 || orders authorizing the debtors to pay certain prepetition

8 || taxes and fees due and owing to taxing authorities that arise

9 || in the ordinary course.  The debtors are requesting authority

10 || to pay, in the aggregate, up to $55,000 in prepetition taxes

11 || and fees in the interim period, and to pay up to $160,000 in

12 || prepetition taxes and fees during these cases.

13 ||          In the ordinary course of business, the debtors

14 || collect, withhold, incur, and comply with a variety of taxes

15 || and tax obligations, including state use taxes, real and

16 || personal property taxes, franchise taxes, business taxes,

17 || reporting fees, and U.S. and Canadian regulatory fees,

18 || including the FCC.

19 ||          The debtors believe that the relief requested in

20 || the taxes motion is necessary and appropriate because failure

21 || to pay these prepetition taxes and regulatory fees, and any

22 || other unpaid amounts owing to the applicable authorities,

23 || could materially and adversely impact the business.

24 || Specifically, if the debtors were to delay paying prepetition

25 || taxes and fees, there's a risk taxing authorities would

1    assess penalties on past due amounts and increase the size of

2    the debtors' financial liability, or that governmental

3    authorities would pursue claims against officers and

4    directors, or seek to retract valuable licenses.

5              Again, we've discussed the order with the Office

6    of the United States Trustee and shared the motion with key

7    stakeholders.  We've incorporated any comments received, but

8    otherwise have not received any objections.

9              Unless Your Honor has any questions on the taxes

10   and fees motion, we'd respectfully request that Your Honor

11   enter the interim order.

12             THE COURT:  Okay.  Is there anybody who would like

13   to be heard regarding the tax motion?

14        (No verbal response)

15             THE COURT:  Okay, I hear no response.

16             Based upon the evidentiary record before me, I do

17   find that the relief requested in the motion is warranted and

18   I will approve it on an interim basis.

19             MR. PERETZ:  Thank you very much, Your Honor.

20   I'll now turn over the podium to my colleague Ms. Lee Sauer

21   for the next item on the agenda, which is the utilities

22   motion.

23             THE COURT:  Thank you, Mr. Peretz.

24             Welcome, Ms. Sauer.

25             MS. SAUER:  Thank you.  Good afternoon, Your

1    Honor, Danielle Lee Sauer of Milbank, proposed counsel to the

2    debtors.  I'll be handling Items 17 and 18 on the agenda for

3    today's hearing, beginning with the utilities motion, which

4    was filed at Docket Number 13.

5          By this motion, the debtors are seeking interim

6    and final relief approving the proposed adequate assurance

7    procedures as detailed in the motion and prohibiting utility

8    companies from altering, refusing, or discontinuing services

9    to the debtors.

10          In the ordinary course of business, Your Honor,

11    the debtors obtain services directly from certain utility

12    providers such as electricity and telecommunication services.

13    Some of the debtors' utility services are billed directly to

14    the debtors' landlords and passed through to the debtors in

15    accordance with the applicable leases.  In total, the debtors

16    spend on average approximately $140,000 per month on utility

17    services.

18          As of the petition date, the debtors estimate that

19    approximately $54,800 in utility costs may be outstanding due

20    to the timing of the commencement of these cases.  And

21    although the debtors expect to have sufficient liquidity to

22    pay their utilities obligations, in order to provide

23    additional adequate assurance of payment to utility

24    companies, the debtors propose to deposit $70,000 into a

25    segregated bank account for the benefit of utility companies.

1  This number will cover one half of the projected post-

2  petition monthly utilities costs, and the debtors propose

3  depositing that cash within 20 days after entry of the

4  interim order.

5          In addition, the debtors are seeking to institute

6  procedures whereby utility companies may seek to request

7  adequate assurance of payment exceeding the debtors' proposed

8  amounts.  These procedures are intended to streamline the

9  process for addressing any potential concerns regarding the

10 proposed adequate assurance and to provide for a more

11 efficient process to do so.

12         In short, Your Honor, the relief requested in this

13 motion is necessary because utility services are vital to the

14 debtors' continued operations and success of these Chapter 11

15 cases.  This motion and the proposed order were shared with

16 the U.S. Trustee and the comments provided by the U.S.

17 Trustee were incorporated prior to this hearing, and we've

18 received no other objections.

19         Unless Your Honor has any other questions, the

20 debtors respectfully ask that the Court enter the interim

21 order attached to the utilities motion.

22         THE COURT:  Okay.  Is there anybody who would like

23 to be heard regarding the utilities motion?

24     (No verbal response)

25         THE COURT:  Okay, I hear no response.

1          Once again, based upon my review of the

2   evidentiary record and having considered the relief requested

3   in the motion, I do find that the procedures being proposed

4   are standard in this district and there's nothing there that

5   gives rise to any sort of concerns, so I'm happy to approve

6   the motion on an interim basis.

7          MS. SAUER:  Thank you, Your Honor.

8          I'll now move on to the next item on the agenda

9   for this afternoon, which is the debtors' insurance motion

10  that appears at Docket Number 14.  By this motion, the

11  debtors seek interim and final orders authorizing the debtors

12  to, one, continue their insurance policies and surety bond

13  programs, and, two, renew, revise, amend, supplement, extend,

14  or enter into new insurance policies and surety bonds in the

15  ordinary course.

16          In the ordinary course, the debtors maintain

17  approximately 16 insurance policies with various third party

18  carriers.  The debtors make premium payments based upon a

19  fixed rate established by each individual insurance carrier

20  on an annual basis.  The aggregate amount of insurance

21  payments paid by the debtors totaled approximately $7,133,611

22  in the 12 months preceding this filing.  The debtors estimate

23  that, as of the petition date, they do not owe any amounts on

24  account of insurance premiums or other payment obligations

25  related to the insurance policies.

1          The debtors also currently maintain two surety

2   bonds in the ordinary course.  As of the petition date, the

3   debtors do not believe they owe any prepetition amounts on

4   account of the surety bond programs, but out of an abundance

5   of caution the debtors seek authority to continue to satisfy

6   all amounts owed in connection with those programs.

7          As Your Honor knows, the Bankruptcy Code requires

8   that the debtors maintain certain insurance coverage

9   throughout the Chapter 11 cases, and it's really just sound

10  business judgment for the debtors to maintain insurance

11  policies, which are essential to the preservation of the

12  value of their estates.

13         We previewed the motion and the order to the U.S.

14  Trustee and implemented and added prior to this hearing, as

15  we did with the utilities motion.  We received no other

16  objection.

17         So, unless Your Honor has any questions, the

18  debtors respectfully request that the Court enter the interim

19  order attached to the insurance motion.

20         THE COURT:  Is there anyone who would like to be

21  heard regarding the insurance motion?

22      (No verbal response)

23         THE COURT:  Okay, I hear no response.

24         Again, based upon my view of the evidentiary

25  record before me, I do find that the relief requested in the

1    motion is warranted and appropriate.  It's necessary to

2    maintain that insurance and certainly Mr. Hackman would have

3    something to say about if the debtors failed to do so.  So I

4    am more than happy to approve the insurance motion on an

5    interim basis.

6              MS. SAUER:  Thank you, Your Honor.  I will now

7    turn the podium over to my colleague Jordan Rosen, who will

8    present the balance of the motions on the agenda today.

9              THE COURT:  Thank you, Ms. Sauer.

10             Good afternoon, Ms. Rosen.

11             MS. ROSEN:  Good afternoon, Your Honor, Jordan

12   Rosen of Milbank, as proposed counsel to the debtors.

13             The next item on the agenda is Item Number 19, the

14   employee compensation and benefits motion, which was filed at

15   Docket Number 15.

16             The debtors request entry of an interim order

17   authorizing them to pay and honor prepetition obligations on

18   account of compensation and benefits programs, and to

19   maintain such programs in the ordinary course of business.

20   The Court has the authority to grant the requested relief

21   pursuant to Sections 105(a) and 363 of the Bankruptcy Code.

22             The debtors have 80 employees who are employed on

23   a full-time, part-time, and temporary basis, and who are

24   based in both the United States and Canada.  The debtors also

25   regularly use the services of six independent contractors.

1  The employees and independent contractors perform various

2  critical functions, are not easily replaced, and are

3  essential to effective operations in Chapter 11 and a

4  successful reorganization.  The employees and independent

5  contractors possess unique skills, experience, knowledge, and

6  understanding of the debtors' business and operations.

7           At a high level, the compensation and benefits

8  programs that the debtors seek to maintain include wages and

9  salaries, payroll service fees, withholdings and payroll

10 taxes, expense reimbursement, manager compensation, bonus and

11 incentive programs; employee benefits programs including

12 health insurance programs, other insurance and disability

13 benefits, workers' compensation programs, paid leaves and

14 other leaves of absence, 401(k) benefits, severance, and

15 certain other benefits.  It is essential that the debtors be

16 able to continue the compensation and benefits programs, and

17 make payments due and owing on account of such programs.

18          For the avoidance of doubt, Your Honor, the

19 debtors are not seeking authority to make any payments to

20 insiders under the bonus programs or severance programs, and

21 the debtors will not pay any employee, independent

22 contractor, or manager any prepetition amount over the

23 statutory cap of $15,150 per individual.

24          The debtors believe that, in their business

25 judgment, the relief requested in the motion is necessary for

1    the continued uninterrupted operations and to preserve value

2    for the debtors' estates.  Absent the relief requested, the

3    debtors would otherwise face severe threats to the successful

4    operation of their businesses, including employee attrition

5    and turnover, as well as the loss of employee morale, which

6    would impair the debtors' ability to effectively continue

7    their current operations.

8          The debtors have shared the motion with the United

9    States Trustee and other key stakeholders, and the U.S.

10   Trustee had no comments to the proposed form of interim

11   order.

12         So, unless Your Honor has any questions, the

13   debtors respectfully request that the Court enter the

14   proposed interim order.

15         THE COURT:  Is there anyone who would like to be

16   heard regarding the employee wage motion?

17       (No verbal response)

18         THE COURT:  Okay, I hear no response.

19         Once again, based upon my review of the evidence,

20   I do find that it's appropriate that I enter this order on an

21   interim basis.  Clearly, immediate and irreparable harm would

22   come to the debtors if I did not approve it because it's,

23   frankly, unthinkable that employees should be in a position

24   where they are not being fully paid for all the work that

25   they may have performed prepetition.  So, therefore, I'm very

1  happy to grant this motion on an interim basis and I will do

2  so.

3             MS. ROSEN:  Thank you, Your Honor.

4             The next item on the agenda is Item Number 20, the

5  redaction motion, which was filed at Docket Number 16.

6             Your Honor, this motion seeks authority to seal

7  and redact certain personal information from the creditor

8  matrix and other documents filed with this Court.  The Court

9  has the authority to grant the requested relief pursuant to

10 Sections 107(c) and 105(a) of the Bankruptcy Code.

11            The debtors submit that cause exists to redact

12 personally identifiable information from the debtors' filings

13 due to concerns of identity theft, harassment, stalking,

14 phishing scams, and other concerns.  The debtors propose to

15 file unredacted versions of all redacted filings under seal,

16 and to also provide unredacted copies to the Court, the

17 United States Trustee, counsel to the Ad Hoc Cross-Holder

18 Group, and Ad Hoc First Lien Group, counsel to any official

19 committee appointed, and any other party as the Court may

20 direct.

21            We have shared drafts of the motion and order with

22 the United States Trustee and other key stakeholders, and

23 have incorporated any comments received.

24            So, unless Your Honor has any additional

25 questions, the debtors request that the Court enter the

1  proposed form of order.

2         THE COURT:  Okay, is there anybody who would like

3  to be heard regarding this redaction motion?

4      (No verbal response)

5         THE COURT:  Okay, I hear no response.

6         Again, based upon the evidence before me, I do

7  find that it is appropriate to grant the relief requested

8  here.  And we see these sorts of motions typically on first

9  days now, and I would note that the scope of redactions

10  sought here are fairly modest and I certainly have no

11  problems with what's being requested.  So, therefore, I'm

12  very happy to grant the motion.

13         MS. ROSEN:  Thank you, Your Honor.

14         The next item on the agenda is Item Number 21, the

15  foreign representative motion, which was filed at Docket

16  Number 17.

17         Your Honor, this motion seeks authorization for

18  Ligado Networks LLC to act as foreign representative of the

19  debtors in any proceedings filed in any foreign country,

20  authorization for Ligado Networks LLC to seek recognition by

21  a Canadian court of the debtors' Chapter 11 cases and orders

22  entered by this Court, and a request for the Canadian court

23  to lend assistance to this Court.  The Court has authority to

24  grant the requested relief pursuant to Sections 1505 and 1107

25  of the Bankruptcy Code.

1          Your Honor, in addition to the operations in the

2    United States, three of the debtors are incorporated in

3    Canada:  Ligado Networks Canada, Inc., Ligado Networks Corp.,

4    and Ligado Networks Holdings Canada, Inc.  The debtors

5    believe it will be necessary to commence ancillary

6    proceedings in Canada pursuant to the Canadian Companies

7    Creditors Arrangement Act, or CCAA.  If appointed, Ligado

8    Networks LLC intends to seek such relief in the Ontario

9    Superior Court of Justice, and request that the Canadian

10   court recognize these Chapter 11 cases as foreign main

11   proceedings under the CCAA.  However, in order to commence

12   the CCAA proceedings the CCAA requires that the debtors

13   receive authority from this Court to act as a foreign

14   representative, as defined in the CCAA.

15          Your Honor, we've shared drafts of the motion and

16   proposed order with the United States Trustee and other

17   stakeholders, and have incorporated any comments received.

18   So, unless Your Honor has any questions, we respectfully

19   request that the Court enter the proposed form of order.

20          THE COURT:  Okay, is there anyone who would like

21   to be heard regarding this motion?

22      (No verbal response)

23          THE COURT:  Okay, I hear no response.

24          Again, I've considered the evidence before me, I

25   have reviewed the motion, I've heard the argument on it, and,

1  under Section 1505 of the Bankruptcy Code, I do possess the

2  authority to grant the relief that the debtor is requesting.

3  So I'm happy to go ahead and grant the motion.

4          MS. ROSEN:  Thank you, Your Honor.

5          Now turning to the last item on the agenda,

6  Item 22, the Omni retention application, which was filed at

7  Docket Number 18.  This application seeks appointment of Omni

8  Agent Solutions as claims and noticing agent, effective as of

9  the petition date.  The application is supported by the

10 declaration of Paul Deutch, executive vice president of Omni,

11 attached as Exhibit B to the application.

12         At this time, the debtors request that the

13 declaration be entered into evidence.

14         THE COURT:  Okay.  Does anybody object to the

15 admission of Mr. Deutch's declaration in support of Omni's

16 retention?

17     (No verbal response)

18         THE COURT:  Okay, I hear no response.

19         Is there anybody who'd like to cross-examine Mr.

20 Deutch?

21     (No verbal response)

22         THE COURT:  I hear no response.

23     (Declaration of Paul Deutch received in evidence)

24         THE COURT:  Okay, Ms. Rosen.

25         MS. ROSEN:  Thank you, Your Honor.

1          The debtors submit that the retention of Omni as

2    claims and noticing agent will ensure the efficient

3    administration of these Chapter 11 cases while relieving the

4    Clerk's Office of a material burden absent Omni's

5    appointment.   The Court has the authority to grant the

6    requested relief pursuant to Section 156(c) of Title 28 of

7    the United States Code and Local Rule 2002-1(f).

8          The debtors submit that Omni has both the

9    necessary qualifications and experience to serve as claims

10   and noticing agent.   As claims and noticing agent, Omni will

11   assume full responsibility for the distribution of notices in

12   these Chapter 11 cases, as well as the maintenance,

13   processing, and docketing of proofs of claim.

14          We've shared drafts of the application and order

15   with the United States Trustee and other stakeholders, and

16   have incorporated comments that we've received from those

17   parties.

18          Unless Your Honor has any additional questions, we

19   respectfully request that the Court enter the proposed order

20   granting the retention application.

21          THE COURT:  Okay, is there anyone who wishes to be

22   heard regarding the Omni retention application?

23       (No verbal response)

24          THE COURT:  Okay, I hear no response.

25          Based upon the evidence before me, I do find that

1   the relief requested is warranted, and I will be happy to

2   enter the order approving Omni's retention.

3            MS. ROSEN:  Thank you, Your Honor.

4            THE COURT:  Thank you.

5            MS. ROSEN:  That concludes the items on the

6   agenda.  I'll now turn the podium back over to Mr. Leblanc.

7            THE COURT:  Thank you very much.

8            MR. LEBLANC:  Good afternoon, Your Honor, Andrew

9   Leblanc of Milbank again on behalf of Ligado.  Your Honor,

10  that concludes our agenda.  We appreciate very much Your

11  Honor taking the time this afternoon.

12           Let me again extend our thanks to Mr. Hackman on

13  behalf of the Office of the United States in making this go

14  so smoothly for us and our team, it's really been a pleasure

15  working with them, and with all of the stakeholders who have

16  got us to this point to have this first day be fully

17  consensual.

18           As a preview of coming attractions, Your Honor, I

19  mentioned -- I think I may have said that we filed the

20  breakup fee motion today, we actually filed it yesterday,

21  Your Honor, that has been calendared by the Court for

22  January 27th at 1:00 p.m.  And then we have final hearings

23  with respect to our first day relief scheduled on

24  February 5th at 1:00 p.m. also.

25           So with that, Your Honor, we -- that's all we had

1    today.  Again, on behalf of the company and our team here at

2    Milbank, we very much appreciate the Court's accommodation of

3    us today and, unless Your Honor has any questions, that's all

4    we have.

5         THE COURT:  Thank you, I don't have any questions.

6    Mr. Leblanc, I do want to thank you for including so many of

7    your colleagues in the presentations today.  I really value

8    having the opportunity to hear from the younger people at the

9    firms, especially since they probably put in a lot of the

10   hours preparing those motions.  So I'm really happy to --

11        MR. LEBLANC:  They certainly did, Your Honor.  And

12   I'm sure, based on their presentations, you understand why we

13   felt totally comfortable doing that.

14        THE COURT:  I do see that and I appreciate it very

15   much, Mr. Leblanc.  Okay.

16        MR. LEBLANC:  Thank you.

17        THE COURT:  Well, thank you all very much and have

18   a good afternoon.

19       (Proceedings concluded at 3:22 p.m.)CERTIFICATION

20        We certify that the foregoing is a correct

21   transcript from the electronic sound recording of the

22   proceedings in the above-entitled matter to the best of our

23   knowledge and ability.

24

25   /s/ William J. Garling_____            January 8, 2025

1  William J. Garling, CET-543

2  Certified Court Transcriptionist

3  For Reliable

4

5  /s/ Tracey J. Williams                    January 8, 2025

6  Tracey J. Williams, CET-914

7  Certified Court Transcriptionist

8  For Reliable

9

10  /s/ Mary Zajaczkowski                     January 8, 2025

11  Mary Zajaczkowski, CET-531

12  Certified Court Transcriptionist

13  For Reliable

14

15

16

17

18

19

20

21

22

23

24

25