# EXHIBIT J

**Exhibit B**

**Framework Agreement**

**FRAMEWORK AGREEMENT**

**by and among**

**AST SPACEMOBILE, INC.,**

**AST & SCIENCE, LLC,**

**SPECTRUM USA I, LLC**

**and**

**LIGADO NETWORKS LLC**

**Dated as of March 22, 2025**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS & INTERPRETATIONS ..................................................2

    1.1    Certain Definitions.............................................................................2
    1.2    Additional Definitions.......................................................................6
    1.3    Certain Interpretations......................................................................7

ARTICLE II AST PAYMENTS ...............................................................................8

    2.1    Warrant ............................................................................................8
    2.2    Deferred Usage Obligation ...............................................................9

ARTICLE III REPRESENTATIONS AND WARRANTIES OF LIGADO ................10

    3.1    Organization and Qualification.........................................................10
    3.2    Corporate Power; Enforceability.......................................................10
    3.3    Consents and Approvals; No Violation ..............................................11
    3.4    Investment Decision.........................................................................11
    3.5    No Other Representations or Warranties ............................................12

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PARENT GROUP .................12

    4.1    Organization and Qualification.........................................................12
    4.2    Corporate Power; Enforceability.......................................................13
    4.3    Consents and Approvals; No Violation ..............................................13
    4.4    No Other Representations or Warranties ............................................14

ARTICLE V COVENANTS......................................................................................14

    5.1    Efforts .............................................................................................14
    5.2    Public Statements.............................................................................16
    5.3    Certain Litigation ............................................................................16
    5.4    Notice of Certain Events ..................................................................17
    5.5    Backstop Commitment......................................................................17
    5.6    Viasat Payment ...............................................................................18

ARTICLE VI CONDITIONS TO THE DUO PAYMENTS OR THE CATCH-UP DUO PAYMENTS (AS APPLICABLE)...............................................................18

    6.1    Conditions to the Obligations of the Parent Group.............................18

ARTICLE VII TERMINATION ...............................................................................19

    7.1    Termination.....................................................................................19
    7.2    Effect of Termination.......................................................................20
    7.3    Fees and Expenses...........................................................................20

ARTICLE VIII GENERAL PROVISIONS................................................................22

    8.1    Amendment.....................................................................................22
    8.2    Extension; Waiver............................................................................22

8.3     Notices .................................................................................................22
8.4     Assignment ...........................................................................................23
8.5     Confidentiality ......................................................................................24
8.6     Entire Agreement ..................................................................................24
8.7     Third Party Beneficiaries .....................................................................24
8.8     Severability ...........................................................................................24
8.9     Remedies; Dispute Resolution..............................................................24
8.10    Governing Law ......................................................................................25
8.11    Consent to Jurisdiction..........................................................................25
8.12    WAIVER OF JURY TRIAL ..................................................................26
8.13    Counterparts ..........................................................................................26
8.14    AST Parent Indemnity ..........................................................................27

**Schedules**

Schedule 1     Dispute Resolutions Representatives

**Exhibits**

Exhibit A     Restructuring Support Agreement
Exhibit B     Strategic Collaboration and Spectrum Usage Agreement
Exhibit C     CCI Agreement
Exhibit D     Governance Letter Agreement
Exhibit E     Pre-Funded Warrant to Purchase Common Stock
Exhibit F     Convertible Note Term Sheet

# FRAMEWORK AGREEMENT

THIS FRAMEWORK AGREEMENT (this "Agreement") is made and entered into as of March 22, 2025 by and among AST SpaceMobile, Inc., a Delaware corporation ("AST Parent"), AST & Science, LLC, a Delaware limited liability company and a wholly owned Subsidiary of AST Parent ("AST"), Spectrum USA I, LLC, a Delaware limited liability company and a wholly owned subsidiary of AST ("SpectrumCo", and together with AST Parent and AST, the "Parent Group") and Ligado Networks LLC, a Delaware limited liability company ("Ligado").

## RECITALS:

WHEREAS, on January 5, 2025, Ligado and certain of its Subsidiaries (collectively, the "Debtors") each commenced a voluntary case under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Debtors continue to operate their respective businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtors, the Consenting Stakeholders (as defined in the RSA) and AST have entered into a Restructuring Support Agreement, dated as of January 5, 2025 (the "RSA"), a copy of which is attached hereto as Exhibit A;

WHEREAS, pursuant to the RSA, the parties thereto have agreed to support and consummate a commercial transaction between the Debtors and AST (the "AST Transaction") and a restructuring of the Debtors' capital structure, to be implemented pursuant to a prearranged Chapter 11 plan of reorganization (as may be amended or supplemented from time to time in accordance with the terms of the RSA, the "Plan");

WHEREAS, the terms and conditions of the AST Transaction shall be governed by this Agreement and the other AST Definitive Agreements (as defined below);

WHEREAS, the (a) board of directors of AST Parent has unanimously approved the execution and delivery by AST Parent of this Agreement, the performance by AST Parent of its covenants and agreements contained herein and the consummation by AST Parent of the transactions contemplated hereby on the terms and subject to the conditions contained herein, (b) the managing member of AST has approved the execution and delivery by AST of this Agreement, the performance by AST of its covenants and agreements contained herein and the consummation by AST of the transactions contemplated hereby on the terms and subject to the conditions contained herein and (c) the sole, managing member of SpectrumCo has approved the execution and delivery by SpectrumCo of this Agreement, the performance by SpectrumCo of its covenants and agreements contained herein and the consummation by SpectrumCo of the transactions contemplated hereby on the terms and subject to the conditions contained herein;

WHEREAS, the board of managers of Ligado has unanimously approved the execution and delivery by Ligado of this Agreement, the performance by Ligado of its covenants and agreements contained herein and the consummation by Ligado of the transactions contemplated hereby on the terms and subject to the conditions contained herein;

WHEREAS, concurrently with the execution and delivery of this Agreement, SpectrumCo and Ligado are entering into the Strategic Collaboration and Spectrum Usage Agreement attached hereto as <u>Exhibit B</u> (the "<u>Collaboration Agreement</u>") and AST and Ligado are entering into the Spectrum Usage Rights Agreement attached hereto as <u>Exhibit C</u> (the "<u>CCI Agreement</u>");

WHEREAS, concurrently with the execution and delivery of this Agreement, AST Parent, Cerberus Capital Management, L.P. and Fortress Credit Advisors LLC are entering into the Governance Letter Agreement attached hereto as <u>Exhibit D</u> (the "<u>Governance Letter Agreement</u>"); and

WHEREAS, AST Parent, AST, SpectrumCo and Ligado desire to make certain representations, warranties, covenants and agreements in connection with this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, and intending to be legally bound hereby, AST Parent, AST, SpectrumCo and Ligado hereby agree as follows:

## ARTICLE I
## DEFINITIONS & INTERPRETATIONS

1.1     <u>Certain Definitions</u>. For all purposes of and under this Agreement, the following capitalized terms shall have the following respective meanings:

"<u>Adverse Impact Determination</u>" has the meaning set forth in the Collaboration Agreement.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of the immediately preceding sentence, the term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"<u>Approval Condition</u>" means the occurrence of all of the following:

(a)     Ligado has duly submitted each NGSO Regulatory Application requested by AST within six months after the date hereof;

(b)     Ligado and AST have obtained the NGSO Regulatory Approvals within 24 months after submission of the FCC NGSO Regulatory Applications; and

(c)     during the nine-month period following receipt of the FCC NGSO Regulatory Approvals, no United States Law has been enacted that prohibits or materially adversely impacts AST's use of the Ligado L-Band MSS Spectrum at the necessary power levels

for operation of the AST NGSO System, as further detailed in Exhibit 4 (*Power Levels for AST NGSO System*) of the Collaboration Agreement.

"Approval Condition Failure" has the meaning set forth in the Collaboration Agreement.

"AST Definitive Agreements" means this Agreement, the Collaboration Agreement, the CCI Agreement, the Warrant, the Governance Letter Agreement and, if issued, the DUO Note.

"AST Definitive Agreements Order" has the meaning set forth in the RSA.

"AST Legal Proceeding" means any Legal Proceeding relating to the AST Transaction in which AST or AST Parent is a named party or has been formally served with notice thereof.

"AST NGSO System" has the meaning set forth in the Collaboration Agreement.

"Business Day" means a day, except a Saturday, a Sunday or other day on which any of the SEC, commercial banks in New York, New York or the Department of State of Delaware are not open for the general transaction of business.

"Consent" means any approval, consent, license, ratification, permission, waiver, order or similar authorization (including from any Governmental Authority), including the expiration or termination of any waiting period pursuant to any Law.

"Contract" means, whether written or oral, any legally binding contract, subcontract, agreement, obligation, commitment, license, sublicense, note, bond, mortgage, indenture, deed of trust, franchise, lease, sublease, loan, credit agreement, guarantee or other similar arrangement or instrument.

"Effective Date" has the meaning set forth in the Collaboration Agreement.

"Exchange Act" means the Securities Exchange Act of 1934.

"FCC" shall mean the U.S. Federal Communications Commission, and any successor agency of the U.S. government exercising substantially equivalent powers.

"GAAP" means generally accepted accounting principles, as applied in the United States and in effect from time to time.

"Governmental Authority" means (a) any government, (b) any governmental or regulatory entity, body, department, commission, subdivision, board, agency or instrumentality or similar authority or office, (c) any court, tribunal, judicial body, arbitrator, arbitration panel or binding mediator or similar authority and (d) any non-governmental self-regulatory agency, securities exchange, commission or similar authority, in each of the preceding clauses (a) through (d), whether multinational, supranational, national, federal, state, county, municipal, provincial, and whether local, domestic or foreign.

-3-

"Law" means any applicable law, statute, constitution, principle of common law, ordinance, code, rule, regulation, ruling or other legal requirement or similar provision having the force or effect of law issued, enacted, adopted, promulgated, implemented or otherwise put into effect by, or under the authority of, any Governmental Authority, including all Orders.

"Legal Proceeding" means any (a) civil, criminal or administrative (whether at law or equity) actions, claims, demands, examinations, hearings, inquiries, investigations or suits and (b) litigations, arbitrations, mediations or other similar proceedings, in each of the preceding clauses (a) and (b), by, before or involving any Governmental Authority.

"Liabilities" means any liability, obligation or commitment of any kind (whether accrued, unaccrued, absolute, contingent, liquidated, unliquidated, matured, unmatured, known, unknown, asserted, unasserted, determined, determinable or otherwise and whether or not required to be recorded or reflected on a balance sheet prepared in accordance with GAAP).

"Lien" means any lien, pledge, hypothecation, charge, mortgage, deed of trust, security interest, license, sub-license, encumbrance, easement, right of way or other restriction of similar nature (including any restriction on the transfer of any security or other asset, or any restriction on the possession, use, exercise or transfer of any other attribute of ownership of any asset).

"Ligado L-Band MSS Spectrum" has the meaning set forth in the Collaboration Agreement.

"Ligado Legal Proceeding" means any Legal Proceeding relating to the Ligado L-Band MSS Spectrum or the AST Transaction in which Ligado is a named party or has been formally served with notice thereof.

"NASDAQ" means The Nasdaq Global Select Market.

"NGSO Regulatory Application" has the meaning set forth in the Collaboration Agreement.

"NGSO Regulatory Approvals" has the meaning set forth in the Collaboration Agreement.

"Order" means any judgment, award, decision, decree, injunction, ruling, writ, assessment, stipulation, determination or similar order of any Governmental Authority (whether temporary, preliminary or permanent) that is binding on any Person or its property or assets under Law.

"Payment Condition" means the occurrence of all of the following:

(a)    Ligado shall be required by an order of the Bankruptcy Court to pay to Viasat all or any portion of the aggregate quarterly fees that Ligado must pay to Viasat under the Viasat Cooperation Agreement for a given year due and payable by Ligado pursuant to the Viasat Cooperation Agreement prior to and as of January 5, 2025 (such order, the "Viasat Order" and such payment, the "Viasat Payment");

-4-

(b)     Ligado shall have provided to AST Parent with at least seven (7) Business Days' notice that the condition set forth in clause (a) has been satisfied; and

(c)     AST shall have received the Backstop Commitment (as defined below).

"Permit" means franchises, grants, authorizations, registrations, licenses, permits, easements, variances, exceptions, Consents, certificates, accreditations, clearances and other similar approvals and Orders, in each case, of any Governmental Authority.

"Person" means any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other similar enterprise, association, organization, entity or Governmental Authority.

"Plan Effective Date" has the meaning set forth in the RSA.

"Representative" means with respect to any Person, its directors, managers, officers or other employees, Affiliates, or any investment banker, attorney or other agent or representative retained by, or on behalf of, such Person.

"SEC" means the United States Securities and Exchange Commission or any successor thereto.

"SEC Report" means all reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein) required to be filed or furnished by AST Parent with the SEC.

"Securities Act" means the Securities Act of 1933.

"Subsidiary" of any Person means (a) a corporation more than 50% of the combined voting power of the outstanding voting stock of which is owned, directly or indirectly, by such Person or by one or more other Subsidiaries of such Person or by such Person and one or more other Subsidiaries thereof, (b) a partnership of which such Person or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, is the general partner or has the power to direct the policies, management and affairs of such partnership, (c) a limited liability company of which such Person or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, is the sole member, managing member or manager or has the power to direct the policies, management and affairs of such company or (d) any other Person (other than a corporation, partnership or limited liability company) in which such Person or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, has at least a majority ownership or power to direct the policies, management and affairs thereof.

"Takings Litigation" means *Ligado Networks LLC v. USA*, Docket No. 1:23-cv-01797 (Fed. Cl. Oct 12, 2023).

"Takings Litigation Proceeds" means any cash proceeds actually received by Ligado and its Affiliates in connection with the Takings Litigation (including any settlement thereof).

"Usage Rights Payments" has the meaning set forth in the Collaboration Agreement.

"Viasat" means Viasat, Inc., Inmarsat Global Limited or any of their respective controlled Affiliates.

"Viasat Cooperation Agreement" means the Amended and Restated Cooperation Agreement, dated as of August 6, 2010, by and among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc. and Inmarsat Global Limited, as amended by Amendment No. 1, dated April 25, 2011, Amendment No. 2, dated April 18, 2012, Amendment No. 3, dated May 4, 2016, Amendment No. 4, dated January 27, 2017, Amendment No. 5, dated June 30, 2020, Amendment No. 6, dated October 1, 2020, Amendment No. 7, dated December 23, 2022, Amendment No. 8, dated March 31, 2023, Amendment No. 9, dated June 15, 2023, Amendment No. 10, dated September 21, 2023, Amendment No. 11, dated October 20, 2023, Amendment No. 12, dated November 9, 2023, Amendment No. 13, dated January 10, 2024, Amendment No. 14, dated May 24, 2024, Amendment No. 15, dated September 5, 2024, Amendment No. 16, dated September 12, 2024, Amendment No. 17, dated October 10, 2024, Amendment No. 18, dated November 13, 2024, Amendment No. 19, dated November 22, 2024, Amendment No. 20 dated December 20, 2024, and Amendment No. 21 dated December 26, 2024.

1.2　　Additional Definitions. The following capitalized terms shall have the respective meanings ascribed thereto in the respective sections of this Agreement set forth opposite each of the capitalized terms below:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Applicable Response Deadline | 5.2 |
| AST | Preamble |
| AST Parent | Preamble |
| AST Transaction | Recitals |
| Backstop Commitment | 5.5 |
| Backstop Financing | 5.5 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Break-Up Fee | 7.3(b) |
| Catch Up DUO Payment | 2.2(b) |
| Catch Up DUO Payment Date | 2.2(b) |
| CCI Agreement | Recitals |
| Chosen Courts | 8.11 |
| Collaboration Agreement | Recitals |
| Confidentiality Agreement | 2.2(a)(ii) |
| Debtors | Recitals |

Dispute Party ..................................................................................................... 8.9(c)
DUO Note ..................................................................................................... 2.2(a)(ii)
DUO Payment Date ........................................................................................ 2.2(a)
DUO Payments ............................................................................................... 2.2(a)
Enforceability Exceptions ............................................................................. 3.2(b)
Financing Sources ................................................................................................ 5.5
Governance Letter Agreement ................................................................. Recitals
Indemnitee .......................................................................................................... 8.14
Ligado ................................................................................................................ Preamble
Parent Common Stock ....................................................................................... 2.1
Parent Group .................................................................................................. Preamble
Plan ................................................................................................................. Recitals
Refund Amount ............................................................................................... 5.5(c)
RSA .................................................................................................................. Recitals
SpectrumCo ..................................................................................................... Preamble
Warrant ................................................................................................................ 2.1

      1.3    <u>Certain Interpretations</u>.

(a)    Unless otherwise indicated, the words "include," "includes" and "including," when used herein, shall be deemed in each case to be followed by the words "without limitation."

(b)    All references herein to the Subsidiaries of a Person shall be deemed to include all direct and indirect Subsidiaries of such Person unless otherwise indicated or the context otherwise requires.

(c)    Unless otherwise indicated, all references herein to Articles, Sections, Annexes, Exhibits or Schedules, shall be deemed to refer to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement, as applicable, and all references herein to "paragraphs" or "clauses" shall be deemed references to separate paragraphs or clauses of the section or subsection in which the reference occurs. The words "hereof," "herein," "hereby," "herewith", "hereunder" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

(e)    Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

(f)    When used herein, the word "extent" and the phrase "to the extent" mean the degree to which a subject or other thing extends, and such word or phrase shall not simply mean "if."

(g)    The table of contents and headings set forth in this Agreement are for convenience of reference purposes only and shall not affect or be deemed to affect in any way the meaning or interpretation of this Agreement or any term or provision hereof.

(h)    References to "$" and "dollars" are to the currency of the United States.

(i)    Any dollar or percentage thresholds set forth herein shall not be used as a benchmark for the determination of what is or is not "material" or a "material adverse effect" under this Agreement.

(j)    "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form in English.

(k)    Except as otherwise specified, (i) references to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder, (ii) references to any Person include the successors and permitted assigns of that Person and (iii) references from or through any date mean from and including or through and including, respectively.

(l)    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day. Unless otherwise specified in this Agreement, when calculating the period of time within which, or following which, any action is to be taken pursuant to this Agreement, the date that is the reference day in calculating such period shall be excluded.

(m)    The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(n)    The word "or" shall be disjunctive but not exclusive.

(o)    Accounting terms used but not otherwise defined herein shall have the meaning given to such terms under GAAP.

## ARTICLE II
## AST PAYMENTS

2.1    <u>Warrant</u>. Concurrently with the execution and delivery of this Agreement, AST Parent is issuing to Ligado that certain pre-funded warrant to purchase up to 4,714,226 shares of Class A Common Stock, $0.0001 par value per share, of AST Parent ("<u>Parent Common Stock</u>") at a purchase price of $0.01 per share (the "<u>Warrant</u>"), a true and complete copy of which is attached hereto as <u>Exhibit E</u>.

-/0

## 2.2    Deferred Usage Obligation.

(a)    No later than the earlier of (x) the fifth (5th) Business Day following the satisfaction (or waiver, if permitted by Law) of the conditions set forth in Article VI (other than those conditions that, by their nature, are to be satisfied on the DUO Payment Date (as defined below), but subject to the satisfaction (or waiver, if permitted by Law) of such conditions) and (y) solely in the event the Payment Condition has been satisfied, the twenty-first (21st) day following the issuance of the Viasat Order (provided, that, as of the DUO Payment Date, the other conditions set forth in Article VI have been satisfied (or waived, if permitted by Law) other than those conditions that, by their nature, are to be satisfied on the DUO Payment Date, but subject to the satisfaction (or waiver, if permitted by Law) of such conditions), subject to Section 2.2(b), AST Parent shall pay and/or issue to Ligado the following:

(i)    a cash payment of $350,000,000 by wire transfer of immediately available funds to an account or accounts designated by Ligado prior to the DUO Payment Date; and

(ii)    a convertible note having the terms and conditions set forth in Exhibit F (the "DUO Note") in an aggregate principal amount of $200,000,000; provided, that AST Parent may, in its sole and absolute discretion, on ten (10) Business Days' prior written notice to Ligado, replace all or any portion of the foregoing issuance with a cash payment in US dollars, to be paid to Ligado by wire transfer of immediately available funds to an account or accounts designated by Ligado prior to the DUO Payment Date (in which case the aggregate principal amount of the DUO Note shall be reduced by the amount of cash so paid); provided, that in the event that the DUO Note is issued pursuant to this Section 2.2(a)(ii), AST Parent shall pay to Ligado, within thirty (30) days of Ligado's written request, an amount equal to (A) all reasonable and documented fees and expenses incurred by Ligado in connection with its efforts to monetize the DUO Note *plus* (B) (1) the aggregate principal amount of the DUO Note *minus* (2) the amount of gross proceeds (before expenses) actually received by Ligado in connection with its monetization of the DUO Note (following completion of such monetization); provided, further, that Ligado shall consult with and consider in good faith any comments from AST Parent regarding, and use reasonable best efforts to maximize the net proceeds received from, the monetization of the DUO Note.

For purposes hereunder, (1) "DUO Payments" shall mean the payment and/or issuance to Ligado made pursuant to this Section 2.2(a) and (2) "DUO Payment Date" shall mean the date on which the DUO Payments are actually made.

(b)    Notwithstanding the foregoing, in the event that (i) the DUO Payment Date occurs before the Approval Condition has been satisfied and (ii) the Viasat Payment is less than $550,000,000, the aggregate amount of the DUO Payments required to be made pursuant to Section 2.2(a) shall be reduced to the amount of the Viasat Payment (it being understood that the DUO Note shall be issued Ligado pursuant to Section 2.2(a) (A) only if the amount of the Viasat Payment exceeds $350,000,000 and (B) in an aggregate principal amount equal to such excess, if any); provided, that within five (5) Business Days following the satisfaction of the Approval

-/0

Condition and the satisfaction (or waiver, if permitted by Law) of the other conditions set forth in Article VI (other than those conditions that, by their nature, are to be satisfied on the Catch-Up DUO Payment Date (as defined below), but subject to the satisfaction (or waiver, if permitted by Law) of such conditions), AST Parent shall pay and/or issue to Ligado the remaining amount of the DUO Payments not previously made to Ligado (the "Catch-Up DUO Payments" and the date on which such payment and/or issuance are actually made, the "Catch-Up DUO Payment Date").

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF LIGADO

Ligado represents and warrants to the Parent Group as follows:

3.1     Organization and Qualification. Ligado is a limited liability company duly organized and validly existing under the Laws of the State of Delaware. Each of Ligado's Subsidiaries is duly organized and validly existing under the Laws of its respective jurisdiction of incorporation or organization. Each of Ligado and each of its Subsidiaries is in good standing under the Laws of its respective jurisdiction of incorporation or organization (to the extent such concepts are recognized in the applicable jurisdiction) and has all limited liability company, corporate or similar power and authority to own, lease and operate its properties and assets in the manner in which they are currently owned, used or held and conduct its business as currently conducted, except in each case for such failure to be in good standing or have such power and authority that would not, individually or in the aggregate, reasonably be expected to be material to Ligado and its Subsidiaries, taken as a whole, or prevent, materially delay or materially impair the ability of Ligado to perform its obligations under this Agreement or consummate the transactions contemplated hereby.

3.2     Corporate Power; Enforceability.

(a)     Ligado has all requisite limited liability company power and authority to execute and deliver this Agreement, to perform its covenants and obligations hereunder and to consummate the transactions contemplated hereby. Subject to requisite Bankruptcy Court approvals, the execution and delivery by Ligado of this Agreement, the performance by Ligado of its covenants and obligations hereunder and the consummation by Ligado of the transactions contemplated hereby have been duly and validly authorized by all necessary limited liability company action on the part of Ligado, and no additional limited liability company proceedings or actions on the part of Ligado are necessary to authorize the execution and delivery by Ligado of this Agreement, the performance by Ligado of its covenants and obligations hereunder or the consummation by Ligado of the transactions contemplated hereby.

(b)     This Agreement has been duly and validly executed and delivered by Ligado and, assuming the due authorization, execution and delivery by AST Parent, AST and SpectrumCo, constitutes a legal, valid and binding obligation of Ligado, enforceable against Ligado in accordance with its terms, except that such enforceability (i) may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar Laws affecting or relating to creditors' rights generally and (ii) is subject to general principles of equity (collectively, the "Enforceability Exceptions").

3.3     <u>Consents and Approvals; No Violation</u>. Neither the execution or delivery of this Agreement by Ligado, the performance by Ligado of its covenants and obligations hereunder nor the consummation of the transactions contemplated hereby will (a) violate or conflict with or result in any breach of any provision of the respective certificate of incorporation or bylaws (or similar governing documents) of Ligado or any of its Subsidiaries, (b) require any Permit of, or filing with or notification to, any Governmental Authority except for the NGSO Regulatory Approvals and as may be required under the Bankruptcy Code, (c) violate, conflict with, or result in a breach of any provisions of, or require any notice or Consent or result in a default (or give rise to any right of termination, cancellation, modification or acceleration or any event that, with the giving of notice, the passage of time or otherwise, would constitute a default or give rise to any such right) under any of the terms, conditions or provisions of any Contract to which Ligado or any of its Subsidiaries is a party or by which any of their respective properties or assets are bound, or result in the loss of a material benefit or rights under any such Contract, (d) result in (or, with the giving of notice, the passage of time or otherwise, would result in) the creation or imposition of any Lien on any asset of Ligado or any of its Subsidiaries (other than a Lien created by any of the Parent Group) or (e) violate any Law or Order, including the Plan, applicable to Ligado or any of its Subsidiaries or by which any of their respective properties or assets are bound, except, in the case of <u>clauses (b)</u> through <u>(e)</u>, as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Ligado and its Subsidiaries, taken as a whole.

3.4     <u>Investment Decision</u>. Ligado is acquiring the DUO Note (and any shares of Parent Common Stock issuable upon conversion of the DUO Note) for its own account, for investment purposes and not with a view toward, or for resale in connection with, the public sale or distribution thereof, in violation of the Securities Act or any applicable state securities Laws. Ligado does not presently have any Contract or understanding, directly or indirectly, with any Person to sell or distribute the DUO Note (or any shares of Parent Common Stock issuable upon conversion of the DUO Note). Ligado is an "accredited investor" as defined in Regulation D of the Securities Act. Ligado acknowledges and understands the economic risk of holding the DUO Note (and any shares of Parent Common Stock issuable upon conversion of the DUO Note). Ligado is familiar with the business and financial condition, properties, operations and prospects of the Parent Group or Ligado has been granted the opportunity to ask questions of, and receive answers from, Representatives of the Parent Group concerning the Parent Group and to obtain any additional information that Ligado deems necessary to verify the accuracy of the information so provided. Ligado has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment. Ligado acknowledges that the DUO Note (and any shares of Parent Common Stock issuable upon conversion of the DUO Note) have not been registered with the SEC or any state securities commission and that any resale of the DUO Note (and any shares of Parent Common Stock issuable upon conversion of the DUO Note) would require registration with the SEC or an exemption from registration. Ligado understands and agrees that no federal or state agency has passed upon or endorsed the merits of the offer and sale of the DUO Note (and any shares of Parent Common Stock issuable upon conversion of the DUO Note) or made any findings or determination as to the fairness of an investment in the DUO Note (and any shares of Parent Common Stock issuable upon conversion of the DUO Note). To Ligado's knowledge, neither Ligado nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder, engaged in any general solicitation with respect to the offer and sale of the DUO Note (or any shares of Parent Common Stock issuable upon conversion of the DUO Note). Ligado

-11-

acknowledges and agrees that the DUO Note and any shares of Parent Common Stock that may be issued on conversion of the DUO Note are "restricted securities" under Rule 144 promulgated under the Securities Act and will contain a customary restricted legend stating that the securities have not been registered under the Securities Act or any state securities law and that such securities may not be sold, pledged, assigned or otherwise transferred except in a transaction registered under the Securities Act or exempt from registration thereunder.

3.5     No Other Representations or Warranties.

(a)     Except for the express written representations and warranties made by Ligado contained in this Article III, any other AST Definitive Agreements and in any certificates delivered by Ligado or any of its Representatives in connection with the transactions contemplated hereby, neither Ligado nor any Representative or other Person on behalf of Ligado makes any express or implied representation or warranty with respect to Ligado or any of its Affiliates or any of its or their respective businesses, assets, Liabilities, financial condition or results of operations or with respect to any other information provided to any of the Parent Group in connection with the transactions contemplated hereby, and Ligado hereby disclaims any other representations or warranties, express or implied (including any implied warranty of merchantability or fitness for a particular purpose), as to the accuracy or completeness of any other information made (or made available) by itself or any of its Representatives with respect to, or in connection with, the negotiation, execution and delivery of this Agreement or the transactions contemplated hereby.

(b)     Ligado acknowledges and agrees that, except for the representations and warranties expressly set forth in Article IV, any other AST Definitive Agreements and in any certificates delivered by any of the Parent Group or any of its Representatives in connection with the transactions contemplated hereby, (i) none of the Parent Group nor any of their respective Representatives makes, or has made, any representations or warranties relating to itself or its business, assets, Liabilities, financial condition or results of operations or otherwise in connection with the transactions contemplated hereby, and Ligado is not relying on any representation or warranty of the Parent Group except for those expressly set forth in this Agreement, any other AST Definitive Agreements and any such certificate and (ii) no Person has been authorized by any of the Parent Group to make any representation or warranty relating to the Parent Group or their business, assets, Liabilities, financial condition or results of operations or otherwise in connection with the transactions contemplated hereby, and if made, such representation or warranty has not been relied on by Ligado.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PARENT GROUP**

The Parent Group hereby represents and warrants to Ligado as follows:

4.1     Organization and Qualification. Each of AST Parent, AST and SpectrumCo is duly organized and validly existing and in good standing under the Laws of the jurisdiction of its organization (to the extent such concepts are recognized in the applicable jurisdiction), with all requisite power and authority to own, lease and operate its properties and assets in the manner in which they are currently owned, used or held and conduct its business as currently conducted, except for such failures to be in good standing or have such power and authority that would not,

individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of AST Parent, AST or SpectrumCo to perform their respective obligations under this Agreement or consummate the transactions contemplated hereby. AST Parent, AST and SpectrumCo are in compliance with the provisions of their respective certificates of incorporation and bylaws (or similar governing documents).

4.2    Corporate Power; Enforceability.

(a)    Each of AST Parent, AST and SpectrumCo has all requisite corporate or limited liability company power and authority to execute and deliver this Agreement, to perform its covenants and obligations hereunder and to consummate the transactions contemplated hereby. Subject to requisite Bankruptcy Court approvals, the execution and delivery by the Parent Group of this Agreement, the performance by the Parent Group of its covenants and obligations hereunder and the consummation by the Parent Group of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate or limited liability company action on the part of the Parent Group, and no additional corporate or limited liability company proceedings or actions on the part of the Parent Group are necessary to authorize the execution and delivery by the Parent Group of this Agreement, the performance by the Parent Group of its covenants and obligations hereunder or the consummation by the Parent Group of the transactions contemplated hereby.

(b)    This Agreement has been duly and validly executed and delivered by the Parent Group and, assuming the due authorization, execution and delivery by Ligado, constitutes a legal, valid and binding obligation of the Parent Group, enforceable against the Parent Group in accordance with its terms, subject to the Enforceability Exceptions.

4.3    Consents and Approvals; No Violation. Neither the execution or delivery of this Agreement by any of the Parent Group, the performance by any of the Parent Group of their respective covenants and obligations hereunder nor the consummation of the transactions contemplated hereby will (a) violate or conflict with or result in any breach of any provision of the respective certificate of incorporation or bylaws (or similar governing documents) of any of the Parent Group, (b) require any Permit of, or filing with or notification to, any Governmental Authority, except as may be required under (i) the Bankruptcy Code, (ii) the applicable requirements of any federal or state securities Laws, including compliance with the Exchange Act or (iii) the applicable requirements of NASDAQ, (c) violate, conflict with or result in a breach of any provision of, or require any notice or Consent or result in a default (or give rise to any right of termination, cancellation, modification or acceleration or any event that, with the giving of notice, the passage of time or otherwise, would constitute a default or give rise to any such right) under any of the terms, conditions or provisions of any Contract to which any of the Parent Group or any of their respective Subsidiaries is a party or by which any of the Parent Group or any of their respective Subsidiaries or any of their respective properties or assets are bound, or result in the loss of a material benefit or rights under any such Contract or (d) violate any Law or Order, including the Plan, applicable to any of the Parent Group or by which any of their respective assets or properties are bound, except, in the case of clauses (b) through (d), as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of any of the Parent Group to perform their respective obligations under this Agreement or consummate the transactions contemplated hereby.

-13-

4.4    <u>No Other Representations or Warranties</u>.

(a)    Except for the express written representations and warranties made by the Parent Group contained in this <u>Article IV</u>, any other AST Definitive Agreements and in any certificates delivered by the Parent Group or any of its Representatives in connection with the transactions contemplated hereby, none of the Parent Group nor any Representative or other Person on behalf of either makes any express or implied representation or warranty with respect to them or any of their Affiliates or any of its or their respective business, assets, Liabilities, financial condition or results of operations or with respect to any other information provided to Ligado in connection with the transactions contemplated hereby, and the Parent Group hereby disclaims any other representations or warranties, express or implied, as to the accuracy or completeness of any other information made (or made available) by themselves or any of their Representatives with respect to, or in connection with, the negotiation, execution and delivery of this Agreement or the transactions contemplated hereby.

(b)    The Parent Group each acknowledge and agree that, except for the representations and warranties expressly set forth in <u>Article III</u>, any other AST Definitive Agreements and in any certificates delivered by Ligado or any of its Representatives in connection with the transactions contemplated hereby, (i) neither Ligado, its Subsidiaries nor any of their respective Representatives makes, or has made, any representations or warranties relating to itself or its business, assets, Liabilities, financial condition or results of operations or otherwise in connection with the transactions contemplated hereby, and none of the Parent Group is relying on any representation or warranty of Ligado except for those expressly set forth in this Agreement, any other AST Definitive Agreements or any such certificate and (ii) no Person has been authorized by Ligado or any of its Subsidiaries to make any representation or warranty relating to Ligado or any of its Subsidiaries or their business, operations, assets, Liabilities, condition (financial or otherwise) or prospects or otherwise in connection with the transactions contemplated hereby, and if made, such representation or warranty has not been relied on by any of the Parent Group.

**ARTICLE V**
**COVENANTS**

5.1    <u>Efforts</u>.

(a)    Prior to the earlier of (x) the valid termination of this Agreement and (y) (A) if the Viasat Payment is greater than or equal to $550,000,000, the DUO Payment Date or (B) if the Viasat Payment is less than $550,000,000, the Catch-Up DUO Payment Date, on the terms and subject to the conditions set forth in this Agreement, each of the parties hereto shall use reasonable best efforts to take, or cause to be taken, all actions that are necessary, proper or advisable to consummate and make effective, as promptly as practicable, the AST Transaction, including using reasonable best efforts to (i) cause each of the conditions to the AST Transaction set forth in <u>Article VI</u> to be satisfied as promptly as practicable after the date of this Agreement, (ii) subject to <u>Section 5.1(b)</u>, obtain, as promptly as practicable after the date of this Agreement, and maintain all necessary actions or non-actions and Consents from Governmental Authorities and make all necessary registrations, declarations and filings with Governmental Authorities, that are necessary to consummate the AST Transaction, (iii) reasonably cooperate with the other party

-14-

with respect to the foregoing and (iv) defend or contest in good faith any Legal Proceeding brought by a third party that could otherwise prevent or impede, interfere with, hinder or delay in any material respect the consummation of the AST Transaction.

(b)     Each of AST Parent and Ligado shall (i) prepare and file any filings or notifications and related material that are necessary, proper or advisable to permit consummation of the AST Transaction, as promptly as reasonably practicable following the date on which the Viasat Order is first issued (or on such earlier date as AST Parent, in consultation with Ligado, deems advisable), (ii) provide or cause to be provided as promptly as reasonably practicable and advisable any information and documentary material that may be requested by any Governmental Authorities under applicable Laws (if any) and (iii) if applicable, use its reasonable best efforts to obtain prompt expiration or termination of any applicable waiting period or other approval of consummation of the AST Transaction by any applicable Governmental Authorities; provided, that, notwithstanding anything in this Agreement to the contrary, no member of the Parent Group shall be obligated to, and without AST Parent's consent, Ligado shall not, take or agree to take any action to the extent such action, individually or in the aggregate with all other such actions taken together, (A) relates to or would impact any capital stock, assets, rights, products, businesses, relationships, contractual rights, obligations, arrangements, conduct or activities, of any member of the Parent Group or (B) would reasonably be expected to adversely impact the benefits the Parent Group or Ligado expects to realize from the AST Transaction in any material respect.

(c)     Subject to applicable Law and the requirements of applicable Governmental Authorities, Ligado and the Parent Group and their respective counsel shall, in connection with the efforts referenced in Sections 5.1(a) and 5.1(b), (i) cooperate in all respects with each other in connection with any filing or submission with a Governmental Authority in connection with the transactions contemplated by this Agreement and in connection with any investigation or other inquiry by or before a Governmental Authority relating to the transactions contemplated by this Agreement, including any proceeding initiated by a private person, (ii) where legally permissible, have the right to review in advance, and to the extent practicable each shall consult and consider in good faith the views of the other regarding, any material filing made with, or written materials to be submitted to, any Governmental Authority in connection with the transactions contemplated by this Agreement and of any material communication received or given in connection with any proceeding by a private person, in each case regarding any of the transactions contemplated by this agreement, (iii) promptly inform each other of any material communication (or any other material correspondence or memoranda) received from, or given to, any applicable Governmental Authority and (iv) where legally permissible, promptly furnish each other with copies of all correspondence, filings and written communications between them or their Subsidiaries or affiliates, on the one hand, and any Governmental Authority or its respective staff, on the other hand, with respect to the transactions contemplated by this Agreement. Subject to applicable Law and the requirements of applicable Governmental Authority, Ligado and the Parent Group shall (with respect to any in-person discussion or meeting), and shall to the extent practicable (with respect to any telephonic discussion or meeting), provide the other party and its counsel with advance notice of and the opportunity to participate in any material discussion or meeting with any Governmental Authority in respect of any filing, investigation or other inquiry in connection with the transactions contemplated by this Agreement. Ligado and the Parent Group may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.1(c) as "Counsel Only Material." Notwithstanding anything to the

-15-

contrary in this <u>Section 5.1(c)</u>, materials provided to the other party or its counsel may be redacted to remove references concerning the valuation of Ligado or the AST Transaction.

      5.2    <u>Public Statements</u>. Except as otherwise required or provided by applicable Law (including releases or disclosures determined in good faith to be reasonably necessary or advisable under applicable Law by the disclosing party or to comply with a party's regulatory obligations), it is agreed that each of Ligado, on the one hand, and the Parent Group, on the other hand, must first approve in writing all other public announcements or other marketing efforts utilizing the other party's name or logo or the general terms and conditions of this Agreement. Each of Ligado, on the one hand, and the Parent Group, on the other hand, agrees to work in good faith to respond to requests for such press releases or other public announcements, in all cases on or prior to the Applicable Response Deadline (as defined below). Such requests shall be submitted to mediat@ligado.com in the case of Ligado and AstSpaceMobile@allisonpr.com in the case of any member of the Parent Group, and the requesting party shall include in such request a reasonable deadline (which shall be no earlier than the fifth (5th) Business Day following the submission of such request) by which the other party must approve or deny such request (the "<u>Applicable Response Deadline</u>"). If no response is received by the Applicable Response Deadline, then such requesting party shall not be deemed to be in breach of this <u>Section 5.2</u> as a result of issuing any press release or other public announcement that was the subject of such request. Any party may issue restatements of previously-approved statements or statements permitted by the first clause of this <u>Section 5.2</u>. Each party may, without complying with the foregoing obligations, make any public statement regarding the AST Transaction in response to questions from the press, analysts, investors or those attending industry conferences, and make internal announcements to employees, in each case, to the extent that such statements are not inconsistent with previous press releases, public disclosures or public statements made jointly by the parties or approved by the parties, and otherwise in compliance with this <u>Section 5.2</u>, and provided that such public statements do not reveal material nonpublic information regarding this Agreement or the AST Transaction. For the avoidance of doubt, AST Parent shall be permitted to file this Agreement as an exhibit to one or more SEC Reports.

      5.3    <u>Certain Litigation</u>. Without limiting the obligations of Ligado or AST under <u>Section 5.4</u>:

      (a)    promptly upon becoming aware of any Ligado Legal Proceeding or any material developments with respect thereto, Ligado shall advise AST thereof unless Ligado determines, based on the good faith advice of outside counsel, that doing so could jeopardize the protection of an attorney-client privilege, attorney work product protection or other legal privilege (<u>provided</u>, that in such event, Ligado shall notify AST if it is withholding any such information and use commercially reasonable efforts to provide such information in a manner that does not waive any such privilege (including pursuant to a common interest agreement)).

      (b)    promptly upon becoming aware of any AST Legal Proceeding or any material developments with respect thereto, AST or AST Parent (as applicable) shall advise Ligado thereof unless AST determines, based on the good faith advice of outside counsel, that doing so could jeopardize the protection of an attorney-client privilege, attorney work product protection or other legal privilege (<u>provided</u>, that in such event, AST shall notify Ligado if it is withholding any

such information and use commercially reasonable efforts to provide such information in a manner that does not waive any such privilege (including pursuant to a common interest agreement)).

5.4    Notice of Certain Events. Prior to the earlier of (x) the valid termination of this Agreement and (y) (A) if the Viasat Payment is greater than or equal to $550,000,000, the DUO Payment Date or (B) if the Viasat Payment is less than $550,000,000, the Catch-Up DUO Payment Date, Ligado shall give prompt notice to AST, and AST, on behalf of the Parent Group, shall give prompt notice to Ligado, (a) of any written notice or other written communication received by such party from any Person alleging that the Consent of such Person is or may be required in connection with the AST Transaction, (b) of any Legal Proceeding commenced or, to any party's knowledge, threatened against, such party or any of its Affiliates or otherwise relating to such party or any of its Affiliates, in each case that would, in the reasonable judgment of such party, have a material adverse effect on the other party's rights with respect to the AST Transaction and (c) if it obtains actual knowledge of any breach by such party of its representations, warranties and covenants hereunder that would, individually or in the aggregate, reasonably be expected to lead to the failure of any condition to the other party's obligations to consummate the AST Transaction; provided, that the delivery of any notice pursuant to this Section 5.4 shall not affect the remedies available hereunder to any party.

5.5    Backstop Commitment.

(a)    No later than sixty (60) days following the Effective Date, Ligado shall obtain a financing commitment (the "Backstop Commitment") pursuant to which, subject only to the satisfaction of customary conditions to a committed financing, the counterparties thereto (the "Financing Sources") shall have committed to provide cash proceeds in an amount sufficient to pay the Refund Amount in the event of an Approval Condition Failure (the "Backstop Financing").

(b)    The Parent Group shall cooperate in good faith and work together with Ligado in connection with Ligado's obligations pursuant to Section 5.5(a); provided, that notwithstanding the foregoing, no member of the Parent Group nor any of their respective Affiliates shall be required to take or permit the taking of any action pursuant to this Section 5.5 that would (i) require any member of the Parent Group or any of their respective Affiliates to pay any commitment or other similar fee or incur any other expense, liability or obligation in connection with the Backstop Commitment or Backstop Financing or (ii) cause any director, officer, employee or stockholder of any member of the Parent Group or any of their respective Affiliates to incur any personal liability.

(c)    In the event of an Approval Condition Failure (unless a breach by the Parent Group of its obligation under the Collaboration Agreement with respect to the satisfaction of the Approval Condition is the primary cause of the failure of such Approval Condition Failure), Ligado shall, as promptly as practicable, (i) cause the Financing Sources to fund the Backstop Financing and (ii) no later than five (5) Business Days after the Backstop Financing has been fully funded, pay (A) to AST Parent, in consideration for any DUO Note issued by AST Parent to Ligado, an amount in cash, by wire transfer of immediately available funds, equal to the aggregate cash value of such DUO Note (valued at the aggregate principal amount of such DUO Note at initial issuance) and (B) to SpectrumCo an amount in cash, by wire transfer of immediately available funds, equal to the aggregate amount of cash previously paid by or on behalf of AST

-17-

Parent (including any such payments made by any other member of the Parent Group to Ligado) pursuant to Section 2.2(a) (the aggregate amounts described in clauses (A) and (B), the "Refund Amount").

5.6     Viasat Payment. Ligado shall use reasonable best efforts to contest any Legal Proceeding brought before the Bankruptcy Court or before any other court at any time that seeks entry of an order requiring Ligado to pay, prior to the satisfaction of the Approval Condition, to Viasat (or any of its Affiliates) any past due amounts under the Viasat Cooperation Agreement, and/or any related interest, that Viasat contends or shall contend is due and payable pursuant to the Viasat Cooperation Agreement as of (or with respect to any period commencing prior to) January 5, 2025.

# ARTICLE VI
# CONDITIONS TO THE DUO PAYMENTS OR THE CATCH-UP DUO PAYMENTS (AS APPLICABLE)

6.1     Conditions to the Obligations of the Parent Group. The obligations of AST Parent to make the DUO Payments or the Catch-Up DUO Payments (as applicable) shall be subject to the satisfaction or waiver (where permissible under Law) by AST Parent of each of the following conditions:

(a)     No Legal Prohibition. No Governmental Authority of competent jurisdiction shall have enacted, issued or promulgated any Law or issued or granted any Order that is in effect and has the effect of making the DUO Payments or the Catch-Up DUO Payments (as applicable) illegal or that has the effect of prohibiting or otherwise preventing the DUO Payments.

(b)     [Reserved].

(c)     Bankruptcy Order. The Bankruptcy Court shall have entered the AST Definitive Agreements Order, which shall be in form and substance consistent with the RSA and acceptable in all respects to AST Parent.

(d)     Representations and Warranties. The representations and warranties of Ligado contained in Article III shall be true and correct in all respects as of the date hereof and as of (i) the DUO Payment Date as if made on the DUO Payment Date or (ii) the Catch-Up DUO Payments as if made on the Catch-Up DUO Payment Date (as applicable) (except with respect to representations and warranties that expressly reference an earlier date, which representations and warranties shall be true and correct at and as of such date), except for any *de minimis* inaccuracies.

(e)     Compliance with Covenants. Ligado shall have complied with or performed in all material respects any agreement or covenant to be complied with or performed by it under this Agreement at or prior to the DUO Payments Date or the Catch-Up DUO Payments Date (as applicable).

(f)     Approval Condition. The Approval Condition shall have been satisfied or the Payment Condition shall have been satisfied.

-18-

(g)     <u>Collaboration Agreement</u>. The Collaboration Agreement shall be in full force and effect in accordance with its terms and Ligado shall not be in material breach of any of the terms thereof.

(h)     <u>Officer's Certificate</u>. Ligado shall have delivered to AST a certificate, signed on behalf of Ligado by a duly authorized executive officer thereof, certifying that the conditions set forth in <u>Sections 6.1(d)</u> and <u>6.1(e)</u> have been satisfied.

## ARTICLE VII
## TERMINATION

7.1     <u>Termination</u>. This Agreement may be terminated at any time (except as otherwise expressly noted):

(a)     by either AST Parent or Ligado, at any time before the Plan Effective Date, if the RSA is terminated;

(b)     by either AST Parent or Ligado, at any time before the (x) if the Viasat Payment is greater than or equal to $550,000,000, the DUO Payment Date or (y) if the Viasat payment is less than $550,000,000, the Catch-Up DUO Payment Date, if any Governmental Authority of competent jurisdiction shall have issued a final and non-appealable permanent Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the issuance of the DUO Payments and such injunction, restraint or prohibition shall have become final and non-appealable;

(c)     (i) by AST Parent, at any time before the (x) if the Viasat Payment is greater than or equal to $550,000,000, the DUO Payment Date or (y) if the Viasat Payment is less than $550,000,000, the Catch-Up DUO Payment Date, if Ligado has breached or failed to perform any of its covenants or agreements set forth in this Agreement or any of its representations or warranties in this Agreement has become inaccurate, which breach or failure to perform or inaccuracy (A) would give rise to the failure of a condition set forth in <u>Section 6.1(d)</u> or <u>6.1(e)</u> and (B) is incapable of being cured or, if curable, is not cured within thirty (30) days after written notice of such breach, failure to perform or inaccuracy, stating AST Parent's intention to terminate this Agreement pursuant to this <u>Section 7.1(c)(i)</u> and the basis for such termination is given by AST Parent to Ligado; or (ii) by Ligado, if any member of the AST Group has breached or failed to perform any of its covenants or agreements set forth in this Agreement or any of its representations or warranties in this Agreement has become inaccurate, in each case, (A) in a manner that would have a material adverse effect on the AST Transaction or Ligado's rights hereunder and (B) which breach or failure to perform or inaccuracy is incapable of being cured or, if curable, is not cured within thirty (30) days after written notice of such breach, failure to perform or inaccuracy, stating Ligado's intention to terminate this Agreement pursuant to this <u>Section 7.1(c)(ii)</u> and the basis for such termination is given by Ligado to AST Parent;

(d)     by AST Parent or Ligado, if the Collaboration Agreement is terminated or otherwise not in full force and effect;

(e)     by AST Parent, if the Plan Effective Date has not occurred on or prior to the Outside Date (as defined in the RSA);

(f)    by AST Parent, at any time after an Adverse Impact Determination; or

(g)    by Ligado, if (i) the conditions set forth in <u>Section 6.1</u> were satisfied on the date the DUO Payments or the Catch-Up DUO Payments were required to have been made pursuant to <u>Section 2.2(a)</u> or <u>Section 2.2(b)</u> (as applicable), (ii) AST Parent has failed to make the DUO Payments or the Catch-Up DUO Payments (as applicable) on such date, (iii) Ligado has, at least three Business Days prior to seeking to terminate this Agreement pursuant to this <u>Section 7.1(g)</u>, delivered a written notice to AST Parent stating that Ligado intends to so terminate this Agreement and (iv) AST Parent has failed to make the DUO Payments or the Catch-Up DUO Payments (as applicable) by the end of the third Business Day following delivery of such notice.

7.2    <u>Effect of Termination</u>. In the event of the termination of this Agreement in accordance with <u>Section 7.1</u>, written notice thereof shall be given to the other parties hereto, specifying the provision pursuant to which such termination is made, and this Agreement shall forthwith become null and void (other than <u>Section 7.2</u>, <u>Section 7.3</u> and <u>Article VIII</u>, each of which shall survive termination of this Agreement), and there shall be no liability on the part of AST Parent, AST, SpectrumCo or Ligado or any of their respective directors, officers or Affiliates; <u>provided</u>, that no such termination shall relieve any party from liability for damages to another party resulting from any breach of this Agreement or from fraud.

7.3    <u>Fees and Expenses</u>.

(a)    Except as otherwise expressly set forth herein, all fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party or parties, as applicable, incurring such fees or expenses.

(b)    <u>Break-Up Fee</u>. In the event that this Agreement is terminated pursuant to <u>Section 7.1(f)</u>, or by any other provision of <u>Section 7.1</u> at a time when AST Parent would have been permitted to terminate this Agreement pursuant to <u>Section 7.1(f)</u>, Ligado shall pay to AST, by wire transfer of immediately available funds within 60 days following such termination, a cash amount (the "<u>Break-Up Fee</u>") equal to:

(i)    if such termination occurs prior to the satisfaction of the Approval Condition, (A) the aggregate amount of all Usage Rights Payments made by or on behalf of the Parent Group to Ligado prior to such termination *plus* (B) the lesser of (1) 2.5% of all Takings Litigation Proceeds received by Ligado and its Affiliates as of the date the Break-Up Fee is paid and (2) $450,000,000 (<u>provided</u>, that if the amount set forth in the foregoing clause (1) is less than $450,000,000, then from and after such date, Ligado shall pay to AST an amount equal to 2.5% of any Takings Litigation Proceeds subsequently received by Ligado and its Affiliates within thirty (30) days following receipt thereof, until such time as the cumulative amounts Ligado has paid to AST pursuant to this clause (B) is equal to $450,000,000);

(ii)    if such termination occurs concurrently with or after the satisfaction of the Approval Condition and prior to January 1, 2036, (A) the aggregate amount of all Usage Rights Payments made by or on behalf of the Parent Group to Ligado prior to such termination *plus* (B) the greater of (1) 2.5% of all Takings Litigation Proceeds received by

-20-

Ligado and its Affiliates as of the date the Break-Up Fee is paid and (2) $450,000,000 (provided, that (x) if the amount set forth in the foregoing clause (1) is greater than or equal to $450,000,000, then from and after such date, Ligado shall pay to AST an amount equal to 2.5% of any Takings Litigation Proceeds subsequently received by Ligado and its Affiliates within thirty (30) days following receipt thereof and (y) if the amount set forth in the foregoing clause (1) is less than $450,000,000, then from and after such time as 2.5% of the aggregate amount all Takings Litigation Proceeds received by Ligado and its Affiliates is equal to $450,000,000, Ligado shall pay to AST an amount equal to 2.5% of the excess of the aggregate amount of all Takings Litigation Proceeds received by Ligado and its Affiliates over $18,000,000,000, in each case within thirty (30) days following receipt thereof) *plus* (C) if AST Parent has made all or any portion of the DUO Payments and/or the Catch-Up DUO Payments (as applicable) to Ligado, the aggregate cash value of all such DUO Payments and Catch-Up DUO Payments (with any DUO Note valued at the aggregate principal amount of such note at initial issuance); or

(iii)     if such termination occurs concurrently with or after the satisfaction of the Approval Condition and on or after January 1, 2036, (A) the aggregate amount of all Usage Rights Payments made by or on behalf of the Parent Group to Ligado prior to such termination *plus* (B) the lesser of (1) 2.5% of all Takings Litigation Proceeds received by Ligado and its Affiliates as of the date the Break-Up Fee is paid and (2) $450,000,000 (provided, that if the amount set forth in the foregoing clause (1) is less than $450,000,000, then from and after such date, Ligado shall pay to AST an amount equal to 2.5% of any Takings Litigation Proceeds subsequently received by Ligado and its Affiliates within thirty (30) days following receipt thereof, until such time as the cumulative amounts Ligado has paid to AST pursuant to this clause (B) is equal to $450,000,000); *plus* (C) if AST Parent has made all or any portion of the DUO Payments and/or the Catch-Up DUO Payments (as applicable) to Ligado, the aggregate cash value of all such DUO Payments and Catch-Up DUO Payments (with any DUO Note valued at the aggregate principal amount of such note at initial issuance).

For the avoidance of doubt, the amount of any Break-Up Fee pursuant to this Section 7.3(b) shall not be deemed to reflect any direct or indirect valuation of Ligado's ATC Deployment (as defined in the Collaboration Agreement), except to the extent the Break-Up Fee incorporates any Takings Litigation Proceeds.

(c)     Liquidated Damages; Payment Default; Sole and Exclusive Remedy.

(i)     The parties acknowledge that the agreements contained in this Section 7.3 are an integral part of the AST Transaction and that, without these agreements, the parties would not enter into this Agreement. Accordingly, the Break-Up Fee, if, as and when required to be paid pursuant to Section 7.3(b), shall constitute not a penalty but rather liquidated damages in a reasonable amount that will compensate the Parent Group in the circumstances in which it is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the AST Transaction.

(ii)     If Ligado fails to pay in a timely manner any amount due pursuant to <u>Section 7.3(b)</u>, then (A) Ligado shall reimburse the Parent Group for all costs and expenses (including reasonable and documented fees of outside counsel) incurred in the successful collection of such overdue amount, including in connection with any related Legal Proceedings and (B) Ligado shall pay to AST a late payment fee in the amount of one percent (1.0%) of the total amount payable pursuant to <u>Section 7.3(b)</u>.

(iii)     Notwithstanding anything in this Agreement to the contrary, in the event the Break-Up Fee is paid to AST in circumstances under which such fee is payable pursuant to this <u>Section 7.3(b)</u>, payment of the Break-Up Fee (plus, if applicable, any additional amounts payable pursuant to <u>Section 7.3(c)(ii)</u>) shall be the sole and exclusive remedy of the Parent Group against Ligado for any loss suffered by the Parent Group as a result of the termination of this Agreement pursuant to <u>Section 7.1(f)</u>; <u>provided</u>, that solely to the extent permitted by the terms of any resolution of the Takings Litigation (as determined by Ligado in consultation with its counsel in its sole discretion), Ligado shall cooperate with and assist the Parent Group in good faith, at the Parent Group's sole cost and expense, in AST's pursuit of any damages or other losses (against parties other than Ligado or its investors) in excess of the Break-Up Fee incurred solely as a direct result of Ligado's resolution of the Takings Litigation. For the avoidance of doubt, nothing in this Agreement or any other AST Definitive Agreement shall impair or effect the rights of any member of the Parent Group to receive any fees or receive any amounts that may be payable under the RSA or the Break-Up Fee Order, and any such fees or amounts shall be in addition to any Break-Up Fee that may be payable hereunder.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     <u>Amendment</u>. To the extent permitted by Law and subject to the other provisions of this Agreement, this Agreement may be amended by the parties hereto at any time by execution of an instrument in writing signed on behalf of each of AST Parent, AST, SpectrumCo and Ligado.

8.2     <u>Extension; Waiver</u>. At any time and from time to time, any party or parties hereto may, to the extent permitted by Law and except as otherwise set forth herein, (a) extend the time for the performance of any of the obligations or other acts of the other party or parties hereto, as applicable, (b) waive any inaccuracies in the representations and warranties made to such party or parties hereto contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party or parties hereto contained herein. Any agreement on the part of a party or parties hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party or parties, as applicable. Any delay in exercising any right under this Agreement shall not constitute a waiver of such right.

8.3     <u>Notices</u>. All notices and other communications hereunder shall be in writing and delivered by (x) email, and shall be deemed to have been duly delivered and received hereunder on the date of dispatch by the sender thereof (to the extent that no "bounce back" or similar message indicating non-delivery is received with respect thereto) or (y) nationally recognized overnight courier service (providing proof of delivery), in each case, to the intended recipient as

-22-

set forth below (or to such other recipient as designated in a written notice to the other parties hereto in accordance with this Section 8.3):

(a)  if to any of the Parent Group, to:

> AST & Science, LLC
> Midland Intl. Air & Space Port
> 2901 Enterprise Lane
> Midland, TX 79706
> Attention: Andrew M. Johnson
> Email: andrew.johnson@ast-science.com

> with a copy (which shall not constitute notice) to:

> Freshfields US LLP
> 3 World Trade Center
> 175 Greenwich Street
> New York, New York 10007
> Attention:    Ethan A. Klingsberg
>               Oliver J. Board
> Email:        ethan.klingsberg@freshfields.com
>               oliver.board@freshfields.com

(b)  if to Ligado, to:

> 10802 Parkridge Boulevard
> Reston, Virginia 20191
> Attention: General Counsel
> Email: legal@ligado.com

> with a copy (which shall not constitute notice) to:

> c/o Milbank LLP
> 55 Hudson Yards
> New York, New York 10001
> Attention:    Patrick S. Campbell
>               Matthew Brod
> Email:        pcampbell@milbank.com
>               mbrod@milbank.com

8.4    Assignment. No party may assign (by operation of Law or otherwise) either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other parties, except that the Parent Group may assign all or any of their rights and obligations under this Agreement to any Affiliate of AST Parent that holds sufficient capital to satisfy the financial obligations of AST Parent hereunder (including, without limitation, the obligations of AST Parent under Section 2.2(a)); provided, that no such assignment shall relieve the assigning party of its obligations under this Agreement if such assignee does not fully and timely perform such obligations. Subject to the preceding sentence, this Agreement shall be

-23-

binding on and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Any purported assignment in violation of this Agreement shall be void *ab initio*.

8.5    <u>Confidentiality</u>. The Parent Group and Ligado hereby acknowledge that AST and Ligado have previously executed a confidentiality agreement, dated as of January 18, 2022, as amended on January 24, 2025 (collectively, the "<u>Confidentiality Agreement</u>"), which shall automatically terminate and shall thereafter be of no further force or effect on execution of this Agreement; <u>provided</u>, that the parties hereto agree that Section 9.1 of the Collaboration Agreement shall apply to and govern this Agreement, *mutatis mutandis*.

8.6    <u>Entire Agreement</u>. This Agreement (including any schedules, annexes and exhibits hereto and the documents and instruments and other agreements among the parties hereto as contemplated by or referred to herein, including the Exhibits hereto) and the other AST Definitive Agreements constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof (including, for the avoidance of doubt, the Confidentiality Agreement and the Confidential Binding Terms of Strategic Collaboration, dated January 5, 2025, by and between AST & Science, LLC and Ligado Networks LLC).

8.7    <u>Third Party Beneficiaries</u>. This Agreement shall be binding on and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to confer on any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

8.8    <u>Severability</u>. In the event that any term or other provision of this Agreement, or the application thereof, is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the AST Transaction is not affected in any manner materially adverse to any party. On such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the AST Transaction be effected as originally contemplated to the fullest extent possible.

8.9    <u>Remedies; Dispute Resolution</u>.

(a)    Except as otherwise provided herein, any and all remedies herein expressly conferred on a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity on such party, and the exercise by a party of any one remedy shall not preclude the exercise of any other remedy.

(b)    The parties hereto hereby agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached, and that money damages or other legal remedies would not be an adequate remedy for any such damages. Accordingly, subject to <u>Section 8.9(c)</u> below, the parties hereto acknowledge and hereby agree that in the event of any breach by Ligado, on the one hand, or any of the Parent Group, on the other hand, of any of their respective covenants or

-24-

obligations set forth in this Agreement, Ligado, on the one hand, and the Parent Group, on the other hand, shall be entitled (without proof of actual damages or otherwise or posting or securing any bond) to an injunction or injunctions to prevent or restrain breaches of this Agreement by the other (as applicable), and to specifically enforce the terms and provisions of this Agreement to prevent breaches of, or to enforce compliance with, the covenants and obligations of the other under this Agreement. Ligado, on the one hand, and the Parent Group, on the other hand, hereby agree not to oppose the availability of the equitable remedy of specific performance on the basis that the other party has an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or in equity.

(c)     If during the term of this Agreement, a dispute arises between the Ligado, on the one hand, and the Parent Group, on the other hand (each, a "Dispute Party"), or one Dispute Party perceives the other as acting unfairly or unreasonably, or a question of interpretation arises hereunder, then the Dispute Parties' respective representatives (as identified in Schedule 1 (*Dispute Resolution Representatives*)) shall promptly confer and exert reasonable best efforts to reach a reasonable and equitable resolution of the dispute. If the representatives are unable to resolve the issue within ten (10) Business Days, then the representative of the Dispute Party that initially raised the dispute shall develop a description of the dispute, identify such dispute as either "technical" or "commercial" in nature and refer such dispute within two (2) Business Days of the lapse of the aforementioned ten (10) Business Days to: (i) a member of the Dispute Parties' technical team in the event such dispute is "technical;" or (ii) a member of the Dispute Parties' executive team (other than the chief executive officer) if the dispute is "commercial." If such member of the Dispute Parties' technical team or executive team (other than the chief executive officer), as applicable, is unable to resolve such dispute within ten (10) Business Days, then such dispute will be referred to each Dispute Parties' chief executive officer for resolution. Neither Dispute Party shall seek judicial resolution of any dispute arising in connection with this Agreement until the chief executive officer of each Dispute Party has had at least ten (10) Business Days to attempt to resolve the dispute following referral of the dispute to such chief executive officers. Notwithstanding anything in this agreement to the contrary, the dispute resolution process in this Section 8.9(c) shall not apply to any disputes between the Dispute Parties as to whether the Payment Condition has been satisfied.

8.10    Governing Law. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, including any claims or causes of action (whether in contract, tort or statute) that may be based on, arise out of or relate to this Agreement, or the negotiation, execution or performance thereof, or the transactions contemplated hereby, shall be governed by and construed and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

8.11    Consent to Jurisdiction. Subject to Section 8.9(c), each of the parties hereto (a) irrevocably consents to the service of the summons and complaint and any other process in any Legal Proceeding relating to the transactions contemplated hereby, for and on behalf of itself or any of its properties or assets, in accordance with Section 8.3 or in such other manner as may be permitted by Law, and nothing in this Section 8.11 shall affect the right of any party to serve legal process in any other manner permitted by Law; (b) irrevocably and unconditionally consents and

-25-

submits itself and its properties and assets in any Legal Proceeding to the exclusive jurisdiction of (i) solely prior to the Plan Effective Date, the Bankruptcy Court, (ii) in the event (but only in the event) that the Bankruptcy Court (if applicable) does not have subject matter jurisdiction over such Legal Proceeding, the Delaware Court of Chancery in and for New Castle County, (iii) in the event (but only in the event) that the courts identified in <u>clauses (i)</u> (if applicable) and <u>(ii)</u> do not have subject matter jurisdiction over such Legal Proceeding, the United States District Court for the District of Delaware or (iv) in the event (but only in the event) that the courts identified in <u>clauses (i)</u> (if applicable), <u>(ii)</u> and <u>(iii)</u> do not have jurisdiction over such Legal Proceeding, Delaware state court sitting in New Castle County (and in each case, appellate courts therefrom) (the courts referred to in <u>clauses (i)</u> (if applicable), <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u>, the "<u>Chosen Courts</u>"), in respect of any claim based on, arising out of or relating to this Agreement, or the negotiation, execution or performance thereof, or the transactions contemplated hereby (<u>provided</u>, that a party hereto may commence any Legal Proceeding in a court other than a Chosen Court solely for the purpose of enforcing an order or judgment issued by a Chosen Court), or for recognition and enforcement of any judgment in respect thereof; (c) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court; (d) agrees that any actions or proceedings in respect of any claim based on, arising out of or relating to this Agreement, or the negotiation, execution or performance thereof, or the transactions contemplated hereby, shall be brought, tried and determined only in the Chosen Courts; (e) waives any objection that it may now or hereafter have to the venue of any such Legal Proceeding in any such court or that such Legal Proceeding was brought in an inconvenient court and agrees not to plead or claim the same; and (f) agrees that it shall not bring any action arising out of or relating to this Agreement or the transactions contemplated hereby in any court other than the Chosen Courts. Each of the parties hereto agrees that a final judgment in any Legal Proceeding in a Chosen Court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

8.12    <u>WAIVER OF JURY TRIAL</u>. EACH OF AST PARENT, AST, SPECTRUMCO AND LIGADO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF AST PARENT, AST, SPECTRUMCO OR LIGADO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATION OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

8.13    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission, including by

-/0

e-mail attachment, shall be effective as delivery of a manually executed counterpart of this Agreement.

8.14    <u>AST Parent Indemnity</u>. AST Parent hereby agrees to indemnify and hold harmless each other member of the Parent Group (each, an "<u>Indemnitee</u>") against any and all liabilities in respect of amounts owed to Ligado or its Affiliates by such Indemnitee under this Agreement, the Collaboration Agreement and/or the CCI Agreement (including in the event of a breach by such Indemnitee of its applicable obligations hereunder or thereunder). The parties hereto acknowledge and agree that (a) AST Parent's obligations under this <u>Section 8.14</u> shall apply notwithstanding whether such Indemnitee has made payments to Ligado in respect of such liabilities (to the extent any such liabilities remain outstanding) and (b) Ligado (or its applicable Affiliates party to the Collaboration Agreement and/or CCI Agreement) is an express third party beneficiary of this <u>Section 8.14</u> and shall be entitled to seek an injunction, specific performance or other remedy available at law or in equity to cause AST Parent to fulfill its obligations under this <u>Section 8.14</u>.

*[Remainder of Page Intentionally Left Blank]*

-/0

**SCHEDULE 1**
**Dispute Resolutions Representatives**

Ligado's representatives for dispute resolution purposes are identified below:

|  | REPRESENTATIVES |
|---|---|
| For Technical Disputes | • Chief Network & Technology Officer<br><br>• President & Chief Executive Officer |
| For Commercial and Other Disputes | • General Counsel<br><br>• Chief Marketing and Strategy Officer |

The Parent Group's representatives for dispute resolution purposes are identified below:

|  | REPRESENTATIVES |
|---|---|
| For Technical Disputes | • Scott Wisniewski, President<br><br>• Andrew Johnson, Chief Financial Officer & Chief Legal Officer |
| For Commercial and Other Disputes | • Scott Wisniewski, President<br><br>• Andrew Johnson, Chief Financial Officer & Chief Legal Officer |

**Exhibit A**
**Restructuring Support Agreement**

**Exhibit B**
**Strategic Collaboration and Spectrum Usage Agreement**

**STRATEGIC COLLABORATION AND SPECTRUM USAGE AGREEMENT**

**by and among**

**LIGADO NETWORKS LLC**

**and**

**SPECTRUM USA I, LLC**

**Dated as of March 22, 2025**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS; INTERPRETATIONS; AND ORDER OF PRECEDENCE .......... 2

    1.1    Definitions ................................................................................................. 2

    1.2    Additional Definitions ............................................................................. 9

    1.3    Interpretation ......................................................................................... 12

    1.4    Order of Precedence .............................................................................. 13

ARTICLE 2 SPECTRUMCO USAGE RIGHT AND SPECTRUMCO L-BAND
             COMMERCIALIZATION PLAN ........................................................ 13

    2.1    Ligado Grant of SpectrumCo Usage Right ........................................... 13

    2.2    SpectrumCo L-band Commercialization Plan ...................................... 18

    2.3    Resolution of Takings Litigation .......................................................... 19

ARTICLE 3 SPECTRUMCO USAGE RIGHT AND SPECTRUMCO REVENUE
             SHARE AMOUNT PAYMENTS ....................................................... 19

    3.1    SpectrumCo Usage Right Payments ..................................................... 19

    3.2    SpectrumCo Net Revenue Share ........................................................... 20

ARTICLE 4 SPECTRUMCO CALL OPTION RIGHT ................................................... 20

    4.1    SpectrumCo Call Option Right ............................................................. 20

ARTICLE 5 LIGADO ATC DEPLOYMENT RIGHT ..................................................... 22

    5.1    ATC Deployment Right ......................................................................... 22

ARTICLE 6 GOVERNANCE ............................................................................................ 22

    6.1    Steering Committee ............................................................................... 22

    6.2    ███████████████████ ................................................... 23

ARTICLE 7 TERM AND TERMINATION ...................................................................... 24

    7.1    Term ....................................................................................................... 24

    7.2    Termination ........................................................................................... 24

    7.3    Effect of Termination ............................................................................ 27

    7.4    Termination of Binding Term Sheet ..................................................... 27

ARTICLE 8 PAYMENT PROVISIONS ............................................................................ 27

    8.1    Payments by SpectrumCo ..................................................................... 27

8.2     Payments by Ligado ................................................................. 28
8.3     Procedures for Notices of Disagreement and Independent Accountant ............. 28
8.4     Places of Payment ................................................................ 30
8.5     Interest for Late Payments ....................................................... 30
8.6     Taxes ............................................................................ 30

ARTICLE 9 CONFIDENTIAL INFORMATION ........................................................ 30

9.1     Confidentiality .................................................................. 30
9.2     Exceptions ....................................................................... 31

ARTICLE 10 REPRESENTATIONS, WARRANTIES, AND COVENANTS ..................................... 31

10.1    Representations and Warranties of the Parties .................................... 31
10.2    Representations and Warranties of Ligado ......................................... 32
10.3    Covenants of the Parties ......................................................... 34
10.4    Covenants of Ligado .............................................................. 34
10.5    Intellectual Property Rights ..................................................... 36
10.6    Security Interest ................................................................ 36

ARTICLE 11 LIMITATION OF LIABILITY ....................................................... 36

11.1    EXCLUSION OF INDIRECT DAMAGES .................................................... 36
11.2    LIMITATION OF LIABILITY .......................................................... 37

ARTICLE 12 INDEMNIFICATION ............................................................... 37

12.1    Indemnification of Ligado ........................................................ 37
12.2    Indemnification of SpectrumCo .................................................... 37
12.3    Indemnification Procedures ....................................................... 38

ARTICLE 13 MISCELLANEOUS ................................................................. 38

13.1    Governing Law .................................................................... 38
13.2    Dispute Resolution ............................................................... 38
13.3    Venue ............................................................................ 39
13.4    Waiver of Jury Trial ............................................................. 39
13.5    Notices .......................................................................... 39
13.6    Publicity ........................................................................ 39
13.7    Assignment ....................................................................... 40
13.8    Further Assurances ............................................................... 40
13.9    Force Majeure .................................................................... 40
13.10   Entire Agreement ................................................................. 40
13.11   No Joint Venture or Agency ....................................................... 40

13.12    Amendments and Waivers ................................................................................... 41

13.13    Severability ....................................................................................................... 41

13.14    Headings ........................................................................................................... 41

13.15    Specific Performance ........................................................................................ 41

13.16    No Third-Party Beneficiaries ............................................................................ 41

13.17    Counterparts ..................................................................................................... 41

13.18    Survival ............................................................................................................. 41

13.19    SpectrumCo Usage Right Continuation ............................................................ 42

ARTICLE 14 FINANCING SOURCES ................................................................................. 42

14.1    Consent to Security Interest ............................................................................... 42

14.2    Notice of Event of Default ................................................................................. 42

14.3    Right to Cure ...................................................................................................... 42

14.4    Step-In Rights .................................................................................................... 43

14.5    Waiver of Claims against Financing Sources ..................................................... 43

## Strategic Collaboration and Spectrum Usage Agreement

This Strategic Collaboration and Spectrum Usage Agreement (the "***Agreement***") is entered into as of March 22, 2025, by and between Ligado Networks LLC, a Delaware limited liability company having offices at 10802 Parkridge Boulevard, Reston, Virginia 20191 ("***Ligado***"), and Spectrum USA I, LLC, a Delaware limited liability company having offices at AST Midland International Air & Space Port, 2901 Enterprise Lane, Midland, Texas 79706 ("***SpectrumCo***"). Ligado and SpectrumCo are each identified as a "***Party***" and together as the "***Parties***" to this Agreement.

## RECITALS

**A.** **WHEREAS**, Ligado is authorized by the FCC (defined below) and ISED (defined below) to use the 1626.5-1660.5 MHz (uplink) and 1525-1559 MHz (downlink) L-band frequency segments within the United States and Canada for mobile satellite services ("***MSS***"), respectively, consistent with United States and Canadian ITU (as defined below) filings;

**B.** **WHEREAS**, pursuant to the Cooperation Agreement (defined below), Ligado has fully coordinated the Ligado L-band MSS Spectrum (defined below) and agreed to certain parameters with Viasat and Inmarsat relating to its use of the Ligado L-band MSS Spectrum;

**C.** **WHEREAS**, pursuant to the other Ligado Coordination Agreements (defined below), Ligado has coordinated the Ligado L-band MSS Spectrum with other Ligado Coordination Partners;

**D.** **WHEREAS**, the Parties have entered into the Binding Terms of Strategic Collaboration dated January 5, 2025 (the "***Binding Term Sheet***"), setting forth the Parties' agreement to a series of transactions whereby, among other things, and as described in further detail therein, Ligado will grant to SpectrumCo certain rights to use and receive many of the economic benefits of the Ligado L-band MSS Spectrum, subject to the provisions, conditions, and limitations of the Cooperation Agreement (defined below) and Ligado's FCC and ISED authorizations and regulatory requirements, in exchange for SpectrumCo providing certain payments and contributions to Ligado and agreeing to collaborate on plans to commercialize the Ligado L-band MSS Spectrum;

**E.** **WHEREAS**, Ligado and SpectrumCo have articulated good, sufficient, and sound business justification for SpectrumCo's right to retain all rights to use the SpectrumCo Usage Right, notwithstanding any purported rejection of this Agreement under Section 365 of the Bankruptcy Code. Namely, among other things, (a) this right was negotiated by Ligado, SpectrumCo, and their respective advisors at arms'-length and in good faith, (b) is necessary to ensure that SpectrumCo will receive the benefits of its bargain under this Agreement, and (c) is fair, reasonable, and appropriate in light of SpectrumCo's substantial investment in reliance on the SpectrumCo Usage Right, including providing certain payments and contributions to Ligado and agreeing to collaborate on plans to commercialize the Ligado L-band MSS Spectrum and substantial expenditures for technology and regulatory compliance necessary to utilize the Ligado L-band MSS Spectrum; and

**F.** **WHEREAS**, the Parties now desire to enter into this Agreement and the other Transaction Agreements (defined below) to definitively memorialize the terms of, and replace and supersede, the Binding Term Sheet.

**NOW THEREFORE**, for and in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties hereto, intending to be legally bound, agree as follows:

## ARTICLE 1
## DEFINITIONS; INTERPRETATIONS; AND ORDER OF PRECEDENCE

1.1 **Definitions**. Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Framework Agreement (as defined below). The following capitalized terms shall have the meanings provided below.

"*Affiliate*" shall mean, with respect to any Person, any other Person (including directors and officers of such Person) directly or indirectly Controlling, Controlled by, or under direct or indirect common Control with such Person.

"*Android Seller*" shall mean any company that designs, manufactures and markets mobile devices that utilize the Linux-based mobile operating system known as "Android", including Google LLC and Samsung Electronics Co., Ltd.

"*Apple*" shall mean Apple Inc., the multinational technology company headquartered in Cupertino, California, which designs, manufactures and markets the "iPhone" mobile device and sells a variety of related services.

"*ATC*" shall mean an ancillary terrestrial component of an MSS system.

"*ATC Deployment*" shall mean the construction and deployment of an ATC network and service.

"*ATC Revenue*" shall mean, with respect to any Revenue Reporting Period, the revenue of Ligado and its Affiliates derived from its ATC business for such Revenue Reporting Period, calculated in accordance with the ATC Revenue Accounting Principles.

"*ATC Revenue Accounting Principles*" shall mean the accounting principles, practices, procedures, policies and methods set forth in Exhibit 1 (*ATC Revenue Accounting Principles*).

"*ATC Revenue Report*" shall mean, with respect to a Revenue Reporting Period, a written report prepared by Ligado that sets forth, with reasonable detail, the calculation of the ATC Revenue for such Revenue Reporting Period.

"*ATC Revenue Share Amount*" shall mean, with respect to any Revenue Reporting Period, seventeen and one-half percent (17.5%) of ATC Revenue for such Revenue Reporting Period.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware before which the chapter 11 cases of Ligado and its debtor affiliates are pending as of the date of this Agreement.

"**Business Day**" shall mean a day, except a Saturday, a Sunday or other day on which any of the SEC, commercial banks in New York, New York or the Department of State of Delaware are not open for the general transaction of business.

"**CCI Usage Rights Agreement**" shall mean the Spectrum Usage Rights Agreement between One Dot Six LLC, a subsidiary of Ligado, and AST & Science, LLC, which shall be executed concurrently with this Agreement and the Framework Agreement.

"**Communications Act**" shall mean the Communications Act of 1934, as amended, and any successor statute of the United States.

"**Confidential Information**" means, with respect to a Disclosing Party or its Affiliates, information in any form (whether written, electronic, graphic, oral or otherwise), including all technical information and schedules, provided by or related to the Disclosing Party or its Affiliates or Representatives to the Receiving Party or its Affiliates or Representatives that (a) was marked confidential (or a similar designation) or was stated to be confidential at the time of disclosure; (b) would reasonably be understood by the Receiving Party to be confidential or proprietary to the Disclosing Party; or (c) is of a type of information identified in this Agreement as the Confidential Information of the Disclosing Party, including, in any event, the terms and conditions of this Agreement and information relating to discussions and negotiations with respect thereto. Notwithstanding the foregoing, "Confidential Information" shall not include information that (i) is publicly known at the time of disclosure or becomes publicly known after disclosure through no wrongful act or breach of this Agreement by the Receiving Party or its Affiliates or Representatives; (ii) is shown to have been already in the possession of the Receiving Party at the time of disclosure without reference to the Disclosing Party's Confidential Information; (iii) is rightfully and lawfully obtained by the Receiving Party from a third party without any confidentiality obligation, directly or indirectly, to the Disclosing Party or its Affiliates; or (iv) is independently developed by or for the Receiving Party without reference to or use of the Disclosing Party's Confidential Information.

"**Control**," "**Controlling**," or "**Controlled**" shall mean that the controlling party directly or indirectly has the beneficial ownership of more than fifty percent (50%) of the stock or other equity interests entitled to vote for the election of directors or an equivalent governing body, or otherwise has the power to direct or cause the direction of the general management of the controlled entity. An entity is an Affiliate only so long as such control exists.

"**Cooperation Agreement**" shall mean the Amended and Restated Cooperation Agreement, dated August 6, 2010, by and among LightSquared L.P. (as predecessor to Ligado), SkyTerra (Canada) Inc. (as predecessor to Ligado Networks (Canada) Inc., an Affiliate of Ligado), LightSquared, Inc. (whose obligations were assumed by LightSquared L.P. prior to it being reorganized as Ligado), and Inmarsat Global Limited, as amended or supplemented, which is subject to the Quadrilateral Coordination Agreement.

"***Cooperation Agreement Fee***" shall mean the quarterly fees that Ligado must pay to Viasat under the Cooperation Agreement for a given year, including any applicable interest or other lawful adjustments accrued as of the date that the applicable SpectrumCo Usage Right Payment is made by SpectrumCo to Ligado in accordance with Section 3.1.1 of this Agreement, but not including any interest or penalty accrued on the portion of the Cooperation Agreement Fee that corresponds to such SpectrumCo Usage Right Payment after the date such SpectrumCo Usage Right Payment is made by SpectrumCo.

"***DUO Payments***" shall have the meaning given to it in the Framework Agreement.

"***Effective Date***" shall be the date that the Bankruptcy Court enters the AST Definitive Agreements Order (as defined in the RSA) in form and substance consistent with the RSA and acceptable in all respects to AST Parent.

"***Escrow Agent***" means the Person appointed to serve as escrow agent under the Escrow Agreement.

"***FCC***" shall mean the U.S. Federal Communications Commission, and any successor agency of the U.S. government exercising substantially equivalent powers.

"***Final Order***" shall mean, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction  with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or (b) any appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, petitioned, or moved.

"***Financial Reports***" shall mean the SpectrumCo Usage Right Payment Reports, the SpectrumCo Net Revenue Reports and the ATC Revenue Reports.

"***Financing Sources***" shall mean the Persons that have entered into any commitment letter, engagement letter, credit agreement, underwriting agreement, purchase agreement, indenture or other agreement with SpectrumCo or any of its Affiliates, or are acting as arrangers, bookrunners, underwriters, initial purchasers, placement agents, administrative agents, collateral agents, trustees or similar roles in connection with any third-party financing provided to SpectrumCo or any of its Affiliates, together with each such Person's Affiliates and the respective representatives, agents, designees, assignees and successors of each of the foregoing Persons (in such capacities).

"***Framework Agreement***" shall mean the Framework Agreement by and among Ligado, SpectrumCo, AST SpaceMobile, Inc. and AST & Science, LLC, which shall be executed concurrently with this Agreement and the CCI Usage Rights Agreement.

"***GEO***" shall mean geostationary Earth orbit.

"***Governmental Authority***" shall mean the FCC, ISED, the U.S. government, any other nation or any political subdivision thereof, whether federal, state, provincial, territorial, local, or

otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government in any jurisdiction (including any supra national bodies such as the European Union or the European Central Bank).

"**Half Year**" shall mean, with respect to any calendar year, (a) the period beginning on January 1 and ending on June 30 in such calendar year or (b) the period beginning on July 1 and ending on December 31 in such calendar year.

"**Independent Accountant**" shall mean an independent certified public accounting firm of nationally recognized standing designated jointly by Ligado and SpectrumCo; provided, that if Ligado and SpectrumCo are unable to agree on such a firm, they shall each nominate such a firm, and the two firms so nominated shall nominate a third such firm, with such third firm to serve as the Independent Accountant; provided, further, that if such a firm is designated the Independent Accountant any time pursuant to this Agreement, such firm shall continue as the Independent Accountant for all purposes hereunder until such time that such firm is no longer an independent certified public accounting firm of nationally recognized standing.

"**Inmarsat**" shall mean Inmarsat Global Limited, a subsidiary of Viasat; provided, that as used herein and in the other Transaction Agreements, "Inmarsat" shall include Viasat and "Viasat" shall include Inmarsat.

"**Inmarsat Litigation**" shall mean the adversary proceeding pending before the Supreme Court for the State of New York, County of New York, captioned *Ligado Networks LLC and Ligado Networks (Canada) Inc. v. Inmarsat Global Limited,* under Index No. 651526/2025 and any other current or future litigation that includes substantially similar claims against Inmarsat or any of its Affiliates..

"**Intellectual Property Rights**" shall mean all intellectual property and similar proprietary rights of any kind, anywhere in the world, whether registered or unregistered, including (a) patents and patent applications, utility models, industrial designs and design patent rights, including any continuations, divisionals, continuations-in-part and provisional applications and statutory invention registrations, and any patents issuing on any of the foregoing and any reissues, reexaminations, substitutes, supplementary protection certificates, extensions of any of the foregoing; and (b) copyrights, works of authorship, data, database and design rights, mask work rights and moral rights, whether or not registered or published, and all registrations, applications, renewals, extensions and reversions of any of any of the foregoing, but excluding any trademarks.

"**ISED**" shall mean the Innovation, Science and Economic Development Canada or any successor governmental entity of Canada thereto performing functions similar to those performed by the Innovation, Science and Economic Development Canada.

"**ITU**" shall mean the International Telecommunications Union.

"**L-band**" shall mean the frequencies 1525-1544/1545-1559 MHz and 1626.5-1645.5/1646.5-1660.5 MHz.

"**LEO**" shall mean low Earth orbit.

"**_Ligado ATC Deployment Right_**" shall mean, with respect to the Ligado L-band MSS Spectrum, Ligado's right to engage in ATC Deployment on its own or together with Ligado's future partners within the following frequency bands: (i) 1526-1536 MHz; (ii) 1627.5-1637.5 MHz; and (iii) 1646.5-1656.5 MHz.

"**_Ligado Call Option_**" shall mean that certain option held by Ligado under the Cooperation Agreement, whereby Ligado has the option to purchase (and thereby permanently satisfy and discharge) all remaining deferred and future payment obligations to Inmarsat under the Cooperation Agreement.

"**_Ligado Coordination Agreement_**" shall mean each agreement between Ligado or any of its Affiliates (on the one hand) and any other Person(s) (on the other hand) related to the coordination or parameters of use of any L-band spectrum within the frequency ranges covered by the Ligado L-band MSS Spectrum, including the agreements identified in Exhibit 2 (*Ligado Coordination Agreements and Partners*).

"**_Ligado Coordination Partner_**" shall mean any Person with which Ligado or any of its Affiliates has coordinated the use of L-band spectrum within the frequency ranges covered by the Ligado L-band MSS Spectrum pursuant to a Ligado Coordination Agreement, including the parties identified in Exhibit 2 (*Ligado Coordination Agreements and Partners*).

"**_Ligado GEO Satellites_**" shall mean the SkyTerra 1 Satellite and any replacement or follow-on satellite thereto, including any satellite launched pursuant to Exhibit 3 (*Future GEO Plan*).

"**_Ligado L-band Licenses_**" shall mean Ligado's FCC and ISED licenses and ITU filings for the Ligado L-band MSS Spectrum.

"**_Ligado L-band MSS Assets_**" shall mean the Ligado GEO Satellites, Ligado's ground station assets, and other Ligado MSS assets, as set forth in Schedule 3 (*Ligado L-band MSS Assets*) hereto.

"**_Ligado L-band MSS Spectrum_**" shall mean the fully coordinated L-band MSS spectrum Ligado has access to pursuant to the Ligado L-band Licenses and the Cooperation Agreement.

"**_MHz_**" shall mean megahertz.

"**_NGSO_**" shall mean non-geostationary Earth orbit.

"**_NGSO Power Levels_**" shall mean the necessary power levels for operation of the SpectrumCo NGSO System, as detailed in Exhibit 4 (*Power Levels for SpectrumCo NGSO System*).

"**_Notice of Event of Default_**" shall mean any written notice provided to Ligado by the Financing Sources that an event of default, under and as defined in one or more of the Finance Documents, has occurred and is continuing.

"**_Parent Group_**" shall have the meaning given to it in the Framework Agreement.

"*Partial Approval*" shall mean the FCC and/or ISED grant of the NGSO Regulatory Applications on terms other than those specified or requested in the NGSO Regulatory Applications, including timing of such grants or terms that provide less than the spectrum amount and power levels requested in the NGSO Regulatory Applications.

"*Person*" shall mean any natural person or any company, partnership, joint venture, firm, corporation, voluntary association, trust, enterprise, unincorporated organization or other corporate body or any other entity whether acting in an individual, fiduciary or other capacity.

"*Plan Confirmation Date*" shall mean the date on which the Bankruptcy Court enters the Confirmation Order (as defined in the RSA).

"*Plan Effective Date*" shall have the meaning set forth in the RSA.

"*Quadrilateral Coordination Agreement*" shall mean the Quadrilateral Coordination Agreement, dated January 27, 2017, by and between Ligado, Inmarsat, and Telecomunicaciones de Mexico.

"*Related Participants*" shall mean all Persons (other than the Parties and any Third Parties) in direct or indirect contractual privity with or having a beneficial interest in either Party to the extent acting directly or indirectly to perform this Agreement, including contractors, subcontractors at any tier (and suppliers of any kind).

"*Relevant Mobile Devices*" shall mean standard, off-the-shelf mobile devices with the capability of using the Ligado L-band MSS Spectrum.

"*Representative*" shall mean with respect to any Person, its directors, managers, officers or other employees, Affiliates, or any investment banker, attorney or other agent or representative retained by, or on behalf of, such Person.

"*Revenue Reporting Period*" shall mean (a) the period beginning on the date hereof through December 31, 2025, (b) each Half Year that begins on or after January 1, 2026 and ends before the date on which this Agreement is terminated, and (c) the period beginning on January 1 of the calendar year in which this Agreement is terminated (if this Agreement is terminated prior to July 1 in such calendar year) or July 1 of the calendar year in which this Agreement is terminated (if this Agreement is terminated on or after July 1 in such calendar year) through the date on which this Agreement is terminated.

"*RSA*" shall mean the Restructuring Support Agreement, dated as of January 5, 2025, by and among Ligado, certain of its subsidiaries listed on the signature page thereto, AST & Science, LLC and the other parties thereto.

"*SkyTerra 1 Satellite*" shall mean the Ligado-owned and Boeing-manufactured satellite identified as "SkyTerra 1".

"*SpectrumCo Contribution*" shall mean the DUO Payments, each SpectrumCo Usage Right Payment and each SpectrumCo Net Revenue Share Amount.

"**SpectrumCo L-band Net Revenue**" shall mean, with respect to any applicable Revenue Reporting Period, the consolidated net revenue of AST Parent and its subsidiaries derived from the AST Parent's and its subsidiaries' usage of the Ligado L-band MSS Spectrum for NGSO operation in the United States of America, Canada, and Mexico for the provision of NGSO services the United States of America, Canada, and Mexico during such period, calculated in accordance with the SpectrumCo Net Revenue Accounting Principles.

"**SpectrumCo Net Revenue Accounting Principles**" shall mean the accounting principles, practices, procedures, policies and methods set forth in Exhibit 5 (*SpectrumCo Net Revenue Accounting Principles*).

"**SpectrumCo Net Revenue Report**" shall mean, with respect to a Revenue Reporting Period, a written report that sets forth, with reasonable detail, the calculation of each of the SpectrumCo L-band Net Revenue and (solely if the Approval Condition has been satisfied prior to the beginning of such Revenue Reporting Period) SpectrumCo North America Net Revenue for such Revenue Reporting Period.

"**SpectrumCo Net Revenue Share Amount**" shall mean, with respect to any Revenue Reporting Period, the greater of the following:

(a)     The amount equal to:

   (i)     If the Approval Condition has not been satisfied before the beginning of such Revenue Reporting Period, seventeen and one-half percent (17.5%) of SpectrumCo L-band Net Revenue for such Revenue Reporting Period; or

   (ii)     If the Approval Condition has been satisfied before the beginning of such Revenue Reporting Period, the greater of: (A) seventeen and one-half percent (17.5%) of SpectrumCo L-band Net Revenue for such Revenue Reporting Period; and (B)(1) if the Ligado L-band MSS Spectrum has been adopted for use in Relevant Mobile Devices marketed by Apple and any Android Seller as of the beginning of such Revenue Reporting Period, five percent (5%) of the SpectrumCo North America Net Revenue for such Revenue Reporting Period, (2) if the Ligado L-band MSS Spectrum has been adopted for use in Relevant Mobile Devices marketed by either (but not both) Apple or any Android Seller as of the beginning of such Revenue Reporting Period, then two and one-half percent (2.5%) of SpectrumCo North America Net Revenue for such Revenue Reporting Period and (3) if the Ligado MSS L-band Spectrum has not been adopted for use in Relevant Mobile Devices marketed by Apple or any Android Seller as of the beginning of such Revenue Reporting Period, zero dollars ($0); and

(b)     Three million dollars ($3,000,000) as multiplied by the number of days in the relevant Revenue Reporting Period and divided by 365 (and, in the case of a leap year, 366).

"**SpectrumCo North America Net Revenue**" shall mean, with respect to any applicable Revenue Reporting Period, the consolidated net revenue of SpectrumCo and its subsidiaries derived from the Parent Group's operations in the United States of America, Canada and Mexico

during such Revenue Reporting Period (excluding any revenue generated by non-communication government application that are not utilizing the Ligado L-Band MSS Spectrum), calculated in accordance with the SpectrumCo Net Revenue Accounting Principles.

"***SpectrumCo Usage Right Payment Report***" shall mean, with respect to a calendar year, a written report that sets forth, with reasonable detail, the calculation of the Cooperation Agreement Fee for such calendar year together with the resulting calculation of the SpectrumCo Usage Right Payment and Usage Right Payment Premium for such calendar year.

"***Step-In Period***" shall mean the period from the Step-In Date up to and including the Step-Out Date.

"***Takings Litigation***" shall mean the case in the U.S. Federal Court of Claims under the caption *Ligado Networks LLC v. USA* (Case No. 23-cv-01797-EJD).

"***Third Party***" or "***Third Parties***" shall mean any Person or Persons other than Ligado, SpectrumCo, and their respective Affiliates and Related Participants.

"***Transaction Agreements***" shall mean this Agreement, the Framework Agreement and the CCI Spectrum Usage Agreement, the Warrant and the Governance Letter Agreement, each of which is to be executed simultaneously.

"***Uncommitted Capacity***" shall mean the Ligado GEO Capacity that has not been committed to a Third Party under a Commercial Agreement from time to time.

"***Usage Right Payment Premium***" shall mean the excess, if any, of (a) the SpectrumCo Usage Right Payment due from SpectrumCo to Ligado for a particular year over (b) the actual Cooperation Agreement Fee due from Ligado to Inmarsat for that year, to the extent such Cooperation Agreement Fee is lower. (For example, (i) if the SpectrumCo Usage Right Payment is $80,000,000 for a particular year and the Cooperation Agreement Fee for the same year is $60,000,000, then the Usage Right Payment Premium shall be $20,000,000 and (ii) if the SpectrumCo Usage Right Payment for a particular is equal to the Cooperation Agreement Fee for the same year, then the Usage Right Payment Premium shall be $0.)

"***Viasat***" shall mean Viasat, Inc.

1.2     **Additional Definitions**.

**Term**                                                                                                                    **Section**

Adverse Impact Determination ................................................................................. 7.2.4
Affiliate ........................................................................................................................ 1.1
Agreement................................................................................................... Preamble
Android Seller .............................................................................................................. 1.1
Anti-Bribery Laws .................................................................................................... 10.1.5
Apple ............................................................................................................................ 1.1
Approval Condition Failure ............................................................................2.1.2(d)(ii)
ATC............................................................................................................................... 1.1

ATC Deployment ........................................................................................... 1.1
ATC Revenue ............................................................................................... 1.1
ATC Revenue Accounting Principles ............................................................. 1.1
ATC Revenue Report ................................................................................... 1.1
ATC Revenue Share Amount ........................................................................ 1.1
Bankruptcy Court ......................................................................................... 1.1
Binding Term Sheet ............................................................................... Recitals
Business Day ............................................................................................... 1.1
CCI Usage Rights Agreement ....................................................................... 1.1
Claim ........................................................................................................ 12.1
Communications Act ..................................................................................... 1.1
Confidential Information ................................................................................ 1.1
Control ....................................................................................................... 1.1
Controlled ................................................................................................... 1.1
Controlling .................................................................................................. 1.1
Cooperation Agreement ............................................................................... 1.1
Cooperation Agreement Fee ......................................................................... 1.1
Disclosing Party ........................................................................................... 9.1
DUO Payments ........................................................................................... 1.1
Effective Date .............................................................................................. 1.1
Escrow Agent .............................................................................................. 1.1
Existing Commercial Agreements ........................................................... 2.1.1(b)
FCC ........................................................................................................... 1.1
Final SpectrumCo Usage Right Payment ..................................................... 8.1.1
Finance Documents ................................................................................. 14.1.2
Financial Reports ......................................................................................... 1.1
Financing Sources ....................................................................................... 1.1
Force Majeure Event .................................................................................... 13.9
Framework Agreement ................................................................................. 1.1
GEO ........................................................................................................... 1.1
Governmental Authority ................................................................................ 1.1
Half Year .................................................................................................... 1.1
Indemnitee ................................................................................................. 12.3
Indemnitor .................................................................................................. 12.3
Independent Accountant ............................................................................... 1.1
Initial Term ............................................................................................... 7.1.1
Inmarsat ..................................................................................................... 1.1
Inmarsat Litigation ....................................................................................... 1.1
Intellectual Property Rights ........................................................................... 1.1
ISED ........................................................................................................... 1.1
ITU ............................................................................................................. 1.1
L-band ........................................................................................................ 1.1
L-band Commercialization Plan ................................................................... 2.2.1
LEO ........................................................................................................... 1.1
Ligado .................................................................................................. Preamble
Ligado ATC Deployment Right ...................................................................... 1.1

Ligado Call Option ........................................................................................................ 1.1
Ligado Coordination Agreement ................................................................................... 1.1
Ligado Coordination Partner ......................................................................................... 1.1
Ligado GEO Capacity ............................................................................................. 2.1.1(a)
Ligado GEO Satellites .................................................................................................. 1.1
Ligado Indemnitee ...................................................................................................... 12.1
Ligado L-band Licenses ............................................................................................... 1.1
Ligado L-band MSS Assets ......................................................................................... 1.1
Ligado L-band MSS Spectrum ..................................................................................... 1.1
███████████████████ ...................................................................................... 2.1.1(a)
Losses ........................................................................................................................ 12.1
MHz ............................................................................................................................ 1.1
MSS ...................................................................................................................... Recitals
N&A ......................................................................................................................... 14.1.1
NGSO ......................................................................................................................... 1.1
NGSO Power Levels .................................................................................................... 1.1
NGSO Regulatory Applications ................................................................................. 2.1.2
NGSO Regulatory Approvals ..................................................................................... 2.1.2
Notice of Disagreement ......................................................................................... 8.3.2(a)
Notice of Event of Default ........................................................................................... 1.1
Option Expiration Date .............................................................................................. 4.1.2
Parent Group ............................................................................................................... 1.1
███████████ ............................................................................................................ 1.1
Parties ................................................................................................................. Preamble
Party .................................................................................................................... Preamble
Person ......................................................................................................................... 1.1
Plan Confirmation Date ........................................................................................ 1.1, 1.1
Quadrilateral Coordination Agreement ........................................................................ 1.1
Receiving Party ........................................................................................................... 9.1
Related Participants ..................................................................................................... 1.1
Revenue Reporting Period ........................................................................................... 1.1
RSA ............................................................................................................................. 1.1
Sales Taxes ................................................................................................................. 8.6
Sanctions and Export Control Laws ......................................................................... 10.1.5
Security Documents .................................................................................................. 14.1.1
Security Interest ....................................................................................................... 14.1.1
SkyTerra 1 Satellite ..................................................................................................... 1.1
SpectrumCo ......................................................................................................... Preamble
SpectrumCo Call Option ............................................................................................ 4.1.1
SpectrumCo Call Option Notice ................................................................................. 4.1.1
SpectrumCo Call Option Price ................................................................................... 4.1.1
SpectrumCo Contribution ............................................................................................ 1.1
SpectrumCo GEO Capacity Notice ...................................................................... 2.1.1(a)
SpectrumCo GEO Usage Right ............................................................................ 2.1.1(a)
SpectrumCo Indemnitee ............................................................................................ 12.2
SpectrumCo L-band Net Revenue ............................................................................... 1.1

SpectrumCo Net Revenue Accounting Principles ........................................................ 1.1
SpectrumCo Net Revenue Report .............................................................................. 1.1
SpectrumCo Net Revenue Share Amount ................................................................. 1.1
SpectrumCo NGSO System ........................................................................................ 2.1.2
SpectrumCo North America Net Revenue ................................................................ 1.1
SpectrumCo Security Interest .................................................................................... 10.6.1
SpectrumCo Usage Right ........................................................................................... 2.1
SpectrumCo Usage Right Payment ........................................................................... 3.1.1
SpectrumCo Usage Right Payment Report ............................................................... 1.1
Steering Committee ................................................................................................... 6.1.1
Step-In Period ............................................................................................................ 1.1
Takings Litigation ...................................................................................................... 1.1
Term ........................................................................................................................... 7.1.2
Third Parties ............................................................................................................... 1.1
Third Party ................................................................................................................. 1.1
Transaction Agreements ............................................................................................ 1.1
True-Up Payment ....................................................................................................... 3.1.2
Uncommitted Capacity .............................................................................................. 1.1
Usage Right Payment Premium ................................................................................. 1.1
Viasat ......................................................................................................................... 1.1

     **1.3**    **Interpretation**.  Unless the context requires otherwise: (a) a reference to "this Agreement" refers to this Agreement as a whole, including all Schedules and Exhibits hereto, and the words "herein," "hereof," "hereunder," and "hereto" and words of similar import refer to this Agreement and its Schedules and Exhibits as a whole and not to any particular Section, Schedule or Exhibit, or any other subdivision; (b) a reference to a Party, Article, Section, Schedule or Exhibit is a reference to that Article, Section, or Exhibit of, or that Party or Schedule to, this Agreement unless otherwise specified; (c) a reference to any legal instrument, treaty, convention, national law, regulation, rule, or other law of any nature in this Agreement shall include any amendment, variation, supplement, or re-enactment of the same from time to time in force; (d) words importing the singular include the plural and vice versa and the masculine, feminine, and neuter genders include all genders; (e) a reference to a Person includes that Person's successors and permitted assigns; (f) the word "including" and words of similar import shall mean "including without limitation" unless otherwise specified; (g) if a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb); (h) the word "extent" and the phrase "to the extent" mean the degree to which a subject or other thing extends, and such word or phrase shall not simply mean "if"; (i) references to "$" and "dollars" are to the currency of the United States of America; (j) any dollar or percentage thresholds set forth herein shall not be used as a benchmark for the determination of what is or is not "material" under this Agreement; (k) references from or through any date mean from and including or through and including, respectively; (l) whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified; (m) whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day; (n) unless otherwise specified in this Agreement, when calculating the period of time within which, or following which, any action is to be taken pursuant to this Agreement, the date that is the reference day in calculating

such period shall be excluded; (o) the Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document; (p) the word "or" shall be disjunctive but not exclusive; and (q) each reference in this Agreement to any agreement, instrument, deed or other document, shall be deemed to be a reference to such agreement, instrument, deed or document, as the case may be, as the same may be amended, supplemented, novated, replaced or otherwise modified from time to time in accordance with the terms hereof and thereof.

1.4    **Order of Precedence**.  In the event of any conflict between the Articles of this Agreement and any Exhibit of or Schedule to this Agreement, the terms of this Agreement shall prevail.

## ARTICLE 2
## SPECTRUMCO USAGE RIGHT AND SPECTRUMCO L-BAND COMMERCIALIZATION PLAN

2.1    **Ligado Grant of SpectrumCo Usage Right**.  Beginning on the Effective Date, in consideration for SpectrumCo's payment of SpectrumCo Usage Right Payments and SpectrumCo Contributions, Ligado shall grant to SpectrumCo the exclusive right to use the Ligado L-band MSS Spectrum and the Ligado L-band MSS Assets, subject to SpectrumCo's observance of the measures and actions deemed necessary by Ligado to remain in compliance in all material respects with the Ligado L-band Licenses and the applicable terms, conditions, limitations, operational requirements, and technical requirements set forth in this Agreement, which include those required to ensure Ligado remains in compliance with the Ligado L-band Licenses and the Cooperation Agreement, in each case, to the extent set forth in Exhibit 6 (*L-band Technical Requirements*) (the "***SpectrumCo Usage Right***").    In connection with the grant of the SpectrumCo Usage Right, Ligado shall provide, and SpectrumCo shall receive, many of the economic benefits of substantially all of the Ligado L-band MSS Spectrum and Ligado L-band MSS Assets, in accordance with the following provisions:

2.1.1    <u>SpectrumCo GEO Usage</u>.

(a)    Beginning on the Effective Date, Ligado shall grant to SpectrumCo the exclusive right to use any or all of the Uncommitted Capacity (the "***SpectrumCo GEO Usage Right***").  SpectrumCo shall provide a written notice to Ligado for any capacity on the Ligado GEO Satellites and related Ligado L-band MSS Spectrum and Ligado L-band MSS Assets ("***Ligado GEO Capacity***") that SpectrumCo seeks to use including SpectrumCo's technical and operational requirements relating to SpectrumCo's intended use of such Ligado GEO Capacity (each, a "***SpectrumCo GEO Capacity Notice***").  To the extent such Ligado GEO Capacity is Uncommitted Capacity, within sixty (60) days after receiving such SpectrumCo GEO Capacity Notice, Ligado shall provide such Uncommitted Capacity to SpectrumCo at no additional charge.  If Ligado is able to provide access to the requested capacity specified in a SpectrumCo GEO Capacity Notice from Uncommitted Capacity, Ligado shall not be required to issue a termination notice pursuant to <u>Section</u>

2.1.1(b), Ligado shall provide notice to SpectrumCo when all Uncommitted Capacity has been fully utilized by SpectrumCo. Notwithstanding the grant of the SpectrumCo GEO Usage Right, to the extent and for as long as necessary to protect Ligado's interest in the Takings Litigation and consistent with Ligado's regulatory requirements, Ligado shall at all times retain ownership and ultimate control of the Ligado GEO Satellites, Ligado L-band MSS Spectrum, Ligado GEO Capacity, Ligado L-band MSS Assets, and Ligado L-band Licenses, which ownership and control shall be exercised consistent with Ligado's regulatory obligations and in a manner that does not adversely affect in any material respect the SpectrumCo Usage Right or SpectrumCo's intended use thereof within the limits of all such measures deemed reasonably necessary to preserve the Ligado GEO Satellites, Ligado L-band MSS Spectrum, Ligado L-band MSS Assets, and Ligado L-band Licenses.

(b)     SpectrumCo acknowledges that, as of the Effective Date, the Ligado GEO Capacity is subject to the existing commercial agreements between Ligado and Third Parties as set forth in Exhibit 7 (*Existing Commercial Agreements*) (the "***Existing Commercial Agreements***") and may enter into additional commercial agreements pursuant to Section 2.1.1(c) (together with the Existing Commercial Agreements, the "***Commercial Agreements***").

(c)



(d)



(e)     Ligado shall (i) keep all Ligado L-band MSS Assets in good working order, and (ii) regularly maintain and repair the Ligado L-band MSS Assets in accordance with customary and usual business practices in the satellite industry and subject to Exhibit 3 (*Future GEO Plan*).

2.1.2     SpectrumCo NGSO System and Regulatory Approvals.     SpectrumCo intends to design, develop, procure, own, and operate an NGSO satellite system that will be licensed to SpectrumCo and that will utilize the Ligado L-band MSS Spectrum pursuant to the SpectrumCo Usage Right (the "*SpectrumCo NGSO System*").     Ligado and SpectrumCo shall collaborate on the design and specifications of the SpectrumCo NGSO System (with SpectrumCo having as much discretion over such design and specifications as may be deemed appropriate by the Parties (acting in good faith) in order to comply with applicable regulatory requirements). With regard to the launch and operation of the SpectrumCo NGSO System, Ligado and SpectrumCo shall also collaborate with the goals of: (i) having Ligado or SpectrumCo (as appropriate) file any necessary applications, including any necessary waivers, with the FCC, ISED, and any other relevant Governmental Authorities to amend and/or modify the Ligado L-band Licenses or secure additional and/or new authorizations in order to authorize the launch and operation of the SpectrumCo NGSO System (the "*NGSO Regulatory Applications*").



The Parties' obligations under this Section shall be carried out in accordance with the following terms:

(a) 

(b)     *Cooperation on NGSO Regulatory Applications*.  Ligado and/or
SpectrumCo, as appropriate based on regulatory considerations agreed upon by the
Parties, shall file any necessary NGSO Regulatory Applications within three (3)
months, but in no event more than six (6) months, after the Effective Date.  In
connection with the preparation and submission of any NGSO Regulatory
Application, the Parties shall: (i) cooperate to prepare and draft any forms or other
documents required to submit any such NGSO Regulatory Application; (ii) after
submission of any NGSO Regulatory Application, keep the other Party and its
counsel informed of any communication received from, or given to, the FCC, ISED,
or any other applicable Governmental Authority relating to such NGSO Regulatory
Applications (and provide a copy to the other Party if such communication is in
writing); (iii) reasonably consult with each other in advance of any meeting or
conference with the FCC, ISED, or any other applicable Governmental Authority
and give the other Party or its counsel the opportunity to attend and participate in
such meetings and conferences; and (iv) permit the other Party or its counsel to

review in advance, and in good faith consider the views of the other Party or its counsel concerning, any submission, filing, or communication intended to be given to the FCC, ISED, or any other applicable Governmental Authority relating to any such NGSO Regulatory Application.

(c)     *SpectrumCo NGSO System and NGSO Regulatory Application Costs*.  SpectrumCo shall bear all costs associated with the SpectrumCo NGSO System, filing the NGSO Regulatory Applications, and obtaining the NGSO Regulatory Approvals, including, upon the submission of a written request therefor by Ligado, reimbursing Ligado for all reasonable and documented costs for any legal professionals and/or technical consultants retained by Ligado in connection with such process; underlined provided that Ligado updates SpectrumCo of such costs on a regular (and no less than monthly) basis ██████████████████████████████
████████████████████████████████████████████████

(d)     *NGSO Regulatory Approvals*.

(i)     To the extent the Parties seek NGSO Regulatory Approvals, each Party shall use reasonable best efforts to ensure that such NGSO Regulatory Approvals are obtained as soon as reasonably practicable after the Effective Date. The Parties further acknowledge and agree that control over the Ligado L-band MSS Spectrum for purposes of the SpectrumCo NGSO System shall be exercised consistent with ISED and FCC policy and law, including relevant precedent with respect to licensee control factors.

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

(ii)     In the event that: (A) Ligado does not submit or consent to SpectrumCo's submission of any NGSO Regulatory Application to the FCC requested by SpectrumCo within six (6) months after the date of this Agreement; (B) Ligado does not submit or consent to SpectrumCo's submission of any NGSO Regulatory Application to ISED requested by SpectrumCo within a reasonable time period after the date of this Agreement; (C) the Parties fail to obtain the NGSO Regulatory Approvals within twenty-four (24) months after submission of the FCC NGSO Regulatory Applications; or (D) within nine (9) months after receiving the FCC NGSO Regulatory Approvals, any U.S. governmental, legislative, or other regulatory action, court order, or applicable law results in SpectrumCo's use of the Ligado L-band MSS Spectrum at the NGSO Power Levels being prohibited or materially adversely impacted (any of (A) – (D) above, an "***Approval Condition Failure***"), SpectrumCo shall have the right to terminate this Agreement in accordance with Section 7.2.2.

2.1.3



2.1.4   <u>Continuing SpectrumCo GEO Usage Right</u>. In the event of an Approval Condition Failure that is not due to SpectrumCo's failure to use reasonable best efforts to ensure that the Approval Condition is met, the Parties agree that SpectrumCo shall continue to have the SpectrumCo GEO Usage Right, <u>provided</u> that (i) <u>Article 3</u> shall continue to apply and (ii) the continued SpectrumCo GEO Usage Right shall be subject to Ligado's rights to terminate this Agreement pursuant to <u>Section 7.2</u>.

2.1.5



## 2.2   **SpectrumCo L-band Commercialization Plan**.

2.2.1   Within thirty (30) days of the Effective Date, SpectrumCo shall deliver to Ligado a comprehensive business plan detailing how SpectrumCo will commercialize the Ligado L-band MSS Spectrum (the "***L-band Commercialization Plan***"), which shall address, among other things, subject to applicable law: (a) "go-to-market" strategies; (b) build and deployment milestones, including timing for service inauguration; (c) key target end markets for mobile wireless and fixed wireless customers; and (d) financial models that project net revenues and profits (taking into account projected subscribership, average revenue per user, operating expenses, capital expenditures, SpectrumCo Usage Right Payments, revenue share obligations with distribution partners, and revenue share obligations to Ligado).

2.2.2   Ligado shall review the L-band Commercialization Plan and either provide written comments to SpectrumCo (or confirm that it has no comments on) the portions of the L-band Commercialization Plan that relate to SpectrumCo's use of the Ligado GEO Satellites, in each case within a reasonable time period (but in no event more than thirty (30) days) after SpectrumCo delivers the L-band Commercialization Plan to Ligado.

2.2.3   If Ligado provides, pursuant to <u>Section 2.2.2</u>, written comments on the L-band Commercialization Plan, then SpectrumCo shall consider such comments in good faith and consult with Ligado in connection with any issues raised by Ligado; provided that

2.3   **Resolution of Takings Litigation**.  Ligado shall notify SpectrumCo immediately following resolution (including settlement) of the Takings Litigation.  Upon SpectrumCo's request at any time following such resolution, the Parties shall negotiate in good faith the terms on which Ligado's rights and assets related to its L-band operations, including the Ligado L-band MSS Assets, the Ligado L-band MSS Spectrum, the Ligado L-band Licenses and Ligado's rights under the Cooperation Agreement would be transferred and assigned to SpectrumCo as soon as reasonably practicable, including the purchase price to be paid by SpectrumCo to Ligado to acquire such rights and assets.  Upon consummation of such a transfer and assignment, SpectrumCo's obligations to pay the SpectrumCo Usage Right Payments and SpectrumCo Net Revenue Share Amounts shall cease.

# ARTICLE 3
## SPECTRUMCO USAGE RIGHT AND SPECTRUMCO REVENUE SHARE AMOUNT PAYMENTS

3.1   **SpectrumCo Usage Right Payments**.

3.1.1   Beginning on the Effective Date and for the Term (and subject further to <u>Section 3.1.3</u> and <u>Section 4.1</u>), SpectrumCo shall pay, in accordance with <u>Section 8.1</u>, to Ligado a usage-right payment (paid quarterly) in the amount that is, for each calendar year, the greater of: (a) $80,000,000; and (b) the Cooperation Agreement Fee for such calendar year (such greater amount, the "***SpectrumCo Usage Right Payment***"), in consideration for the SpectrumCo Usage Right.  For the avoidance of doubt, the SpectrumCo Usage Right Payment shall at all times be equal to or greater than one hundred percent (100%) of the Cooperation Agreement Fee owed by Ligado to Inmarsat for the applicable calendar year, or pro rata portion thereof, pursuant to the Cooperation Agreement.  Notwithstanding the foregoing, for a period of thirty-six (36) months beginning on the Effective Date, SpectrumCo may elect to pay all or any portion of the Usage Right Payment Premium in shares of Class A Common Stock of AST SpaceMobile, Inc. (such shares to be valued at the average of the volume weighted averages of the trading price of the Class A Common Stock of AST SpaceMobile, Inc. on NASDAQ (as reported by Bloomberg L.P. or, if not reported thereby, by another authoritative source mutually selected by SpectrumCo and Ligado in good faith) on each of the thirty (30) consecutive trading days ending on the last trading day prior to the applicable payment date).  Ligado further agrees to execute and deliver to SpectrumCo any customary documentation and certificates (and provide any account-opening information) reasonably requested by SpectrumCo or SpectrumCo's transfer agent in order to implement the issuance of the Parent Common Stock.

3.1.2   SpectrumCo shall be obligated: (a) to provide to Ligado, at least sixty (60) days prior to each Cooperation Agreement Fee becoming due to Inmarsat (or, if such

payment is due to Inmarsat within sixty (60) days after the Effective Date, as soon as reasonably practicable after the Effective Date), with documentation showing that an amount equal to the applicable SpectrumCo Usage Right Payment or portion thereof (excluding, prior to the Plan Confirmation Date, any Usage Right Payment Premium) corresponding to such Cooperation Agreement Fee is held in an escrow account in accordance with an escrow agreement (the "***Escrow Agreement***") to be negotiated by the Parties after the Effective Date in accordance with the agreed principles set forth in Exhibit 9 hereto (*Escrow Agreement Agreed Principles*); and (b) to ensure that such amount (excluding, prior to the Plan Confirmation Date, any Usage Right Payment Premium) is paid to Ligado at least ten (10) days prior to such corresponding Cooperation Agreement Fee becomes due to Inmarsat. All accumulated Usage Right Payment Premium amounts and any other portion of the SpectrumCo Usage Right Payment incurred and remaining unpaid as of the Plan Confirmation Date through January 1 of the following year (the "***True-Up Payment***") shall become due and payable by SpectrumCo to Ligado within forty-five (45) days after the Plan Confirmation Date. Any amounts deposited into the escrow account by SpectrumCo pursuant to this <u>Section 3.1.2</u> shall be free and clear of all liens and/or other security interests at the time of deposit. No later than five (5) Business Days prior to such time that any amounts are due and payable by SpectrumCo to Ligado pursuant to this <u>Section 3.1.2</u>, the Parties shall deliver to the Escrow Agent a joint written instruction in accordance with the Escrow Agreement directing the Escrow Agent to disburse such amounts to Ligado (or, at Ligado's election, to Inmarsat) on the date such amounts will become due and payable hereunder or, to the extent the payment is being made directly to Inmarsat, on the date on which the Cooperation Agreement Fee will become due and payable to Inmarsat. Nothing in this Agreement (including, for the avoidance of doubt, <u>Section 3.1.1</u> or <u>Section 8.1</u>) shall require SpectrumCo to pay any amount with respect to any portion of any Cooperation Agreement Fee incurred prior to the Effective Date, or to pay any Usage Right Payment Premium prior to the Plan Confirmation Date.

3.1.3 In the event that, in any period during the Term, SpectrumCo is unable to exercise all or part of the SpectrumCo Usage Rights as a result of any willful and intentional act or omission of Ligado or its Affiliates, then the Parties shall work together in good faith to negotiate an adjustment to the SpectrumCo Usage Right Payments payable with respect to such period and any disputes regarding any such adjustment shall be resolved in accordance with the dispute resolution provisions in Section 13.2.

3.2 **SpectrumCo Net Revenue Share**. For each Revenue Reporting Period, SpectrumCo shall pay, or cause to be paid, to Ligado an amount in cash equal to the SpectrumCo Net Revenue Share Amount for each Revenue Reporting Period in accordance with <u>Section 8.1.2</u>.

## ARTICLE 4
## SPECTRUMCO CALL OPTION RIGHT

4.1 **SpectrumCo Call Option Right**.

4.1.1 SpectrumCo shall have the option to direct Ligado, upon written notification to Ligado (the "***SpectrumCo Call Option Notice***"), to exercise the Ligado Call

Option (the "**SpectrumCo Call Option**"), in which case SpectrumCo shall be obligated to make the payments in the amounts and on the terms described in the Cooperation Agreement with respect to such Ligado Call Option, <u>plus</u> an amount equal to the cumulative Usage Right Payment Premium amounts that are payable by SpectrumCo throughout the Term, as set forth in more detail in Exhibit 10 (*Usage Right Payment Premium Amounts*), <u>minus</u> the sum of all Usage Right Payment Premium amounts previously paid by SpectrumCo (the "**SpectrumCo Call Option Price**"). The SpectrumCo Call Option Notice shall include financial documentation showing that funds sufficient to pay the SpectrumCo Call Option Price are held in an escrow account in accordance with the Escrow Agreement to provide evidence that SpectrumCo has the requisite funding to immediately pay the SpectrumCo Call Option Price. Ligado shall exercise the Ligado Call Option in accordance with the Cooperation Agreement as soon as possible after receipt of such financial documentation and in any event prior to the Option Expiration Date. Ligado shall immediately notify SpectrumCo following such exercise of the Ligado Call Option and SpectrumCo shall pay the SpectrumCo Call Option Price to Ligado within fifteen (15) Business Days following such exercise, which payment shall be made to the Ligado account identified in <u>Schedule 1</u> (*Places of Payment*) or to such other U.S. account as may be notified in writing by Ligado to SpectrumCo. Any amounts deposited into the escrow account by SpectrumCo pursuant to this <u>Section 4.1.1</u> shall be free and clear of all liens and/or other security interests at the time of deposit. No later than five (5) Business Days prior to such time that any amounts are due and payable by SpectrumCo to Ligado pursuant to this <u>Section 4.1.1</u>, the Parties shall deliver to the Escrow Agent a joint written instruction in accordance with the Escrow Agreement directing the Escrow Agent to disburse such amounts to Ligado in accordance with this <u>Section 4.1.1</u> on the date such amounts are due hereunder.

4.1.2    SpectrumCo's right to exercise the SpectrumCo Call Option shall expire at 11:59 p.m., New York time, on October 15, 2025 (the "**Option Expiration Date**"), <u>provided</u> that the Parties may agree to extend the Option Expiration Date if: (a) Ligado and Inmarsat have agreed to extend the latest date by which Ligado is able to exercise the Ligado Call Option under the Cooperation Agreement or (b) the Bankruptcy Court extends the latest date by which Ligado is able to exercise the Ligado Call Option under the Cooperation Agreement. If SpectrumCo fails to exercise the SpectrumCo Call Option by the Option Expiration Date (as may be extended in accordance with this <u>Section 4.1</u>), then SpectrumCo shall be deemed to have forfeited the SpectrumCo Call Option.

4.1.3    With effect from exercise of the Ligado Call Option, SpectrumCo's obligation to make the SpectrumCo Usage Right Payments shall cease.

4.1.4    In the event that Ligado exercises the Ligado Call Option pursuant to SpectrumCo's exercise of the SpectrumCo Call Option, and Inmarsat challenges or otherwise rejects Ligado's exercise of the Ligado Call Option, Ligado shall not be in material breach of this <u>Article 4</u> for any failure to exercise or consummate the Ligado Call Option if Ligado has (i) used its reasonable best efforts to consummate the Ligado Call Option (including taking customary measures to enforce the Ligado Call Option) and (ii) returned the SpectrumCo Call Option Price to SpectrumCo; <u>provided</u>, that this shall not limit Ligado's obligations under this <u>Article 4</u> in any respect.

4.1.5    Ligado shall be entitled to exercise the Ligado Call Option other than pursuant to <u>Section 4.1.1</u>; <u>provided</u>, that Ligado shall be solely responsible for the payment required for any such exercise of the Ligado Call Option and, unless SpectrumCo otherwise agrees in writing, such payment shall not form part of the Cooperation Agreement Fee.

## ARTICLE 5
## LIGADO ATC DEPLOYMENT RIGHT

5.1    **ATC Deployment Right**.  Neither this Agreement nor any other Transaction Agreements shall be deemed to prohibit or in any way limit Ligado from exercising the Ligado ATC Deployment Right, subject to the following:

5.1.1    <u>ATC Deployment</u>.  Ligado may exercise the Ligado ATC Deployment Right at any time during the Term (or any renewal thereof) of this Agreement; <u>provided</u>, that Ligado has retained the Ligado ATC Deployment Right following a final, non-appealable judgment, order or settlement of the Takings Litigation.  If Ligado decides to exercise the Ligado ATC Deployment Right, then Ligado shall promptly notify SpectrumCo of such decision.   Ligado shall then notify SpectrumCo of its ATC Deployment within three (3) days after such completion ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

5.1.2    <u>Notice of Ligado ATC Deployment Right</u>.  No later than six (6) months after a final, non-appealable judgment, order or settlement of the Takings Litigation that results in Ligado retaining the Ligado ATC Deployment Right, Ligado will notify SpectrumCo of its decision whether or not to exercise the Ligado ATC Deployment Right. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5.1.3    <u>ATC Revenue Share</u>.  In accordance with <u>Section 8.2</u>, for each Revenue Reporting Period, Ligado shall pay, or cause to be paid, to SpectrumCo an amount in cash equal to the ATC Revenue Share Amount for such Revenue Reporting Period.

## ARTICLE 6
## GOVERNANCE

6.1    **Steering Committee**.

6.1.1    Within five (5) days after the Effective Date, each Party shall appoint two (2) representatives of appropriate seniority and experience to a steering committee with responsibility for: (a) acting as a first-level forum for discussing and seeking to resolve any disputes related to this Agreement, including any operational or technical issues faced by a Party as a result of the other Party's use of the Ligado L-band MSS Spectrum or Ligado L-band Assets but other than any disputes related to any Financial Report (which shall be addressed according to the provisions of <u>Section 8.3</u>); (b) overseeing Ligado's progress towards terminating any Commercial Agreements pursuant to <u>Section 2.1.1(b)</u> and discussing any technical requirements or issues with transitioning any counterparties using capacity on the Ligado GEO Satellites under any Commercial Agreement off such

capacity; (c) discussing the status of the Takings Litigation and the Inmarsat Litigation and the potential resolution of either of them (in a manner that preserves attorney-client privilege, attorney work product protection or other legal privilege); and (d) the matters described in <u>Section 2.2</u>, <u>Section 2.3</u>, and <u>Sections 6.2</u> and any other matters agreed by the Parties (the "***Steering Committee***"), in each case, subject to compliance with applicable law. Without each Party's prior written consent, the steering committee shall not make any determination or take any action that is inconsistent with the terms of this Agreement.

6.1.2   Each Party's representatives on the Steering Committee shall be authorized to make decisions on behalf of such Party with respect to the day-to-day implementation and overall management of this Agreement (but not to amend this Agreement). Either Party may (i) within five (5) Business Days after the nomination of Steering Committee representatives by the other Party, provide written notice to the other Party to object to its nominated representatives on the Steering Committee if such nominated representatives do not reasonably have the appropriate seniority, experience or authority to serve on the Steering Committee (and any disputes regarding nominated representatives shall be resolved in accordance with the dispute resolution provisions in <u>Section 13.2</u>) and (ii) replace one or more of its representatives on the Steering Committee at any time by written notice to the other Party's representatives; <u>provided</u>, that the Steering Committee shall at all times be comprised of an equal number of Ligado and SpectrumCo representatives, unless otherwise agreed to by the Parties in writing.

6.1.3   The Steering Committee shall meet at least once per quarter during the Term, unless otherwise agreed by both Parties. Meetings may be held in person or via telephone or videoconference as may be agreed by the Steering Committee members. The Parties shall be jointly responsible for convening meetings of the Steering Committee, agreeing the dates, times, and places of the meetings, and compiling and distributing relevant information, agendas, and other similar materials in advance of each such meeting. Meetings shall be held on at least five (5) Business Days' notice, except where all members of the Steering Committee agree otherwise. In the event of an issue of a serious nature arising in respect of any obligations relating to this Agreement, each Party shall have the right to convene an emergency meeting of the Steering Committee on no less than forty-eight (48) hours' notice to the members thereof. Each Party shall ensure that its Steering Committee representatives (or their alternatives) are available at reasonable times and on reasonable notice in accordance with this <u>Section 6.1.3</u>. Steering Committee meetings shall only be held if an equal number of representatives from each Party are in attendance (including virtually), unless waived by the Party represented by fewer representatives.

6.2





## ARTICLE 7
## TERM AND TERMINATION

7.1    **Term**.

7.1.1    <u>Initial Term</u>. This Agreement shall become effective on the Effective Date and remain effective until: (a) the earlier of (i) December 31, 2035 and (ii) the date of termination or expiration of the Cooperation Agreement; or (b) this Agreement is terminated by either Party in accordance with <u>Section 7.2</u> (the "***Initial Term***").

7.1.2    <u>Renewal Term</u>. Unless SpectrumCo elects to not renew this Agreement by providing written notice to Ligado at least three (3) months prior to the end of the Initial Term, this Agreement shall automatically renew after the expiration of the Initial Term and remain effective until: (a) the later of (i) December 31, 2107 and (ii) the date of termination or expiration of the Cooperation Agreement; or (b) this Agreement is terminated by either Party in accordance with <u>Section 7.2</u> (together with the Initial Term, the "***Term***").

7.1.3    <u>Regulatory Approval</u>.    If SpectrumCo reasonably determines, in consultation with Ligado, that any notification, filing, consent and/or other approval is required under the HSR Act and other applicable Antitrust Laws in connection with renewal of the Initial Term under <u>Section 7.1.2</u>, each Party shall use reasonable best efforts to cooperate with each other and promptly prepare, file and obtain, as applicable, any such notification, filing, consent and/or other approval.

7.2    **Termination**.

7.2.1    <u>Termination for Material Breach</u>.    Either Party, <u>provided</u> that it is not currently in default of a material provision of this Agreement, may terminate this Agreement in the event of a material breach of this Agreement by the other Party, upon written notice of such material breach to the other Party if the other Party has not cured such material breach within forty five (45) days after receipt of such written notice; provided, that if such material breach (i) is not related to a payment obligation of either of the Parties, (ii) cannot reasonably be cured within a forty five (45) day period and (iii) the

breaching Party promptly takes diligent actions to cure the breach, then the cure period for such breach shall be extended to ninety (90) days.

7.2.2    Termination for Approval Condition Failure.  SpectrumCo may terminate this Agreement in the event of an Approval Condition Failure (provided, that a material breach by SpectrumCo of any provision of this Agreement is not a primary cause of such Approval Condition Failure) by providing written notice (specifying in reasonable detail the basis for which SpectrumCo is terminating this Agreement pursuant to an Approval Condition Failure) to Ligado within thirty (30) days after the occurrence of the Approval Condition Failure; provided, that Ligado may (provided Ligado is acting reasonably and in good faith) dispute an SpectrumCo termination based on an Approval Condition Failure by providing a written response (with sufficient details regarding the rationale for its dispute of the Approval Condition Failure) to SpectrumCo within ten (10) Business Days after Ligado's receipt of SpectrumCo's notice of termination relating to an Approval Condition Failure and, after receipt of such written response by SpectrumCo, the Parties shall discuss in good faith how to resolve such dispute.  If the Parties cannot resolve the dispute within thirty (30) days after SpectrumCo's receipt of Ligado's written response, such dispute shall be resolved according to the dispute resolution provisions in Section 13.2.

7.2.3    Termination for Failure to Pay SpectrumCo Usage Payments and SpectrumCo Contribution.  Ligado may terminate this Agreement immediately upon written notice to SpectrumCo if SpectrumCo fails to timely pay any SpectrumCo Usage Right Payment or SpectrumCo Contribution within forty-five (45) days after the applicable due date for such SpectrumCo Usage Right Payment or SpectrumCo Contribution as set forth in this Agreement or the Framework Agreement, as applicable; provided Ligado has notified SpectrumCo that it has not received the relevant payment during the forty-five (45) day period.

7.2.4    Termination for Adverse Resolution of Takings Litigation.  In the event that any final resolution (including any final order or settlement) of the Takings Litigation results in SpectrumCo's intended exercise of the SpectrumCo Usage Right being materially adversely impacted, ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ (such event, an "*Adverse Impact Determination*"), SpectrumCo may terminate this Agreement by providing written notice (specifying in reasonable detail the basis for which SpectrumCo is terminating this Agreement pursuant to such Adverse Impact Determination) to Ligado; provided, however, that Ligado may (provided that Ligado is acting reasonably and in good faith) dispute a SpectrumCo termination based on an Adverse Impact Determination by providing a written response (with sufficient details regarding the rationale for its dispute of the Adverse Impact Determination) to SpectrumCo within ten (10) days after Ligado's receipt of SpectrumCo's notice of termination relating to an Adverse Impact Determination and, after receipt of such written response by SpectrumCo, the Parties shall discuss in good faith how

to resolve such dispute. If the Parties cannot resolve the dispute within fifteen (15) days after SpectrumCo's receipt of Ligado's written response, such dispute shall be resolved according to the dispute resolution provisions in <u>Section 13.2</u>. Upon termination of this Agreement pursuant to an Adverse Impact Determination (whether due to Ligado not disputing SpectrumCo's termination notice or following conclusion of the resolution of the dispute resolution process in <u>Section 13.2</u>), Section 7.3(b) of the Framework Agreement shall apply.

7.2.5    <u>Termination for Excessive Force Majeure</u>. Either Party may terminate this Agreement upon thirty (30) days' prior written notice to the other Party if the other Party is prevented from carrying out any of its material obligations under this Agreement for more than one hundred and eighty (180) days due to a Force Majeure Event.

7.2.6    <u>Termination for Adverse Action with Respect to Licenses or MSS Assets</u>.

(a)    Ligado may terminate this Agreement upon thirty (30) days' prior written notice to SpectrumCo in the event that SpectrumCo takes any action with the effect of materially jeopardizing or harming the Ligado L-band Licenses or the Ligado L-band MSS Assets and fails to remedy such action within ninety (90) days of SpectrumCo's receipt of written notice thereof from Ligado.

(b)    SpectrumCo may terminate this Agreement upon thirty (30) days' prior written notice to Ligado in the event that Ligado takes any action with the effect of materially jeopardizing or harming SpectrumCo's licenses from any Governmental Authority related to SpectrumCo's use of the Ligado L-band Spectrum or Ligado L-band MSS Assets, or the SpectrumCo NGSO System, and fails to remedy such action within ninety (90) days of Ligado's receipt of written notice thereof from SpectrumCo.

7.2.7    <u>Termination Upon Cooperation Agreement Termination</u>. SpectrumCo may terminate this Agreement upon thirty (30) days' prior written notice to Ligado if the Cooperation Agreement terminates or expires.

7.2.8    <u>Termination Upon Framework Agreement Termination</u>. Ligado may terminate this Agreement upon thirty (30) days' prior written notice to the other Party if (a) the Framework Agreement is terminated prior to payment of the DUO Payments; and (b) SpectrumCo has provided a written notice to Ligado that it does not intended to exercise its right under <u>Section 2.1.4</u>.

7.2.9    <u>Other Termination Events</u>. This Agreement may be terminated at any time:

(a)    by either SpectrumCo or Ligado, at any time before the Plan Effective Date, if the RSA is terminated; or

(b)    by SpectrumCo, if the Plan Effective Date has not occurred on or prior to the Outside Date (as defined in the RSA).

7.3    **Effect of Termination**.  Unless otherwise provided for in this Agreement, if either Party exercises its rights to terminate this Agreement pursuant to Section 7.2, then: (a) SpectrumCo shall surrender the SpectrumCo Usage Right to Ligado and cease using the Ligado L-band MSS Spectrum as of the effective date of termination of the Agreement (or as soon as reasonably practicable thereafter, if not possible to cease use as of such effective date of termination); (b) for twelve (12) months (or such other period as may be agreed by both Parties in writing) following the effective date of termination of this Agreement, the Parties shall cooperate in good faith to ensure an orderly wind-down of their activities pursuant to this Agreement (including, to the extent applicable, as required by Article 6); and (c) subject to Section 13.18, neither Party shall have any continuing liabilities or obligations of any kind to the other Party as of the effective date of such termination (without prejudice to any liabilities accrued prior to such termination, including for breach of this Agreement), and this Agreement shall terminate and cease to have any further force or effect except with respect to any provisions that expressly survive termination.

7.4    **Termination of Binding Term Sheet**.  This Agreement shall supersede and replace the Binding Term Sheet, which shall be terminated and have no further force or effect as of the Effective Date.

## ARTICLE 8
## PAYMENT PROVISIONS

8.1    **Payments by SpectrumCo**.

8.1.1    SpectrumCo Usage Right Payment. On or prior to January 1 of each year during the Term, Ligado shall deliver to SpectrumCo (i) the SpectrumCo Usage Right Payment Report for such calendar year and (ii) supporting documentation for such SpectrumCo Usage Right Payment Report; provided, however, that the SpectrumCo Usage Right Payment Report for the 2025 calendar year shall be delivered by Ligado to SpectrumCo within five (5) days after the Effective Date.  SpectrumCo shall make each SpectrumCo Usage Right Payment and any True-Up Payment required to be paid to Ligado on or prior to the applicable due date set forth in Section 3.1.2.  Other than any payment to be made in equity as permitted by last sentence of Section 3.1.1, SpectrumCo shall pay, or cause to be paid, each such payment Ligado by wire transfer of immediately available funds, to the Ligado account identified in Section 8.4.  In the event of any dispute between the Parties regarding the amount of any SpectrumCo Usage Right Payment, within ten days after the applicable SpectrumCo Usage Right Payment has been finally determined in accordance with Section 8.3 (as so finally determined, the "***Final SpectrumCo Usage Right Payment***"), if the SpectrumCo Usage Right Payment as set forth in the applicable SpectrumCo Usage Right Payment Report delivered by Ligado to SpectrumCo is greater than such Final SpectrumCo Usage Right Payment, Ligado shall pay, or cause to be paid, to SpectrumCo an amount in cash equal to such excess by wire transfer of immediately available funds to the SpectrumCo account identified in Section 8.4.  The penultimate sentence of this Section 8.1.1 shall also apply in the event of any dispute between the Parties regarding the amount of the True-Up Payment, *mutatis mutandis*.

8.1.2    SpectrumCo Net Revenue Share Amount Payment.  No later than sixty (60) days following the end of each Revenue Reporting Period, SpectrumCo shall deliver to

Ligado (i) the SpectrumCo Net Revenue Report for such Revenue Reporting Period and (ii) supporting documentation for such SpectrumCo Net Revenue Report, including invoices and other relevant financial documentation.  Within ten days after the applicable SpectrumCo Net Revenue Share Amount has been finally determined in accordance with Section 8.3, SpectrumCo shall pay, or cause to be paid, to Ligado such SpectrumCo Net Revenue Share Amount by wire transfer of immediately available funds to the Ligado account identified in Section 8.4.

8.2     **Payments by Ligado**.  No later than sixty 60 days following the end of each Revenue Reporting Period, Ligado shall deliver to SpectrumCo (i) the ATC Revenue Report for such Revenue Reporting Period and (ii) supporting documentation for such ATC Revenue Report, including invoices and other relevant financial documentation.  Within ten days after the applicable ATC Revenue Share Amount has been finally determined in accordance with Section 8.3, Ligado shall pay, or cause to be paid, to SpectrumCo such ATC Revenue Share Amount by wire transfer of immediately available funds, to the SpectrumCo account identified in Section 8.4.

8.3     **Procedures for Notices of Disagreement and Independent Accountant**.

8.3.1   <u>Access to Books and Records</u>.  Within thirty (30) days after receipt by a Party of any Financial Report that is required to be delivered to such Party under this Agreement, the Party who prepared and delivered such Financial Report shall, at the receiving Party's request, provide the receiving Party and its accountants and other Representatives, on reasonable advance notice, with reasonable access during normal business hours to the books and records (including work papers, subject to the execution of customary access letters, if requested) of the delivering Party and its Affiliates to the extent relevant to, and solely for purposes of, their review of such Financial Report and the preparation of any Notice of Disagreement; <u>provided</u>, that the receiving Party's Representatives (as defined in the Framework Agreement) shall conduct any such activities in such a manner as not to interfere unreasonably with the business or operations of the delivering Party or its Affiliates; <u>provided</u>, <u>further</u>, that the delivering Party shall not be obligated to provide such access or information if it determines, in good faith consultation with its outside counsel, that doing so is reasonably likely to (i) violate any applicable law or court order or (ii) jeopardize the protection of an attorney-client privilege, attorney work product protection or other legal privilege (in which case the delivering Party shall notify the receiving Party that it is withholding any such information and use reasonable best efforts to provide such information in a manner that does not result in the waiver any such privilege (including pursuant to a common interest agreement)).

8.3.2   <u>Notices of Disagreement</u>.

(a)     Each Financial Report delivered by a Party pursuant to this Agreement shall become final, conclusive and binding on the Parties thirty (30) days after receipt of such Financial Report by the other Party, unless the receiving Party delivers written notice of its disagreement with any such Financial Report or the calculation of any amount set forth therein (a "***Notice of Disagreement***") to the delivering Party on or prior to such date.  Any Notice of Disagreement shall specify in reasonable detail the nature and amount of any disagreement so asserted and shall

set forth the receiving Party's alternative calculations of the disputed amounts, together, in each case, with reasonably detailed supporting calculations and documentation. The receiving Party shall be deemed to have agreed with all amounts and other line items contained in the Financial Report that are not disputed in a Notice of Disagreement.

(b)     If any Party delivers a timely Notice of Disagreement to the other Party pursuant to <u>Section 8.3.2(a)</u>, then the applicable Financial Report and related calculations set forth therein (in each case as revised in accordance with this <u>Section 8.3.2(b)</u>) shall become final, conclusive, and binding upon the Parties on the earlier of: (i) the date any and all matters specified in the Notice of Disagreement are finally resolved in writing by the Parties; and (ii) the date any and all matters specified in the Notice of Disagreement and not resolved in writing by the Parties pursuant to <u>clause (i)</u> of this <u>Section 8.3.2(b)</u> are finally resolved by an Independent Accountant pursuant to <u>Section 8.3.3</u>. The applicable Financial Report and the related calculations set forth therein shall be revised by SpectrumCo and Ligado to the extent necessary to reflect any resolution by Ligado and SpectrumCo and any final resolution made by the Independent Accountant pursuant to <u>Section 8.3.3</u>. During the fifteen (15) day period immediately following the delivery to the applicable Party of a Notice of Disagreement, or such longer period as Ligado and SpectrumCo may agree in writing, Ligado and SpectrumCo shall seek in good faith to resolve in writing any differences that they may have with respect to any matter specified in the Notice of Disagreement, and all such discussions related thereto shall be governed by Rule 408 of the Federal Rules of Evidence and any applicable similar state or local rule. At the end of such fifteen (15) day period (or such longer period as may have been agreed by Ligado and SpectrumCo), Ligado and SpectrumCo, pursuant to <u>Section 8.3.3</u>, shall submit to an Independent Accountant for review and resolution any and all matters (but only such matters) that remain in dispute and that were included in the Notice of Disagreement, and any such resolution by the Independent Accountant shall be final, conclusive and binding on the Parties (absent manifest mathematical error).

8.3.3   <u>Independent Accountant</u>.

(a)     If a dispute is submitted to the Independent Accountant pursuant to <u>Section 8.3.2(b)</u>, SpectrumCo and Ligado shall instruct the Independent Accountant to make a final determination of all such matters (but only such matters) that remain in dispute and that were included in the Notice of Disagreement. Such determination shall be made in accordance with the applicable terms and provisions of this Agreement and any applicable Exhibits. SpectrumCo and Ligado shall cooperate with the Independent Accountant during the term of its engagement. Neither SpectrumCo nor Ligado shall have any ex parte communications with the Independent Accountant. The Independent Accountant shall not assign a value to any item in dispute greater than the greatest value for such item assigned by in the applicable Financial Report, on the one hand, or in the Notice of Disagreement, on the other hand, or less than the smallest value for such item assigned in applicable Financial Report, on the one hand, or in the Notice of Disagreement, on the other

hand.  The Independent Accountant shall make its determination based solely on presentations by SpectrumCo and Ligado that are in accordance with the GAAP and the applicable terms and provisions of this Agreement and not on the basis of an independent review and as an expert and not an arbitrator.

(b)    SpectrumCo and Ligado shall request the Independent Accountant to deliver its final determination in writing and within thirty (30) days following final submission of the disputed matters to it.  The fees and expenses of the Independent Accountant shall be borne by Ligado, on the one hand, and SpectrumCo, on the other hand, based on the percentage that the portion of the contested amount not awarded to each Party bears to the amount actually contested by such Party, and such allocation of fees and expenses shall be calculated by the Independent Accountant and such calculation shall be final, conclusive and binding on the Parties.  At any time, SpectrumCo and Ligado may agree to settle any objections raised in the Notice of Disagreement, which agreement shall be in writing and final, conclusive and binding on all of the Parties with respect to the subject matter of any such objection so resolved.

8.4    **Places of Payment**.  The Parties shall make their respective payments owned under this Agreement to the accounts identified in Schedule 1 (*Places of Payment*), or to such other account as may be notified in writing by the non-paying Party to the paying Party.

8.5    **Interest for Late Payments**.  If an amount due under this Agreement is not paid within the applicable due date of such payment as identified in Section 8.1 or Section 8.2 (as applicable), all such payments shall bear interest at one percent (1%) per month starting on the date such payment is due until but excluding the date the overdue amount and the interest are paid.

8.6    **Taxes**.  Each Party shall pay all sales, goods and services, and other similar taxes imposed on or payable with respect to payments such Party is otherwise required to make under this Agreement (collectively, "***Sales Taxes***") (excluding, for purposes of clarification, income taxes of the other Party), subject to the receipt from the other Party of a valid invoice required by law to be issued in connection with such Sales Taxes.  Each Party shall be entitled to deduct and withhold from any payment under this Agreement all taxes that such Party is required to deduct and withhold under any applicable provision of law. All such amounts withheld and properly paid over to the appropriate taxing authority shall be treated as having been paid to the person in respect of whom such deduction and withholding was made.  Each Party shall promptly provide the other Party with any applicable tax forms and certifications (including IRS Form W-9 or the applicable version of IRS Form W-8) reasonably requested and shall promptly provide an update of any such tax form or certificate previously delivered if the same has become incorrect or has expired.

## ARTICLE 9
## CONFIDENTIAL INFORMATION

9.1    **Confidentiality**.  Each Party (each a "***Receiving Party***") shall, and shall ensure that its Affiliates shall, treat as strictly confidential all of the other Party's (each a "***Disclosing Party***") Confidential Information and shall not, except with the prior written consent of the Disclosing Party, make use of (save for the purposes of performing its obligations or exercising its rights

under Transaction Agreement) or disclose to any Person (other than in accordance with this Article 9) any Confidential Information. Each Receiving Party undertakes that it shall (and shall ensure that its Affiliates shall) only disclose Confidential Information to its Representatives where it is reasonably required for the purposes of exercising its rights or performing its obligations under this Agreement and only where the Representatives are informed of the confidential nature of the Confidential Information and the provisions of this Article 9 and such Representatives are bound to abide by confidentiality obligations substantially as protective as those contained herein. The Receiving Party shall be liable for any violation of this Article 9 by its Representatives. The confidentiality obligations set forth in this Article 9 shall bind the Receiving Party (a) with respect to Confidential Information that is a trade secret right or business secret, for so long as such Confidential Information remains a trade secret right or business secret under applicable law, and (b) with respect to all other Confidential Information, perpetually unless any of the exceptions set forth in Section 9.2 applies.

9.2    **Exceptions**.  Notwithstanding Section 9.1, a Receiving Party shall have the limited right to disclose Confidential Information to the extent that such disclosure is:

9.2.1   required by applicable law or by any stock exchange or any Governmental Authority having applicable jurisdiction and the Receiving Party (or its Affiliate) has (to the extent legally permissible and reasonably practicable in the circumstances) given the Disclosing Party sufficient prior notice in order for the Disclosing Party to obtain a protective order or other appropriate remedy;

9.2.2   to a Governmental Authority for the purposes of seeking, obtaining, maintaining or renewing any NGSO Regulatory Approval or other Consent required under any Transaction Agreement; or

9.2.3   (to the extent SpectrumCo is the Receiving Party) required in order to facilitate any financing transaction proposed to be entered into by SpectrumCo or its Affiliates; provided, however, (i) such disclosure is made only to those parties on an as-needed basis, (ii) any third party who has access to the Confidential Information is subject to confidentiality obligations and restrictions at least as protective of the Confidential Information as set forth herein, and (iii) in the case of any technical-related Confidential Information or the Inmarsat Litigation, SpectrumCo agrees that such third party shall only be able to access such information through a secure virtual data room hosted and managed by Ligado.

## ARTICLE 10
## REPRESENTATIONS, WARRANTIES, AND COVENANTS

10.1    **Representations and Warranties of the Parties**.  Each Party represents and warrants to the other Party that:

10.1.1   It has the right, power, and authority to execute and perform its obligations under this Agreement.

10.1.2   It has taken all requisite corporate or governmental action to approve the extension, delivery, and performance of this Agreement, and this Agreement constitutes

the legal, valid and binding obligation of such Party enforceable against it in accordance with its terms.

10.1.3 The execution, delivery, and performance by it of its obligations hereunder and the consummation of the transactions contemplated hereby will not result in a violation of, or default under, any agreement or instrument to which it is a party or by which it or any of its property is bound, its organization or governing documents or any law, regulation, rule, or judgment of any court or governmental or other agency having jurisdiction over it or any of its properties.

10.1.4 To its knowledge, there is no outstanding judgment, pending or threatened litigation or proceeding involving or affecting the execution, delivery or performance of this Agreement.

10.1.5 Neither it nor, to its knowledge, anyone acting on its behalf, has at any time in the past five years engaged in or facilitated, directly or indirectly, any material violation of laws, rules, or regulations relating to (i) sanctions or the export or import of commodities, technical data, products, or services, including, but not limited to, those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury and the Bureau of Industry and Security of the U.S. Department of Commerce ("**Sanctions and Export Control Laws**"); or (ii) the prohibition of bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable corruption or bribery law ("**Anti-Bribery Laws**").

10.2 **Representations and Warranties of Ligado**. Ligado represents and warrants to SpectrumCo that:

10.2.1 Each Ligado Coordination Agreement is in full force and effect and constitutes the legal, valid and binding obligation of each party thereto enforceable against each such party in accordance with its terms.

10.2.2 Ligado has provided to SpectrumCo a complete and accurate copy of each Ligado Coordination Agreement and any spectrum coordination or usage plan entered into with each Ligado Coordination Partner that applies as of the Effective Date to the Ligado L-band MSS Spectrum, or, when a copy or portion of such Ligado Coordination Agreement or plan could not be provided due to third party confidentiality obligations, has provided to SpectrumCo such information as is sufficient to substantiate Ligado's usage rights under such Ligado Coordination Agreement or plan.

10.2.3 Except for the outstanding Cooperation Agreement Fees due to Inmarsat under the Cooperation Agreement, which are to be paid to Inmarsat using the funds paid to Ligado pursuant to the Framework Agreement, Ligado is in all material respects in compliance with the terms of each Ligado Coordination Agreement and, to Ligado's knowledge, there is no basis on which any Ligado Coordination Partner would be entitled to terminate the Ligado Coordination Agreement to which such Ligado Coordination Partner is a party.

10.2.4 To Ligado's knowledge, except for the alleged breaches by Inmarsat of the Cooperation Agreement that are the subject of the Inmarsat Litigation, each Ligado Coordination Partner is in all material respects in compliance with the terms of the Ligado Coordination Agreement to which such Ligado Coordination Partner is a party.

10.2.5 To Ligado's knowledge, no Governmental Authority (i) has used, or is using, the L-band spectrum in a manner that conflicts with SpectrumCo's planned use of the Ligado L-band MSS Spectrum for MSS (including in connection with the SpectrumCo NGSO System) in any material respect, or (ii) opposes use of the Ligado L-band MSS Spectrum for MSS (including in connection with the SpectrumCo NGSO System).

10.2.6 Ligado has not granted any Person any right to use any Ligado L-band MSS Spectrum except for Third Party counterparts to the Existing Commercial Agreements pursuant to the terms of the Existing Commercial Agreements.

10.2.7 The Ligado L-band Licenses and the Ligado L-band MSS Assets constitute all of the assets owned or controlled by Ligado or any of its Affiliates that are reasonably necessary for SpectrumCo to exercise the SpectrumCo GEO Usage Right.

10.2.8 Ligado holds the Ligado L-band Licenses listed and described on Exhibit 11 (*Ligado L-Band Licenses*). Exhibit 11 (*Ligado L-Band Licenses*) includes all of the authorizations required under the Communications Act of 1934, as amended (the "***Communications Act***"), the Radiocommunication Act (Canada), or the rules, regulations and policies of the FCC or ISED for the present operation of the Ligado L-Band MSS Assets. The Ligado L-band Licenses are in full force and effect and have not been revoked, suspended, canceled, rescinded or terminated and have not expired. ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Ligado and the Ligado L-band MSS Assets are in compliance in all material respects with the Ligado L-band Licenses, the Communications Act, the Radiocommunication Act (Canada), and the rules, regulations and policies of the FCC and ISED. The Ligado L-band MSS Assets are operating in accordance with their FCC and ISED licensed parameters. All material reports and filings required to be filed with, and all regulatory fees required to be paid to, the FCC and ISED by Ligado with respect to the Ligado L-band Licenses have been timely filed and paid. All such reports and filings are accurate and complete.

10.2.9 Exhibit 7 (*Existing Commercial Agreements*) contains a complete and accurate list of the Existing Commercial Agreements and specifies, for each Existing Commercial Agreement whether Ligado has a right to terminate the Existing Commercial Agreements for convenience. The relevant counterparties have no right to use the capacity on the Ligado GEO Satellites (and Ligado shall have no transitional or other support obligations) following the termination notice period set out on Exhibit 7 (*Existing*

*Commercial Agreements*). The information in Exhibit 7 (*Existing Commercial Agreements*) is complete and accurate in all material respects.

10.2.10 To Ligado's knowledge, other than (i) the technical coordination requirements and constraints in the Cooperation Agreement, (ii) as identified on Exhibit 6 (*L-band Technical Requirements*) or Exhibit 2 (*Ligado Coordination Agreements and Partners*); and (iii) any operational requirement or limitation that is applicable to SpectrumCo's planned operations in the Ligado L-band MSS Spectrum under any law, rule or regulation of the FCC, ISED, ITU, or any other relevant Governmental Authority (including the requirement to obtain NGSO Regulatory Approvals), there are no limitations on SpectrumCo's rights to operate the Ligado L-band MSS Spectrum as contemplated by this Agreement.

10.3 **Covenants of the Parties**. Each Party covenants to the other Party that:

10.3.1 It shall comply with the laws, permits, and licenses of any territory where this Agreement is in effect, and without legitimate claims of a Governmental Authority affecting or applicable to this Agreement. Should such Governmental Authority's claims be contrary to this Agreement or to the Parties' obligations under this Agreement, then it shall undertake, to the extent possible, any reasonably necessary actions to change, cancel, or otherwise overcome such claims in order to give effect to this Agreement and the performance of its obligations under this Agreement.

10.3.2 It shall comply with all applicable laws, rules, or regulations relating to Sanctions and Export Control Laws.

10.3.3 When performing its obligations under this Agreement, it shall not, and it shall not authorize or permit any Person acting for or on behalf of it to, directly or indirectly (a) give, offer or promise, or authorize (or tolerate to be given, offered, or promised) anything of value to an official or employee of government or of any subdivision thereof or to use its influence to effect or influence any act or decision of a government or any subdivision thereof in violation of any Anti-Bribery Law; or (b) take any other action that constitutes a violation of any Anti-Bribery Law.

10.3.4 It shall not take any action with the intent and effect of materially jeopardizing or harming the other Party's licenses from any Governmental Authority related to such other Party's use of the Ligado L-band Spectrum or Ligado L-band MSS Assets (or, with respect to SpectrumCo, the SpectrumCo NGSO System).

10.3.5 It shall use commercially reasonable efforts to negotiate and execute the Escrow Agreement no later than ten (10) Business Days after the Effective Date.

10.4 **Covenants of Ligado**. Ligado covenants to SpectrumCo that, during the Term, it shall (and shall ensure that its Affiliates shall):

10.4.1 Comply with each Ligado Coordination Agreement in all material respects (and, for this purpose, all payment obligations shall be considered material obligations)

and not take or omit to take any action that could result in termination of any Ligado Coordination Agreement.

10.4.2 Without prejudice to Section 10.4.3, notify SpectrumCo as soon as is reasonably practicable of any amendment, waiver or breach of any Ligado Coordination Agreement.

10.4.3 Not (a) amend, (b) waive any right under or breach of or (c) exercise any right to terminate any Ligado Coordination Agreement, in each case in a manner that could reasonably be expected to adversely affect SpectrumCo's intended exercise of the SpectrumCo Usage Right (including in connection with the SpectrumCo NGSO System), or initiate, agree, threaten or give notice to do any of the foregoing, in each case, without SpectrumCo's prior written consent.

10.4.4 Notify SpectrumCo as soon as is reasonably practicable after it receives any claims or notices (whether written or oral) from any Ligado Coordination Partner or any of its representatives alleging any breach of any Ligado Coordination Agreement or grounds on which any Ligado Coordination Agreement may be terminated, and reasonably consult with SpectrumCo in connection with the response to and resolution of any such claims or notices; provided, however, that: (i) such consultations may be conducted by Ligado in any manner that protects attorney-client privilege or any other legal privilege and (ii) Ligado shall have ultimate control over the responses to, and resolutions of, such claims or notices (except that, in respect of (ii), Ligado shall not respond to such claims or notices in a manner that could reasonably be expected to adversely affect SpectrumCo's intended exercise of the SpectrumCo Usage Right (including in connection with the SpectrumCo NGSO System) without SpectrumCo's prior written consent).

10.4.5 Not settle or resolve, or agree to settle or resolve, the Inmarsat Litigation in a manner that could (a) reasonably have an adverse effect in any material respect on SpectrumCo's intended exercise of the SpectrumCo Usage Right (including in connection with the SpectrumCo NGSO System) or increase any Cooperation Agreement Fees or other amounts required to be paid by SpectrumCo under any Transaction Agreement, in each case, without SpectrumCo's prior written consent or (b) result in any payment to Viasat or any of its Affiliates, prior to the satisfaction of the Approval Condition, of the Cooperation Agreement Fee (or any portion thereof), and/or any related interest, due by Ligado pursuant to the Cooperation Agreement as of (or with respect to any period commencing prior to) January 5, 2025.

10.4.6 In consultation with and to the extent reasonably requested by SpectrumCo, enforce its rights under any Ligado Coordination Agreement to the extent that the applicable Ligado Coordination Partner is in breach of the applicable Ligado Coordination Agreement and such breach adversely affects in any material respect the intended exercise of the SpectrumCo Usage Right (including due to spectrum interference).

10.4.7 Use best efforts (███████████████████████████████████████████████████████████████████████████████████████) to maintain the Ligado L-band MSS Spectrum,

including by maintaining in force and renewing as required (i) all Ligado L-band Licenses, (ii) any other permits or approvals required from any Governmental Authority to operate the Ligado L-band MSS Assets and/or Ligado L-band MSS Spectrum and (iii) all NGSO Regulatory Approvals granted during the Term.

10.4.8 From and after the Effective Date, without the prior written consent of SpectrumCo, Ligado and its Affiliates shall not (a) incur any new indebtedness for borrowed money other than to the extent necessary to fund essential capital expenditures or operations (as reasonably determined by Ligado) or (b) engage in any business activities other than (i) as required for the conduct of the Takings Litigation and/or (ii) as expressly contemplated by the SpectrumCo Definitive Agreements.

10.4.9 No later than the Plan Effective Date, Ligado shall assume the Cooperation Agreement pursuant to Section 365 of the Bankruptcy Code.

10.5   **Intellectual Property Rights**.  During the Term, Ligado, on behalf of itself and its Affiliates, hereby grants to SpectrumCo a non-exclusive, worldwide, royalty-free, paid-up, irrevocable (subject to <u>Section 7.2</u>), sublicensable, transferable (in accordance with <u>Section 13.7</u>) license to use any Intellectual Property Rights owned or controlled by Ligado or any of its Affiliates to the extent necessary to exercise the SpectrumCo Usage Right (including in connection with the SpectrumCo NGSO System).

10.6   **Security Interest**.

10.6.1 On or before the Plan Effective Date, Ligado shall grant SpectrumCo a silent, junior security interest in and lien over all of Ligado's rights, title and interest, in, to and under its rights and assets which constitute the SpectrumCo Usage Rights to the extent permitted by and consistent with applicable law and with the security interests and liens that have been granted to Ligado's secured creditors (the "***SpectrumCo Security Interest***").

10.6.2 Notwithstanding anything to the contrary herein, the obligations of Ligado set forth in <u>Sections 10.4.8</u> and <u>10.6.1</u> shall apply so long as no material breach of the Agreement on the part of SpectrumCo has occurred and is continuing that would give rise to a right of Ligado to terminate this Agreement under <u>Section 7.2.1</u> if such material breach were not cured within the relevant time periods set forth therein.


# ARTICLE 11
# LIMITATION OF LIABILITY

11.1   **EXCLUSION OF INDIRECT DAMAGES**.  EXCEPT WITH RESPECT TO EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER <u>ARTICLE 12</u>, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY, ITS RELATED PARTICIPANTS OR ANY OTHER PERSONS CLAIMING BY OR THROUGH THE PARTY UNDER ANY THEORY, INCLUDING UNDER TORT, CONTRACT, STRICT LIABILITY, NEGLIGENCE OR ANY OTHER LEGAL OR EQUITABLE THEORY FOR INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES.

11.2 **LIMITATION OF LIABILITY**. EXCEPT FOR A BREACH OF CONFIDENTIALITY, FRAUD, WILLFUL MISCONDUCT, OR GROSS VIOLATION OF APPLICABLE LAW, IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY TO THE OTHER PARTY, ITS RELATED PARTICIPANTS AND ANY OTHER PERSONS CLAIMING BY OR THROUGH THE PARTY FOR ANY CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT EXCEED THE AGGREGATE AMOUNT OF THE SPECTRUMCO USAGE RIGHT PAYMENTS, SPECTRUMCO CONTRIBUTIONS, TRUE-UP PAYMENTS, USAGE RIGHT PAYMENT PREMIUMS, AND/OR ANY OTHER PAYMENTS OR FEES PAYABLE UNDER THIS AGREEMENT AND THE FRAMEWORK AGREEMENT.

## ARTICLE 12
## INDEMNIFICATION

12.1 **Indemnification of Ligado**. SpectrumCo shall defend, hold harmless, and indemnify Ligado, Ligado's Affiliates, and each of its Related Participants (each, a "***Ligado Indemnitee***") from and against any and all liabilities, losses, damages, claims, and expenses, including reasonable legal fees ("***Losses***") incurred by such Ligado Indemnitee arising from, relating to, or incurred in connection with any Third Party claim (a "***Claim***") arising out of or related to: (i) SpectrumCo's gross negligence or willful misconduct; (ii) SpectrumCo's material breach of this Agreement; (iii) SpectrumCo's knowing unpermitted use of the SpectrumCo Usage Right in any manner; or (iv)



If a Claim is made against a Ligado Indemnitee, or Ligado or SpectrumCo reasonably believes that a Claim against a Ligado Indemnitee is likely to occur, based on an assertion that SpectrumCo's use of the Ligado L-band MSS Spectrum or Ligado L-band MSS Assets infringes, misappropriates, or violates the Intellectual Property Rights or spectrum rights of a Third Party, in addition to the indemnification obligation set forth herein, SpectrumCo shall, in consultation with Ligado, use reasonable best efforts to modify SpectrumCo's usage of the Ligado L-band MSS Spectrum or Ligado L-band MSS Assets to eliminate the alleged infringement, misappropriation, or violation of the Intellectual Property Rights and spectrum rights of a Third Party.

12.2 **Indemnification of SpectrumCo**. Ligado shall defend, hold harmless, and indemnify SpectrumCo, SpectrumCo's Affiliates, and each of its Related Participants (each, a "***SpectrumCo Indemnitee***") from and against any and all Losses incurred by such SpectrumCo Indemnitee arising from, relating to, or incurred in connection with: (a) any Claim arising out of or related to: (i) Ligado's gross negligence or willful misconduct; (ii) Ligado's material breach of this Agreement; (iii) Ligado's knowing unpermitted use of the Ligado L-band MSS Spectrum or Ligado L-band MSS Assets, or (iv)

; (b) any breach by Ligado of the Cooperation

Agreement; or (c) any act or omission of Inmarsat solely to the extent that Inmarsat is required to indemnify Ligado for such Losses pursuant to the Cooperation Agreement.

12.3  **Indemnification Procedures**.  The Ligado Indemnitee or SpectrumCo Indemnitee (as applicable, the "*Indemnitee*") shall:  (a) promptly notify the indemnifying Party (the "*Indemnitor*") in writing of any Losses or Claim for which indemnification is sought, provided that failure or delay of such notice shall not relieve the Indemnitor of its indemnity obligations hereunder except to the extent, if any, that it is materially prejudiced by such failure or delay; (b) allow the Indemnitor to assume the sole control of the defense of such Claim and all related settlement negotiations, except that the Indemnitor may not, without the Indemnitee's prior written consent, enter into any settlement or consent to any judgment that (i) makes any admission on behalf of any Indemnitee or (ii) does not unconditionally release the Indemnitee from liability; and (c) provide the Indemnitor, at the Indemnitor's request and expense, with the assistance, information, and authority necessary to perform the Indemnitor's obligations under this Section. The Indemnitee may participate in the defense and settlement of any Claim through counsel of its own choosing at its own cost.  If the Indemnitor fails to take over defense of any Claim within thirty (30) days after the Indemnitee provides the Indemnitor with notice of the same or at any time thereafter fails to continue such defense, the Indemnitee may defend such Claim (including with counsel of its sole choosing) at the cost and expense of the Indemnitor, which costs and expenses the Indemnitor shall pay or reimburse as they are incurred.

# ARTICLE 13
## MISCELLANEOUS

13.1  **Governing Law**.  This Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of Delaware.

13.2  **Dispute Resolution**.  Other than with respect to any disputes arising pursuant to Section 3.1.2 or Section 4.1.1 relating to the delivery by the Parties of a joint written instruction to the Escrow Agent, if during the term of this Agreement, a dispute arises between the Parties, or one Party perceives the other as acting unfairly or unreasonably, or a question of interpretation arises hereunder, then the Parties' respective representatives (as identified in Schedule 2 (*Dispute Resolutions Representatives*)) shall promptly confer and exert reasonable best efforts to reach a reasonable and equitable resolution of the dispute.  If the representatives are unable to resolve the issue within ten (10) Business Days, then the representative of the Party that initially raised the dispute shall develop a description of the dispute, identify such dispute as either "technical" or "commercial" in nature and refer such dispute within two (2) Business Days of the lapse of the aforementioned ten (10) Business Days to: (i) a member of the Parties' technical team in the event such dispute is "technical;" or (ii) a member of the Parties' executive team (other than the chief executive officer) if the dispute is "commercial." If such member of the Parties' technical team or executive team (other than the chief executive officer), as applicable, is unable to resolve such dispute within ten (10) Business Days, then such dispute will be referred to each Parties' chief executive officer for resolution.  Neither Party shall seek judicial resolution of any dispute arising in connection with this Agreement until the chief executive officer of each Party has had at least

ten (10) Business Days to attempt to resolve the dispute following referral of the dispute to such chief executive officers.

13.3     **Venue**.  Each Party agrees to the exclusive personal jurisdiction and venue in the federal and state courts in Delaware, for any dispute arising out of this Agreement.

13.4     **Waiver of Jury Trial**.  Each of SpectrumCo and Ligado hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this agreement or the actions of SpectrumCo or Ligado in the negotiation, administration, performance and enforcement hereof.  Each Party certifies and acknowledges that (a) no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, (b) each Party understands and has considered the implication of this waiver, (c) each Party makes this waiver voluntarily, and (d) each Party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this section.

13.5     **Notices**.  All notices and other communications hereunder shall be in writing and delivered by (x) email, and shall be deemed to have been duly delivered and received hereunder on the date of dispatch by the sender thereof (to the extent that no "bounce back" or similar message indicating non-delivery is received with respect thereto) or (y) nationally recognized overnight courier service (providing proof of delivery), in each case, to the intended recipient as set forth below (or to such other recipient as designated in a written notice to the other parties hereto in accordance with this <u>Section 13.5</u>):

>       if to SpectrumCo, to:
>
>       Spectrum USA I, LLC
>       AST Midland International Air & Space Port
>       2901 Enterprise Lane
>       Midland, Texas 79706
>       Attention: Chief Legal Officer
>       Email: <u>andrew.johnson@ast-science.com</u>
>
>       with a copy to legal@ast-science.com
>
>       if to Ligado, to:
>
>       Ligado Networks LLC
>       10802 Parkridge Boulevard
>       Reston, Virginia 20191
>       Attention: General Counsel
>       Email: legal@ligado.com

13.6     **Publicity**.  No public announcement, release, or other public disclosure of information relating to this Agreement, including the existence of this Agreement, shall be made by either Party except as required by law or by prior written agreement of the Parties and/or their Affiliates, as applicable.

13.7    **Assignment**.  Except as permitted under this <u>Section 13.7</u> or <u>Article 14</u>, this Agreement shall not be assigned, delegated, or transferred, in full or in part, as security or otherwise, or delegated to any other individual, firm, institution, organization or government agency by any Party without the prior written consent of the other Party.  Notwithstanding the forgoing, either Party may assign this Agreement to: (a) any Person that acquires all or substantially all of the assets of such Party; or (b) an Affiliate <u>provided</u> that, in each case of <u>clause (a)</u> and <u>(b)</u>, the assignment will not impair the other Party's rights under this Agreement; provided further that, in the case of <u>clause (b)</u>, no such assignment to an Affiliate shall relieve the assigning Party of its obligations under this Agreement if such Affiliate does not fully and timely perform such obligations.  Subject to the foregoing, this Agreement shall be binding on and inure to the benefit of the Parties' respective successors and permitted assigns.  Any assignment, delegation, or transfer of this Agreement made in contravention of the terms hereof shall be null and void.

13.8    **Further Assurances**.  Each Party shall do and execute, or arrange for the doing and executing of, each necessary act, document and thing reasonably within its power to implement and give effect to this Agreement.

13.9    **Force Majeure**.  If either Party's performance under this Agreement is affected without fault or negligence of that Party by any act, event, cause or circumstance beyond its reasonable control and that cannot be reasonably avoided or overcome (each, a "***Force Majeure Event***"), then it shall immediately notify the other Party of the nature and extent of the Force Majeure Event.  Neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other Party, by reason of any delay in performance, or non-performance, of any of its obligations under this Agreement to the extent that such delay or non-performance is due to any Force Majeure Event of which it has notified the other Party and the time for performance of that obligation shall be extended accordingly.  Each Party shall use its reasonable efforts to minimize the effects of or shorten the duration of any Force Majeure Event and resume the performance of its obligations under this Agreement as soon as possible.

13.10    **Entire Agreement**.  This Agreement (including any schedules, annexes and exhibits hereto and the documents and instruments and other agreements among the parties hereto as contemplated by or referred to herein, including the Exhibits hereto), the other AST Definitive Agreements and the RSA (which is incorporated by reference herein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof (including, for the avoidance of doubt, the Confidentiality Agreement and the Confidential Binding Terms of Strategic Collaboration, dated January 5, 2025, by and between AST & Science, LLC and Ligado Networks LLC).

13.11    **No Joint Venture or Agency**.  None of the provisions of this Agreement will be deemed to constitute a partnership, joint venture, or any other similar relationship between the Parties, and neither Party will have any authority to bind the other Party in any manner, except as expressly indicated in this Agreement.  Neither Party will have or hold itself out as having any right, authority or agency to act on behalf of the other Party in any capacity or in any manner, except as may be expressly authorized in this Agreement. Without limitation to the foregoing, the Parties agree (a) that the transactions contemplated herein are not intended to give rise to a partnership for U.S. federal and applicable state and local income tax purposes, and (b) not to file

any tax return or take any tax position inconsistent with such treatment, unless required by applicable law following a determination (within the meaning of Section 1313 of the Code) on the matter.

13.12    **Amendments and Waivers**.  To the extent permitted by law and subject to the other provisions of this Agreement, this Agreement may be amended by the Parties hereto at any time by execution of an instrument in writing signed on behalf of each of SpectrumCo and Ligado. The failure of any Party to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach.

13.13    **Severability**.  In the event that any term or other provision of this Agreement, or the application thereof, is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

13.14    **Headings**.  The Article and Section captions set forth herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

13.15    **Specific Performance**.  The transactions contemplated by this Agreement are unique transactions and any failure on the part of a Party to complete the transactions contemplated by this Agreement on the terms of this Agreement will not be fully compensable in damages and the breach or threatened breach of the provisions of this Agreement would cause the other Party irreparable harm.  Accordingly, in addition to and not in limitation of any other remedies available to the Parties for a breach or threatened breach of this Agreement, each Party will be entitled to specific performance of this Agreement upon any breach by the other Party, and to an injunction restraining such Party from such breach or threatened breach.

13.16    **No Third-Party Beneficiaries**.  This Agreement shall be binding on and inure solely to the benefit of each Party hereto, and nothing in this Agreement, express or implied, is intended to confer on any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

13.17    **Counterparts**.  This Agreement may be executed in one (1) or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission, including by e-mail attachment, shall be effective as delivery of a manually executed counterpart of this Agreement.

13.18    **Survival**.  Notwithstanding any other provision to the contrary, the provisions contained in Article 1, Section 8.5, Section 9.1, Article 11, Article 12, Section 13.1, Section 13.2, Section 13.3, Section 13.4, Section 13.5, Section 13.6, Section 13.10, Section 13.13, Section 13.14 and this Section 13.18, as well as any other provision that expressly states that it shall survive the

termination or expiration of this Agreement, shall survive the termination or expiration of this Agreement.

13.19 **SpectrumCo Usage Right Continuation**.  Provided that, and for so long as SpectrumCo is, in compliance with all of its obligations under this Agreement, including its obligations to pay SpectrumCo Usage Right Payments, then SpectrumCo shall continue to have the SpectrumCo Usage Right notwithstanding any purported rejection of the Agreement by Ligado under Section 365 of the Bankruptcy Code in connection with any future case under the Bankruptcy Code.

# ARTICLE 14
# FINANCING SOURCES

14.1 **Consent to Security Interest**.

14.1.1 Ligado hereby acknowledges and agrees that, upon delivery of a duly executed notice and acknowledgment agreement (an "***N&A***") from SpectrumCo to Ligado, in form and substance reasonably satisfactory to Ligado, and delivered in accordance with this Agreement, SpectrumCo shall have the right to grant one or more enforceable security interests in and liens over all of SpectrumCo's rights, title and interest, in, to and under this Agreement (any such grant of security interest and/or lien, the "***Security Interest***") for the benefit of the Financing Sources (including the assignment of this Agreement) pursuant to one or more security agreements (as in effect from time to time, and together with the N&A, collectively, the "***Security Documents***").

14.1.2 Ligado agrees that the Financing Sources have the right, but not the obligation, in the exercise of the Financing Sources' rights and remedies under the Security Documents, or under in respect of any of the other financing documents related thereto (as in effect from time to time, the "***Finance Documents***"), to make all demands, give all notices, take all actions, and exercise all rights of SpectrumCo (whether or not SpectrumCo has then been dissolved, liquidated or wound up) in and under this Agreement in accordance with its terms.

14.2 **Notice of Event of Default**.  Upon the delivery of a Notice of Event of Default by the Financing Sources to Ligado, and until the Financing Sources revoke such Notice of Event of Default in writing, the Financing Sources shall be entitled (but not obligated) to exercise any and all rights of SpectrumCo to cure any defaults of SpectrumCo under this Agreement and Ligado shall accept such exercise in all respects in lieu of performance by SpectrumCo and in satisfaction of the SpectrumCo's obligations under this Agreement.

14.3 **Right to Cure**.

14.3.1 Notwithstanding any right that Ligado may have under this Agreement, Ligado agrees that upon the occurrence and during the continuation of any event giving rise to or that could give rise to Ligado's right to cancel, terminate or suspend performance under this Agreement:

(a)    that cannot by its nature be cured by the payment of money, Ligado will not cancel, terminate or suspend its performance under this Agreement if, and for so long as, (i) the Financing Sources shall have commenced to remedy the breach or default and is using all reasonable endeavors (including implementation of any remedial program) to remedy such breach or default or, if (ii) the Financing Sources shall be using all reasonable endeavors (which may include private negotiations) to institute proceedings to foreclose or otherwise acquire or transfer SpectrumCo's interest in this Agreement, provided that, to the extent such breach or default has not been cured by the expiration of any cure period remaining to SpectrumCo under this Agreement or by the mutual agreement of Ligado and the Financing Sources, the Financing Source's right to cure such default shall automatically terminate without the provision of any notice thereof

14.3.2  Ligado shall deal with both the Financing Sources and SpectrumCo during the Cure Period.  Ligado will accept payment and/or performance from the Financing Sources during the Cure Period without requiring assumption of liability from the Financing Sources or the issuance of a Step-In Notice.

14.3.3  Notwithstanding any right the Parties may have under this Agreement, each Party shall continue performance of each its respective obligations under this Agreement during the Cure Period.

## 14.4    **Step-In Rights**.

14.4.1  The Financing Sources may provide Ligado with a Step-In Notice prior to the cancellation or termination of this Agreement at any time: (a) during the occurrence and continuation of an event which gives rise to the right to deliver a Notice of Event of Default or an SpectrumCo Default Notice or (b) during the Cure Period.

14.4.2  The Step-In Notice shall designate a representative of the Financing Sources to assume all of SpectrumCo's rights, and any obligations of SpectrumCo under this Agreement.  During the Step-In Period, (i) Ligado shall not recognize the exercise by SpectrumCo of any of its rights and powers under the this Agreement, (ii) Ligado shall, beginning five (5) Business Days following receipt of a Step-In Notice, thereafter pay to the Financing at such account as the Financing Sources may nominate all moneys from time to time payable by Ligado under this Agreement and (iii) Ligado shall perform, observe and comply with all Ligado's other undertakings and obligations under this Agreement in the Financing Sources' favor and for the Financing Sources' benefit as if such Financing Sources, collectively, were named as "SpectrumCo" herein.  SpectrumCo and Ligado agree that if the Financing Sources issue Ligado a Step-In Notice, the Financing Sources' shall thereafter (x) be obligated to honor all of the duties, obligations and liabilities of the "SpectrumCo" under this Agreement, and (y) be entitled to the benefit of, and to exercise, all of the rights, benefits and remedies of the "SpectrumCo" under this Agreement.

14.5    **Waiver of Claims against Financing Sources**.  Notwithstanding anything in this Agreement to the contrary, each Party, hereby: (i) agrees that all matters, claims, controversies,

disputes, suits, actions or proceedings (whether sounding in contract, tort, common or statutory law, equity or otherwise) arising out of or relating to this Agreement, the Finance Documents or any of the transactions contemplated hereby or thereby or the performance of any services thereunder involving the Financing Sources shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each party hereto irrevocably submits itself and its property with respect to any such matters, claims, controversies, disputes, suits, actions or proceedings to the exclusive jurisdiction of such court, and such matters, claims, controversies, disputes, suits, actions or proceedings shall be governed by the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws, (ii) agrees not to bring or support or permit any of its controlled Affiliates to bring or support any matters, claims, controversies, disputes, suits, actions or proceedings (whether sounding in contract, tort, common or statutory law, equity or otherwise) that may be based upon, arise out of or relate to this Agreement, the Finance Documents or any other documents entered into in connection with the Finance Documents or any of the transactions contemplated hereby or thereby or the performance of any services thereunder against any Financing Source in any forum other than any federal or state court in the Borough of Manhattan, New York, New York, (iii) agrees that service of process upon Ligado in any matters, claims, controversies, disputes, suits, actions or proceedings shall be effective if notice is given in accordance with Section 13.5, (iv) irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such matter, claim, controversy, dispute, suit, action or proceeding in any such court, (v) irrevocably and unconditionally waives to the fullest extent permitted by applicable law any right it may have to a trial by jury in any matter, claim, controversy, dispute, suit, action or proceeding brought against the Financing Sources directly or indirectly arising out of, under or in connection with this Agreement, the Finance Documents or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, (vi) agrees that other than during a Step-In Period and as expressly provided for herein, this Agreement may not be enforced against any Financing Source and agrees that none of the Financing Sources will have any liability to Ligado or its Affiliates relating to or arising out of this Agreement, the Finance Documents or any of the transactions contemplated hereby or thereby or the performance of any services thereunder (whether sounding in contract, tort, common or statutory law, equity or otherwise) (provided, that, notwithstanding the foregoing, nothing herein shall affect the rights of SpectrumCo or its Affiliates against the Financing Sources with respect to the Finance Documents or any of the transactions contemplated thereby or any services thereunder following the consummation of the transactions contemplated by this Agreement) and (vii) notwithstanding anything to the contrary in this Agreement, the parties agree that the Financing Sources are express third-party beneficiaries of, and may enforce, any of the provisions in this Agreement reflecting the foregoing provisions in this Article 14 and such provisions and the definition of "Financing Sources" shall not be amended in any way affecting the rights of the Financing Sources without the prior written consent of the Financing Sources. Nothing in this Section 14.5 shall in any way limit or qualify the obligations and liabilities of the parties to the Financing Documents to each other thereunder or in connection therewith.

*[Signature Page Follows]*

## <u>LIST OF EXHIBITS</u>

- EXHIBIT 1 – ATC Revenue Accounting Principles
- EXHIBIT 2 - Ligado Coordination Agreements and Partners
- EXHIBIT 3 – Future GEO Plan
- EXHIBIT 4 – Power Levels for SpectrumCo NGSO System
- EXHIBIT 5 – SpectrumCo Net Revenue Accounting Principles
- EXHIBIT 6 – L-band Technical Requirements
- EXHIBIT 7 – Existing Commercial Agreements
- EXHIBIT 8 – Frequency Agility Requirements
- EXHIBIT 9 – Escrow Agreement Agreed Principles
- EXHIBIT 10 – Usage Right Payment Premium Amounts
- EXHIBIT 11 – Ligado L-band Licenses

## LIST OF SCHEDULES

- SCHEDULE 1 – Places of Payment
- SCHEDULE 2 – Dispute Resolutions Representatives
- SCHEDULE 3 – Ligado L-band MSS Assets

**Exhibit C**
**CCI Agreement**

*Execution Version*

**SPECTRUM USAGE RIGHTS AGREEMENT**

**by and among**

**ONE DOT SIX LLC**

**and**

**AST & SCIENCE, LLC**

**Dated as of March 22, 2025**

# TABLE OF CONTENTS

**Page**

SECTION 1    USAGE RIGHTS AND PREEMPTION ................................................................. 6

    1.1    Usage Rights ............................................................................................... 6
    1.2    Retained One Dot Six Terrestrial and SCS Rights ....................................... 6
    1.3    Limitations of Usage Rights ......................................................................... 6
    1.4    Notification of Usage ................................................................................... 6
    1.5    Preemption .................................................................................................. 6
    1.6    Material Interference .................................................................................... 7

SECTION 2    TERM ........................................................................................................... 7

    2.1    Term ........................................................................................................... 7

SECTION 3    USAGE PAYMENTS ....................................................................................... 7

    3.1    Usage Payments .......................................................................................... 7
    3.2    Usage Payments Timing .............................................................................. 8
    3.3    Usage Payments Adjustment ........................................................................ 8

SECTION 4    SPECTRUM OPTION ..................................................................................... 8

    4.1    Exercise of Spectrum Option ....................................................................... 8
    4.2    Spectrum Option Payment ........................................................................... 9
    4.3    Spectrum Option Payment Timing ............................................................... 9
    4.4    FCC Consent ............................................................................................... 9
    4.5    Consummation of Spectrum Option .............................................................. 10
    4.6    Usage Premium and Spectrum Option Payment ............................................ 10

SECTION 5    REVENUE SHARING ..................................................................................... 10

    5.1    Revenue Share ............................................................................................ 10
    5.2    Revenue Share Payment Timing ................................................................... 11
    5.3    Usage Payment Credits ................................................................................ 11
    5.4    Restriction on Terrestrial Sale ..................................................................... 11

SECTION 6    REGULATORY COOPERATION ...................................................................... 11

    6.1    License Renewal .......................................................................................... 11
    6.2    Notification of Violation or Material Changes .............................................. 11
    6.3    Obligations as Service Provider ................................................................... 12
    6.4    Communication and Audit Rights ................................................................. 12

6.5 ███████ ................................................................................................ 12
6.6 Backstop Security ......................................................................................... 12

SECTION 7 MONETIZATION.████████████████████████████ ...... 12

7.1 Reevaluation of Monetization ....................................................................... 12
7.2 ██████████████████ ................................................................. 12
7.3 ████████████ ....................................................................................... 13

SECTION 8 TERMINATION ............................................................................... 14

8.1 Automatic Termination ................................................................................. 14
8.2 Termination of the Collaboration Agreement ............................................... 14
8.3 Termination for Non-Payment ...................................................................... 14
8.4 Termination for Material Breach ................................................................... 14
8.5 ████████████████████ ....................................................................... 15
8.6 Termination for Substantial Preemption ....................................................... 15
8.7 Termination for Excessive Force Majeure .................................................... 15
8.8 Other Termination Events ............................................................................. 15
8.9 Effect of Termination .................................................................................... 15

SECTION 9 REPRESENTATIONS, WARRANTIES AND COVENANTS ......................... 15

9.1 Mutual Representations and Warranties ........................................................ 15
9.2 Representations and Warranties of One Dot Six ........................................... 16
9.3 General Covenants ........................................................................................ 17
9.4 AST Covenants ............................................................................................. 17
9.5 One Dot Six Covenants ................................................................................ 18
9.6 Intellectual Property Rights .......................................................................... 19

SECTION 10 TAXES, LATE PAYMENTS AND SET-OFF ............................................ 19

10.1 Taxes ............................................................................................................ 19
10.2 Payments ...................................................................................................... 19
10.3 Interest for Late Payments ............................................................................ 20

SECTION 11 CONFIDENTIALITY ........................................................................ 20

11.1 Confidentiality .............................................................................................. 20
11.2 Exceptions .................................................................................................... 20

SECTION 12 INDEMNIFICATION ......................................................................... 21

12.1 General Indemnification ............................................................................... 21
12.2 Indemnification of One Dot Six .................................................................... 21

12.3    Indemnification of AST ........................................................................................ 21

SECTION 13    LIMITATION OF LIABILITY ............................................................................. 21

13.1    Limitation on Damages ....................................................................................... 21
13.2    Disclaimer ............................................................................................................ 21
13.3    Liability Cap ........................................................................................................ 22

SECTION 14    GOVERNING LAW AND DISPUTE RESOLUTION .................................... 22

14.1    Governing Law .................................................................................................... 22
14.2    Dispute Resolution .............................................................................................. 22
14.3    Venue ................................................................................................................... 22
14.4    Waiver of Jury Trial ............................................................................................ 22
14.5    Usage Rights Continuation .................................................................................. 23

SECTION 15    MISCELLANEOUS ............................................................................................ 23

15.1    Notices ................................................................................................................. 23
15.2    Publicity .............................................................................................................. 23
15.3    Assignment .......................................................................................................... 24
15.4    Force Majeure ..................................................................................................... 24
15.5    Entire Agreement ................................................................................................ 24
15.6    No Joint Venture or Agency ............................................................................... 24
15.7    Amendment .......................................................................................................... 25
15.8    Extension; Waiver ............................................................................................... 25
15.9    Severability .......................................................................................................... 25
15.10   Headings .............................................................................................................. 25
15.11   Specific Performance .......................................................................................... 25
15.12   No Third Party Beneficiaries .............................................................................. 25
15.13   Counterparts ........................................................................................................ 25
15.14   Survival ............................................................................................................... 25
15.15   Definitions and Interpretation ............................................................................ 26

## SPECTRUM USAGE RIGHTS AGREEMENT

This **SPECTRUM USAGE RIGHTS AGREEMENT**, dated as of March 22, 2025 (this "**Agreement**"), is made between **ONE DOT SIX LLC**, a Delaware limited liability company (formerly constituted as One Dot Six Corp.) with offices at 10802 Parkridge Blvd., Reston, VA 20191 ("**One Dot Six**"), a wholly owned subsidiary of Ligado Networks LLC ("**Ligado**"), and **AST & SCIENCE, LLC**, a Delaware limited liability company with offices at AST Midland International Air & Space Port, 2901 Enterprise Lane, Midland, Texas 79706 ("**AST**", together with One Dot Six, each a "**Party**" and collectively, the "**Parties**"). Capitalized terms used and not otherwise defined herein shall have the meaning assigned to such terms in the Collaboration Agreement.

## W I T N E S S E T H:

**WHEREAS**, on October 1, 2003, the U.S. Federal Communications Commission ("**FCC**") granted to OP LLC, a Delaware limited liability company with offices at 8020 Katy Freeway, Houston, Texas 77024 ("**OP**"), certain nationwide spectrum rights for the 5 MHz that is the 1670 – 1675 MHz band (the "**Licensed Spectrum**") under Call Sign WPYQ831(the "**License**");

**WHEREAS**, OP and One Dot Six are parties to that certain (i) Master Agreement (1670-1675 MHZ Spectrum), dated as of July 16, 2007 (as assigned, amended, modified and assumed from time to time, including under that certain Amendment to Master Agreement dated as of December 2, 2022 among One Dot Six, OP and Crown Castle Investment Corp. ("**CCIC**") (the "**Master Agreement**"), and (ii) Amended and Restated Long-Term De Facto Transfer Lease Agreement, dated as of December 2, 2022, between One Dot Six and OP (the "**Lease**") pursuant to which OP has leased the Licensed Spectrum (the "**Leased Spectrum**") to One Dot Six in accordance with the provisions of Title 47 of the U.S. Code of Federal Regulations and the published decisions of the FCC (as each may be amended from time to time, the "**FCC Rules**");

**WHEREAS**, Ligado and AST have entered into the Binding Terms of Strategic Collaboration, dated January 5, 2025 (the "**Binding Term Sheet**"), which sets forth the Parties' agreement to a series of transactions whereby, among other things, and as described in further detail therein, AST will assume One Dot Six's financial obligations under the Lease and provide other financial incentives to One Dot Six in consideration for (i) certain usage rights to use the Leased Spectrum for supplemental coverage from space ("**SCS**"), (ii) collaboration between the Parties to seek permission from the FCC to authorize AST's secondary, preemptible use of the Leased Spectrum for SCS (while One Dot Six retains primary, preemptive rights to all terrestrial-based use of the Leased Spectrum) under the License and (iii) a portion of the profits received by One Dot Six resulting from the sale of the Leased Spectrum to a third party; and

**WHEREAS**, the Parties now desire to enter into this Agreement which, along with the Strategic Collaboration and Spectrum Usage Agreement by and between Ligado and Spectrum USA I, LLC (the "**Collaboration Agreement**") and the Framework Agreement by and among Ligado, AST, AST SpaceMobile, Inc. and Spectrum USA I, LLC (the "**Framework Agreement**"), each being entered into simultaneously herewith, will replace and supersede the Binding Term Sheet.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the Parties hereto agree as follows:

## SECTION 1    USAGE RIGHTS AND PREEMPTION.

1.1    Usage Rights.  Subject to AST's compliance with the terms of this Agreement and to One Dot Six's rights to Preemption (as defined below), and provided that the Parties obtain the ███████████████████████ and any and all other necessary regulatory approvals, One Dot Six hereby grants to AST and its Affiliates a right to use the Leased Spectrum solely for SCS (the "**Usage Rights**") for the duration of the Term (as defined below). AST and its Affiliates shall at all times utilize the Usage Rights solely for lawful purposes, in a manner that is consistent with the terms of the License, the Lease and this Agreement and in compliance with all applicable laws and regulations, including without limitation the FCC Rules.

1.2    Retained One Dot Six Terrestrial and SCS Rights.  Notwithstanding anything to the contrary in this Agreement, One Dot Six shall retain all primary, preemptive terrestrial rights over the Leased Spectrum (the "**Terrestrial Rights**") and shall retain the right to market, solicit or enter into any transaction with OP and/or any third party relating to the lease, sub-lease or sale of the Leased Spectrum for terrestrial use; provided, however, that One Dot Six shall not (and shall ensure that its Affiliates shall not) use the Leased Spectrum for SCS, or enter into any transaction with any other Person or grant any other Person rights to use or access the Leased Spectrum for SCS.

1.3    Limitations of Usage Rights.  The Usage Rights shall not include any rights that One Dot Six is not entitled to under the License ███████████████████████ or the Lease. AST shall at all times use the Usage Rights in accordance with the specifications (the "**Usage Rights Technical Requirements**") set forth in Exhibit 1 (*Usage Rights Technical Requirements*) attached hereto, and AST shall not utilize the Usage Rights to perform any action that materially jeopardizes or violates such Usage Rights Technical Requirements or any of One Dot Six's rights with respect to the Leased Spectrum under the License or the Lease.

1.4    Notification of Usage.  AST shall provide One Dot Six with written notification regarding any new, modified or terminated use of the Usage Rights (other than where such new, modified or terminated use does not substantially alter AST's use of the Usage Rights) no later than thirty (30) Business Days prior to initiating any such use under the Usage Rights (each, a "**Usage Notification**"). Such Usage Notification shall include a description of (i) the current scope of its network, ██████████████████████████████████████████████████████ ██████████████████████████ and (ii) any planned modifications to the network that would materially alter the scope of services to be provided or otherwise differ materially from AST's then current use of the Usage Rights.

1.5    Preemption.  To the extent One Dot Six (or, as applicable, a Third Party Purchaser (as defined below)) utilizes the Terrestrial Rights within a radius of any particular geographic area ██████████████████████████ (each, a "**Terrestrial Service Zone**") having given AST at least thirty (30) days' prior written notice of such use, any AST use of the Usage Rights within such Terrestrial Service Zone shall be on a preemptible, secondary basis to One Dot Six's (or, as

6

applicable, such Third Party Purchaser's) use of the Terrestrial Rights, and AST shall in no circumstances be entitled to claim interference protection therefrom.  If One Dot Six's (or, as applicable, such Third Party Purchaser's) use of the Terrestrial Rights suffer (or could be reasonably expected to suffer) radiofrequency interference ███████████████████ as a result of AST's use of the Usage Rights for SCS within such Terrestrial Service Zone, then One Dot Six's (or, as applicable, such Third Party Purchaser's) use of the Terrestrial Rights shall preempt and be given precedence over any use by AST of the Usage Rights, and AST shall as soon as possible, and in any event no later than five (5) days, discontinue or modify its use of the Usage Rights (in a manner that ends such interference) within such Terrestrial Service Zone following written notice from One Dot Six (or, as applicable, such Third Party Purchaser) to the extent that such use of the Usage Rights causes such interference; provided that, to the extent that AST is unable to resolve such harmful interference to Ligado's reasonable satisfaction within five (5) days after AST's receipt of such notice, AST shall immediately discontinue its use of the Usage Rights within the applicable Terrestrial Service Zone (each such instance, a "**Preemption**").

1.6     Material Interference.  Subject at all times to One Dot Six's (or, as applicable, a Third Party Purchaser's) rights to Preemption set forth in Section 1.5, AST shall use reasonable efforts to promptly resolve material episodes of harmful interference ████████████████████████████ as described in further detail in Exhibit 1 (*Usage Rights Technical Requirements*) attached hereto that degrade the real-world utility of the Terrestrial Rights after receipt of a technical showing demonstrating that AST's exercise of the Usage Rights are the immediate cause of such interference.

**SECTION 2   TERM**.

2.1     Term.  The term of this Agreement (the "**Term**") shall commence on the "Effective Date" (as defined in the Collaboration Agreement) and shall continue, unless earlier terminated under Section 8 of this Agreement, (i) until the expiration or termination of the Lease, except following a Consummation Termination (as defined below), or (ii) following a Consummation Termination, in automatic successive renewal periods of two (2) years each unless and until AST elects to not renew this Agreement upon written notice to One Dot Six at least three (3) months prior to the end of the then current two-year renewal period.

**SECTION 3   USAGE PAYMENTS**.

3.1     Usage Payments.  From the Effective Date until a Consummation Termination (or, if there is no Consummation Termination, the end of the Term), subject to Section 3.3, AST shall pay to One Dot Six in consideration for the Usage Rights in accordance with Section 3.2:

3.1.1   the "Annual Lease Fee" (as defined in Section 5 of the Lease), in cash (the "**Usage Fee**"); *plus*

3.1.2   a number of shares of Class A Common Stock, $0.0001 par value per share, of AST SpaceMobile, Inc. ("**AST Parent**") equal to (a) thirty percent (30%) of the cash value of the Annual Lease Fee divided by (b) the average of the volume weighted averages of the trading price of "Parent Common Stock" (as defined in the Framework Agreement) on NASDAQ (as reported by Bloomberg L.P. or, if not reported thereby, by another

authoritative source mutually selected by AST and Ligado in good faith) on each of the thirty (30) consecutive trading days ending on the last trading day prior to the payment date ("**Parent Share Price**"), rounded down to the nearest whole number (the "**Usage Premium**", and together with the Usage Fee, the "**Usage Payments**").

3.2     Usage Payments Timing.  Within five (5) days after the Effective Date and on or prior to January 1 of each year thereafter during the Term, One Dot Six shall deliver to AST a written report that sets forth, with reasonable detail, the Usage Fee for such calendar year together with the date(s) by which One Dot Six is required to pay the corresponding Annual Lease Fee to OP. The Usage Fee incurred after the Effective Date shall become due and payable to One Dot Six no later than ten (10) days prior to the date that the corresponding Annual Lease Fee is due and payable from One Dot Six to OP; provided, that AST shall be obligated to provide to One Dot Six, at least sixty (60) days prior each such Annual Lease Fee becoming due and payable to OP (or, if such payment is due to OP within sixty (60) days after the Effective Date, as soon as reasonably practicable after the Effective Date), documentation showing that an amount equal to the applicable Usage Fee (excluding such Usage Premium) is held in an escrow account in accordance with an escrow agreement (the "**Escrow Agreement**") to be negotiated by the Parties after the Effective Date in accordance with the agreed principles set forth in set forth in Exhibit 2 (*Escrow Agreement Agreed Principles*).  The Usage Premium shall become due and payable to One Dot Six on the date that the corresponding Annual Lease Fee is due and payable from One Dot Six to OP; provided further, that AST shall not be required to pay any Usage Premium until after the Plan Confirmation Date. All accumulated Usage Premium amounts (with respect to Usage Payments incurred after the Effective Date) remaining unpaid as of the Plan Confirmation Date (the "**True-Up Payment**") shall become due and payable by AST to One Dot Six within thirty (30) days after the Plan Confirmation Date.  Nothing in this Agreement shall require AST to pay any amount with respect to any portion of any Annual Lease Fee incurred prior to the Effective Date, or to pay any Usage Premium prior to the Plan Confirmation Date.  Any amounts deposited into the escrow account by AST pursuant to this Section 3.2 shall be free and clear of all liens and/or other security interests at the time of deposit. No later than five (5) Business Days prior to such time that any amounts are due and payable by AST to One Dot Six pursuant to this Section 3.2, the Parties shall deliver to the escrow agent under the Escrow Agreement (the "**Escrow Agent**") a joint written instruction in accordance with the Escrow Agreement directing the Escrow Agent to disburse such amounts to One Dot Six (or, at One Dot Six's election, to OP) on the date such amounts will become due and payable hereunder or, to the extent the payment is being made directly to OP, on the date on which the Annual Lease Fee will become due and payable to OP.

3.3     Usage Payments Adjustment.  In the event that, ███████████ ███████████████████████ during the Term, AST is unable to exercise all or part of the Usage Rights due to any act or omission of One Dot Six or its partners or customers, including due to any Preemption, the Usage Payments payable with respect to such period shall be adjusted as set forth in Exhibit 3 (*Usage Payments Preemption-Based Adjustments*).

# SECTION 4   SPECTRUM OPTION.

4.1     Exercise of Spectrum Option.  For a period of seven (7) years beginning on the Effective Date and upon thirty (30) days' prior written notice to One Dot Six, AST shall have the right to direct One Dot Six to exercise the Spectrum Option on a specified Exercise Date (or as

permitted by Section 5.2(c) of the Master Agreement) by One Dot Six's delivery of an Exercise Notice to OP ("Spectrum Option", "Exercise Date" and "Exercise Notice", each as defined in Section 5.2 of the Master Agreement).

4.2     Spectrum Option Payment.   In consideration for One Dot Six exercising the Spectrum Option in accordance with Section 4.1 of this Agreement, AST shall pay to One Dot Six in accordance with Section 4.3:

      4.2.1   the "Exercise Price" (as defined in Section 5.2 of the Master Agreement), subject to any set-offs permitted by the terms of the Master Agreement, in cash; *plus*

      4.2.2   a number of shares of Class A Common Stock, $0.0001 par value per share, of AST Parent equal to (a) thirty percent (30%) of the cash value of the Exercise Price divided by (b) the Parent Share Price as calculated on the date of the payment of the "Exercise Price" in accordance with Section 4.3, rounded down to the nearest whole number (the "**Spectrum Option Premium**" and together with the Exercise Price, the "**Spectrum Option Payment**").

4.3     Spectrum Option Payment Timing.   No later than sixty (60) days before the Exercise Date, AST shall provide to One Dot Six documentation showing that an amount equal to Exercise Price is held in an escrow account in accordance with the Escrow Agreement.   The Exercise Price shall be due and payable from AST to One Dot Six no later than ten (10) days prior to the Exercise Price becoming due and payable to OP pursuant to the terms of the Master Agreement and the Spectrum Option Premium shall be due and payable from AST to One Dot Six on the Exercise Date; provided that, if the Exercise Date is prior to the Plan Confirmation Date or if the FCC has not approved the Consent Application (as defined below), AST Parent shall only be required to issue such Class A Common Stock within fifteen (15) days after (a) the Plan Confirmation Date or (b) the date the FCC approves the Consent Application (whichever is later). Any amounts deposited into the escrow account by AST pursuant to this Section 4.3 shall be free and clear of all liens and/or other security interests at the time of deposit.   No later than five (5) Business Days prior to such time that any amounts are due and payable by AST to One Dot Six pursuant to this Section 4.3, the Parties shall deliver to the Escrow Agent a joint written instruction in accordance with the Escrow Agreement directing the Escrow Agent to disburse such amounts to One Dot Six (or, at One Dot Six's election, to OP) on the date such amounts will become due and payable hereunder or, to the extent the payment is being made directly to OP, on the date on which the Exercise Price will become due and payable to OP.

4.4     FCC Consent.   Within ten (10) Business Days following the Exercise Date, One Dot Six shall prepare and use reasonable best efforts to cause OP to file an application to the FCC for consent to assign the License from OP to One Dot Six in accordance with Section 5.2 of the Lease (the "**Consent Application**").   Following the filing of the Consent Application, One Dot Six shall cooperate with OP and use commercially reasonable efforts to seek FCC approval of the Consent Application.   Upon One Dot Six's or OP's request, AST agrees to execute and deliver such documents and take or cause to be taken such actions as may be necessary or advisable in furtherance of such Consent Application.  If the FCC (i) denies the Consent Application, (ii) does not consent to assignment of the License within one-year of the filing of the Consent Application, or (iii) does not consent to the assignment of the License while the Lease is effective, One Dot Six

9

shall terminate the Spectrum Option, return the aggregate cash value of the Exercise Price to AST within thirty (30) days after such successful termination and shall have no continuing obligation to seek OP's assignment of the License to One Dot Six. This paragraph shall not preclude (i) the Parties from extending this one-year period if AST so requests, and OP consents to extend the one-year period under Section 5.2(g) of the Master Agreement, nor (ii) AST from exercising the Spectrum Option on any subsequent valid Exercise Date pursuant to the provisions and requirements of this <u>Section 4</u> and Section 5.2 of the Master Agreement.

4.5    <u>Consummation of Spectrum Option</u>.  Following the "Closing Date" (as defined in Section 5.2 of the Master Agreement), and notwithstanding any termination of the Lease under Section 10(A)(iv) of the Lease (a "**Consummation Termination**"), this Agreement and the rights and obligations of the Parties (other than AST's obligation to make the Usage Payments) hereunder shall continue in full force for the duration of the Term, and any cross-references herein to definitions in the Lease shall be given effect as if no such Consummation Termination had occurred.

4.6    <u>Usage Premium and Spectrum Option Payment</u>.  In connection with any issuance of Parent Common Stock to discharge AST's obligation to pay the Usage Premium and the Spectrum Option Payment, Ligado agrees to execute and deliver to AST any customary documentation and certificates (and provide any account-opening information) reasonably requested by AST or AST's transfer agent in order to implement the issuance of the Parent Common Stock.

## SECTION 5   REVENUE SHARING.

5.1    <u>Revenue Share</u>.  Upon consummation of any direct or indirect disposal, whether in a single transaction or a series of transactions, of any interest (whether through an actual sale, long-term lease or sale of a majority interest in One Dot Six) of the Leased Spectrum and/or the Terrestrial Rights by One Dot Six to a third party (a "**Third Party Purchaser**") that occurs after the Effective Date (a "**Terrestrial Sale**"), One Dot Six shall pay in cash to AST a portion of the amount of revenues generated from each such sale (the "**Revenue Share Payment**"), which portion shall be calculated in accordance with the following:

5.1.1    Fifty percent (50%) of any proceeds in excess of One Billion Two Hundred Fifty Million US Dollars (US$1,250,000,000) but less than or equal to One Billion Seven Hundred Fifty Million US Dollars (US$1,750,000,000) generated from any Terrestrial Sales, in aggregate; and

5.1.2    For aggregate proceeds in excess of One Billion Seven Hundred Fifty Million US Dollars (US$1,750,000,000), the amount calculated in <u>Section 5.1.1</u>; *plus* seventy-five percent (75%) of any proceeds in excess of One Billion Seven Hundred Fifty Million US Dollars (US$1,750,000,000) generated from any Terrestrial Sales, in aggregate.

By way of illustration only, if the aggregate proceeds from one or more Terrestrial Sales total Two Billion US Dollars (US$2,000,000,000), the Revenue Share Payment payable to AST shall be Four Hundred Thirty Seven Million Five Hundred Thousand US Dollars

10

(US$437,500,000), being the sum of Two Hundred Fifty Million US Dollars (US$250,000,000) and One Hundred Eighty Seven Million Five Hundred Thousand US Dollars (US$187,500,000).

5.2   Revenue Share Payment Timing. The Revenue Share Payment for each Terrestrial Sale shall be due and payable from One Dot Six to AST in cash within ten (10) Business Days following the date that One Dot Six receives the revenues generated from the applicable Third Party Purchaser in connection with the related Terrestrial Sale.

5.3   Usage Payment Credits. In lieu of payment of any portion of the Revenue Share Payment in cash and upon fifteen (15) Business Days' prior written notice to One Dot Six, AST, at its sole discretion, may request that the Revenue Share Payment be paid from One Dot Six to AST in the form of a credit that may be offset against existing or future Usage Payments.

5.4   Restriction on Terrestrial Sale. Subject to AST's compliance with the terms of this Agreement and to One Dot Six's (and, as applicable, a Third Party Purchaser's) rights to Preemption, any Terrestrial Sale shall be subject to the rights of AST and its Affiliates under this Agreement, and One Dot Six shall use reasonable best efforts ensure that such rights are not foreseeably adversely affected by the consummation of any such Terrestrial Sale.

## SECTION 6   REGULATORY COOPERATION.

6.1   License Renewal. AST and One Dot Six shall use commercially reasonable efforts, including but not limited to the AST obligations set forth in this Section 6.1, and shall fully cooperate with each other (and OP, as applicable before the Closing Date) to obtain renewals of the License (and to obtain any required FCC approvals for the continuation of the Lease as a long-term de facto transfer lease of the Leased Spectrum, as applicable before the Closing Date), including as may be assigned to One Dot Six after the Closing Date. ███████████████████████████ ████████████████████████████████████████████████████████████████████

6.2   Notification of Violation or Material Changes. Each Party shall promptly (but in no event later than five (5) Business Days or such earlier date that is prudent under the circumstances) notify the other Party if the first Party becomes aware of the occurrence of any (i) violations, or inquiries or allegations of violations, which relate to AST's operation of network facilities utilizing the Leased Spectrum pursuant to the Usage Rights, or (ii) inquiries or regulatory proceedings by the FCC initiated with respect to this Agreement, that may reasonably impact One Dot Six's qualifications to hold the right to lease the Leased Spectrum. Each Party shall also promptly (but in no event later than five (5) Business Days or such earlier date that is prudent under the circumstances) inform the other Party of any other written or oral communications with the FCC or other "Governmental Authority" (as defined in the Master Agreement) concerning the other Party's utilization of the Usage Rights or the Terrestrial Rights, as applicable. In the event that the FCC or other Governmental Authority initiates an investigation or inquiry of which either Party becomes aware concerning the other Party in connection with this Agreement or any of the other Party's actions or operations hereunder, such Party shall (i) promptly (but in no event later than five (5) Business Days or such earlier date that is prudent under the circumstances) notify the other Party thereof, (ii) cooperate with the other Party, OP, and the FCC or other Governmental

11

Authority and (iii) use its commercially reasonable efforts to remediate any violations by the other Party of FCC rules or other applicable law arising from such investigation or inquiry.

      6.3    <u>Obligations as Service Provider</u>.  AST shall comply with any and all obligations that apply to AST directly as a result of its own status as a service provider of SCS.  One Dot Six shall comply with any and all obligations that apply to One Dot Six directly as a result of its own status as a service provider of the Leased Spectrum.

      6.4    <u>Communication and Audit Rights</u>.  Upon One Dot Six's reasonable request and on fifteen (15) Business Days' prior written notice, AST shall meet (in-person or virtually) with One Dot Six to discuss AST's use of the Usage Rights.  During such meetings, AST shall disclose in detail any complaints that it has received regarding radiofrequency interference resulting from its use of the Usage Rights.  AST shall also fully disclose in detail any operational problems with its use of the Usage Rights that are inconsistent with FCC Rules.

      6.5



      6.6    <u>Backstop Security</u>.  The Parties acknowledge and agree that the Terrestrial Rights may be used as security for Ligado to obtain a Backstop Commitment (as defined in the Framework Agreement) on the terms and subject to the conditions set forth in the Framework Agreement, and the Parties shall negotiate in good faith any amendments to this Agreement to the extent necessary to permit such Backstop Commitment.

## SECTION 7   MONETIZATION, ██████████████████████

      7.1    <u>Reevaluation of Monetization</u>.  At any time following the third anniversary of AST's SCS usage, the Parties shall negotiate in good faith to consider any mutually acceptable amendments to this Agreement that optimize the monetization of the Terrestrial Rights and Usage Rights.

      7.2





7.3



## SECTION 8  TERMINATION

8.1    Automatic Termination.  This Agreement shall automatically terminate upon the occurrence of:

8.1.1    the expiration without renewal of the License;

8.1.2    an "FCC Final Order" (as defined in the Lease) revoking, terminating or canceling the License;

8.1.3    with respect to all or substantially all of the Leased Spectrum, if such Leased Spectrum is lawfully reclaimed or taken by the FCC or any other Governmental Authority; or

8.1.4    the termination of the Lease; provided that, if such termination is the result of a Consummation Termination, this Agreement shall continue, and the Consummation Termination shall not affect the Parties' rights and obligations under this Agreement.

8.2    Termination of the Collaboration Agreement  Either Party shall be entitled, at its sole discretion, to terminate this Agreement upon the termination or expiration of the Collaboration Agreement following thirty (30) Business Days written notice thereof to the other Party.

8.3    Termination for Non-Payment.  One Dot Six shall be entitled, at its sole discretion, to terminate this Agreement, if AST fails to make a Usage Payment, a Spectrum Option Payment or the True-Up Payment, and such failure continues for fifteen (15) Business Days after One Dot Six provides written notice thereof to AST.

8.4    Termination for Material Breach.  Either Party, provided that it is not currently in default of a material provision of this Agreement, may terminate this Agreement in the event of a material breach of this Agreement by the other Party, upon written notice of such material breach to the other Party if the other Party has not cured such material breach within thirty (30) Business Days after receipt of such written notice; provided, that if such material breach (i) is not related to a payment obligation of either of the Parties, (ii) cannot reasonably be cured within a thirty (30) day period, (iii) the breaching Party promptly takes diligent actions to cure the breach and (iv) the continuation of such material breach does not result in a default under the Lease, then the cure period for such breach shall be extended to sixty (60) days.

14

8.5 ████████████████████████████████████████████

8.6     <u>Termination for Substantial Preemption</u>.  AST shall be entitled, at its sole discretion, to terminate this Agreement in the event that AST (or its Affiliates) is unable to exercise the "Substantial Preemption Amount" (as defined in Exhibit 3 (*Usage Payments Preemption-Based Adjustments*)).

8.7     <u>Termination for Excessive Force Majeure</u>.  Either Party may terminate this Agreement upon thirty (30) days' prior written notice to the other Party if the other Party is prevented from carrying out any of its material obligations under this Agreement for more than one hundred and eighty (180) days due to a Force Majeure Event.

8.8     <u>Other Termination Events</u>.  This Agreement may be terminated at any time:

8.8.1     by either AST or Ligado, at any time before the Plan Effective Date, if the RSA is terminated; or

8.8.2     by AST, if the Plan Effective Date has not occurred on or prior to the "Outside Date" (as defined in the RSA).

8.9     <u>Effect of Termination</u>.  Unless otherwise provided for in this Agreement, if either Party exercises its rights to terminate this Agreement pursuant to this <u>Section 8</u>, then: (a) AST shall surrender the Usage Rights to One Dot Six and cease using the Usage Rights as of the effective date of termination of this Agreement (or as soon as possible thereafter, if not possible to cease use as of such effective date of termination); and (b) neither Party shall have any continuing liabilities or obligations of any kind to the other Party as of the effective date of such termination (without prejudice to any liabilities accrued prior to such termination, including for breach of this Agreement, or with respect to any other remedies expressly set forth in this Agreement), and this Agreement shall terminate and cease to have any further force or effect except with respect to any provisions that expressly survive termination.

**SECTION 9   REPRESENTATIONS, WARRANTIES AND COVENANTS**.

9.1     <u>Mutual Representations and Warranties</u>.  Each Party represents and warrants to the other Party that:

9.1.1     It has the right, power, and authority to execute and perform its obligations under this Agreement.

9.1.2     It has taken all requisite corporate or governmental action to approve the extension, delivery, and performance of this Agreement, and this Agreement constitutes the legal, valid and binding obligation of such Party enforceable against it in accordance with its terms.

15

9.1.3    The execution, delivery, and performance by it of its obligations hereunder and the consummation of the transactions contemplated hereby will not result in a violation of, or default under, any agreement or instrument to which it is a party or by which it or any of its property is bound, its organization or governing documents or any law, regulation, rule, or judgment of any court or governmental or other agency having jurisdiction over it or any of its properties.

9.1.4    To its knowledge, there is no outstanding judgment, pending or threatened litigation or proceeding involving or affecting the execution, delivery or performance of this Agreement.

9.1.5    Neither it nor, to its knowledge, anyone acting on its behalf, has at any time in the past five years engaged in or facilitated, directly or indirectly, any material violation of laws, rules, or regulations relating to (i) sanctions or the export or import of commodities, technical data, products, or services, including, but not limited to, those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury and the Bureau of Industry and Security of the U.S. Department of Commerce ("*Sanctions and Export Control Laws*"); or (ii) the prohibition of bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable corruption or bribery law ("*Anti-Bribery Laws*").

9.2    <u>Representations and Warranties of One Dot Six</u>.    One Dot Six represents and warrants to AST that:

9.2.1    The Master Agreement and Lease are each in full force and effect and constitutes the legal, valid and binding obligation of each party thereto enforceable against each such party in accordance with its terms.

9.2.2    One Dot Six is also in all material respects in compliance with the terms of the Master Agreement and Lease and, to One Dot Six's knowledge, there is no basis upon which CCIC or OP would be entitled to terminate the Master Agreement or the Lease.

9.2.3    To One Dot Six's knowledge, CCIC and OP are in all material respects in compliance with the terms of the Master Agreement, and OP is in all material respects in compliance with the terms of the Lease.

9.2.4    To One Dot Six's knowledge, no Governmental Authority (i) has used, or is using, the Leased Spectrum in a manner that conflicts (or would reasonably be expected to conflict) in any material respect with AST's planned use of the Leased Spectrum or (ii) opposes AST's planned use of the Leased Spectrum in any material respect.

9.2.5    One Dot Six has not granted any Person any right to use any Leased Spectrum for SCS.

9.2.6    Exhibit 4 (*Ligado Licenses*) contains a complete and accurate list of all licenses (including the License) held by OP, One Dot Six or any of their Affiliates for use of the Leased Spectrum as of the date of this Agreement.  Such licenses are valid and in

force and, to One Dot Six's knowledge, there is no basis for any Governmental Authority to revoke or cancel any such licenses.

9.2.7    There are no actual or threatened claims, proceedings, or other actions (including before the ITU or other Governmental Authority) that challenge One Dot Six's full access to the Leased Spectrum.

9.2.8    ████████████████████████████████████████████
████████████████████████████

9.3    <u>General Covenants</u>.  Each Party covenants to the other Party that:

9.3.1    It shall comply with the laws, permits, and licenses of any territory where this Agreement is in effect.  Should such Governmental Authority's claims be contrary to this Agreement or to the Parties' obligations under this Agreement, then it shall undertake, to the extent possible, any reasonably necessary actions to change, cancel, or otherwise overcome such claims in order to give effect to this Agreement and the performance of its obligations under this Agreement.

9.3.2    It shall comply with all applicable laws, rules, or regulations relating to Sanctions and Export Control Laws.

9.3.3    When performing its obligations under this Agreement, it shall not, and it shall not authorize or permit any Person acting for or on behalf of it to, directly or indirectly (a) give, offer or promise, or authorize (or tolerate to be given, offered, or promised) anything of value to an official or employee of government or of any subdivision thereof or to use its influence to effect or influence any act or decision of a government or any subdivision thereof in violation of any Anti-Bribery Law; or (b) take any other action that constitutes a violation of any Anti-Bribery Law.

9.3.4    It shall use commercially reasonable efforts to negotiate and execute the Escrow Agreement no later than ten (10) Business Days after the Effective Date.

9.4    <u>AST Covenants</u>.  AST covenants to One Dot Six that:

9.4.1    AST shall comply with any and all applicable (i) requirements of the License applicable to it and provisions of the Communications Act of 1934, 47 USC § 151 et seq., as amended, and (ii) FCC Rules that apply to commercial operations in the Leased Spectrum, including 47 CFR §§ 27.6(f), 27.14, 27.50(f)(l), 27.53(j), 27.903, 1.924, and the relevant portion of §§ 1.9005-1.9080;

9.4.2    AST shall promptly (but in no event later than ten (10) Business Days or such earlier date that is prudent under the circumstances) notify One Dot Six in writing of any communication, written or oral, from the FCC relating to the Leased Spectrum or AST's use of the Usage Rights that reasonably could affect negatively One Dot Six's qualifications to be the lessee of the Spectrum or affect One Dot Six's or OP's use of the Leased Spectrum or OP's status as a licensee of the Licensed Spectrum and shall only

respond to the FCC regarding the aforementioned in collaboration with and through One Dot Six and/or OP;

9.4.3    AST shall promptly (but in no event later than ten (10) Business Days or such earlier date that is prudent under the circumstances) notify One Dot Six in writing of inquiries made by the FCC relating to the Leased Spectrum and AST's operations under the Usage Rights and shall only respond to the FCC regarding the aforementioned in collaboration with and through One Dot Six and/or OP;

9.4.4    AST shall refrain from taking any actions that reasonably could be viewed as (i) jeopardizing OP's qualifications under FCC Rules to lease the Leased Spectrum or that otherwise jeopardizes the License, including renewal of the License or (ii) jeopardizing, objecting to, interfering with, preventing or otherwise materially inhibiting the consummation of any Terrestrial Sale to a Third Party Purchaser;

9.4.5    █████████████████████████████████████████
██████████████████; and

9.4.6    AST shall use reasonable best efforts to assist One Dot Six and OP in renewing the License.

9.5    <u>One Dot Six Covenants</u>. One Dot Six covenants to AST that, during the Term:

9.5.1    One Dot Six shall comply with the Master Agreement and the Lease in all material respects (and, for this purpose, all payment obligations shall be considered material obligations) and not take or omit to take any action that could result in termination of either agreement.

9.5.2    Without prejudice to <u>Section 9.5.3</u>, notify AST as soon as is reasonably practicable of any amendment, waiver or breach of the Master Agreement or Lease that could reasonably be expected to affect AST's intended exercise of the Usage Right.

9.5.3    One Dot Six shall not amend, waive any right under or breach of, or exercise any right to terminate the Master Agreement or the Lease in a manner that could reasonably be expected to adversely affect AST's intended exercise of the Usage Right, or agree, threaten or give notice to do any of the foregoing, in each case, without AST's prior written consent.

9.5.4    One Dox Six shall notify AST as soon as reasonably practicable after it receives any claims or notices (whether written or oral) from CCIC, OP, or any of their respective representatives, alleging any breach of the Master Agreement or the Lease or grounds on which the Master Agreement or the Lease may be terminated, and reasonably consult with AST in connection with the response to and resolution of any such claims or notices; provided, however, that: (i) such consultations may be conducted by One Dot Six in any manner that protects attorney-client privilege or any other legal privilege and (ii) One Dot Six shall have ultimate control over the responses to, and resolutions of, such claims or notices (except that, in respect of (ii), Ligado shall not respond to such claims or

notices in a manner that could reasonably be expected to adversely affect AST's intended exercise of the Usage Right without AST's prior written consent).

9.5.5   One Dot Six shall take reasonable best efforts to maintain the Leased Spectrum, including by maintaining in force (a) the License, (b) any other permits or approvals required from any Governmental Authority to use the Leased Spectrum and (c) ███████████████████████████.

9.5.6   In consultation with and to the extent reasonably requested by AST, One Dot Six shall enforce its rights under the Master Agreement and the Lease to the extent that CCIC and/or OP (as applicable) is in breach of the Master Agreement or the Lease (as applicable) and such breach adversely affects in any material respect the intended exercise of the Usage Right.

9.5.7   No later than the Plan Effective Date, One Dot Six shall assume the Master Agreement and the Lease pursuant to Section 365 of the Bankruptcy Code.

9.6   <u>Intellectual Property Rights</u>.  During the Term, One Dot Six, on behalf of itself and its Affiliates, hereby grants to AST and its Affiliates a non-exclusive, worldwide, royalty-free, paid-up, irrevocable (subject to <u>Section 8</u>), sublicensable, transferrable (in accordance with <u>Section 15.3</u>) license to use any Intellectual Property Rights owned or controlled by One Dot Six or any of its Affiliates to the extent necessary or useful for AST's exercise of the Usage Right.

**SECTION 10 TAXES, LATE PAYMENTS AND SET-OFF**.

10.1   <u>Taxes</u>.  Each Party shall pay all sales, goods and services, and other similar taxes imposed on or payable with respect to payments such Party is otherwise required to make under this Agreement (collectively, "**Sales Taxes**") (excluding, for purposes of clarification, income taxes of the other Party), subject to the receipt from the other Party of a valid invoice required by law to be issued in connection with such Sales Taxes.  Each Party shall be entitled to deduct and withhold from any payment under this Agreement all taxes that such Party is required to deduct and withhold under any applicable provision of Law. All such amounts withheld and properly paid over to the appropriate taxing authority shall be treated as having been paid to the person in respect of whom such deduction and withholding was made.  Each Party shall promptly provide the other Party with any applicable tax forms and certifications (including IRS Form W-9 or the applicable version of IRS Form W-8) reasonably requested and shall promptly provide an update of any such tax form or certificate previously delivered if the same has become incorrect or has expired.

10.2   <u>Payments</u>.

10.2.1 Amounts due and payable in respect of Usage Payments, the Spectrum Option Payment and Revenue Share Payments shall be paid by the specified Party on or before the applicable date that such amounts are due and payable without any requirement for the provision of an invoice or other notice from the non-paying Party.  Any payment under this Agreement due and payable on a date that is not a Business Day shall be made on or before the Business Day immediately preceding such date.

10.2.2 Payments of the Usage Fee, the Exercise Price and Revenue Share Payments shall be made by wire transfer of immediately available funds to the bank account specified in Schedule 1 (*Places of Payment*) attached hereto, as applicable, or to such other account as may be notified in writing by the non-paying Party to the paying Party.

10.3    Interest for Late Payments. If an amount due under this Agreement is not paid within the applicable due date of such payment as identified in this Agreement, all such payments shall bear interest at the federal funds rate as published by the Wall Street Journal starting on the date such payment is due until but excluding the date the overdue amount and the interest are paid.

## SECTION 11 CONFIDENTIALITY.

11.1    Confidentiality. Each Party (each a "**Receiving Party**") shall, and shall ensure that its Affiliates shall, treat as strictly confidential all of the other Party's (each a "**Disclosing Party**") "Confidential Information" (as defined in the Collaboration Agreement) and shall not, except with the prior written consent of the Disclosing Party, make use of (save for the purposes of performing its obligations or exercising its rights under Transaction Agreement) or disclose to any Person (other than in accordance with this Section 11) any Confidential Information. Each Receiving Party undertakes that it shall (and shall ensure that its Affiliates shall) only disclose Confidential Information to its Representatives where it is reasonably required for the purposes of exercising its rights or performing its obligations under this Agreement and only where the "Representatives" (as defined in the Collaboration Agreement) are informed of the confidential nature of the Confidential Information and the provisions of this Section 11 and such Representatives are bound to abide by confidentiality obligations substantially as protective as those contained herein. The Receiving Party shall be liable for any violation of this Section 11 by its Representatives. The confidentiality obligations set forth in this Section 11 shall bind the Receiving Party (a) with respect to Confidential Information that is a trade secret right or business secret, for so long as such Confidential Information remains a trade secret right or business secret under applicable Law, and (b) with respect to all other Confidential Information perpetually unless any of the exceptions set forth in Section 11.2 applies.

11.2    Exceptions. Notwithstanding Section 11.1, a Receiving Party shall have the limited right to disclose Confidential Information to the extent that such disclosure is:

11.2.1  required by applicable Law or by any stock exchange or any Governmental Authority having applicable jurisdiction and the Receiving Party (or its Affiliate) has (to the extent legally permissible and reasonably practicable in the circumstances) given the Disclosing Party sufficient prior notice in order for the Disclosing Party to obtain a protective order or other appropriate remedy;



11.2.2

11.2.3

11.2.4  to a Third Party Purchaser, OP and/or CCIC for the purpose of, and to the extent reasonably necessary for, consummating a Terrestrial Sale; or

11.2.5  (to the extent AST is the Receiving Party) required in order to facilitate any financing transaction proposed to be entered into by AST or its Affiliates; provided, however, that such disclosure is made only to those parties on an as-needed basis and any third party who has access to the Confidential Information is subject to confidentiality obligations and restrictions at least as protective of the Confidential Information as set forth herein.

## SECTION 12 INDEMNIFICATION.

12.1  General Indemnification.  Each Party agrees to indemnify, defend and hold the other Party and each of its "Affiliates" (as defined in the Collaboration Agreement), members, officers, managers, directors and employees (each, an "**Indemnitee**") harmless against any and all "Losses" (as defined in the Collaboration Agreement) incurred by such Indemnitee arising from, relating to, or incurred in connection with any "Claim" (as defined in the Collaboration Agreement) arising out of or related to: (a) the breach of any representation or warranty made by such Party, (b) such Party's material breach of this Agreement, or (c) the operation of such Party prior to the Effective Date.

12.2  Indemnification of One Dot Six.  AST agrees to indemnify, defend and hold One Dot Six, Ligado and each of their Indemnitees harmless against any and all Losses incurred by One Dot Six, Ligado or the applicable Indemnitees to the extent arising out of a third party claim against One Dot Six, Ligado or the applicable Indemnitees relating to AST's provision of SCS under the Usage Rights.

12.3  Indemnification of AST.  One Dot Six agrees to indemnify, defend and hold AST and each of their Indemnitees harmless against any and all Losses incurred by AST or the applicable Indemnitees (i) in connection with One Dot Six's failure to comply with the Master Agreement or the Lease; and (ii) to the extent arising out of a third party claim against AST or the applicable Indemnitees relating to One Dot Six's or Ligado's use or provision to customers or partners of the Leased Spectrum.

## SECTION 13 LIMITATION OF LIABILITY.

13.1  Limitation on Damages.  Except with respect to the applicable Party's indemnification obligations for third party claims under Section 12, neither Party shall be liable to the other Party for any indirect, incidental, consequential, punitive or special damages of any nature arising out of or relating to this Agreement, whether arising in tort, contract or otherwise.

13.2  Disclaimer.  Except as set forth in this Agreement, One Dot Six makes no warranty, express or implied, to AST with respect to the Leased Spectrum, the Usage Rights or ██████, including (i) any implied warranty of merchantability or fitness for a particular purpose or any warranty as to the quality of the Leased Spectrum or the Usage Rights and (ii) ████████████████████████████████████████████████.

21

13.3 <u>Liability Cap</u>. Each Party's liability for any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby, including claims of negligence, breach of contract or warranty, failure of a remedy to accomplish its essential purpose or otherwise, will in no case exceed the aggregate amount of the Usage Payments actually paid by AST to One Dot Six.

**SECTION 14 GOVERNING LAW AND DISPUTE RESOLUTION**.

14.1 <u>Governing Law</u>. This Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of Delaware.

14.2 <u>Dispute Resolution</u>. Other than with respect to any disputes arising pursuant to <u>Section 3.2</u> or <u>Section 4.3</u> relating to the delivery by the Parties of a joint written instruction to the Escrow Agent, if during the term of this Agreement, a dispute arises between the Parties, or one Party perceives the other as acting unfairly or unreasonably, or a question of interpretation arises hereunder, then the Parties' respective representatives (as identified in <u>Schedule 2</u> (*Dispute Resolution Representatives*) attached hereto) shall promptly confer and exert commercially reasonable efforts to reach a reasonable and equitable resolution of the dispute. If the representatives are unable to resolve the issue within ten (10) Business Days, then the representative of the Party that initially raised the dispute shall develop a description of the dispute, identify such dispute as primarily either "technical" or "commercial" in nature and refer such dispute within two (2) Business Days of the lapse of the aforementioned ten (10) Business Days to: (i) a member of the Parties' technical team in the event such dispute is "technical;" or (ii) a member of the Parties' executive team (other than the chief executive officer) if the dispute is "commercial" or "other." If such member of the Parties' technical team or executive team (other than the chief executive officer), as applicable, is unable to resolve such dispute within ten (10) Business Days, then such dispute will be referred to each Parties' chief executive officer for resolution. Neither Party shall seek judicial resolution of any dispute arising in connection with this Agreement until the chief executive officer of each Party has had at least ten (10) Business Days to attempt to resolve the dispute following referral of the dispute to such chief executive officers.

14.3 <u>Venue</u>. Each Party agrees to the exclusive personal jurisdiction and venue in the federal and state courts in Delaware, for any dispute arising out of this Agreement.

14.4 <u>Waiver of Jury Trial</u>. Each of AST and One Dot Six hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this agreement or the actions of AST or One Dot Six in the negotiation, administration, performance and enforcement hereof. Each Party certifies and acknowledges that (a) no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, (b) each Party understands and has considered the implication of this waiver, (c) each Party makes this waiver voluntarily, and (d) each Party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this section.

14.5    Usage Rights Continuation.  Provided that, and for so long as, AST is in compliance with all of its obligations under this Agreement, including its obligations to pay Usage Fees, then AST shall continue to have the Usage Right notwithstanding any purported rejection of the Agreement by Ligado or One Dot Six under Section 365 of the Bankruptcy Code in connection with any future case under the Bankruptcy Code. One Dot Six and AST have articulated good, sufficient, and sound business justification for AST's right to retain all rights to use the Usage Right, notwithstanding any purported rejection of this Agreement under Section 365 of the Bankruptcy Code, in accordance with the previous sentence.  Namely, among other things, this right (a) was negotiated by One Dot Six, AST, and their respective advisors at arms'-length and in good faith, (b) is necessary to ensure that AST will receive the benefits of its bargain under this Agreement, and (c) is fair, reasonable, and appropriate in light of AST's substantial investment in reliance on the Usage Right, including providing certain payments and contributions to One Dot Six and substantial expenditures for technology and regulatory compliance necessary to exercise the Usage Right.

## SECTION 15 MISCELLANEOUS.

15.1    Notices.  All notices and other communications hereunder shall be in writing and delivered by (a) email, and shall be deemed to have been duly delivered and received hereunder on the date of dispatch by the sender thereof (to the extent that no "bounce back" or similar message indicating non-delivery is received with respect thereto), or (b) nationally recognized overnight courier service (providing proof of delivery), in each case, to the intended recipient as set forth below (or to such other recipient as designated in a written notice to the other Party hereto in accordance with this Section 15.1):

      if to AST, to:

      AST & Science, LLC
      AST Midland International Air & Space Port
      2901 Enterprise Lane
      Midland, Texas 79706
      Attention: Chief Legal Officer
      Email: andrew.johnson@ast-science.com

      with a copy to: legal@ast-science.com

      if to One Dot Six, to:

      One Dot Six LLC
      c/o Ligado Networks LLC
      10802 Parkridge Boulevard
      Reston, Virginia 20191
      Attention: General Counsel
      Email: legal@ligado.com

15.2    Publicity.   No public announcement, release, or other public disclosure of information relating to this Agreement, including the existence of this Agreement, shall be made

by either Party except as required by law or by prior written agreement of the Parties and/or their Affiliates, as applicable.

15.3    Assignment.  Except as permitted under this Section 15.3, this Agreement shall not be assigned, delegated, or transferred, in full or in part, as security or otherwise, or delegated to any other individual, firm, institution, organization or government agency by any Party without the prior written consent of the other Party.  Notwithstanding the foregoing, either Party may assign this Agreement to: (a) any Person that acquires all or substantially all of the assets of such Party; or (b) an Affiliate provided that, in each case of clause (a) and (b), the assignment will not impair the other Party's rights under this Agreement; provided further that, in the case of clause (b), no such assignment to an Affiliate shall relieve the assigning Party of its obligations under this Agreement if such Affiliate does not fully and timely perform such obligations.  Subject to the foregoing, this Agreement shall be binding on and inure to the benefit of the Parties' respective successors and permitted assigns.  Any assignment, delegation, or transfer of this Agreement made in contravention of the terms hereof shall be null and void.

15.4    Force Majeure.  Neither Party will be liable for any nonperformance under this Agreement (other than the obligation to pay amounts due and payable hereunder) due to causes beyond its reasonable control that could not have been reasonably anticipated by the non-performing Party and that cannot be reasonably avoided or overcome (each such cause, a "**Force Majeure Event**"); if: (a) the non-performing Party gives the other Party prompt written notice of such cause, and in any event, within ten (10) calendar days after its discovery; and (b) such nonperformance will be excused only during the period when the Force Majeure Event occurs, continues to exist and cannot be reasonably overcome.

15.5    Entire Agreement.  This Agreement (including any schedules, annexes and exhibits hereto and the documents and instruments and other agreements among the Parties hereto as contemplated by or referred to herein, including the Exhibits hereto) and the other AST Definitive Agreements constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof (including, for the avoidance of doubt, the Confidentiality Agreement and the Confidential Binding Terms of Strategic Collaboration, dated January 5, 2025, by and between AST & Science, LLC and Ligado Networks LLC).

15.6    No Joint Venture or Agency.  None of the provisions of this Agreement will be deemed to constitute a partnership, joint venture, or any other similar relationship between the Parties, and neither Party will have any authority to bind the other Party in any manner, except as expressly indicated in this Agreement.  Neither Party will have or hold itself out as having any right, authority or agency to act on behalf of the other Party in any capacity or in any manner, except as may be expressly authorized in this Agreement. Without limitation to the foregoing, the Parties agree (a) that the transactions contemplated herein are not intended to give rise to a partnership for U.S. federal and applicable state and local income tax purposes, and (b) not to file any tax return or take any tax position inconsistent with such treatment, unless required by applicable law following a determination (within the meaning of Section 1313 of the Code) on the matter.

15.7 <u>Amendment</u>.  To the extent permitted by Law and subject to the other provisions of this Agreement, this Agreement may be amended by the Parties hereto at any time by execution of an instrument in writing signed on behalf of each of AST and One Dot Six.

15.8 <u>Extension; Waiver</u>.  At any time and from time to time, the parties may mutually agree, to the extent permitted by Law and except as otherwise set forth herein, (a) extend the time for the performance of any of the obligations or other acts of the other party or Parties hereto, as applicable, (b) waive any inaccuracies in the representations and warranties made to such Party or Parties hereto contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such Party or Parties hereto contained herein.  Any agreement on the part of a Party or Parties hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party or Parties, as applicable.  Any delay in exercising any right under this Agreement shall not constitute a waiver of such right.

15.9 <u>Severability</u>.  In the event that any term or other provision of this Agreement, or the application thereof, is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

15.10 <u>Headings</u>.  The Article and Section captions set forth herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

15.11 <u>Specific Performance</u>.  The transactions contemplated by this Agreement are unique transactions and any failure on the part of a Party to complete the transactions contemplated by this Agreement on the terms of this Agreement will not be fully compensable in damages, and the breach or threatened breach of the provisions of this Agreement would cause the other Party irreparable harm.  Accordingly, in addition to and not in limitation of any other remedies available to the Parties for a breach or threatened breach of this Agreement, each Party will be entitled to specific performance of this Agreement upon any breach by the other Party and to an injunction restraining such Party from such breach or threatened breach.

15.12 <u>No Third Party Beneficiaries</u>.  This Agreement shall be binding on and inure solely to the benefit of each Party hereto, and nothing in this Agreement, express or implied, is intended to confer on any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

15.13 <u>Counterparts</u>.  This Agreement may be executed in one (1) or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission, including by e-mail attachment, shall be effective as delivery of a manually executed counterpart of this Agreement.

15.14 <u>Survival</u>.  Notwithstanding any other provision to the contrary, the provisions contained in <u>Section 10.1</u> (*Taxes*), <u>Section 11</u> (*Confidentiality*), <u>Section 12</u> (*Indemnification*),

Section 13 (*Limitation of Liability*), Section 14 (*Governing Law and Dispute Resolution*), Section 15.1 (*Notices*), Section 15.2 (*Publicity*), Section 15.5 (*Entire Agreement*), Section 15.9 (*Severability*), Section 15.10 (*Headings*), Section 15.14 (*Survival*) and Section 15.15 (*Definitions and Interpretation*) shall survive the termination or expiration of this Agreement.

15.15   Definitions and Interpretation.

15.15.1 The following capitalized terms shall have the respective meanings ascribed thereto in the respective sections of this Agreement set forth opposite each of the capitalized terms below:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Anti-Bribery Laws | 8.1.5 |
| AST | Preamble |
| AST Parent | 3.1.3 |
| Binding Term Sheet | Preamble |
| CCIC | Preamble |
| Collaboration Agreement | Preamble |
| Consent Application | 4.4 |
| Consummation Termination | 4.5 |
| Escrow Agent | 3.2.1 |
| FCC | Preamble |
| FCC Rules | Preamble |
| Force Majeure Event | 14.4 |
| Framework Agreement | Preamble |
| Indemnitee | 11.1 |
| Lease | Preamble |
| Leased Spectrum | Preamble |
| License | Preamble |
| Licensed Spectrum | Preamble |
| Ligado | Preamble |
| Master Agreement | Preamble |
| ███████████ | 7.2 |
| ███████████ | 7.2 |
| ███████████ | 7.2 |
| ███████████ | 7.2 |
| ███████████ | 7.2 |
| Notice Acceptance | 7.3.2 |
| Notice of Intent | 7.3.1 |
| Notice Rejection | 7.3.2 |
| One Dot Six | Preamble |
| OP | Preamble |
| Parties | Preamble |
| Party | Preamble |
| PFSD | 1.4 |

| | |
|---|---|
| Preemption ................................................................................................ | 1.5 |
| Relevant Assets ........................................................................................ | 7.3 |
| Revenue Share Payment .......................................................................... | 5.1 |
| ████████ ................................................................................................ | 7.3 |
| ................................................................................................................ | 7.3.3 |
| Sanctions and Export Control Laws ........................................................ | 8.1.5 |
| SCS ............................................................................................. | Preamble |
| ████████ ................................................................................................ | 6.5 |
| Spectrum Option Payment ....................................................................... | 4.2.2 |
| Spectrum Option Premium ...................................................................... | 4.2.2 |
| Term .............................................................................................. | Section 2 |
| Terrestrial Rights ..................................................................................... | 1.2 |
| Terrestrial Sale ........................................................................................ | 5.1 |
| Terrestrial Service Zone ........................................................................... | 1.5 |
| Third Party Deadline ................................................................................ | 7.3.4 |
| Third Party Purchaser .............................................................................. | 5.1 |
| Third Party Sale ....................................................................................... | 7.3.4 |
| True-Up Payment ..................................................................................... | 3.2.1 |
| Usage Fee ................................................................................................. | 3.1.1 |
| Usage Notification ................................................................................... | 1.4 |
| Usage Payments ....................................................................................... | 3.1.3 |
| Usage Premium ........................................................................................ | 3.1.3 |
| Usage Rights ............................................................................................ | 1.1 |
| Usage Rights Technical Requirements ..................................................... | 1.3 |

15.15.2  Unless the context requires otherwise: (a) a reference to "this Agreement" refers to this Agreement as a whole, including all Schedules and Exhibits hereto, and the words "herein," "hereof," "hereunder," and "hereto" and words of similar import refer to this Agreement and its Schedules and Exhibits as a whole and not to any particular Section, Schedule or Exhibit, or any other subdivision; (b) a reference to a Party, Article, Section, Schedule or Exhibit is a reference to that Article, Section, or Exhibit of, or that Party or Schedule to, this Agreement unless otherwise specified; (c) a reference to any legal instrument, treaty, convention, national law, regulation, rule, or other law of any nature in this Agreement shall include any amendment, variation, supplement, or re-enactment of the same from time to time in force; (d) words importing the singular include the plural and vice versa and the masculine, feminine, and neuter genders include all genders; (e) a reference to a Person includes that Person's successors and permitted assigns; (f) the word "including" and words of similar import shall mean "including without limitation" unless otherwise specified; (g) if a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb); (h) the word "extent" and the phrase "to the extent" mean the degree to which a subject or other thing extends, and such word or phrase shall not simply mean "if"; (i) references to "$" and "dollars" are to the currency of the United States of America; (j) any dollar or percentage thresholds set forth herein shall not be used as a benchmark for the determination of what is or is not "material" under this Agreement; (k) references from or through any date mean from and including or through and including, respectively;

(l) whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified; (m) whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day; (n) unless otherwise specified in this Agreement, when calculating the period of time within which, or following which, any action is to be taken pursuant to this Agreement, the date that is the reference day in calculating such period shall be excluded; (o)  Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document; (p) the word "or" shall be disjunctive but not exclusive; and (q) each reference in this Agreement to any agreement, instrument, deed or other document, shall be deemed to be a reference to such agreement, instrument, deed or document, as the case may be, as the same may be amended, supplemented, novated, replaced or otherwise modified from time to time in accordance with the terms hereof and thereof.

*[Signature Page Follows]*

**Exhibit D**
**Governance Letter Agreement**

**Exhibit E**
**Pre-Funded Warrant to Purchase Common Stock**

THIS SECURITY AND THE SECURITIES THAT MAY BE ISSUED UPON EXERCISE OF THIS SECURITY ARE SUBJECT TO A LOCKUP PERIOD FOR ONE YEAR FROM THE ORIGINAL ISSUE DATE (THROUGH MARCH 22, 2026) AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, CHARGED, PLEDGED OR OTHERWISE DISPOSED DURING THE TERM OF SUCH LOCKUP PERIOD.

NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR IN ANY OTHER JURISDICTION. NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE MAY BE OFFERED, SOLD, PLEDGED OR TRANSFERRED EXCEPT (X) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (Y) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR (Z) PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS, INCLUDING RULE 144 UNDER THE SECURITIES ACT. NOTWITHSTANDING THE FOREGOING, THIS SECURITY AND THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY SUCH SECURITIES AFTER THE EXPIRATION OF THE LOCKUP PERIOD REFERENCED ABOVE. PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (Z) ABOVE, THE COMPANY AND THE COMPANY'S TRANSFER AGENT RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

# AST SPACEMOBILE, INC.

## WARRANT TO PURCHASE COMMON STOCK

Warrant No. 001

Number of Shares: 4,714,226
(subject to adjustment)

Original Issue Date: March 22, 2025 (the "Original Issue Date")

AST SpaceMobile, Inc., a Delaware corporation (the "Company"), hereby certifies that, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Ligado Networks LLC or its permitted assigns (the "Holder"), is entitled, subject to the terms set forth below, to purchase from the Company up to a total of 4,714,226 shares (subject to adjustment in accordance with the terms hereof) of Class A common stock, $0.0001 par value per share (the "Common Stock"), of the Company (each such share, a "Warrant Share" and all such shares, the "Warrant Shares"), at an exercise price per share equal to $0.01 per share (as adjusted from time to time as provided in Section 9 herein, the "Exercise Price"), upon surrender of this Warrant to Purchase Common Stock (including any Warrants to Purchase Common Stock issued in exchange, transfer or replacement hereof, the "Warrant") at any time after the one-year anniversary of the Original Issue Date (the "Initial Exercise Date"), and subject to the following terms and conditions:

1      Definitions. In addition to the other terms defined herein, the following terms are defined as follows:

(a)      "Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 under the Securities Act. In furtherance (and not in limitation) of the foregoing, an Affiliate of a Person shall include any fund or account managed, advised, or sub-advised by such Person.

(b)      "Business Day" means a day, except a Saturday, a Sunday or other day on which any of the SEC, commercial banks in New York, New York or the Department of State of Delaware are not open for the general transaction of business.

(c)      "Closing Sale Price" means, for any security as of any date, the last trade price for such security on the Principal Trading Market for such security, as reported by Bloomberg Financial Markets, or, if such Principal Trading Market begins to operate on an extended hours basis and does not designate the last trade price, then the last trade price of such security prior to 4:00 P.M., New York City time, as reported by Bloomberg Financial Markets, or if the foregoing do not apply, the last trade price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg Financial Markets, or, if no last trade price is reported for such security by Bloomberg Financial Markets, the average of the bid and ask prices, of any market makers for such security as reported in the OTC Link or "pink sheets" by OTC Markets Group Inc. (formerly OTC Markets Inc.) as of 4:00 P.M., New York City time on such date. If the Closing Sale Price cannot be calculated for a security on a particular date on any

of the foregoing bases, the Closing Sale Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then the Board of Directors of the Company shall use its good faith judgment to reasonably determine the fair market value. The determination of the Board of Directors of the Company shall be binding upon all parties absent demonstrable error. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period.

(d)     "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(e)     "Person" means an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

(f)     "Principal Trading Market" means the national securities exchange or other trading market on which the Common Stock is primarily listed on and quoted for trading, which, as of the Original Issue Date shall be the Nasdaq Global Select Market.

(g)     "SEC" means the United States Securities and Exchange Commission.

(h)     "Securities Act" means the Securities Act of 1933, as amended.

(i)     "Standard Settlement Period" means the standard settlement period, expressed in a number of Trading Days, for the Company's primary trading market or quotation system with respect to the Common Stock that is in effect on the date of delivery of an applicable Exercise Notice, which as of the Original Issue Date was "T + 1".

(j)     "Trading Day" means (a) a day on which the Common Stock is traded on the Principal Trading Market or (b) if the Common Stock is not listed or quoted for trading on a securities exchange or trading market, a Business Day.

(k)     "Transfer Agent" means Continental Stock Transfer & Trust Company, the Company's transfer agent and registrar for the Common Stock, and any successor appointed in such capacity.

(l)     "VWAP" means, for any date, the daily volume weighted average price of the Common Stock on such date (or the nearest preceding date) on the Principal Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)), or if the Common Stock is not then listed or quoted for trading on a securities exchange or trading market, the fair market value of a share of Common Stock as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then the fair market value of such security shall be determined by a nationally recognized investment banking, accounting or valuation firm jointly selected in good faith by the Holder and the Company (the "Independent Appraiser") (with the Holder and the Company each bearing 50% of the costs of such Independent Appraiser in connection with such determination); provided that all determinations of the fair market value of such security shall be appropriately adjusted for any

dividends, stock splits or other similar transactions during such period. The determination of fair market value of such security by an Independent Appraiser shall be based upon the fair market value of the Company determined on a going concern basis as between a willing buyer and a willing seller and taking into account all relevant factors determinative of value, and shall be final and binding on all parties.

(m)    "Warrant Agent" means, initially, the Company in its capacity as transfer agent and registrar for the Warrant.

2    Issuance of Securities; Registration of Warrants. The Warrant, as initially issued by the Company, and the Warrant Shares are "restricted securities" under Rule 144 promulgated under the Securities Act. The Company shall register ownership of this Warrant, upon records to be maintained by the Company for that purpose (the "Warrant Register"), in the name of the record Holder (which shall include the initial Holder or, as the case may be, any assignee to which this Warrant is permissibly assigned hereunder) from time to time. The Company may deem and treat the registered Holder of this Warrant as the absolute owner and holder hereof for the purpose of any exercise hereof or any distribution to the Holder, and for all other purposes, absent actual notice to the contrary.

3    Registration of Transfers. Subject to compliance with all applicable securities laws, the transfer restrictions set forth in Section 15(c), and any restrictive legends included herein the Company shall, or shall cause the Warrant Agent to, register the transfer of all or any portion of this Warrant in the Warrant Register, upon surrender of this Warrant, together with a written assignment of this Warrant substantially in the form attached hereto as Schedule 2 duly executed by the Holder or its agent or attorney, and payment for all applicable transfer taxes by the Holder or its transferee accompanied by reasonable evidence of authority of the party making such request that may be required by the Warrant Agent. Upon any such registration or transfer, a new warrant to purchase Common Stock in substantially the form of this Warrant (any such new warrant, a "New Warrant") evidencing the portion of this Warrant so transferred shall be issued to the transferee, and a New Warrant evidencing the remaining portion of this Warrant not so transferred, if any, shall be issued to the transferring Holder. The acceptance of the New Warrant by the transferee thereof shall be deemed the acceptance by such transferee of all of the rights and obligations in respect of the New Warrant that the Holder has in respect of this Warrant. The Company shall, or shall cause the Warrant Agent to, prepare, issue and deliver at the Company's own expense any New Warrant under this Section 3. Until due presentment for registration of transfer, the Company may deem and treat the registered Holder of this Warrant as the absolute owner and holder for all purposes, absent actual notice to the contrary.

4    Exercise of Warrant.

(a)    All or any part of this Warrant shall be exercisable by the registered Holder in any manner permitted by this Warrant at any time and from time to time on or after the Initial Exercise Date.

(b)    The Holder may exercise this Warrant by delivering to the Company (i) an exercise notice, in the form attached as Schedule 1 hereto (the "Exercise Notice"), completed and duly executed by the Holder or its agent or attorney and (ii) payment of the aggregate Exercise Price

for the number of Warrant Shares as to which this Warrant is being exercised (which may take the form of a "cashless exercise" pursuant to <u>Section 10</u> if so indicated in the Exercise Notice), and each date on which an Exercise Notice is delivered to the Company (as determined in accordance with the notice provisions hereof) is an "<u>Exercise Date</u>". The aggregate exercise price of this Warrant, except for the Exercise Price, was pre-funded to the Company on or before the Original Issue Date, and consequently no additional consideration (other than the Exercise Price) shall be required to be paid by the Holder to effect any exercise of this Warrant. The Holder shall not be entitled to the return or refund of all, or any portion, of such pre-funded exercise price under any circumstance or for any reason whatsoever. In the event that the aggregate Exercise Price is being paid in cash (a "<u>Cash Exercise</u>"), the Holder shall deliver the aggregate Exercise Price for the Warrant Shares specified in the applicable Exercise Notice by wire transfer within one Trading Day following the Exercise Date (the "<u>Exercise Price Delivery Deadline</u>"). The Holder shall not be required to deliver the original Warrant in order to effect an exercise hereunder. Execution and delivery of the Exercise Notice shall have the same effect as cancellation of the original Warrant and issuance of a New Warrant evidencing the right to purchase the remaining number of Warrant Shares, if any. The Holder and any permitted assignee, by acceptance of this Warrant, acknowledge and agree that, by reason of the provisions of this paragraph, following the purchase of a portion of the Warrant Shares hereunder, the number of Warrant Shares available for purchase hereunder at any given time may be less than the amount stated on the face hereof.

5    <u>Delivery of Warrant Shares</u>. Upon exercise of this Warrant, the Company shall promptly, but in no event later than the number of Trading Days comprising the Standard Settlement Period, following the Exercise Date (or, in the case of a Cash Exercise, if the applicable aggregate Exercise Price is not received by the Company by the Exercise Price Delivery Deadline, one Trading Day after the date the applicable aggregate Exercise Price is received by the Company): (a) credit the aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with The Depository Trust Company ("<u>DTC</u>") through its Deposit/Withdrawal At Custodian system if either (i) there is an effective registration statement permitting the issuance of such Warrant Shares to or resale of such Warrant Shares by the Holder, (ii) such Warrant Shares are eligible for resale by the Holder without volume or manner-of-sale limitations pursuant to Rule 144 promulgated under the Securities Act or (iii) any other unrestricted conditions are then satisfied in respect of such Warrant Shares or (b) otherwise issue such Warrant Shares in the name of the Holder or its designee in restricted book-entry form in the Company's share register. The Company agrees to maintain a transfer agent that is a participant in the FAST program so long as this Warrant remains outstanding and exercisable. The Holder, or any other Person permissibly so designated by the Holder to receive Warrant Shares, shall be deemed to have become the holder of record of such Warrant Shares as of the Exercise Date, irrespective of the date such Warrant Shares are credited to the Holder's or its designee's DTC account or the date of the book entry positions evidencing such Warrant Shares, as the case may be. The Holder acknowledges that the Warrant Shares acquired upon the exercise of this Warrant, if issued in restricted book-entry form, will contain a customary legend to the effect that the Warrant Shares are not registered.

6    <u>Charges, Taxes and Expenses</u>. Issuance and delivery of Warrant Shares upon exercise of this Warrant shall be made without charge to the Holder for any issue or transfer tax, transfer agent fee or other incidental tax or expense in respect of the issuance of such shares, all of which taxes and expenses shall be paid by the Company; <u>provided</u>, that the Company shall not be

required to pay any tax that may be payable in respect of any transfer involved in the registration of any Warrant Shares or the Warrant in a name other than that of the Holder or an Affiliate thereof. The Holder shall be responsible for all other tax liability that may arise as a result of holding or transferring this Warrant or receiving Warrant Shares upon exercise hereof.

7    <u>Replacement of Warrant</u>. In the event of any loss, theft or destruction of a Warrant for which the Company and the Warrant Agent shall have received from the registered holder an indemnification reasonably satisfactory to the Company and the Warrant Agent holding the Warrant Agent and Company harmless, the Warrant Agent shall issue a New Warrant in a form mutually agreed to by the Warrant Agent and the Company for those certificates alleged to have been lost, stolen or destroyed, absent notice to the Warrant Agent that such certificates have been acquired by a bona fide purchaser and, at the Company's or the Warrant Agent's request, reimbursement to the Company and the Warrant Agent of all reasonable expenses incidental thereto. The Warrant Agent may, at its option, issue replacement Warrants for mutilated certificates upon presentation thereof without such indemnity.

8    <u>Reservation of Warrant Shares</u>. The Company covenants that it shall at all times, from and after the Initial Exercise Date while this Warrant is outstanding, reserve and keep available a number of its authorized but unissued shares of Common Stock that shall be sufficient to permit the exercise of the Warrant in full.

9    <u>Certain Adjustments</u>. The Exercise Price and number of Warrant Shares or issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this <u>Section 9</u>.

(a)    <u>Stock Dividends and Splits</u>. If the Company, at any time while this Warrant is outstanding, (i) declares a stock dividend on its outstanding Common Stock or otherwise makes a distribution on any class of outstanding capital stock that is payable in shares of Common Stock, (ii) subdivides or reclassifies its outstanding shares of Common Stock into a larger number of shares of Common Stock, (iii) combines or reclassifies its outstanding shares of Common Stock into a smaller number of shares of Common Stock or (iv) issues by reclassification of shares of capital stock any additional shares of Common Stock of the Company, then in each such case the Exercise Price shall be adjusted to equal to (A) the Exercise Price in effect immediately prior to the occurrence of such event <u>multiplied by</u> (B) (1) the number of shares of Common Stock outstanding immediately before such event <u>divided by</u> (2) the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to <u>clause (i)</u> of this <u>Section 9(a)</u> shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution, <u>provided</u>, that if such record date shall have been fixed and such dividend is not fully paid on the date fixed therefor, the Exercise Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Exercise Price shall be adjusted pursuant to this paragraph as of the time of actual payment of such dividends. Any adjustment pursuant to <u>clauses (ii)</u> through <u>(iv)</u> of this <u>Section 9(a)</u> shall become effective immediately upon the effectiveness of such subdivision, combination or issuance.

(b)    <u>Pro Rata Distributions</u>. If, on or after the Original Issue Date, the Company shall declare or make any dividend or other pro rata distribution of its assets (or rights to acquire its

assets) (including by way of return of capital) to holders of shares of Common Stock (including any distribution of cash, stock or other securities, property, options, evidence of indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction, but, for the avoidance of doubt, excluding any distribution of shares of Common Stock subject to Section 9(a), any distribution of Purchase Rights subject to Section 9(c) and any Fundamental Transaction (as defined below) subject to Section 9(d)) (a "Distribution") then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant) immediately before the date on which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution.

(c)     Purchase Rights. If at any time on or after the Original Issue Date, the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property, in each case, pro rata to the record holders of any class of Common Stock (the "Purchase Rights"), then the Holder shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights that the Holder could have acquired if the Holder had held the number of Warrant Shares acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issuance or sale of such Purchase Rights. As used in this Section 9(c), (i) "Options" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities and (ii) "Convertible Securities" mean any capital stock, debt, securities or other contractual rights (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(d)     Fundamental Transactions. If, at any time while this Warrant is outstanding (i) the Company effects any merger or consolidation of the Company with or into another Person, in which the Company is not the surviving entity or the stockholders of the Company immediately prior to such merger or consolidation do not own, directly or indirectly, at least 50% of the voting power of the surviving entity immediately after such merger or consolidation, (ii) the Company effects any sale to another Person of all or substantially all of its assets in one or a series of related transactions, (iii) pursuant to any tender offer or exchange offer (whether by the Company or another Person), holders of capital stock who tender shares representing more than 50% of the voting power of the capital stock of the Company and the Company or such other Person, as applicable, accepts such tender for payment, (iv) the Company consummates a stock purchase agreement or other business combination (including a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than the 50% of the voting power of the capital stock of the Company (except for any such transaction in which the stockholders of the Company immediately prior to such transaction maintain, in substantially the same proportions, the voting power of such Person immediately after the transaction) or (v) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (other than as a result of a subdivision or

combination of shares of Common Stock covered by <u>Section 9(a)</u> above) (in any such case, a "<u>Fundamental Transaction</u>"), then following such Fundamental Transaction the Holder shall have the right to receive, upon exercise of this Warrant, the same amount and kind of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of the number of Warrant Shares then issuable upon exercise in full of this Warrant without regard to any limitations on exercise contained herein (the "<u>Alternate Consideration</u>"). If holders of shares of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction that is within the Company's control, including approval by its Board of Directors, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any exercise of this Warrant following such Fundamental Transaction. The Company shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "<u>Successor Entity</u>") to assume in writing all of the obligations of the Company under this Warrant in accordance with the provisions of this <u>Section 9(d)</u> pursuant to written agreements in form and substance reasonably satisfactory to the Holder (without unreasonable delay) prior to the consummation of such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant which is exercisable for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the Warrant Shares acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price that applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the Warrant Shares pursuant to such Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction), and that is reasonably satisfactory in form and substance to the Holder (without unreasonable delay, condition or withholding). Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the occurrence or consummation of such Fundamental Transaction, each and every provision of this Warrant referring to the "Company" shall refer instead to each of the Company and the Successor Entity or Successor Entities, jointly and severally), and the Successor Entity or Successor Entities, jointly and severally, may exercise every right and power of the Company prior thereto and the Successor Entity or Successor Entities shall assume all of the obligations of the Company prior thereto under this Warrant with the same effect as if the Company and such Successor Entity or Successor Entities, jointly and severally, had been named as the Company herein.

(e)    <u>Number of Warrant Shares</u>. Simultaneously with any adjustment to the Exercise Price pursuant to <u>Section 9(a)</u> (including any adjustment to the Exercise Price that would have been effected but for the final sentence of this <u>Section 9(e)</u>), the number of Warrant Shares that may be purchased upon exercise of this Warrant shall be increased or decreased proportionately, so that after such adjustment, the aggregate Exercise Price payable hereunder for the increased or decreased number of Warrant Shares shall be the same as the aggregate Exercise Price in effect immediately prior to such adjustment. Notwithstanding the foregoing, in no event may the Exercise Price be adjusted below the par value of the Common Stock then in effect.

8

(f)　　Calculations. All calculations under this Section 9 shall be made to the nearest one ten-hundredth of one cent or the nearest share, as applicable.

(g)　　Notice of Adjustments. Upon the occurrence of each adjustment pursuant to this Section 9, the Company at its expense shall, at the written request of the Holder, promptly compute such adjustment, in good faith, in accordance with the terms of this Warrant and prepare a certificate setting forth such adjustment, including a statement of the adjusted Exercise Price and adjusted number or type of Warrant Shares or other securities issuable upon exercise of this Warrant (as applicable), describing the transactions giving rise to such adjustments and showing in detail the facts upon which such adjustment is based. Upon written request, the Company shall promptly deliver a copy of each such certificate to the Holder and to the Company's transfer agent and the Warrant Agent.

(h)　　Notice of Corporate Events. If, while this Warrant is outstanding, the Company (i) declares a dividend or any other pro rata distribution of cash, securities or other property in respect of its Common Stock, including any granting of rights or warrants to subscribe for or purchase any capital stock of the Company or any subsidiary, (ii) authorizes or approves, enters into any agreement contemplating or solicits stockholder approval for any Fundamental Transaction or (iii) authorizes the voluntary dissolution, liquidation or winding up of the affairs of the Company, then the Company shall deliver to the Holder a notice of such transaction at least five Business Days prior to the applicable record or effective date on which a Person would need to hold Common Stock in order to participate in or vote with respect to such transaction; provided, that the failure to deliver such notice or any defect therein shall not affect the validity of the corporate action required to be described in such notice. In addition, if while this Warrant is outstanding, the Company authorizes or approves, enters into any agreement contemplating or solicits stockholder approval for any Fundamental Transaction contemplated by Section 9(d), other than a Fundamental Transaction under clause (iii) of Section 9(d), the Company shall deliver to the Holder a notice of such Fundamental Transaction at least 30 days prior to the date such Fundamental Transaction is consummated. Holder agrees to maintain any information disclosed pursuant to this Section 9(h) in confidence until such information is publicly available, and shall comply with applicable law with respect to trading in the Company's securities following receipt of any such information.

10　　Payment of Exercise Price. This Warrant may only be exercised in whole or in part either (i) by the payment to the Company of the Exercise Price in cash or (ii) on a cashless basis in a "cashless exercise", in which event the Company shall issue to the Holder the number of Warrant Shares in an exchange of securities effected pursuant to Section 3(a)(9) of the Securities Act, determined as follows:

$$X = Y \ [(A - B)/A]$$

where:

"X" equals the number of Warrant Shares to be issued to the Holder;

"Y" equals the total number of Warrant Shares with respect to which this Warrant is then being exercised;

"<u>A</u>" equals the VWAP of the shares of Common Stock as of the Trading Day immediately preceding the Exercise Date; and

"<u>B</u>" equals the Exercise Price then in effect for the applicable Warrant Shares as of the Exercise Date.

For purposes of Rule 144 promulgated under the Securities Act, it is intended, understood and acknowledged that the Warrant Shares issued in a "cashless exercise" transaction shall be deemed to have been acquired by the Holder, and the holding period for the Warrant Shares shall be deemed to have commenced, on the date this Warrant was originally issued.

11    <u>No Fractional Shares</u>. No fractional Warrant Shares shall be issued in connection with any exercise of this Warrant. In lieu of any fractional shares that would otherwise be issuable, the number of Warrant Shares to be issued shall be rounded down to the next whole number and the Company shall pay the Holder in cash the fair market value (based on the Closing Sale Price) for any such fractional shares; <u>provided</u>, the Company shall not be required to pay an amount for any fractional share less than $100.

12    <u>Notices</u>. Any and all notices or other communications or deliveries hereunder (including any Exercise Notice) shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via confirmed email at the email address specified below prior to 5:30 P.M., New York City time, on a Trading Day, (b) the next Trading Day after the date of transmission, if such notice or communication is delivered via confirmed email at the email address specified below on a day that is not a Trading Day or later than 5:30 P.M., New York City time, on any Trading Day, (c) the Trading Day following the date of mailing, if sent by nationally recognized overnight courier service specifying next Business Day deliver, or (d) upon actual receipt by the Person to whom such notice is required to be given, if by hand delivery.

If to the Company, to:

AST SpaceMobile, Inc.
Midland Intl. Air & Space Port
2901 Enterprise Lane
Midland, TX 79706
Attn:    Andrew M. Johnson
Email: andrew.johnson@ast-science.com

If to the Holder, at such address or other contact information delivered by the Holder to Company or as is on the books and records of the Company.

13    <u>Warrant Agent</u>. The Warrant Agent shall initially serve as warrant agent under this Warrant. Upon 10 days' notice to the Holder, the Company may appoint a new warrant agent. Any entity into which the Warrant Agent or any new warrant agent may be merged or any entity resulting from any consolidation to which the Warrant Agent or any new warrant agent shall be a party or any entity to which the Warrant Agent or any new warrant agent transfers substantially all of its corporate trust or stockholders services business shall be a successor warrant agent under this Warrant without any further act. Any such successor warrant agent shall promptly cause notice

10

of its succession as warrant agent to be mailed (by first class mail, postage prepaid) to the Holder at the Holder's last address as shown on the Warrant Register.

14      Cancellation. Upon the execution of binding agreements for an Alternative Commercial Transaction (as defined in that certain Restructuring Support Agreement, dated as of January 5, 2025, by and among Ligado Networks LLC, certain of its subsidiaries, the Consenting Stakeholders (as defined therein), and AST & Sciences, LLC), this Warrant, together with any rights, interests or obligations of the parties hereunder, shall become null and void and of no further force or effect (except for the terms of this Section 14 and Section 15), without liability of any party hereto to the other party, without any further action or consideration required by the parties hereto.

15      Miscellaneous

(a)      No Rights as a Stockholder. Except as otherwise set forth in this Warrant, the Holder, solely in such Person's capacity as a holder of this Warrant, shall not be entitled to vote or receive dividends or be deemed the holder of share capital of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, solely in such Person's capacity as the Holder of this Warrant, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, amalgamation, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise, prior to the issuance to the Holder of the Warrant Shares which such Person is then entitled to receive upon the due exercise of this Warrant. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

(b)      Authorized Shares.

(i)      Except and to the extent as waived or consented to by the Holder, the Company shall not by any action, including amending its certificate or articles of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment. Without limiting the generality of the foregoing, the Company shall (A) not increase the par value of any Warrant Shares above the amount payable therefor upon such exercise immediately prior to such increase in par value, (B) take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares upon the exercise of this Warrant and (C) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof as may be necessary to enable the Company to perform its obligations under this Warrant.

11

(ii)     Before taking any action that would result in an adjustment in the number of Warrant Shares for which this Warrant is exercisable or in the Exercise Price, the Company shall obtain all such authorizations or exemptions thereof, or consents thereto, as may be necessary from any public regulatory body or bodies having jurisdiction thereof.

(c)     Transfer Restrictions.  The Holder may not, directly or indirectly, (i) transfer, sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of this Warrant, in whole or in part, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any of this Warrant (each of the actions specified in clauses (i) and (ii), a "Transfer"); provided that the Holder may, on five Business Days' prior written notice to the Company, Transfer all or any portion of this Warrant to an Affiliate thereof. Any attempted Transfer in violation of the terms of this Section 15(c) shall be null and void *ab initio*.

(d)     Successors and Assigns. This Warrant may not be assigned by the Company without the written consent of the Holder except to a successor in the event of a Fundamental Transaction. This Warrant shall be binding on and inure to the benefit of the Company and the Holder and their respective successors and permitted assigns. Subject to the preceding sentence, nothing in this Warrant shall be construed to give to any Person other than the Company and the Holder any legal or equitable right, remedy or cause of action under this Warrant. This Warrant may be amended only in writing signed by the Company and the Holder, or their successors and permitted assigns.

(e)     Amendment and Waiver. The provisions of the Warrant may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Holder.

(f)     Acceptance; Acknowledgment. Receipt of this Warrant by the Holder shall constitute acceptance of and agreement to all of the terms and conditions contained herein. The Holder acknowledges that the Company may, to the extent required by applicable law, rule or regulation, publicly reference, or include as an exhibit a form of, this Warrant with the SEC in connection with a current or periodic report or a registration statement.

(g)     Governing Law; Jurisdiction. ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS WARRANT, AND ALL OTHER MATTERS RELATING HERETO, SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF. EACH OF THE COMPANY AND THE HOLDER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN (OR IF, BUT ONLY IF, THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK DECLINES TO ACCEPT JURISDICTION, THEN IN THE SUPREME COURT OF THE STATE OF NEW YORK, LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN) FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR WITH ANY TRANSACTION CONTEMPLATED HEREBY

OR DISCUSSED HEREIN, AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT IN ANY SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF ANY SUCH COURT. EACH OF THE COMPANY AND THE HOLDER HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO PROCESS BEING SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING BY MAILING A COPY THEREOF VIA REGISTERED OR CERTIFIED MAIL OR OVERNIGHT DELIVERY (WITH EVIDENCE OF DELIVERY) TO SUCH PERSON AT THE ADDRESS IN EFFECT FOR NOTICES TO IT AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE GOOD AND SUFFICIENT SERVICE OF PROCESS AND NOTICE THEREOF. NOTHING CONTAINED HEREIN SHALL BE DEEMED TO LIMIT IN ANY WAY ANY RIGHT TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW. EACH OF THE COMPANY AND THE HOLDER HEREBY WAIVES ALL RIGHTS TO A TRIAL BY JURY.

(h)     Counterparts. This Warrant may be executed in any number of original or facsimile counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

(i)     Headings. The section headings herein are for convenience only and are not part of this Warrant and shall not affect the interpretation thereof.

(j)     Severability. In case any one or more of the provisions of this Warrant shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Warrant shall not in any way be affected or impaired thereby, and the Company and the Holder shall attempt in good faith to agree upon a valid and enforceable provision which shall be a commercially reasonable substitute therefor, and upon so agreeing, shall incorporate such substitute provision in this Warrant.

(k)     Interpretation. When a reference is made in this Warrant to a Section, such reference shall be to a Section of this Warrant unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Warrant, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Warrant shall refer to this Warrant as a whole and not to any particular provision of this Warrant unless the context requires otherwise. The words "date hereof" when used in this Warrant shall refer to the date of this Warrant. The terms "or," "any" and "either" are not exclusive. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." All terms defined in this Warrant shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Warrant are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Unless otherwise specifically indicated, all references to "dollars" or "$" shall refer to, and all payments hereunder shall be made in, the lawful money of

13

the United States. References to a Person are also to its successors and permitted assigns. When calculating the period of time between which, within which or following which any act is to be done or step taken pursuant to this Warrant, the date that is the reference date in calculating such period shall be excluded (and, unless otherwise required by law, if the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

SCHEDULE 1

**FORM OF EXERCISE NOTICE**

[To be executed by the Holder to purchase shares of Common Stock under the Warrant]

AST SPACEMOBILE, INC.

Ladies and Gentlemen:

1.      The undersigned is the Holder of Warrant No. [●] (the "Warrant") issued by AST SpaceMobile, Inc., a Delaware corporation (the "Company"). Capitalized terms used herein and not otherwise defined herein have the respective meanings set forth in the Warrant.

2.      The undersigned hereby exercises its right to purchase [●] Warrant Shares pursuant to the Warrant.

3.      The Holder intends that payment of the Exercise Price shall be made as (check one):

☐ Cash Exercise

☐ "Cashless Exercise" pursuant to Section 10 of the Warrant

4.      If the Holder has elected a Cash Exercise, the Holder shall pay the sum of $[●] in immediately available funds to the Company in accordance with the terms of the Warrant.

5.      Pursuant to this Exercise Notice, the Company shall deliver to the Holder Warrant Shares determined in accordance with the terms of the Warrant.

6.      By its delivery of this Exercise Notice, the undersigned represents and warrants to the Company that it will not purchase or sell any securities, including the Warrant Shares, in violation of applicable securities laws.

Dated: _____

Name of Holder: _____

By:_____
Name:_____
Title:_____

(Signature must conform in all respects to name of Holder as specified on the face of the Warrant)

## SCHEDULE 2

## **ASSIGNMENT FORM**

*(To assign the foregoing Warrant, execute this form and supply required information. Do not use this form to purchase shares.)*

FOR VALUE RECEIVED, the foregoing Warrant and all rights evidenced thereby are hereby assigned to

      Name: _____

      Address: _____

      Phone Number: _____

      Email Address: _____

      Dated: _____

      Holder's Signature: _____

      Holder's Address: _____

**Exhibit F**
**Convertible Note Term Sheet**

*Final Form*

**TERM SHEET**

**DATED MARCH 22, 2025**



## AST SPACEMOBILE, INC.

### CONVERTIBLE SENIOR NOTES DUE 203[●][1]

*The information in this term sheet supplements the framework agreement dated as of March 22, 2025 by and among AST SpaceMobile, Inc., AST & Science, LLC, Spectrum USA I, LLC and Ligado Networks LLC (the "Framework Agreement"), and supersedes the information in the Framework Agreement to the extent inconsistent with the information in the Framework Agreement. In all other respects, this term sheet is qualified in its entirety by reference to the Framework Agreement. References to "we," "our" and "us" refer to AST SpaceMobile, Inc. and not to its consolidated subsidiaries. References to "Ligado" are to Ligado Networks LLC. References to "Existing Convertible Notes" are to AST SpaceMobile, Inc.'s 4.25% Convertible Senior Notes due 2032. All references to dollar amounts are references to U.S. dollars.*

| | |
|---|---|
| **Issuer:** | AST SpaceMobile, Inc. |
| **Ticker/Exchange for Our Class A Common Stock ("Class A common stock"):** | "ASTS" / The Nasdaq Global Select Market |
| **Securities:** | [●][2]% Convertible Senior Notes due 20[●][3] (the "notes") |
| **Principal Amount:** | Up to $200,000,000 as set forth in the form of note representing the notes (the "Note") pursuant to the Framework Agreement (or, if Ligado makes a "DTC Election" as set forth below, an indenture and form of note). |
| **Denominations:** | $1,000 and integral multiples of $1,000 in excess thereof |
| **Ranking:** | Senior unsecured |
| **Maturity:** | The seventh anniversary of the initial issue date of the notes, unless earlier converted, redeemed or repurchased |
| **DTC Eligibility:** | If Ligado so elects (any such election, a "DTC Election"), we will issue the Notes pursuant to an indenture that mirrors the indenture governing the Existing Convertible Notes except for the regular interest rate, initial conversion price/rate, make-whole changes and other changes to reflect these terms and the timing of the issuance of the Notes (the "New Notes Indenture"). We will also use commercially reasonable efforts to make the Notes eligible for clearance and settlement through The Depository Trust Company ("DTC eligible"). Ligado shall be responsible for the costs in making the Notes DTC eligible. In the event Ligado makes a DTC Election, references to the "Note" shall include the New Notes Indenture, as applicable. |
| **Redemption at Our Option:** | We may not redeem the notes prior to the fourth anniversary of the initial issue date of the notes (the "First Call Date"). We may redeem for cash all or any portion of the notes (subject to the limitation described in the next succeeding sentence), at our option, on or after the First Call Date if the "liquidity condition" |

---

[1] To be 7 years from the initial issue date of the notes.

[2] Interest rate to be set at pricing along with conversion rate on the basis of quotes from 3 top-tier investment banks. Coupon/premium to result in market instrument at the time of pricing/issuance.

[3] To be 7 years from the initial issue date of the notes.

a(as defined in the Note) is satisfied and the last reported sale price of our Class A common stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the notes to be redeemed, *plus* accrued and unpaid interest to, but excluding, the redemption date.

No "sinking fund" is provided for the notes, which means that we are not required to redeem or retire the notes periodically.

**Fundamental Change:** If we undergo a "fundamental change" (as defined in the Note[4]), then, subject to certain conditions and except as described in the Note, the holder of the Note may require us to repurchase for cash all or any portion of the Note in principal amounts of $1,000 or an integral multiple thereof. The fundamental change repurchase price will be equal to 100% of the principal amount of the notes to be repurchased, *plus* accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

**Interest:** Interest will accrue from the initial issue date of the Note and will be payable in cash semiannually in arrears. We will pay additional interest, if any, under the circumstances described in the Note related to a lack of free tradability of the notes.

**Issue Price:** Notes issued to Ligado shall be deemed to be issued at 100% of principal for purposes of the Framework Agreement.

**Conversion Premium:** Approximately [●]%[5] above the last reported sale price of our Class A common stock on The Nasdaq Global Select Market on the date of the purchase agreement for the notes (the "Agreement Date").

**Initial Conversion Rate:** To be a number of shares of our Class A common stock per $1,000 principal amount of the notes, subject to adjustment, based on the Conversion Premium.

**Initial Conversion Price:** A price per share of our Class A common stock equal to $1,000 divided by the Initial Conversion Rate, subject to adjustment.

**Settlement Method:** Shares of our Class A common stock, plus cash in lieu of any fractional share; *provided* that, if Ligado makes a DTC Election, we may settle conversions of Notes by paying or delivering, as the case may be, cash, shares of our Class A common stock, or a combination of cash and Class A common stock, at our election consistent with the Existing Convertible Notes.

**Anti-Dilution:** To mirror the provisions in the Existing Convertible Notes as adjusted for the settlement method. For the avoidance of doubt, will be consistent with Nasdaq guidelines for publicly marketed convertible notes registered under the Securities

---

[4] Definition to mirror "Fundamental Change" in Existing Convertible Notes.

[5] See footnote 2. Note: Premium necessary for make-whole/144A resale eligibility.

Act or sold to qualified institutional buyers pursuant to Rule 144A under the Securities Act.

**Covenants:**        Consistent with Existing Convertible Notes.

**Listing:**        None.

**Make-Whole Table:**        Standard make-whole table to be included in the Note, reflecting adjustments to the conversion rate for notes converted in connection with a "make-whole fundamental change" (as defined in the Note) or a notice of redemption based on the relevant stock price and effective date for such transaction[6]. The make-whole table will be based on typical inputs for such make-whole tables in publicly marketed convertible notes as of the Agreement Date.

**Events of Default:**        Events of default to be consistent with Existing Convertible Notes.

**Format:**        The notes will be offered and sold to Ligado in reliance on an exemption under Section 4(a)(2) from the registration requirements of the Securities Act.

**Documentation:**        Customary 4(a)(2) subscription agreement and Note to be negotiated with Ligado as soon as practicable once the decision to issue the notes pursuant to the Framework Agreement has been made.

**Marketing Cooperation:**        Management of AST SpaceMobile, Inc. will, as reasonably requested by Ligado, cooperate in any marketing effort in connection with the resale of the Notes by Ligado as soon as practicable following the initial settlement, including by participating in a customary number of calls with potential investors. AST SpaceMobile, Inc. will pay to Ligado, within thirty (30) days of Ligado's written request, an amount equal to (A) all reasonable and documented fees and expenses incurred by Ligado in connection with its efforts to monetize the Notes plus (B) (i) the aggregate principal amount of the Note minus (ii) the amount of gross proceeds (before expenses) actually received by Ligado in connection with its monetization of the Note; provided, further, that Ligado shall consult with and consider in good faith any comments from AST SpaceMobile, Inc. regarding, and use reasonable best efforts to maximize the net proceeds received from, the monetization of the Notes.[7]

---

[6] Make-whole provisions to mirror those in the Existing Convertible Notes.

[7] Note to Draft: Conformed to Framework Agreement – to be updated as appropriate.

*Final Form*

_____

This communication is intended for the sole use of the person to whom it is provided by the sender. This material is confidential and is for your information only and is not intended to be used by anyone other than you. This information does not purport to be a complete description of the notes or the offering thereof. This communication does not constitute an offer to sell or the solicitation of an offer to buy any notes in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction.

The notes and any shares of Class A common stock issuable upon conversion of the notes have not been and will not be registered under the Securities Act, or any other securities laws, and may not be offered or sold within the United States or any other jurisdiction, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any other applicable securities laws.