# EXHIBIT K

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC, *et. al.*[1] | Case No. 25-10006-TMH |
| Debtors. | Jointly Administered |

### INMARSAT GLOBAL LIMITED'S MOTION TO COMPEL
### LIGADO NETWORKS LLC AND LIGADO NETWORKS (CANADA)'S
### COMPLIANCE WITH 11 U.S.C. §§ 365(d)(5) AND 503(b)

Inmarsat Global Limited ("Inmarsat") hereby files this motion (the "Motion") pursuant to sections 365(d)(5) and 503(b) of the Bankruptcy Code for entry of an order (i) compelling debtors Ligado Networks LLC and Ligado Networks (Canada) Inc. (collectively, "Ligado") to pay to Inmarsat all amounts arising on and after March 7, 2025 under the Amended and Restated Cooperation Agreement, dated August 6, 2010 (as amended, the "Cooperation Agreement"), as and when such payments come due, or, in the alternative, (ii) compelling such payments as and when they come due as administrative expenses in the same amount. In support of this Motion, Inmarsat respectfully states as follows:[2]

### I.        PRELIMINARY STATEMENT

1.        Inmarsat's provision of significant, unique, and valuable spectrum usage rights to Ligado, memorialized in a Cooperation Agreement dating back nearly two decades and blessed by governmental entities in multiple countries, is the cornerstone of Ligado's contemplated

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

[2]    All emphasis herein is added, unless otherwise indicated.

reorganization.  Inmarsat has worked constructively with Ligado during that time to allow Ligado to launch its business.   This includes entering into more than twenty amendments to the Cooperation Agreement allowing Ligado to defer hundreds of millions of dollars of payment owed to Inmarsat, while Inmarsat continues to provide Ligado with spectrum usage rights.   Indeed, Inmarsat is currently owed more than $500 million in prepetition amounts.  Ligado will have to cure its payment defaults by paying those amounts in connection with its contemplated assumption of the Cooperation Agreement.  But that is an issue for another day and one in respect of which Inmarsat reserves all rights.  For now, Ligado must comply with the Bankruptcy Code's mandate that it timely perform its postpetition obligations to Inmarsat under the Cooperation Agreement— namely, Ligado must make its quarterly payments to Inmarsat beginning on March 31, 2025.

2. Bankruptcy Code section 365(d)(5) requires a debtor to timely perform all of its obligations under a lease of personal property that arise from or after 60 days following the petition date, regardless of whether such amounts would or would not qualify for administrative expense treatment.  Ligado itself has repeatedly characterized the Cooperation Agreement as a lease and the spectrum usage rights thereunder as valuable personal property.   Thus, as Congress has mandated, Ligado must make "timely and complete" payment of all postpetition quarterly payments coming due under the Cooperation Agreement.

3. Moreover, although unnecessary, the postpetition payments under the Cooperation Agreement are actual and necessary costs of preserving Ligado's estate.  Thus, in addition to being required under section 365(d)(5), the postpetition payments are also "administrative expenses" that are entitled to priority under Bankruptcy Code section 503(b)(1).  They should be promptly paid. Indeed, Ligado's continued use of the Cooperation Agreement spectrum is essential—and in fact a condition—to the proposed restructuring on which Ligado has staked its future.  Ligado's

monetization of spectrum usage rights under the Cooperation Agreement to anchor its restructuring is a quintessential benefit to the estate (and a corresponding detriment to Inmarsat, which cannot use those spectrum rights and remains unpaid on hundreds of millions of dollars). And, Ligado is actively using its spectrum usage rights, including those it received under the Cooperation Agreement, as the foundation of its takings litigation against the United States Government, and to justify its asserted $39 billion in damages. There can thus be no doubt that the spectrum usage rights under the Cooperation Agreement are beneficial to the estate and must be paid as administrative expenses.

4.      Ligado should have no issue with the relief requested herein. As noted, Ligado contemplates assumption of the Cooperation Agreement and thus would have to cure all amounts outstanding in any event. Moreover, Congress here has come down on the side of equity. Inmarsat is owed approximately $500 million under the Cooperation Agreement, has not been paid quarterly payments for years, and should not be forced to allow Ligado to continuing using Inmarsat's valuable spectrum rights for no compensation while waiting for Ligado's formal assumption determination. The relief should be granted.

## II.      **JURISDICTION AND VENUE**

5.      This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference, dated February 29, 2012.

6.      This is a core proceeding under 28 U.S.C. § 157(b). Inmarsat confirms its consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are sections 365(d)(5) and 503(b)(1) of the Bankruptcy Code.

### III.      RELIEF REQUESTED

9.      By this Motion, Inmarsat requests that the Court enter an order pursuant to Bankruptcy Code section 365(d)(5), substantially in the form attached hereto as Exhibit A, compelling Ligado to immediately pay Inmarsat all amounts arising on or after March 7, 2025, under the Cooperation Agreement as and when such payments come due, or, in the alternative, compelling such payments in the same amounts as and when they come due as administrative expenses pursuant to Bankruptcy Code section 503(b)(1).

### IV.      RELEVANT FACTUAL BACKGROUND

#### A.      The Cooperation Agreement

10.      In the early 2000s, a Ligado predecessor, SkyTerra (which, at the time, was a publicly traded company) planned to integrate its traditional mobile satellite services with a land-based network of "cellular towers" to create a nationwide, next-generation "ATC" communications network. SkyTerra's ATC network was supposed to compete with incumbent cellular companies like AT&T and Verizon, who have paid tens of billions of dollars to acquire their spectrum.

11.      SkyTerra's plans required it to have access to large, contiguous blocks of L-band spectrum—spectrum it did not have.[3]   Inmarsat had rights to use spectrum between 1525-1559

---

[3]      As Ligado has described, "spectrum' is a range of electromagnetic frequencies by which satellite signals travel.  Complaint ¶ 26, *Ligado v. Inmarsat*, Adv. Pro. 25-5000 (Bankr. D. Del. Jan. 9, 2025). [D.I. 3] (the "Ligado Adv. Compl.").  Slices of spectrum are commonly grouped together in "bands," based on their characteristics and suitable uses (*e.g.*, for television signals, radio broadcasting, voice, data, etc.).  *Id*. ¶¶ 26-27.  The L-band is a unique portion of spectrum with very desirable characteristics.  *See* Jan. 7, 2025 H'rg Tr. at 20:17-21:4, attached to the *Declaration of Benjamin I. Finestone in Support of Inmarsat Global Limited's Motion to Compel Ligado Networks LLC and Ligado Networks*

MHz and 1626.5-1660.5 MHz ("MSS L-band"). Accordingly, SkyTerra (and certain affiliates) and Inmarsat entered into the Cooperation Agreement, dated December 20, 2007 ("Original Cooperation Agreement").[4] The Original Cooperation Agreement was submitted to the FCC, the United Kingdom's Ofcom, and Canada's Innovation, Science and Economic ("ISED"), which ratified the initial provision of spectrum to Ligado.[5]

12.     The Original Cooperation Agreement contemplated that Inmarsat would make available substantial, contiguous blocks of L-band spectrum to SkyTerra. The spectrum would be provided to SkyTerra in two phases, and, in the second phase, SkyTerra would be required to pay Inmarsat $115 million per year (increasing 3% annually) pursuant to the spectrum option elected by Ligado, through the year 2107. *Id.* § 4.5(a). The Cooperation Agreement also fulfilled the parties' respective regulatory obligations to coordinate their satellite systems and their respective usage of the L-band spectrum with each other.[6]

13.     In March 2010, SkyTerra was taken private and renamed "LightSquared." *See Skyterra Commc'ns, Inc.*, 25 FCC Rcd. 3059 (2010) (Ex. 2);[7] Press Release, LightSquared, Introducing LightSquared, Revolutionizing the U.S. Wireless Industry (July 20, 2010) (Ex. 3).

14.     In August 2010, three LightSquared entities and Inmarsat entered into an Amended and Restated Cooperation Agreement. Ex. 4 ("Cooperation Agreement"). The basic structure of

---

*(Canada)'s Compliance with 11 U.S.C. §§ 365(d)(5) and 503(b)*, filed contemporaneously with this Motion (the "Finestone Declaration"), as Exhibit 34.

[4]     The Original Cooperation Agreement is attached to the Finestone Declaration as Exhibit 1.

[5]     National governments generally regulate and allocate spectrum. In the United States, the FCC has "authority to allocate electromagnetic spectrum." 47 U.S.C. § 303(y). Ligado satellites are licensed by the FCC and ISED, and cover North America and Central America. Inmarsat satellites are licensed by the United Kingdom and operate on a global basis.

[6]     *See* Ex. 1 (Original Cooperation Agreement), § 3.1.

[7]     Unless otherwise noted herein, all exhibit references are to those attached to the Finestone Declaration.

the agreement was unchanged from the original, although the phasing and other aspects of the various spectrum plans were modified.  The Cooperation Agreement as amended still called for annual payments to Inmarsat of $115 million (increasing 3% annually) through the end of the term in 2107 if LightSquared opted for the "30 MHz" spectrum plan, with different annual payments if Inmarsat provided less (or more) spectrum.  *Id.* § 4.5(a).

### B.   GPS Challenges Lead to LightSquared's Bankruptcy

15.   In January 2011, the FCC authorized LightSquared to move forward with ATC.  But its approval was conditioned on LightSquared working with the Global Positioning System (GPS) community to resolve concerns that the planned ATC network presented an interference risk to certain GPS operators.  *See LightSquared Subsidiary LLC*, 26 FCC Rcd. 566 (2011) (Ex. 5).

16.   In December 2011, Congress passed a law prohibiting the FCC from using funds "to remove the conditions imposed on" LightSquared, "or otherwise permit [LightSquared's] operations, until the Commission has resolved concerns of potential widespread harmful interference by such commercial terrestrial operations to commercially available Global Positioning System devices."  *See* Defense Authorization Act for Fiscal Year 2012, Pub. L. 112-81, § 911(a)(1); 125 Stat. 1298, 1534 (Dec. 31, 2011).  Thus, LightSquared's GPS woes continued and ultimately led LightSquared to file for bankruptcy protection in May 2012.  *See In re LightSquared Inc.*, No. 12-12080-scc (Bankr.  S.D.N.Y.); *see also* Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC in Support of Chapter 11 Petitions and First Day Pleadings filed January 6, 2025 [D.I. 2] (the "Smith Decl.") ¶ 92.[8]

---

[8]   Shortly before the bankruptcy, Inmarsat agreed to various payment deferrals in return for Inmarsat's right to use the majority of the spectrum longer than otherwise anticipated in the Cooperation Agreement. *See* Cooperation Agreement, Amendment No. 2 (April 18, 2012) (Ex. 6).

C. **LightSquared Emerges As Ligado And Seeks Inmarsat's Forbearance To Pursue FCC Approvals**

17.     In March 2015, the bankruptcy court confirmed LightSquared's plan of reorganization, and the reorganized company emerged from bankruptcy re-named as "Ligado" under the control of its three major backers: Fortress Investment Group, LLC, Centerbridge Partners LP, and JPMorgan Chase & Co.[9]  The Cooperation Agreement was among the contracts the reorganized company assumed.[10]

18.     In December 2015, Ligado applied to the FCC to amend the conditions on its ATC license in ways that it believed would satisfy the GPS industry and allow it to operate commercially.  *See LightSquared Tech. Working Grp. Rep. LightSquared Licenses Modification Application*, 35 FCC Rcd. 3772 ¶ 9 (2020). (Ex. 9).

19.     Recognizing that FCC approval of its new proposal would likely take several years, Ligado sought from Inmarsat deferral of portions of payments due under the Cooperation Agreement to Inmarsat in 2016-18, and all of its payment obligations in 2019.  Inmarsat agreed to the deferrals in return for Ligado's agreement that Inmarsat would have the right to continue to use the majority of the L-band spectrum otherwise provided to Ligado.  *See* Cooperation Agreement Amendment No. 3 (May 4, 2016) (Ex. 10).

20.     Four years passed while the FCC considered Ligado's proposal to deploy an ATC network in coexistence with the GPS industry.  In the meantime, Ligado was not authorized to operate its ATC business, and owed significant sums to Inmarsat.

---

[9]     *See* Order Confirming Modified Second Amended Joint Plan, *In re LightSquared Inc.*, No. 12-12080-scc (Bankr. S.D.N.Y. Mar. 27, 2015), ECF No. 2276 (Ex. 7).

[10]    *See* Revised Schedule of Assumed Agreements at Ex. A-1, at 13, *In re LightSquared Inc.*, No. 12-12080-scc (Bankr. S.D.N.Y. Dec. 7, 2015), ECF No. 2433 (Ex. 8).

21.     In April 2020, the FCC granted Ligado's license application, albeit with more stringent conditions to mitigate the risk of interference to GPS (including tighter power limitations) than Ligado had proposed in 2015.  *See LightSquared Tech. Working Grp. Rep. LightSquared Licenses Modification Application*, 35 FCC Rcd. 3772 ¶¶ 9-18 (2020). (Ex. 9).

22.     Inmarsat and Ligado signed Amendment No. 5 to the Cooperation Agreement in June 2020, restructuring Ligado's payment obligations yet again.  *See* Cooperation Agreement, Amendment No. 5 (June 2, 2020) (Ex. 11).  Ligado offered and agreed to make an upfront payment in order to reduce its annual payment obligations by 60%.  *Id*. §§ 1.13, 1.22, 2, 6.  In addition, Inmarsat agreed to yet a further deferral of other outstanding amounts that Ligado owed to Inmarsat, dating back to 2016.  *Id*. § 4.  Various accruing amounts would combine into a payment of $395,775,143, due January 1, 2023.  *Id*. § 5.  After that payment was made, starting in March 2023, Ligado would then pay a reduced quarterly amount of approximately $15 million for its use of Inmarsat's spectrum (the "Quarterly Payments").  The amount of the Quarterly Payments increases 3% per year until Inmarsat's spectrum is returned in 2107.  *Id*. § 6.

23.     Under Amendment No. 5, the spectrum plan that Ligado had elected (the "30 MHz Up-Shift Spectrum Plan") was to be implemented on December 31, 2021, and Inmarsat would provide Ligado a majority of the spectrum for the expected launch of Ligado's ATC network.  *Id*.

**D.      Inmarsat Provides Substantial Spectrum To Ligado, But Ligado Fails To Launch Its Network**

24.     Complying with its contractual obligations, Inmarsat implemented the 30 MHz Up-Shift Spectrum Plan in the fourth quarter of 2021 by providing Ligado with the bulk of the L-band spectrum in North America.  Inmarsat offered Ligado the option of delaying implementation of that spectrum plan to allow Ligado to further defer its payments—Ligado declined.

25.     Despite receiving FCC approval and significant amounts of new funding,[11] Ligado still failed to launch its business.  In late 2022, Ligado told Inmarsat that it was not going to make the approximately $395 million payment due in January 2023, forcing Inmarsat to file a lawsuit for anticipatory breach in December 2022.  *See* Complaint, *Inmarsat Global Limited v. Ligado Networks LLC*, No. 654860/2022 (N.Y. Sup. Ct. Dec. 15, 2022), NYSCECF Doc. 1 (Ex. 14).

26.     Inmarsat and Ligado resolved the case without prejudice.  As part of the resolution, Inmarsat shifted the deadline for payment of the outstanding amounts to April 2023 to allow Ligado breathing room to refinance its business.  *See* Cooperation Agreement, Amendment No. 7 (Dec. 23, 2022) (Ex. 17).  This would be the first in a series of *fourteen* Cooperation Agreement amendments since the December 2022 lawsuit, in each case deferring the $395 million payment Ligado owed, along with certain accruing quarterly payments and interest.  *See* Cooperation Agreement, Amendment Nos. 8-21 (Exs. 18-31).  Ligado made down payments of $30 million in December 2022 and April 2023, but has not paid Inmarsat anything since.  Ligado's current prepetition obligation to Inmarsat under the Cooperation Agreement is approximately $525 million.

## E.     Ligado Sues The U.S. Government For Unlawfully Taking Its Spectrum

27.     On October 12, 2023, Ligado filed a complaint in the United States Court of Federal Claims alleging that the federal government "engaged in an unlawful scheme to take tens of billions of dollars of property, in the form of spectrum rights, belonging to [Ligado]."  *See*

---

[11]     *See* Press Release, Ligado, Ligado Raises Over $100 Million to Build Mission-Critical 5G Networks (May, 28, 2020) (Ex. 12); Press Release, Ligado, Ligado Secures Significant New Capital to Advance 5G Plans and Enhance Next-Generation Connectivity for U.S. Infrastructure (Oct. 23, 2020) (Ex. 13); Smith Decl. ¶¶ 116-19.

Complaint ¶ 1, *Ligado Networks LLC v. United States*, No. 23-1797-L (Fed. Ct. Cl. Oct. 12, 2023),

ECF No. 1 (Ex. 32) (the "Takings Complaint" or "Takings Compl.").

28.    Citing an unnamed whistleblower, the Takings Complaint alleges that the U.S.

Department of Defense ("**DOD**") has secretly been using the L-band spectrum for a classified

national security program, and that DOD has advanced "fabricated arguments" about GPS

interference to prevent Ligado's ATC network from getting off the ground and disrupting DOD's

secret program. *Id*. ¶ 2.

29.    In the Takings Complaint, Ligado alleges that in this scheme, the government

carried out a "taking of Ligado's ***exclusive property* [*the spectrum rights*]** without paying just

compensation to Ligado," and this property was taken "both physically and regulatorily."  *Id.* ¶ 9,

¶ 9 n.43; *see also id.* ¶ 133.  Ligado further alleges that the DOD has "deprived Ligado of property

rights—including the right to use or lease to others the spectrum . . . and the right to exclude others

from using the spectrum."  *Id.* ¶ 129.

30.    The Takings Complaint describes the case as involving the "largest uncompensated

taking of private property by our nation's government in modern times," and claims that the

spectrum rights the government has "destroyed" are "worth as much as $39 billion." *Id.* ¶¶ 1, 121.

On November 18, 2024, the Court of Federal Claims largely denied the Government's motion to

dismiss, including holding that Ligado's FCC license (spectrum rights) was a property interest vis-

à-vis DOD,[12] thus rejecting the Government's argument that there was no property interest

involved.  *See* Opinion and Order at 9, *Ligado Networks LLC v. United States*, No. 23-1797L (Fed.

Ct. Cl. Nov. 18, 2024), ECF No. 31 (Ex. 33).

---

[12]    The Court of Federal Claims distinguished *Mobile Relay Assocs. v. F.C.C.*, 457 F. 3d 1, 12 (D.C. Cir. 2006), noting that an FCC licensee might not have a property interest with respect to regulatory actions of the FCC, *id.* at 5 n.3, 8-9.

31.      As described, a substantial portion of Ligado's spectrum rights are those that it received from Inmarsat under the Cooperation Agreement.  Indeed, Ligado's stakeholders have told Inmarsat that Ligado must retain its rights over the bulk of the L-band spectrum to maximize its negotiation and litigation position against the U.S. government.  Ligado is apparently concerned that if it loses its rights to Inmarsat's spectrum under the Cooperation Agreement (*i.e.*, loses its claim to a significant portion of the property at issue in the takings case), its takings claim (or its damages) based on those property rights will be severely compromised.

**F.      With A More Than $500 Million Payment Deadline Looming, Ligado Files For Bankruptcy**

32.      The most recent Cooperation Agreement amendment—Amendment No. 21—was entered into on December 26, 2024, and called for Ligado to pay Inmarsat $524,929,337.40 by January 10, 2025.  *See* Cooperation Agreement Amendment No. 21, Recital U, §§ 1.2-1.3 (Ex. 31).  This figure represents a combination of the long-running $395 million obligation originally set forth in Amendment No. 5, minus $60 million in payments from Ligado in early 2023, plus various Quarterly Payment obligations accruing since January 2023 and interest.  *Id*.

33.      Ligado filed the bankruptcy petition in this case on January 5, 2025.  D.I. 1.  The Petition discloses that Ligado is controlled by a group of large hedge funds: Fortress, Cerberus, Great Elm Capital, and Harbinger Capital Partners.  *Id.* at Ex. A.

34.      Ligado's filings make clear that it intends to reorganize around the uninterrupted benefits of the Cooperation Agreement (including positioning itself in the takings litigation).  Indeed, the centerpiece of Ligado's restructuring plan is a commercial agreement with AST & Science, LLC ("AST") reflected in a binding term sheet.  *See* Smith Decl. at Ex. B, Ex. B(the "AST Term Sheet").  It purports to give to AST Ligado's spectrum usage rights under the

Cooperation Agreement, through the term of the Cooperation Agreement ending in 2107, in exchange for certain cash payments and revenue sharing for Ligado's benefit. *Id.*

35.     Ligado's secured lenders have entered into a "Restructuring Support Agreement," (*see* Smith Decl. at Ex. B (the "RSA")), which sets forth various "Milestones" mapping out how the secured lenders expect the bankruptcy to proceed:

- a definitive agreement with AST would be executed within 75 days of the petition;

- Ligado would issue a disclosure statement 35 days after that (*i.e.*, 110 days from the petition); and

- Ligado would have its plan confirmed within 35 days after the disclosure statement is approved (*i.e.*, 145 days from the petition).

*See* RSA § 4.04; *see also* Hg. Tr., Jan. 7, 2025, at 32.

36.     Notably, the final milestone, a Plan Effective Date, is ***40 months*** from the petition, or May 2028—which can be extended even further if sufficient stakeholders consent. *See* RSA § 4.04(p). Counsel for Ligado told the Court that the extended timeframe was necessary because of "regulatory preconditions" to the effective date. Hg. Tr., Jan. 7, 2025, at 32; *see* RSA, Ex. A at 10 (requiring all necessary government approvals or consents by the Plan Effective Date).

37.     Nowhere in the RSA or Ligado's other filings is there a timetable explaining when Inmarsat is to be paid the overdue amounts under the Cooperation Agreement or the postpetition Quarterly Payments coming due. Nor is there anything indicating where Ligado will get the money to pay Inmarsat the hundreds of millions of dollars it owes. This is all despite the fact that Ligado's spectrum rights under the Cooperation Agreements are *the* essential component of Ligado's bankruptcy case, takings litigation, and proposed restructuring.[13]

---

[13]     The AST Term sheet has two vague references to paying Inmarsat that do not provide any comfort that payment is contemplated or that the funds have been raised. One provision refers to AST making an

38.     The first postpetition Quarterly Payment is due on March 31, 2025.  *See* Ex. 31 §

1.4 (Amendment No. 21); Ex. 11 §§ 1.22, 3 (Amendment No. 5).  When asked to confirm that the

Debtors would timely make the postpetition Quarterly Payments to Inmarsat, the Debtors stated

that those payments are not in the DIP budget.  *See*, *e.g.*, D.I. 4, Proposed Order Ex. 2 (Initial DIP

Budget).

## V.     ARGUMENT

### A.     Ligado Is Required Under Bankruptcy Code Section 365(d)(5) To Timely Make Its Quarterly Payments Under The Cooperation Agreement Arising From And After March 7

39.     Bankruptcy Code section 365(d)(5) requires Ligado to "timely perform all of the

obligations" arising from or after 60 days after the petition date under a lease of personal property

until such lease is assumed or rejected.  *See* 11 U.S.C. § 365(d)(5).  Bankruptcy Code section

365(d)(5) provides in pertinent part:

> The trustee shall timely perform all of the obligations of the debtor . . . first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property . . . , until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof . . . .

11 U.S.C. § 365(d)(5).

---

annual $80 million "usage rights" payment to Ligado to "cover 100% of amounts due from Ligado to utilize the L-band Spectrum," but those payments would only start on the "effective date" of the definitive agreements, which is undefined, but presumably after obtaining the necessary regulatory approvals that could be three or more years away.  *See* AST Term Sheet at 2.  The second provision states, in essence, that if the Court requires payments relating to the Cooperation Agreement, Ligado and AST will work together to find funding for it: "If . . . a payment to [Inmarsat] related to usage rights under the Cooperation Agreement is required by the Ch. 11 Process, Ligado and AST shall work together to use their best commercial efforts to obtain a backstop commitment for such obligations . . . ." *Id*. at 4.  By including this provision, Ligado and AST recognize that they may not be able to avoid paying Inmarsat in this proceeding.

40.     Ligado itself has repeatedly characterized its spectrum usage rights as valuable property and characterized the Cooperation Agreement as a lease of such property.  Indeed, it has done so here, in the takings litigation, and in its prior bankruptcy.  Thus, Ligado must perform all of its obligations under the Cooperation Agreement, including payment of quarterly fees, arising on or after March 7, 2025 (*i.e.*, 60 days after the Petition Date).

> **1.     Ligado Itself Characterizes The Spectrum As Personal Property, And The Cooperation Agreement As A Lease Of That Property**

41.     Under Ligado's own characterizations, the Cooperation Agreement is subject to the requirements of section 365(d)(5).

42.     As described above, the Cooperation Agreement provides to Ligado spectrum usage rights in the L-Band spectrum that Inmarsat has pursuant to its authorizations from the United Kingdom.  *See supra* ¶¶ 12, 14, 24; *see also* Ligado Adv. Compl. ¶ 60 (alleging that under the Cooperation Agreement, "Inmarsat would then provide certain spectrum in the contiguous blocks to Ligado for Ligado to use in North America").  In this bankruptcy case Ligado has asserted under oath that the Cooperation Agreement is a "lease" and that its outstanding balance owed thereunder is the "future lease balance."  *See* Smith Decl. ¶ 115.  Moreover, in its DIP Loan Agreement, Ligado  defined "Material Lease" to expressly include the Cooperation Agreement. *See* D.I. 4, Ex. 1 § 1.01, at pp. 28 & 32 (defining "Material Lease" to include the "Inmarsat Agreement" and defining the "Inmarsat Agreement" as the Cooperation Agreement).  Similarly, Ligado, in its prior bankruptcy case (when Ligado was known as LightSquared), characterized the Cooperation Agreement as a "spectrum lease" and the "Inmarsat Lease," and referred to the obligations thereunder as the "Inmarsat lease obligations."[14]

---

[14]     *See* Notice of Filing of Clean and Blackline Versions of First Amended General Disclosure Statement, Exhibit C at 10, No. 12-12080-scc (Bankr. S.D.N.Y. Oct. 7, 2013), ECF No. 918; Declaration of

43.     Ligado's characterizations of the Cooperation Agreement as a lease are apt.  A personal property lease is a "contract by which the rightful possessor of personal property conveys the right to use that property in exchange for consideration."  *Lease*, BLACK'S LAW DICTIONARY (12th ed. 2024); *In re CNB Int'l, Inc.*, 307 B.R. 363, 369 (Bankr. W.D.N.Y. 2004) ("[T]he essential concept of lease requires a transfer of some right to use."); *cf.* N.Y. U.C.C. Law § 2-A-103 (defining "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration . . . .").

44.     Ligado successfully defeated a motion to dismiss in its takings litigation against the United States Government by asserting that spectrum usage rights are valuable property rights.  *See supra* ¶¶ 27-31.  Other courts are in accord.  *See Alpine PCS, Inc. v. United States*, 128 Fed. Cl. 303, 309 (2016), *aff'd on other grounds*, 878 F.3d 1086 (Fed. Cir. 2018) (holding that Alpine's licenses "to use particular wireless spectrums for a period of ten years" were "property interest[s]" that could be the subject of a takings claim).

45.     Ligado cannot turn around in this Court and contradict its own successful arguments in the takings litigation as to the same spectrum usage rights granted to Ligado under the Cooperation Agreement.  Nor has Ligado tried to do so.  Rather, Ligado told this Court during the first day hearing that its spectrum rights under the Cooperation Agreement are essentially "premier beachfront property."  *See* Jan. 7, 2025 H'rg Tr. at 21:2.  Of course, unlike actual

---

Matthew S. Barr In Connection With LightSquared's (I) Memorandum of Law in Support of Confirmation of Second Amended Plan Pursuant to Chapter 11 of Bankruptcy Code and (II) Omnibus Response to Objections to (A) Confirmation of Plan, (B) Alternative Transaction Fee Motion, and (C) DIP Motion, Exhibit A at 7-9, Exhibit G at Exhibit 1A, Exhibit O at 19, 31, 32, 34, 44-46, 58, No. 12-12080-scc (Bankr. S.D.N.Y. March 5, 2015), ECF No. 2185.

beachfront property, spectrum rights do not constitute real property,[15] and thus they are personal property subject to Bankruptcy Code section 365(d)(5).[16]

> ### 2. Inmarsat Need Not Establish Any Other Fact Or Circumstance To Trigger Ligado's Requisite Compliance With Section 365(d)(5)

46. Because, consistent with Ligado's own assertions, the Cooperation Agreement is subject to section 365(d)(5), Ligado must make "timely and complete payment" of all amounts coming due after the statutory 60-day grace period. *See In re Avianca Holdings S.A.*, 2023 WL 9016495, at *4 (S.D.N.Y. Dec. 23, 2023) (finding that debtors' obligation to make additional lease payments "arose" upon their respective incremental due dates—not at the time of the signing of the underlying agreement—for the purposes of section 365(d)(5) and, as such "those [payments] merit timely and complete payment").

47. Moreover, unlike Bankruptcy Code section 503(b), which places the burden on the claimant to establish that the expense to the estate was "actual and necessary," the "burden of going forward shifts to the Debtor-in-possession" under section 365(d)(5), and the lessor of personal property need not establish that the costs were "actual and necessary expenses of preserving the estate." *In re Wyo. Sand & Stone Co.*, 393 B.R. 359, 361 (Bankr. M.D. Pa. 2008); *see also In re Midway Airlines*, 406 F.3d 229, 237 (4th Cir. 2005) ("[W]hen a lessor seeks an administrative expense for 'all of the obligations' due under a lease, the 'notwithstanding § 503(b)(1)' proviso . . . relieves the lessor from proceeding under § 503(b)(1)(A), which would

---

[15] *See Real Property*, Black's Law Dictionary (12th ed. 2024) ("Land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land.").

[16] There are two types of property—real and personal—and thus property that is not real property is personal property. *See, e.g., In re Paulson*, 276 F.3d 389, 393 (8th Cir. 2002) ("Property is either real property or personal property . . . ."); *Starke v. Goodwin Est. Ass'n, Inc.*, 249 A.3d 72, 76 (Conn. App. Ct. 2021) ("Property is divided into two great divisions, things personal and things real . . . ."); 73 C.J.S. Property § 17 ("In modern usage, all property is divided into two classes, real and personal . . . .").

limit the recovery to an amount representing only the actual and necessary use by the estate.").

48.     Similarly, a "[b]enefit to the estate is not an issue under § 365(d)(5), and, in the absence of an intervening action by the Debtor [*i.e.*, assumption or rejection], the obligation to perform under the lease remains." *Wyo. Sand & Stone*, 393 B.R. at 361; *see also In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 472 (D. Del. 2006) ("Unlike parties claiming administrative expense status under section 503(b), [creditors] claiming under section [365(d)(5)] need not prove they conferred any benefit upon the estate."); *In re Lakeshore Const. Co. of Wolfeboro, Inc.*, 390 B.R. 751, 756 (Bankr. D.N.H. 2008) ("[P]ersonal property lessors may assert administrative claims under § 365(d)(5) based upon the terms of the lease and not the benefit to the bankruptcy estate.").

49.     Accordingly, although Ligado is in fact using the spectrum usage rights under the Cooperation Agreement as the centerpiece of its restructuring and thus benefitting from them, *see infra* V.B, Inmarsat need not make such a showing under section 365(d)(5). Indeed, "Congress . . . intended Section 365(d) to prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-à-vis the estate," and "[s]ection 365(d)(5)'s unequivocal language . . . was supposed to encourage debtors to make up their mind to reject a lease before some onerous payment comes due during the prerejection period." *In re Avianca Holdings S.A.*, 2023 WL 9016495, at *7 (S.D.N.Y. Dec. 29, 2023), *aff'd* 2025 WL 364632 (2d Cir. Feb. 3, 2025). Ligado must therefore make timely and complete payment of the Quarterly Payments beginning with the payment due under the Cooperation Agreement on March 31, 2025, and any future Quarterly Payments until Ligado assumes or rejects the Cooperation Agreement, just as Congress intended.

**B.** **In The Alternative, Inmarsat Is Entitled To Payment Of The Postpetition Quarterly Payments As An Administrative Claim Under Bankruptcy Code Section 503(b)(1)**

50.     In the alternative, and regardless of the Cooperation Agreement's status as a lease of personal property, the postpetition payments thereunder—including the Quarterly Payments— are actual and necessary costs of preserving Ligado's estate, and thus are "administrative expenses" that should be given priority pursuant to Bankruptcy Code section 503(b)(1) and paid as they come due.

51.     The Cooperation Agreement, and the spectrum rights thereunder, are central to Ligado's reorganization process. *First*, Ligado's proposed restructuring is expressly contingent upon Ligado "closing a commercial transaction with AST (the 'AST Transaction') on the terms set forth in the AST Term Sheet." *See* RSA, Ex. A at 4. Pursuant to this AST Transaction, in consideration for contributions and payments, "Ligado [would] provide, and AST [would] assume the economic benefits of a certain portion of the fully coordinated L-band Spectrum and other L-band MSS assets to which Ligado has access pursuant to . . . the Cooperation Agreement." AST Term Sheet at 1.

52.     *Second*, one of the Debtors' express objectives in these chapter 11 cases is to "pursue their lawsuit against the U.S. Government to obtain just compensation for the taking of their spectrum"—*i.e.*, the Takings Litigation. *See* Smith Decl. ¶ 139. Ligado's counsel emphasized at the first day hearing the importance of the takings litigation to Ligado: "[I]n fact, one of the key elements of our bankruptcy is to make sure that we do nothing to interfere with the continuation of that litigation in the Court of Federal Claims." *See* Jan. 7, 2025 H'rg Tr. at 11:10-13; 19:14-19. The purported property rights at the heart of Ligado's takings litigation are actually Inmarsat's spectrum's usage rights, provided to Ligado under the Cooperation Agreement.

53.     Bankruptcy Code section 503(b)(1) provides, in relevant part, that there "shall be allowed administrative expenses [for] the actual, necessary, costs and expenses of preserving the estate[.]"  11 U.S.C. § 503(b)(1)(A).  For a claim to qualify as an administrative expense, it must (1) arise from a transaction with the debtor-in-possession and (2) yield a "benefit to the estate."  *In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021).  Both requirements are met here.

54.     Here, Ligado—the debtor in possession—has undoubtedly elected to continue to receive the benefits under the Cooperation Agreement pending its decision to assume or reject.  Indeed, assumption of the Cooperation Agreement, and the assignment of benefits thereunder to AST, are necessary to Ligado's proposed restructuring, while the spectrum rights Ligado receives thereunder are the very property interests underlying the takings litigation, which it continues to prosecute postpetition.  *See In re Sharon Steel Corp.*, 161 B.R. 934, 937 (Bankr. W.D. Pa. 1994) (finding debtor had an obligation to pay postpetition insurance premiums as an administrative expense where debtor elected to continue to receive the benefits under the insurance policy pending its decision to assume or reject).  Unquestionably, Inmarsat's continued provision of spectrum rights under the Cooperation Agreement is "essential to preserving the estate of a Chapter 11 debtor in possession."  *In re MEI Diversified, Inc.*, 106 F.3d 829, 832 (8th Cir. 1997) (concluding that postpetition premiums for continued workers compensation insurance were administrative expenses, notwithstanding a lack of any "positive postpetition act" by the debtor that induced insurer to continue coverage).

55.     Inmarsat's performance under the Cooperation Agreement also qualifies as a "benefit" to the debtors in possession, as it provides the centerpiece around which Ligado's entire proposed restructuring was formulated.  Specifically, the continued availability of the spectrum

pursuant to the Cooperation Agreement is essential to the AST transaction on which Ligado has staked its future, as well as essential to Ligado's multi-billion dollar takings litigation. Such direct benefits to the estate render any postpetition payments due to Inmarsat under the Cooperation Agreement as administrative expense claims. *See Sharon Steel Corp.*, 161 B.R. at 938 ("Keeping the policy in force assisted the Debtor in negotiations with the USWA and in development of a plan of reorganization—a direct benefit to the bankruptcy estate.").

56.    The quarterly payments at issue should not only be recognized as administrative expenses; they should also be paid promptly as they come due.

57.    Under § 503(a) of the Bankruptcy Code, creditors may "file a request for payment of an administrative expense," 11 U.S.C. § 503(a), and the timing of when to actually make the payment "is within the discretion of the court." *In re Shihai*, 392 B.R. 62, 67-68 (Bankr. S.D.N.Y. 2008) (collecting cases).

58.    Delaware courts consider three factors in determining whether to allow immediate payment of allowed administrative expense claims: (1) the prejudice to the debtors, (2) the hardship to the claimant, and (3) any potential detriment to other creditors. *In re NE Opco, Inc.*, 501 B.R. 233, 259 (Bankr. D. Del. 2013); *In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005); *see In re HQ Glob. Holdings, Inc.*, 282 B.R. 169, 174 (Bankr. D. Del. 2002). Each of those factors supports the immediate payment of Inmarsat's administrative expense claim.

59.    First, there is no evidence that Ligado would be harmed or prejudiced by requiring it to timely pay amounts as they come due under the Cooperation Agreement, especially absent grounds to conclude that Ligado is administratively insolvent (if Ligado *is* administratively insolvent, then it is all the more imperative for Inmarsat to not be left in limbo).

60.     Second, delay is obviously prejudicial to Inmarsat, which has made its "beachfront" spectrum available to Ligado, at great cost to itself, its investors, its customers, and the public, and with each passing day is foregoing opportunities to use (and profit from) its valuable property.

61.     Third, there is no evidence that other creditors would be harmed by immediate and timely payment, especially considering that the Cooperation Agreement is part and parcel of Ligado's future business.  Thus, the payments are ultimately in service of retaining the spectrum that all stakeholders have an interest in preserving.

## VI.     RESERVATION OF RIGHTS

62.     In light of the Debtors' stated timeline pursuant to the AST Transaction and the RSA, Inmarsat is not moving to compel the Debtors to determine whether to assume the Cooperation Agreement.  For the avoidance of doubt, however, Inmarsat fully reserves its rights to bring such a motion, and fully reserves all rights as to any effort by Ligado to assume the Cooperation Agreement as contemplated under the RSA.  This includes, without limitation, any purported cure of defaults under the Cooperation Agreement, and Ligado's ability to provide adequate assurance of future performance under the Cooperation Agreement pursuant to Bankruptcy Code section 365(b)(1)(C).

## VII.     NOTICE

63.     Notice of this Motion has been given to all parties requesting notice in the above-captioned proceedings via the Court's CM/ECF system.  Inmarsat submits that such notice is sufficient and no other or further notice need be provided.

## VIII.     CONCLUSION

64.     For the foregoing reasons Inmarsat respectfully requests that the Court grant the Motion and such other or further relief as is just and reasonable.

Dated: February 6, 2025
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone
295 5th Avenue,
New York, NY 10016
Telephone: (212) 849-7000
Email:
benjaminfinestone@quinnemanuel.com

Matthew Scheck
300 West 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100
Email: matthewscheck@quinnemanuel.com

-and-

**STEPTOE LLP**
Jeffrey M. Reisner
Charles Michael
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900
Email: jreisner@steptoe.com
        cmichael@steptoe.com

Alfred M. Mamlet
Joshua R. Taylor
1330 Connecticut Avenue, NW
Washington, DC 20036

22

Telephone:  (202) 429-3000
Email: amamlet@steptoe.com
          jrtaylor@steptoe.com

*Counsel to Inmarsat Global Limited*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| In re: | Chapter 11 |
|---|---|
| LIGADO NETWORKS LLC, *et. al.*[1] | Case No. 25-10006-TMH |
| Debtors. | Jointly Administered |

**Objection Deadline: February 20, 2025 at 4:00 p.m. (ET)**
**Hearing Date: March 4, 2025 at 11:00 a.m. (ET)**

### NOTICE OF INMARSAT GLOBAL LIMITED'S MOTION TO COMPEL LIGADO NETWORKS LLC AND LIGADO NETWORKS (CANADA)'S COMPLIANCE WITH 11 U.S.C. §§ 365(d)(5) AND 503(b)

**PLEASE TAKE NOTICE** that Inmarsat Global Limited ("Inmarsat") filed *Inmarsat Global Limited's Motion to Compel Ligado Networks LLC and Ligado Networks (Canada)'s Compliance with 11 U.S.C. §§ 365(d)(5) and 503(b)* (the "Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that any response or objection with respect to the relief sought in the Motion must be filed with the Bankruptcy Court on or before **February 20, 2025 at 4:00 p.m. prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE** that at the same time, you must also serve a copy of the response or objection upon counsel to Inmarsat: (a) Quinn Emanuel Urquhart & Sullivan, LLP, 295 5th Avenue, New York, New York 10016, Attn: Benjamin Finestone (benjaminfinestone@quinnemanuel.com), (b) Quinn Emanuel Urquhart & Sullivan, LLP, 300

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

West 6th St., Suite 2010, Austin, Texas 78701, Attn: Matthew Scheck (matthewscheck@quinnemanuel.com), (c) Steptoe LLP, 1114 Avenue of the Americas, New York, New York 10036, Attn: Jeffrey M. Reisner (jreisner@steptoe.com) and Charles Michael (cmichael@steptoe.com), (d) Steptoe LLP, 1330 Connecticut Avenue, NW, Washington, DC 20036, Attn: Alfred M. Mamlet (amamlet@steptoe.com) and Joshua R. Taylor (jrtaylor@steptoe.com), and (e) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn.: Laura Davis Jones (ljones@pszjlaw.com) and Timothy P. Cairns (tcairns@pszjlaw.com).

**PLEASE TAKE FURTHER NOTICE** THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING TO CONSIDER THE RELIEF SOUGHT IN THE MOTION WILL BE HELD ON **MARCH 4, 2025 AT 11:00 A.M. EASTERN TIME** BEFORE THE HONORABLE THOMAS M. HORAN, UNITED STATES BANKRUPTCY COURT JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 3RD FLOOR, COURTROOM NO. 7, WILMINGTON, DELAWARE 19801.

Dated: February 6, 2025
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com
      tcairns@pszjlaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone
295 5th Avenue
New York, NY  10016
Telephone: (212) 849-7000
Email: benjaminfinestone@quinnemanuel.com

Matthew Scheck
300 West 6th St., Suite 2010
Austin, TX  78701
Telephone: (737) 667-6100
Email: matthewscheck@quinnemanuel.com

-and-

**STEPTOE LLP**
Jeffrey M. Reisner
Charles Michael
1114 Avenue of the Americas
New York, NY  10036
Telephone:  (212) 506-3900
Email: jreisner@steptoe.com
      cmichael@steptoe.com

Alfred M. Mamlet
Joshua R. Taylor
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone:  (202) 429-3000
Email: amamlet@steptoe.com
      jrtaylor@steptoe.com

*Counsel to Inmarsat Global Limited*

# EXHBIT A

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC, *et. al.*[1] | Case No. 25-10006-TMH |
| Debtors. | Jointly Administered |

## ORDER GRANTING INMARSAT GLOBAL LIMITED'S MOTION TO COMPEL LIGADO NETWORKS LLC AND LIGADO NETWORKS (CANADA)'S COMPLIANCE WITH 11 U.S.C. §§ 365(d)(5) AND 503(b)

Upon consideration of *Inmarsat Global Limited's Motion to Compel Ligado Networks LLC and Ligado Networks (Canada)'s Compliance with 11 U.S.C. §§ 365(d)(5) and 503(b)* (the "Motion")[2] filed by Inmarsat Global Limited (the "Movant"), including any testimony, evidence, documents, and declarations submitted in support thereof; and any responses or objections filed; and this Court having subject matter jurisdiction to consider and to determine the Motion in accordance with 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2023; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and Movants having consented to entry of a final order by this Court under Article III of the United States Constitution; and this Court having found that due and sufficient notice was given under the circumstances; and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED that:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

[2] All capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.

1.      The Motion is granted;

2.      Ligado shall pay to the Movant all amounts owing to the Movant under the Cooperation Agreement arising on or after March 7, 2025, and each payment shall be made as and when such payments come due in accordance with the terms under the Cooperation Agreement; and

3.      The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.