# EXHIBIT L

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGADO NETWORKS LLC, *et al.*,[1] | ) Case No. 25-10006 (TMH) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Re: Docket No. 193** |

### THE DEBTORS' OBJECTION TO INMARSAT'S MOTION TO COMPEL

Ligado Networks LLC and Ligado Networks (Canada) Inc. (together, for purposes of this objection, "Ligado" and, together with their above-captioned affiliates, the "Debtors") submit this objection (the "Objection") to *Inmarsat Global Limited's Motion to Compel Ligado Networks LLC and Ligado Networks (Canada)'s Compliance with 11 U.S.C. §§ 365(d)(5) and 503(b)* [Docket No. 193] (the "Motion"),[2] filed by Inmarsat Global Limited ("Inmarsat"), and respectfully state as follows:

### PRELIMINARY STATEMENT

1.      Through the Motion, Inmarsat seeks the extraordinary relief of compelling Ligado to pay to Inmarsat all amounts arising under the Cooperation Agreement (as defined below) on and after March 7, 2025, or, in the alternative, compelling such payments to be made as and when they come due as administrative expenses.   Inmarsat makes this extraordinary request notwithstanding a complete lack of necessity of current payment or harm from deferring payment

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).  The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [Docket No. 2].

as shown from, even as acknowledged in the Motion, Inmarsat's voluntarily entry into numerous agreements in recent years, whereby Inmarsat agreed to defer payment of amounts due under the Cooperation Agreement and, more importantly, without even mentioning that Ligado has commenced an adversary proceeding against Inmarsat (the "Adversary Proceeding") seeking **more than $1.7 billion** in damages for, among other things, Inmarsat's breach of that same Cooperation Agreement, an amount that far exceeds any amounts purportedly owed to Inmarsat. Inmarsat has not, and cannot, articulate any legally cognizable justification for such an exceptional request.

2.      Knowing that to be the case, Inmarsat makes the incredible assertion that the Cooperation Agreement, pursuant to which the parties have agreed to coordinate their shared use of certain L-Band Spectrum (as defined below), is a **lease** of personal property and, thus, Inmarsat is entitled to current payment under section 365(d)(5) of the Bankruptcy Code. But there can be no question—the Cooperation Agreement is **not** a lease. Indeed, the Cooperation Agreement cannot be a lease as a matter of law.

3.      Each of Inmarsat and Ligado is licensed by the United States Federal Communications Commission (the "FCC") to provide mobile satellite service ("MSS") in the L-Band Spectrum. Neither license is exclusive as to the other party. And because both Inmarsat and Ligado are permitted to use the L-Band Spectrum, they have agreed, in the Cooperation Agreement, how best to coordinate their shared use so as to not interfere with each other and to maximize the benefits of their respective licenses. Such coordination is particularly valuable to Ligado because it also holds an exclusive license to use the L-Band Spectrum to provide terrestrial service, which, unlike MSS, requires unhindered access to contiguous spectrum. Thus, to maximize the value of its terrestrial license, Ligado obtained Inmarsat's agreement to limit its use of specific portions of the otherwise shared L-Band Spectrum, thereby giving Ligado access to the

contiguous unencumbered bands of spectrum that are necessary for the provision of terrestrial service.

4.      Pursuant to FCC regulations, while certain licensed terrestrial spectrum can be leased by their licensees to third parties, neither Ligado nor Inmarsat is allowed to lease their respective MSS rights in the L-Band Spectrum.  But even if Inmarsat were to set aside this prohibition—something it cannot do—Inmarsat would still have nothing to "lease" to Ligado as Ligado already has the same rights to use the L-Band Spectrum for MSS under its own FCC license.  In other words, if tomorrow the FCC revoked Inmarsat's license to use the L-Band Spectrum, Ligado's rights vis-à-vis the same spectrum would remain, and would in fact become more valuable, as it would no longer be shared with Inmarsat.

5.      Moreover, had the Cooperation Agreement been a lease of personal property—which it is not—section 365(d)(5) of the Bankruptcy Code would require this Court to consider the equities of the case in determining whether Ligado is obligated to timely perform its obligations thereunder.  Here, the equities of the case—such as the lack of any necessity for immediate payment by Inmarsat, the severe detriment to the Debtors' estates, the massive litigation claim that Ligado has asserted against Inmarsat for fraudulent transfer and the breach of the Cooperation Agreement that prevented Ligado from receiving its full benefits, for which Ligado has already paid hundreds of millions of dollars—militate against granting the extraordinary relief Inmarsat seeks.

6.      For the same reasons, even if the payments allegedly due under the Cooperation Agreement were administrative expenses, Inmarsat has not, and cannot, establish that the Court should deviate from the standard practice of having allowed administrative expense claims paid under a confirmed plan.  In the likely event Ligado prevails in the Adversary Proceeding, Inmarsat

3

will ***owe to Ligado*** an amount that dwarfs any quarterly payments under the Cooperation Agreement, and Ligado intends to pursue its right to set off against such payments any damages awarded to it in the Adversary Proceeding. If Ligado were forced to make the requested payments as they come due, it would only add to the amount Ligado would seek to recover.

7.      In sum, Inmarsat has not satisfied its burden to establish any reason to deviate from the past practice of continued deferral of the Quarterly Payments. The Cooperation Agreement is not a lease of personal property and Inmarsat is not entitled to the protections of section 365(d)(5) of the Bankruptcy Code. The equities of these cases, particularly in light of the pending Adversary Proceeding, require deferral. And Inmarsat has not shown that there is any reason to order immediate payment of any administrative expense claims it may have. Thus, the Court should deny the Motion.

## **BACKGROUND**

### I.      **Ligado and Inmarsat Hold Non-Exclusive Licenses to Provide MSS in the L-Band Spectrum**

8.      Wireless communications work by transmitting and receiving electromagnetic waves. The different types of electromagnetic waves are defined according to their frequencies— how many times per second the wave oscillates—and are categorized along an electromagnetic spectrum. A given range of spectrum is known as a "band." The Communications Act of 1934, codified at 47 U.S.C. §§ 151 *et seq.* (as amended, the "Communications Act"), exclusively empowers the FCC to, among other things, issue licenses to use spectrum bands and regulate the activities of licensed operators for spectrum in the United States. *See* 47 U.S.C. §§ 303(b) and (c).

9.      The FCC has granted both Ligado and Inmarsat non-exclusive licenses authorizing them to use electromagnetic spectrum between 1525-1559 MHz and 1626.5-1660.5 MHz (the "L-Band Spectrum") for MSS—communications between satellites and mobile receivers on the

ground.  *See Declaration of Melanie Westover Yanez in Support of the Debtors' Objection to Inmarsat's Motion to Compel* ("Yanez Decl."), filed contemporaneously herewith, Ex. A ¶ 2 (SkyTerra Sept. 15, 2006 license); Ex. B (Ligado Networks Subsidiary LLC July 25, 2010 license); Exs. C, D, E (Ligado Networks Subsidiary LLC licenses); Exs. F, G, H (Inmarsat Solutions US Inc. licenses); *see also* First Day Declaration [Docket No. 2] ¶ 20.[3]  All licenses to operate MSS in the L-Band are non-exclusive, so that multiple operators are required to share the spectrum and coordinate their respective uses to avoid interference.  Because of its shared nature, operators have coordinated the MSS use of the L-Band Spectrum to mitigate interference and maximize its utility since at least the 1990s.  *See, e.g.,* FCC Report and Order and Notice of Proposed Rulemaking, *Flexibility for Delivery of Communications by Mobile Satellite Service Providers in the 2 GHz Band, the L-Band, and the 1.6/2.4 GHz Bands*, 18 FCC Rcd 1962, 2093 (2003), attached as Ex. I to the Yanez Decl., ¶ 54 n.144 (discussing historical memorandum of understanding for shared use of spectrum).  Under FCC regulations, L-Band Spectrum for MSS use cannot be leased.  *See* 47 CFR § 1.9005 (2025) (listing licensed services permitted to be leased and excluding MSS use in the L-Band Spectrum from such list).

## II.   Ligado and Inmarsat Enter the Cooperation Agreement to Coordinate Spectrum Use

10.   In the early 2000s, the increased use of wireless devices created an increased demand for terrestrial spectrum.  Given the technical requirements for terrestrial service, and the flexible uses of terrestrial spectrum bands permitted by the FCC, the FCC grants licenses for terrestrial spectrum bands to one operator at a time on an exclusive basis.  *See* FCC Notice of Proposed Rulemaking, *In the Matter of Single Network Future: Supplemental Coverage from*

---

[3]   Although Inmarsat's satellites are licensed by the United Kingdom (Motion ¶ 11 n.5), Inmarsat provides spectrum services in the United States and, consequently, holds spectrum licenses from the FCC and is subject to FCC regulations.  *See* Yanez Decl., Exs. F, G, H (Inmarsat Solutions US Inc. current licenses).

*Space Innovation*, 38 FCC Rcd 2790, 2801 (2023), attached as Ex. J to the Yanez Decl., ¶ 6. Indeed, most exclusive terrestrial spectrum bands have been sold to operators in FCC auctions for billions of dollars and, pursuant to FCC regulations, can be leased by the licensees to third parties. 47 C.F.R. § 1.9005 (2025). This is distinct from MSS and other satellite licenses, which (a) are never sold in FCC auctions, (b) permit a licensee to use satellite spectrum solely in connection with a specifically authorized satellite system, rather than for flexible services on an exclusive basis, (c) require licensees to observe specific technical rules and limitations that allow other operators to use the same spectrum on a shared, non-interference basis, and (d) cannot be leased to third parties.

11.     Historically, the FCC permitted terrestrial wireless service in specific bands, *not* including the L-Band, allocated for terrestrial use. The increased demand for terrestrial spectrum, and the scarcity of spectrum bands ideally suited for terrestrial services, led the FCC to recognize the untapped capacity for terrestrial service within L-Band Spectrum as an ancillary service to the existing MSS use, and it invited operators of MSS networks, like Ligado, to seek authority to provide terrestrial wireless service using L-Band Spectrum through the provision of Ancillary Terrestrial Component ("ATC") service. *See* FCC Order and Authorization, *In the Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application,* 35 FCC Rcd 3772, 3774 (2020), attached as Ex. K to the Yanez Decl., ¶ 3. Ligado did just that and applied to the FCC in 2004 to modify its existing MSS license to include an exclusive license for provision of ATC in specific bands of the L-Band Spectrum. *Id.* ¶ 4. Ligado's planned terrestrial service, through ATC, would require use of the applicable bands of L-Band Spectrum without the possibility of interference from Inmarsat's MSS use of the same L-Band Spectrum bands. Ligado's application for ATC authorization was approved in 2004. *See id.*

12.     To that end, Ligado and Inmarsat entered into a cooperation agreement on December 20, 2007 (the "Original Cooperation Agreement"), and, later, into the Amended and Restated Cooperation Agreement on August 6, 2010 (as further amended and restated from time to time, the "Cooperation Agreement").  The fundamental purpose of the Cooperation Agreement is for Ligado and Inmarsat to coordinate their shared use of the L-Band Spectrum to enable Ligado to use sufficient contiguous L-Band Spectrum blocks to provide ATC, unencumbered by interference from Inmarsat's use of the same L-Band Spectrum blocks for its MSS system.  *See* First Day Declaration ¶ 25.

13.     Under the Cooperation Agreement, Inmarsat agreed, *inter alia*, to reallocate its customers' use from specified bands of the L-Band Spectrum and upgrade some of its equipment so that those bands of the L-Band Spectrum could be used by Ligado without the possibility of interference.  *See* First Day Declaration ¶ 25.  Under the Cooperation Agreement, Inmarsat is also obligated to (i) help Ligado obtain necessary FCC license authorization and any other necessary government approvals to use its MSS spectrum for ATC (First Day Declaration ¶ 8); (ii) resolve terminal interference issues caused by Inmarsat's MSS terminals installed on airplanes and ships (First Day Declaration ¶ 27); and (iii) implement the spectrum allocation plans contemplated in the Cooperation Agreement and use its best commercial efforts to ensure that Ligado received the full anticipated benefit of the unencumbered L-Band Spectrum.  *Id.*

14.     In return, Ligado agreed to make payments to Inmarsat, including approximately $15 million quarterly from March 31, 2023 until December 31, 2107 (the "Quarterly Payments").  *See* Amendment No. 5 to the Cooperation Agreement, attached as Exhibit L to the Yanez Declaration, § 6.  To date, Ligado has paid Inmarsat more than $1.7 billion, including

7

approximately $700 million in 2020, pursuant to the Cooperation Agreement.[4]  *See* First Day
Declaration ¶ 25.

15.     Ligado has never missed a required Quarterly Payment.  Due to Ligado's financial
difficulties, at the end of 2022, the parties agreed to amend the Cooperation Agreement with
respect to certain payments to Inmarsat.  The parties further amended the Cooperation Agreement
five more times in 2023 and nine more times in 2024 to, among other things, defer payment of
additional amounts—including Quarterly Payments—due to Inmarsat.[5]  Every time, Inmarsat
***agreed to voluntarily defer*** the payments.  *See* First Day Declaration ¶¶ 31-32.

### III.    The FCC Issues Ligado the Exclusive Right to Provide ATC in the L-Band

16.     On April 22, 2020, the FCC granted Ligado's request to modify its license to
operate ATC in the L-Band according to a revised spectrum plan, thus enabling Ligado exclusively
to offer ATC using specified bands of L-Band Spectrum.  *See* Yanez Decl., Ex. K ¶ 3.

17.     Accordingly, Inmarsat and Ligado both maintain non-exclusive licenses vis-à-vis
the other to operate MSS in the L-Band, but pursuant to the Cooperation Agreement, Inmarsat is
obligated not to use specified portions of the L-Band for MSS in a way that would interfere with
Ligado's exclusive right to use those portions of the L-Band Spectrum to operate its ATC network
without interference.

---

[4]     Ligado made the following payments under the Cooperation Agreement to Inmarsat in October 2020, among
others:  $35,528,939.00 on October 13, 2020; $664,471,061.00 on October 23, 2020.  *See* First Day Declaration
¶ 30.

[5]     Although Inmarsat agreed to defer amounts due under the Cooperation Agreement, interest continued to accrue
on such amounts.  *See, e.g.*, Amendment No. 21 to the Cooperation Agreement, attached as Exhibit O to the
Yanez Declaration) §§ 1.2, 1.3.

## IV.    Ligado Commences These Chapter 11 Cases and the Adversary Proceeding Against Inmarsat

18.    On January 5, 2025 (the "Petition Date"), the Debtors filed these chapter 11 cases. On January 6, 2025, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 4] (the "DIP Motion"), attaching, *inter alia*, the 13-week budget (the "DIP Budget").   The DIP Budget does not contemplate that the Debtors will be making the Quarterly Payments.

19.    On January 29, 2025, Inmarsat objected to the DIP Motion.  *See Inmarsat Global Limited's Objection to Ligado's DIP Financing Motion* [Docket No. 150] ("DIP Objection").  In its DIP Objection, Inmarsat described itself as an unsecured creditor (DIP Objection at 4) but did not object to the exclusion of the Quarterly Payments from the DIP Budget.

20.    The exclusion of the Quarterly Payments from the DIP Budget was discussed by counsel to the Debtors and Inmarsat prior to Inmarsat filing the DIP Objection.  Ligado's counsel invited Inmarsat to make a proposal regarding payment of the Quarterly Payments, but Inmarsat never did and the DIP Budget continued to omit the Quarterly Payments.

21.    Yet, in the Motion, Inmarsat raises—for the first time before this Court—the omission of the Quarterly Payments from the DIP Budget.  Motion ¶ 38.  Yet, even now, Inmarsat does not assert an urgent need for the approximately $15 million Quarterly Payments (nor did the DIP Objection mention any such need).

22.    Immediately after commencing these chapter 11 cases, on January 7, 2025, Ligado commenced the Adversary Proceeding asserting seven causes of action against Inmarsat in

connection with Inmarsat's failures to honor its obligations under the Cooperation Agreement. Ligado seeks more than $1.7 billion in damages, an amount that far exceeds what Inmarsat alleges in the Motion it is owed under the Cooperation Agreement.[6]

23.     In the Adversary Complaint, Ligado asserts that Inmarsat failed to fulfill its contractual obligations under the Cooperation Agreement, depriving Ligado of the full benefits for which it has bargained and paid. The Adversary Complaint alleges that Inmarsat breached the Cooperation Agreement by failing to (i) modify or replace user terminals to eliminate interference, (ii) allow Ligado's use of spectrum at agreed power levels, and (iii) sufficiently support Ligado's ATC license application. Adversary Complaint ¶ 5.

24.     Inmarsat is contractually obligated to adequately resolve terminal interference issues, but it has neglected to do so. Inmarsat's systems operate near the L-Band Spectrum designated for Ligado's ATC service, and this proximity gives rise to the possibility of interference. *Id.* ¶ 35. Inmarsat agreed in the Cooperation Agreement to replace or modify its terminals as necessary to prevent any interference with Ligado's ATC. *Id.* ¶ 36. Because Inmarsat failed to do so, when the FCC issued its order in 2020 approving Ligado's application for ATC operations in the L-Band Spectrum, that order included power limits near airports and waterways thereby decreasing the geographic coverage that Ligado had negotiated to receive. *Id.* ¶ 6. Indeed, Inmarsat identified "approximately 12,000 Inmarsat maritime customers and over 10,000 aircraft that use Inmarsat terminals that are not modified to address terminal interference." *Id.* ¶ 7.

25.     Furthermore, Inmarsat has failed to support Ligado's ATC license application in direct contravention of the Cooperation Agreement. *Id.* ¶ 8. During the application process,

---

[6]     *See Debtors' Complaint Against Inmarsat Regarding the Cooperation Agreement*, Adv. Pro. 25-50000 [Docket No. 3] (the "Adversary Complaint").

Inmarsat's customers raised concerns to the FCC regarding the approval of Ligado's application and Inmarsat's response was inadequate.  *Id.* ¶¶ 95, 137, 152.  Ligado has made well-supported allegations sufficient to show that Inmarsat took no action to directly address their customers' concerns.

26.     The Adversary Complaint also alleges claims for fraudulent inducement, reformation and restitution, unjust enrichment, and avoidance of fraudulent transfers.  *Id.* ¶¶ 54-56.  Critically, Ligado has paid Inmarsat more than $1.7 billion under the Cooperation Agreement over the past fifteen years  But due to Inmarsat's failures, at no point has Ligado been able to reap the benefits it paid for.  *Id.* ¶ 10.  Furthermore, upon information and belief, Inmarsat was aware that the DOD was using certain L-Band Spectrum that Inmarsat was coordinating with Ligado, and that the DOD would not permit any commercial use of that spectrum for ATC purposes.  *Id.* ¶ 158.  But Inmarsat never informed Ligado of these facts, and simply sat back as Ligado continued to make payments under the Cooperation Agreement—now totaling over $1.7 billion—an act that constitutes fraudulent inducement.  *Id.* ¶ 163.

27.     Inmarsat's deadline to respond to the Adversary Complaint is February 27, 2025.  *See Stipulation Granting Inmarsat an Extension of Time to Answer, Move, Or Otherwise Respond and Scheduling Related Deadlines*, Adv. Pro. 25-50000 [Docket No. 16].[7]

## ARGUMENT

28.     Inmarsat is not entitled to current payment of any amounts under the Cooperation Agreement under any theory asserted in the Motion.  *First*, the Cooperation Agreement is ***not*** a lease.  The Cooperation Agreement is a decades-old agreement that, by its own terms, establishes

---

[7]     On February 11, 2025, Ligado served the *Debtors' First Request for Production of Documents Directed to Inmarsat Global Limited*.  As of this filing, the Debtors have not received any responsive documents and discovery is ongoing.  Accordingly, the Debtors reserve all rights to amend and/or supplement the Objection.

*cooperation* and *coordination* among the parties to facilitate each party's maximization of its non-exclusive license to use shared L-Band Spectrum.  In fact, pursuant to FCC regulations, neither Ligado nor Inmarsat is allowed to lease their respective rights to use L-Band Spectrum.  *Second,* even were the Cooperation Agreement a lease—it is not—the equities of these cases demand continued deferral of payment.  The Adversary Proceeding—which Inmarsat glaringly omits from its Motion—calls into serious question whether Ligado will owe any amounts to Inmarsat and indeed, argues that Inmarsat owes Ligado.  *Third*, Inmarsat has not, and cannot, establish that current payment is necessary, even if Inmarsat's claim is entitled to administrative expense status.  Accordingly, this Court should deny the extraordinary relief requested in the Motion.

**I.      Inmarsat Is Not Entitled to Current Payment Under Bankruptcy Code Section 365(d)(5) Because the Cooperation Agreement Is Not a Lease**

29.      Inmarsat alleges that the Cooperation Agreement is a lease of personal property and accordingly, under section 365(d)(5) of the Bankruptcy Code, Ligado must pay the Quarterly Payments coming due 60 days after the Petition Date as they come due.  Motion ¶¶ 39-40.  Inmarsat is flatly wrong.

30.      Section 365(d)(5) provides, in relevant part:

> The trustee shall timely perform all of the obligations of the debtor . . . first arising from or after 60 days after the order for relief in a case under chapter 11 of this title **under an unexpired lease of personal property** . . . , until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, *unless the court*, after notice and a hearing and **based on the equities of the case**, *orders otherwise* with respect to the obligations or timely performance thereof.

11 U.S.C. § 365(d)(5) (emphasis added).

31.      "Lease" is not defined in the Bankruptcy Code.  Accordingly, courts look to applicable non-bankruptcy law to determine what constitutes a lease within the meaning of section 365(d)(5). *See In re Montgomery Ward, L.L.C.,* 469 B.R. 522, 528 (Bankr. D. Del. 2012) (applying

12

Illinois law on question of whether a contract was a lease because "[t]he Bankruptcy Code does not provide which features of a transaction define its nature. Such determination depends on [applicable non-bankruptcy] law."); *United Airlines, Inc. v. HSBC Bank USA, N.A.,* 416 F.3d 609, 615 (7th Cir. 2005) (noting that "[l]eases are state-law instruments, after all, and the norm in bankruptcy law is that contracts (of which leases are a species) and property rights in general have the same force they would have in state court, unless the Code overrides the state entitlement"); *see also Butner v. United States,* 440 U.S. 48, 55 (1979) (finding "[p]roperty interests are created and defined by state law"). The Cooperation Agreement is not a lease either under FCC regulations or New York state law.

32.    Both Inmarsat and Ligado are licensed by the FCC to provide MSS in the L-Band Spectrum, while neither has the exclusive license for such use with respect to the other party. Neither party has something that the other party does not already have. If the Cooperation Agreement were to go away tomorrow, Ligado's right to use the L-Band Spectrum would not be diminished one iota. The sole purpose of the Cooperation Agreement is to **coordinate** the parties' shared MSS use across the L-Band—spectrum that both parties are already licensed to use—so Ligado could pursue its ATC business objective by using certain portions of the L-Band Spectrum without interference from Inmarsat's use of the same bands for MSS.

A.    **The Cooperation Agreement Is Subject to FCC Regulations and Cannot Be a Lease as a Matter of Law**

33.    Following application from an operator, the FCC grants or denies a license to use spectrum, pursuant to FCC regulations set forth in the Code of Federal Regulations ("CFR"). The FCC is permitted to place restrictions, limitations, or other parameters on a spectrum license. *See* 47 U.S.C. § 316(a)(1) (the FCC may modify a license "either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public

13

interest, convenience, and necessity"); *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 12 (D.C. Cir. 2006) (noting that the FCC has the unilateral authority to modify a spectrum lease); *see also Order and Opinion*, *Ligado Networks LLC v. United States, et al.*, C.A. No. 23-cv-01797 (Fed. Cl. Nov. 18, 2024) (observing that both parties agreed "the FCC can modify or revoke any license that it has granted").  Thus, an FCC license is a valuable property interest, providing the licensee with certain rights limited by FCC regulations.[8]  *In re Cool Springs LLC*, 657 B.R. 767, 774 n. 55 (Bankr. D. Del. 2024) (holding that title which did not properly attach cannot be transferred and noting "a lessor can transfer no greater rights than he possesses") (citation and internal quotation marks omitted); *Legal Maxims; Nemo dat quod non habet,* BLACK'S LAW DICTIONARY (12th ed. 2024) ("No one gives what he does not have; no one transfers (a right) that he does not possess. According to this maxim, no one gives a better title to property than he himself possesses.");  *see also* 47 U.S.C. § 301 (Communications Act provides that FCC licenses should not be construed "to create any right, beyond the terms, conditions, and periods of the license").

34.     Under FCC regulations, a third party may lease certain kinds of spectrum from a holder of spectrum rights pursuant to a specific process called a "spectrum leasing arrangement." *See* 47 C.F.R. §§ 1.9001–1.9080 (2025) (subpart implementing policies and rules pertaining to spectrum leasing arrangements between licensees and spectrum lessees).  The FCC explicitly provides which types of spectrum licenses are permitted to be leased.  *See* 47 C.F.R. § 1.9005 (2025).  Included in the list of permitted spectrum leasing is, for example, the ATC of a mobile satellite service (*id*. at 1.9005(jj)) and other types of terrestrial uses of spectrum (*see, e.g.,* 1.9005(d), (k), and (t)).  MSS use of L-Band Spectrum is not included in the list of permissible

---

[8]     Similarly, under New York law, a license confers "the nonexclusive, revocable right to enter the land of the licensor to perform an act." *Mirasola v. Advanced Cap. Grp., Inc.*, 905 N.Y.S.2d 180, 181 (App. Div. 2010); *see also Sherhan v. Numyal Food, Inc.*, 862 N.Y.S.2d 709, 712 (App. Term 2008) (noting that a license grants to the licensee a revocable non-assignable privilege to do one or more acts upon the land of the licensor).

spectrum leasing and, therefore, the FCC does not allow leasing of the L-Band Spectrum for such use.  *See In re Ry. Reorg. Est., Inc*., 133 B.R. 578, 581 (Bankr. D. Del. 1991) ("A general canon of statutory construction is that the enumeration of specific statutory sections subject to a rule implies that the omitted sections are excluded from that rule's application.").  Consequently, there can be no lease by one operator (Inmarsat) of the right for MSS use of the L-Band Spectrum to another operator (Ligado) as a matter of law.[9]

35.     Even if the right for MSS use of the L-Band Spectrum ***could*** be leased by one operator to another—as it cannot be—any "spectrum leasing arrangement" requires FCC approval. 47 C.F.R. §§ 1.9020, 1930, 1035.  Inmarsat has not even alleged in the Motion that it has obtained—or indeed even sought—such approval.[10]

36.     Inmarsat well knows that the Cooperation Agreement is not a lease and could not be a lease under FCC regulations.  The Motion is a blatant attempt to mischaracterize the Cooperation Agreement to squeeze it into the ambit of section 365(d)(5) of the Bankruptcy Code to further Inmarsat's litigation agenda.

---

[9]     By contrast, from July 2007 to the present, the Debtors, through their wholly owned subsidiary One Dot Six LLC, have leased 5 MHz of spectrum in the 1670-1675 MHz spectrum band through agreements with Crown Castle MM Holding LLC and OP LLC, the entity which holds the underlying U.S. nationwide spectrum license.  *See* First Day Declaration ¶ 23.  These agreements lease terrestrial spectrum for ATC purposes, as opposed to MSS, and Ligado received FCC approval to treat these agreements as leases under 47 C.F.R § 1.9005(n).  *See* First Day Declaration ¶ 24; FCC Public Notice, titled *Wireless Telecommunications Bureau Seeks Comment on Request by Op LLC for Extension or Waiver of the Constr. Deadline Concerning Its 1670-1675 MHz Band License*, 27 FCC Rcd 13524, 13525 (2012), attached as Ex. N to the Yanez Declaration.

[10]    The Cooperation Agreement states that the parties agree to comply ███████████████████████
███████████████████████████████████  *See* Yanez Decl., Ex. O § 9.14.

15

**B.       The Cooperation Agreement Is Not a Lease Under New York Law**

37.       Although the FCC's prohibition on Inmarsat's ability to lease spectrum should end the inquiry, there is further support that the Cooperation Agreement is not a lease under New York law.[11]

38.       New York courts have interpreted a "lease" to mean a bilateral agreement "whereby one party *gives up [its] control and possession of property* to another in return for the latter's understanding to pay rent for its use." *Cobbs Hill Vill. Tenants' Assn. v. City of Rochester*, 149 N.Y.S.3d 409, 415 (App. Div. 2021) (emphasis added) (citation and internal quotation marks omitted).  "[T]he surrender of *absolute possession and control* of property to another party for an agreed-upon rental" is "[t]he central distinguishing characteristic of a lease." *Mirasola*, 905 N.Y.S.2d at 181 (emphasis added) (citation and internal quotation marks omitted).

39.       Inmarsat cites three different sources in an attempt to support its contention that the Cooperation Agreement is a lease, all standing for the proposition that a lease is the transfer of a right to use or possess property.  *See* Motion ¶ 43 (where one definition of lease is a "contract by which the rightful possessor of personal property conveys the right to use that property in exchange for consideration") (citing *Lease*, BLACK'S LAW DICTIONARY (12th ed. 2024); *In re CNB Int'l, Inc.*, 307 B.R. 363, 369 (Bankr. W.D.N.Y. 2004) (noting that the "essential concept of lease requires a transfer of some right to use" but finding that no lease existed because creditor did not have ownership interest in software); N.Y. U.C.C. Law § 2-A-103(1)(j) (defining "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration")).  But even by Inmarsat's chosen definitions, the Cooperation Agreement is not a lease.

---

[11]     The Cooperation Agreement is governed by New York law.  *See* Yanez Decl., Ex. O § 9.6.

40.     Inmarsat has not given up its control or possession over L-Band Spectrum because it has no "absolute possession or control" over the L-Band Spectrum to give.  Rather, both Ligado and Inmarsat were granted the non-exclusive right to utilize the spectrum by the FCC on a shared basis and solely in connection with their described and authorized satellite networks.  There never was a *transfer* of a right to use or possess the L-Band Spectrum from Inmarsat.  Inmarsat still possesses the right to use the L-Band Spectrum—it has merely contractually agreed to coordinate its use of the L-Band Spectrum with Ligado.  Critically, if tomorrow the FCC revoked Inmarsat's license to use the L-Band Spectrum, Ligado's rights vis-à-vis the same spectrum would not be reduced—Ligado would continue to have the same right to operate in the L-Band Spectrum as it does now, and would in fact have significantly improved rights, as it would no longer have to share the spectrum with Inmarsat.  By contrast, if the FCC were to revoke a wireless broadband license being leased to a third party pursuant to FCC regulations, both the licensee and the lessee would have their rights to use the spectrum to provide such wireless broadband service extinguished.  Thus, the Cooperation Agreement is not a lease under New York law.[12]

C.     **Under the Plain Text of the Cooperation Agreement, Inmarsat Does Not Lease Spectrum Rights to Ligado**

41.     The plain words of the Cooperation Agreement further demonstrate that it is not a lease.  New York follows the "four corners rule" of contract interpretation, which dictates that contracts are interpreted by the words used in the agreement.  *See Donohue v. Cuomo,* 164 N.Y.S.3d 39, 45 (2022) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."); *R/S*

---

[12]   The Cooperation Agreement is instead, without question, a classic executory contract given the parties' respective material ongoing obligations under the agreement.  *See In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 504 (3d Cir. 2021) (stating that the test for an executory contract in the Third Circuit is "whether, under the relevant state law governing the contract, each side has at least one material unperformed obligation as of the bankruptcy petition date").

*Assocs. v. N.Y. Job Dev. Auth.*, 744 N.Y.S.2d 358, 360 (2002) ("[W]hen interpreting an unambiguous contract term evidence outside the four corners of the document is generally inadmissible to add to or vary the writing.") (citation and internal quotation marks omitted).

42.     Looking within the four corners of the Cooperation Agreement, it is apparent that it is not a lease.  Nowhere in the Cooperation Agreement does the word "lease" or "leasing agreement" appear to describe the arrangement between the parties.  Indeed, the only time the word "lease" appears in the Cooperation Agreement is in section 3.1(b), which states ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ *See* Yanez Decl., Ex. O § 3.1(b) (emphasis added).

43.     The Cooperation Agreement plainly and repeatedly describes the agreement as a contract for the ***coordination*** of spectrum use.  For example:

- ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████ Yanez
  Decl., Ex. O at 1 (emphasis added).

- ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████

---

[13]     A capacity lease allows an operator to rent the right to use a portion of another operators' infrastructure, such as an existing satellite, whereas a spectrum lease allows an operator to rent the right to use spectrum, launch a satellite utilizing that spectrum, and then lease capacity on that satellite to third-party customers. *See* Yanez Decl., Ex. I ¶ 215 n.137 (2003).



*Id.* § 3.1(a) (emphasis added).

*Id.* § 3.1(b) (emphasis added).

44.     Inmarsat completely ignores the plain words of the Cooperation Agreement.  Only by doing that can Inmarsat even attempt to allege that the Cooperation Agreement is a lease instead of an executory contract for the coordination of spectrum use.  To try to compel payment under the narrow circumstances permitted by the Bankruptcy Code, Inmarsat points to a handful of instances where the Debtors, in simple terms, referred to the Cooperation Agreement as a lease. *See* Motion ¶ 42.  Although Ligado has described the Cooperation Agreement in different contexts as a lease, Ligado's use of the word "lease" when describing the Cooperation Agreement does not change the true legal nature of the agreement.  *See Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 505-06 (E.D. Pa. 2014) (finding that references to a contract in subsequent correspondence did not change interpretation of contract's terms and that the "polestar" of the inquiry is the language of the contract).

45.     The Court should decline to accept Inmarsat's self-serving characterization of the Cooperation Agreement and find that section 365(d)(5) of the Bankruptcy Code is not applicable to the Cooperation Agreement.[14]

---

[14]   Inmarsat cites a handful of cases purportedly in support of the relief it is seeking under section 365(d)(5).  But these cases are irrelevant because the Cooperation Agreement is not a lease.  Moreover, the cases Inmarsat cites are easily distinguishable from the agreement before the Court:  whether the relevant agreement was a lease was not disputed in any of the cases and, in the only in circuit case, the court invoked the equities of the case to limit the claim.  *See In re Avianca Holdings S.A.*, 2023 WL 9016495 (S.D.N.Y. Dec. 23, 2023) (no dispute aircraft lease agreements were leases within the meaning of section 365(d)(5)); *In re Wyo. Sand & Stone Co.*, 393 B.R.

**D.**      **The Equities of the Case Do Not Compel Payment Under Section 365(d)(5)**

46.      Section 365(d)(5) does not apply to the Cooperation Agreement and Ligado is not obligated to make the Quarterly Payments as they come due. Even assuming *arguendo*, however, that section 365(d)(5) did apply, it would still not mandate current payment of the Quarterly Payments under the circumstances. Indeed, section 365(d)(5) explicitly provides that a court may prevent payment of amounts that may otherwise be due under section 365(d)(5) "***based on the equities of the case.***"[15]

47.      The equities of these chapter 11 cases require the Court to deny the relief sought in the Motion. *See, e.g.*, *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461 (Bankr. D. Del. 2006) (equities of the case mandated modification of a lease under section 365(d)(5) because the terms would have been inequitable and overly punitive to the debtor); *In re Young Trucking, Inc.,* No. 00-71809, 2003 WL 21299633 (Bankr. C.D. Ill. June 4, 2003) (equities of the case mandated modification of the lease).

48.      Here, there is no harm to Inmarsat for continued deferral of the Quarterly Payments. The Quarterly Payments are approximately $15 million. In 2023, Inmarsat was acquired by Viasat, a company that recently reported approximately $1.56 billion cash on hand and an equity value of approximately $4.8 billion. *See* Yanez Decl. Ex. P (Viasat, Inc., Quarterly Report (Form 10-Q) at

---

359 (Bankr. M.D. Pa. 2008) (no dispute lease of a haul truck was a lease within the meaning of section 365(d)(5)); *In re Midway Airlines*, 406 F.3d 229 (4th Cir. 2005) (no dispute a lease of telephone equipment was a lease within the meaning of section 365(d)(5)); *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461 (D. Del. 2006) (no dispute a machine lease agreement was a lease within the meaning of section 365(d)(5) and invoking equities of the case exception to limit claim); *In re Lakeshore Constr. Co. of Wolfeboro, Inc.*, 390 B.R. 751 (Bankr. D.N.H. 2008) (no dispute lease of machinery was a lease within the meaning of section 365(d)(5)).

[15]    For the avoidance of doubt, to the extent the Court finds the Cooperation Agreement is a lease within the meaning of section 365(d)(5), the Objection shall constitute notice of the Debtors invocation of the equities of the case exception pursuant to section 365(d)(5).

3 (Dec. 21, 2024)).  Inmarsat has made no showing as to why the Quarterly Payments of $15 million are urgently needed by a company with more than $1.5 billion cash on hand.

49.     On the other hand, the Debtors would be harmed if forced to make the Quarterly Payments as they come due.  The DIP Budget, subject to a final order (*see* Final DIP Order [Docket No. 188]), was carefully calibrated to support the Debtors' operations and the administration of these cases.  *See* DIP Motion; *Debtors' Reply to Inmarsat's DIP Objection* [Docket. No. 165]. Inmarsat—aware that the DIP Budget did not include payments under the Cooperation Agreement—never objected to the DIP Motion on this basis.  Consequently, the Debtors, if mandated to make the Quarterly Payments beginning March 2025, would have to seek additional financing at rates at least the same as, if not higher than, those applied to the DIP Financing.  *See e.g.*, Interim DIP Order, Ex. 1, § 2.06 (providing generally for interest on the DIP Loans at a rate per annum equal to 17.5%, payable in kind) [Docket. No. 104].  Such additional borrowing would add considerable burden to a company with a negative 13-week operating cashflow of $19.8 million.  *See* DIP Motion Ex. 2.

50.     What is more Ligado already has paid hundreds of millions of dollars to Inmarsat under the Cooperation Agreement, including approximately $700 million in 2020, even while Inmarsat failed to fulfill its obligations under the Cooperation Agreement.  Ligado asserts that Inmarsat breached its fundamental obligations under the Cooperation Agreement and because of Inmarsat's breaches, Ligado has not received the full benefits of the Cooperation Agreement.  *See* Adversary Complaint ¶ 10.  Instead, because of Inmarsat's failures under the Cooperation Agreement, Ligado has suffered damages of at least $1.7 billion.

51.     If successful in the Adversary Proceeding, even if only partially, Ligado would be owed money *by* Inmarsat—not the other way around.  In such case, Ligado would be entitled to

exercise setoff rights under section 558 of the Bankruptcy Code, including the right to set off Inmarsat's postpetition administrative claims against Ligado's prepetition claims.  *See In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002) (allowing debtors to offset administrative postpetition claim with debtors' prepetition claim); *In re ADI Liquidation, Inc.*, No. 14-12092, 2015 WL 4638605, at *3-6 (Bankr. D. Del. May 5, 2015) (holding that the Bankruptcy Code, case law, and equitable considerations support the position that debtors may apply their setoff rights against administrative claims).  This Court should not mandate payment of the Quarterly Payments, at least while the Adversary Proceeding is pending.

52. Given the disproportionate harm the Debtors would suffer and because Inmarsat has breached the Cooperation Agreement, preventing Ligado from receiving the full benefit of its bargain and giving rise to substantial claims against Inmarsat, the equities of the case militate denying the relief sought in the Motion.[16]

## II. Inmarsat Is Not Entitled to Immediate Payment of an Administrative Claim Under Section 503(b)(1) of the Bankruptcy Code

53. Inmarsat argues in the alternative that the Quarterly Payments are entitled to priority status as administrative expenses under section 503(b)(1) of the Bankruptcy Code and asks the Court to require the Debtors to make these payments "promptly."  Motion ¶ 56.  Even if postpetition Quarterly Payments (or some portion thereof) constitute administrative expenses, the Debtors are under no obligation to make the Quarterly Payments as they come due.   Inmarsat has not provided a single compelling reason to warrant the extraordinary relief it is seeking.

---

[16] It is within the Court's discretion to deny the Motion without prejudice and, in the unlikely event that Inmarsat is successful in the Adversary Proceeding, the issue of current payment can be revisited.  Demanding payment prior to the resolution of the Adversary Proceeding, however, is premature.

54.     Administrative expense claims are typically paid after plan confirmation.  *In re Cont'l Airlines, Inc.*, 146 B.R. 520, 531 (Bankr. D. Del. 1992).  A party may seek exceptional, immediate payment of an administrative expense under section 503(a) of the Bankruptcy Code.  11 U.S.C. § 503(a).  The creditor seeking this extraordinary relief, however, carries the burden of establishing that immediate payment is necessary.  *See In re Glob. Home Prods., LLC*, No. 06-10340, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("To qualify for exceptional immediate payment, a creditor must show that 'there is a necessity to pay and not merely that the Debtor has the ability to pay.'") (quoting *In re Cont'l Airlines*, 146 B.R. at 531).  The decision whether to grant this exceptional relief is left to the discretion of the court.  *See In re MTE Holdings LLC*, No. 19-12269, 2021 WL 2258270, at *8 (Bankr. D. Del. June 2, 2021) ("Whether to require immediate payment of an allowed administrative expense is a matter left to the discretion of the bankruptcy court."); *In re Glob. Home Prods.*, 2006 WL 3791955, at *3 (when requested, "the timing of the payment of that administrative expense claim is left to the discretion of the Court"); *In re Garden Ridge Corp.,* 323 B.R. 136, 143 (Bankr. D. Del. 2005) ("Courts have discretion to determine when an administrative expense will be paid.").

55.     Courts look at three factors when deciding whether a creditor has established it is entitled to immediate payment of an administrative expense:  "(i) the prejudice to the debtors; (ii) the hardship to the claimant; and (iii) potential detriment to other creditors."  *In re MTE Holdings*, 2021 WL 2258270, at *8; *see also In re Glob. Home Prods.*, 2006 WL 3791955, at *4 (citing the factors used to determine how the court should "exercise its discretion on the timing of payment of an administrative expense claim"); *In re Garden Ridge Corp.*, 323 B.R. at 143 (same).

56.     Inmarsat cannot meet its burden under these factors.  In fact, Inmarsat has not presented one compelling reason why it should be paid immediately.  Motion ¶¶ 56-61.  Inmarsat

23

points to ordinary inconveniences common to any creditor awaiting the payment of a claim in a chapter 11 case.  *See, e.g.*, Motion ¶ 60 (arguing delay is prejudicial because Inmarsat must forgo opportunities to use and profit off the L-Band Spectrum).  But the prejudice to the Debtors and other creditors far outweighs any such inconveniences.

57.     *First*, the Debtors are already deeply burdened by negative cashflow and the DIP Budget does not provide for the Quarterly Payments.  Courts evaluate the potential prejudice to a debtor holistically.  *See Glob. Home Prods.*, 2006 WL 3791955, at *4 (taking into account considerations such as whether the debtors have funds available to make immediate payments and whether the debtors' current financing is needed to provide for continuing operations).  As established in the DIP Motion and the *Debtors' Reply to Inmarsat's DIP Objection* [Docket. No. 165], the Debtors' DIP financing is carefully calibrated to support the Debtors' operations and the administration of these cases.  The Quarterly Payments are not included in the DIP Budget and Inmarsat never objected to the DIP Motion on this basis.

58.     If the Debtors are mandated to make all current Quarterly Payments beginning March 2025, the Debtors would have to seek additional financing at rates at least the same as, if not higher than, those applied to the DIP Financing.  This is a substantial incremental cost to impose on the Debtors and to the detriment of the other administrative claimants.  *See e.g.,* Interim DIP Order, Ex. 1, § 2.06 (providing that interest will be payable on the unpaid principal amount of all outstanding DIP Loans at a rate per annum equal to 17.5%, payable in kind) [Docket. No. 104].  This would add considerable burden to a company with a negative 13-week operating cashflow of $19.8 million.  *See* DIP Motion Ex. 2.  If the Debtors are forced to make these

24

payments immediately, it would be extremely prejudicial to their reorganization efforts, cause unnecessary strain to the Debtors' estates, and harm all other claimants.[17]

59.    The Debtors would be further prejudiced if forced to make immediate Quarterly Payments in light of the pending Adversary Proceeding.  In the Adversary Proceeding, Ligado alleges damages in an amount that dramatically exceeds any amounts for which Inmarsat seeks current payment.  If Ligado is forced to make current payments to Inmarsat and is later successful in the Adversary Proceeding, even if only as to certain claims, there is substantial risk that Ligado would have to expend further resources to recover those additional monies paid, if that recovery is even possible.[18]  *See In re TI Acquisition, LLC*, 410 B.R. 742, 751 (Bankr. N.D. Ga. 2009) (denying immediate payment of administrative expense pending determination of adversary proceeding because, *inter alia*, "if the Court were to order immediate payment and the Debtor later obtained a judgment against [defendant] in its avoidance action and [defendant] was unable to pay, other creditors would be prejudiced").

60.    *Second*, Inmarsat has not demonstrated harm sufficient to warrant immediate payment.  Inmarsat claims that the delay in payment is "obviously prejudicial" to Inmarsat (Motion ¶ 60), but fails to explain why such delay is any more compelling than the ordinary hardship all

---

[17]    The Motion points to a provision in a term sheet negotiated between Ligado and AST to suggest that Ligado recognized that it may be forced to pay Inmarsat the amounts provided for under the Cooperation Agreement.  *See* Motion ¶ 37 n.13.  The suggestion is inapposite.  Although Inmarsat could be commended for trying to protect itself for various future outcomes, a term sheet negotiated with AST is not yet a full, definitive agreement finalized, executed and approved by this Court.  More importantly, any AST term sheet does not diminish the sizeable claims Ligado continues to pursue against Inmarsat in the Adversary Proceeding nor does it satisfy Inmarsat's burden as to why the Quarterly Payments should be made before plan confirmation.

[18]    If Ligado is successful in obtaining a judgment against Inmarsat in excess of $1.7 billion, such judgment may place such financial pressure on Inmarsat that it is unable to continue as a going concern, subjecting Ligado, and the remainder of its creditors, to the risk of Inmarsat's bankruptcy.

creditors have to endure in any bankruptcy case.[19]  All creditors awaiting payment on account of their claims experience some prejudice, but that is the cost of Congress's decision to allow debtors a breathing spell and, as such, cannot justify deviation from the usual timing of such payments. *See In re Goody's Fam. Clothing, Inc.*, 392 B.R. 604, 615 (Bankr. D. Del. 2008) (noting that while creditors may lose the time value of their unpaid claims, this "is simply a normal and unremarkable result of the fact that bankruptcy proceedings take time").[20]  Inmarsat also fails to explain how further deferral of payments is "obviously prejudicial" when Inmarsat has voluntarily agreed to defer these same payments *fourteen* times since 2022.  Motion ¶ 1.  *See In re NE Opco, Inc.*, 501 B.R. 233, 259 (Bankr. D. Del. 2013) (finding that creditor provided insufficient evidence necessitating immediate payment, and that immediate payment would "unduly prejudice" the debtors).  Inmarsat has offered no evidence that it will suffer any undue hardship for continued deferral of the Quarterly Payments.

61.     Indeed, Inmarsat was well aware that the DIP Budget did not include the Quarterly Payments.  Yet, although Inmarsat filed its DIP Objection, that objection made no mention of the Quarterly Payments and did not ask for the DIP Budget to be modified to include their immediate payment.  It is hard to imagine that Inmarsat's need for payment became critical in just the past few weeks.

62.     *Third*, premature payments to Inmarsat could harm other creditors.  The fact that the Quarterly Payments are not accounted for in the DIP Budget means that, if compelled to make these payments immediately, the Debtors would not have sufficient funds to pay the undisputed

---

[19]    The Court should place little value on the mere statement that the hardship to Inmarsat is "obvious."  *See In re Glob. Home Prods.*, 2006 WL 3791955, at *4 (finding testimony that hardship was "self-evident" was insufficient).

[20]    Inmarsat mentions that the Plan Effective Date is 40 months from the Petition Date.  Motion ¶ 36.  But it is within the Court's discretion to deny the Motion without prejudice and revisit Inmarsat's request for current payments in the unlikely event that Inmarsat is successful in the Adversary Proceeding.

amounts and other administrative claimants, whose claims were deemed sufficiently critical to be included in the DIP Budget, would have to go unpaid.  Creating that risk is unnecessary, and inappropriate, because Ligado's setoff right (described *supra* ¶ 51) may eliminate Inmarsat's administrative claim altogether.  Because other creditors could be negatively affected by immediate payment to Inmarsat—when no payment may be ultimately necessary—the Court should deny Inmarsat's request for immediate payment.

63.     Inmarsat has presented zero evidence of prejudice sufficient to satisfy its burden of proof and this Court should deny the request for immediate payment under section 503.  *See, e.g., In re MTE Holdings*, 2021 WL 2258270, at *8 (denying request for immediate payment despite creditors having continued business with debtors); *In re Glob. Home Prods.*, 2006 WL 3791955, at *4 (denying request for immediate payment where creditors presented no evidence that ability to remain in business would be harmed); *In re LTV Steel Co.*, 288 B.R. 775, 779 (Bankr. N.D. Ohio 2002) (denying immediate payment of an administrative expense claim because the Bankruptcy Code provides for permissive payments rather than immediate payments, and "ordering immediate payment contradicts the Code's *pro rata* distribution to administrative expense claimants").

## **CONCLUSION**

64.     For the reasons set forth above, the Debtors ask that the Court sustain the Objection and deny the relief sought in the Motion.

*[Remainder of page intentionally left blank]*

| | |
|---|---|
| Dated: February 20, 2025 | */s/ Michael J. Merchant* |
| Wilmington, Delaware | Mark D. Collins, Esq. (Bar No. 2981) |

Michael J. Merchant, Esq. (Bar No. 3854)
Amanda R. Steele, Esq. (Bar No. 5530)
Emily R. Mathews, Esq. (Bar No. 6866)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          collins@rlf.com
                merchant@rlf.com
                steele@rlf.com
                mathews@rlf.com

-and-

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Matthew L. Brod, Esq. (admitted *pro hac vice*)
Lauren C. Doyle, Esq.  (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:     (212) 530-5000
Facsimile:     (212) 530-5219
Email:          ddunne@milbank.com
                mbrod@milbank.com
                ldoyle@milbank.com

Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
Melanie Westover Yanez, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
1850 K Street, NW,
Suite 1100
Washington DC 20006
Telephone:     (202) 835-7500
Facsimile:     (202) 263-7586
Email:          aleblanc@milbank.com

*Co-Counsel for Debtors in Possession*